Howard A. Belodoff, ISB # 2290
Martin C. Hendrickson, ISB # 5876
Idaho Legal Aid Services, Inc.
1447 S. Tyrell Lane
Boise, ID 83706
Tel: (208) 807-2496 Fax: (208) 342-2561
howardbelodoff@idaholegalaid.org
martinhendrickson@idaholegalaid.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| MH and TB, individually,<br><br>    Plaintiffs,<br><br>    vs.<br><br>DAVE JEPPESEN, in his official capacity as the Director of the Idaho Department of Health and Welfare; Dr. MAGNI HAMSO, in her official capacity as the Medical Director of the Idaho Division of Medicaid and individually; and the IDAHO DEPARTMENT OF HEALTH AND WELFARE,<br><br>    Defendants. | CASE NO. 1:22-CV-409<br><br>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED**<br><br>DEMAND FOR JURY TRIAL |

For their Complaint against Defendants, Plaintiffs allege as follows:

## INTRODUCTION

1.     Plaintiffs bring this suit to challenge Idaho Medicaid's discriminatory policies that deny transgender individuals of essential, and sometimes life-saving, health care. Idaho Medicaid excludes coverage for health care – specifically, genital reconstruction surgery – that is medically necessary for transgender individuals to address the clinically significant distress caused by gender dysphoria. While cisgender people receive the same or similar health care as a

matter of course, Defendants Jeppesen and Hamso refuse to cover the identical care for transgender Medicaid beneficiaries, under a policy of characterizing gender affirming surgery as "cosmetic" and not medically necessary. Defendants Jeppesen and Hamso also have a policy of indefinitely and unreasonably delaying prior authorization of genital reconstruction surgery and coverage determinations for transgender Idaho Medicaid recipients. This discrimination against transgender Idaho Medicaid recipients is unlawful under the United States Constitution and federal law.

2. Plaintiff "MH" is a 21 year-old transgender Idaho resident who receives health coverage through Idaho's Medicaid program. as established by Title XIX of the Social Security Act.

3. Plaintiff "TB" is an 18 year-old transgender Idaho resident who receives health coverage through Idaho's Medicaid program.

4. Idaho Medicaid is a health insurance program that provides medical assistance to eligible low-income individual Idahoans. Idaho Medicaid is jointly funded by the federal government and the State. The Idaho Department of Health and Welfare ("IDHW") is responsible for administering Idaho's Medicaid program.

5. Gender dysphoria is the clinically significant distress that transgender individuals experience due to having a gender identity that conflicts with the sex they were assigned at birth.

6. There is broad consensus within the medical community that genital reconstruction surgery is a safe, effective, and medically necessary treatment for many transgender individuals with gender dysphoria.

7. Despite this broad consensus, Defendants Jeppesen's, Hamso's, and IDHW's policy is to characterize genital reconstruction surgery as cosmetic and not medically necessary

when it is performed to treat gender dysphoria. As a result, Jeppesen's, Hamso's and IDHW's policy is to unreasonably delay and deny prior authorization to cover genital reconstruction surgery when it is undisputed that it is medically necessary to treat a transgender individual diagnosed with gender dysphoria, even though Idaho Medicaid will authorize and cover the same or similar surgical procedures when indicated for the treatment of other conditions.

8.      MH has been diagnosed with gender dysphoria. She has undergone a gender transition to live in accordance with her gender identity. As part of her transition, MH has received medical treatment, including hormone therapy, to align her physical characteristics with her gender identity and treat her gender dysphoria.

9.      MH's health care providers have recommended that she undergo genital reconstruction surgery to alleviate her ongoing symptoms of gender dysphoria.

10.     MH relies on Idaho Medicaid to cover the costs of her health care. She does not have the financial resources to pay for the surgery out-of-pocket or to obtain private health insurance to cover her medically necessary care.

11.     TB has been diagnosed with gender dysphoria. She has undergone gender transition to live in accordance with her gender identity. As part of her transition, MH has received medical treatment, including hormone therapy, to align her physical characteristics with her gender identity and treat her gender dysphoria.

12.     TB's health care providers have recommended that she undergo genital reconstruction surgery to alleviate her ongoing symptoms of gender dysphoria.

13.     TB relies on Idaho Medicaid to cover the costs of her health care. She does not have the financial resources to pay for the surgery out-of-pocket or to obtain private health insurance to cover her medically necessary care.

14.    MH's health care providers determined it was medically necessary that she receive genital reconstruction surgery to treat her gender dysphoria. MH applied to Medicaid for prior authorization of the surgery. MH was denied authorization for failure to complete twelve (12) months of hormone therapy. MH timely appealed the denial and requested a fair hearing.

15.    Medicaid's nurse reviewer and MH testified and presented evidence during a fair hearing. The hearing officer found MH had received twelve (12) months of hormone therapy. The hearing officer asked the nurse reviewer if there was another reasons for denying MH authorization for the genital reconstruction surgery to treat her gender dysphoria. The nurse reviewer indicated it was not medically necessary because under IDHW's and Idaho Medicaid's policy MH's request was considered cosmetic surgery. Defendants Jeppesen, Hamso, and IDHW failed to provide MH adequate notice that her request for the authorization of genital reconstruction surgery was denied because under IDHW's and Idaho Medicaid's policy it was considered a cosmetic surgery and not medically necessary.

16.    The hearing officer's decision remanded MH's request for authorization of genital reconstruction surgery to IDHW to provide MH with proper notice of the new reasons for the denial. Defendants Jeppesen, Hamso, and IDHW have unreasonably delayed and refused to take action on her request for authorization and coverage of genital reconstruction surgery. After four months had elapsed following the hearing officer's remand of the appeal, MH requested a hearing to appeal the delay. Defendants Jeppesen, Hamso, and IDHW refused to provide a hearing or allow her to appeal the denial and delay, despite the clear requirement in the Medicaid Act to make a final decision within ninety (90) days after the filing of an appeal.

17.    Seventeen (17) months have passed since MH requested authorization and coverage for surgery that her providers have determined is medically necessary. Defendants still

have not provided a final decision or an opportunity for a fair hearing to challenge the denial or delay.

18.     Defendants Jeppesen's, Hamso's, and IDHW's refusal to provide MH with a final decision following the hearing officer's remand or a hearing to challenge the denial of medically necessary genital reconstruction surgery violates MH's procedural due process rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, the Medicaid Act, 42 U.S.C. §1396a(a)(3), and the Medicaid Act's implementing federal regulations, 42 CFR §§ 431.200 *et seq.*

19.     TB's health care providers determined it was medically necessary that she receive genital reconstruction surgery to treat her gender dysphoria. TB, through her health care providers, applied to Idaho Medicaid for prior authorization of the surgery. Idaho Medicaid has failed or refused to either authorize the treatment or deny it, depriving TB of both the medically necessary treatment and notice and a meaningful opportunity to appeal the delay and denial.

20.     Defendants Jeppesen's, Hamso's, and IDHW's policy of excluding coverage of genital reconstruction surgery for the treatment of gender dysphoria by characterizing the surgery as cosmetic is preventing MH and TB from receiving medically necessary care. Consequently, they have suffered, and are continuing to suffer severe emotional, mental, and psychological distress.

21.     Defendants Jeppesen's, Hamso's, and IDHW's discriminatory policy of refusing to cover genital reconstruction surgery for the treatment of gender dysphoria violates Plaintiffs' civil rights under Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116 ("Section 1557"); the availability and comparability provisions of the Medicaid

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 5

Act, 42 U.S.C. §§ 1396a(a)(10)(A) and (B); and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

22.     MH and TB seek declaratory and injunctive relief to enjoin Defendants Jeppesen, Hamso, and IDHW from continuing to deny their medically necessary treatment, and failing to accord them with an adequate notice and opportunity to be heard about this denial, in violation of the United States Constitution and federal law. MH and TB also seek compensatory damages against Defendant Hamso to compensate them for the injuries arising from being denied medically necessary health care coverage and being discriminated against because MH and TB are transgender. In addition, MH and TB seek their reasonable attorneys' fees and costs and such other relief as the Court deems just and equitable.

## PARTIES

23.     Plaintiff MH is a transgender woman residing in Idaho. She has been eligible for and enrolled in the Idaho Medicaid program at all times material to this Complaint.

24.     Plaintiff TB is a transgender woman residing in Idaho. She has been eligible for and enrolled in the Idaho Medicaid program at all times material to this Complaint.

25.     Defendant Jeppesen is the Director of the Idaho Department of Health & Welfare ("IDHW"), the state department charged with the administration of Idaho's Medicaid program to eligible people under Idaho Code § 56-202(a). He is sued in his official capacity for equitable relief.

26.     Defendant Hamso is an Idaho licensed physician who previously practiced internal medicine and is presently the Medical Director for the Division of Medicaid. Dr. Hamso is responsible for approving surgical procedures which require prior authorization for individuals enrolled in Idaho's Medicaid program. She has unreasonably delayed and refused MH's and

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 6

TB's requests to authorize medically necessary genital reconstruction surgery. Dr. Hamso is sued in her official capacity for equitable relief and in her individual capacity for damages.

27.    Defendant IDHW is an executive department of the government of the State of Idaho created under I.C. § 56-1002.

28.    Defendants' actions or omissions complained of in this Complaint were taken under the color of state law.

## JURISDICTION AND VENUE

29.    This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

30.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–2202, 42 U.S.C. § 1983, and F.R.C.P. 65.

31.    Venue is proper in this Court and District, under 28 U.S.C. § 1391(b), because Defendants are subject to personal jurisdiction here and because the events and omissions giving rise to this action occurred in this District.

## FACTS

### *Gender Identity and Gender Dysphoria*

32.    Every person's sex is multifaceted and comprised of a number of characteristics, including but not limited to chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics (physical characteristics that develop at puberty and are not directly involved in reproduction, such as hair growth patterns, body fat distribution, and muscle mass development), and most importantly, gender identity.

33.    Gender identity is a person's internal sense of their sex – i.e, being male or female. It is a basic part of every person's core identity and a well-established concept in

medicine. Gender identity is innate, immutable, and has biological underpinnings, such as the sex differentiation of the brain that takes place during prenatal development.

34.     Gender identity is the most important determinant of a person's sex.

35.     A person's sex is usually assigned at birth based solely on a visual assessment of external genitalia. External genitalia are only one of several sex-related characteristics. For most people, these sex-related characteristics all align, and the visual assessment performed at birth serves as an accurate proxy for their gender.

36.     Transgender individuals, however, have a gender identity that is different from their assigned sex. A transgender man is a man who was assigned female at birth but has a male gender identity. A transgender woman is a woman who was assigned male at birth but has a female gender identity. When a person's gender identity does not match their sex assigned at birth, gender identity is the critical determinant of that person's sex.

37.     Some transgender individuals become aware of having a gender identity that does not match their sex assigned at birth early in childhood. For others, the onset of puberty, and the resulting physical changes in their bodies, leads them to recognize that their gender identity is not aligned with their assigned sex.

38.     For transgender individuals, the incongruence between their gender identity and assigned sex can result in clinically significant distress known as gender dysphoria. Gender dysphoria is a serious medical condition recognized by the American Psychiatric Association. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451-53 (5th ed. 2013) ("DSM-5").[1]

---

[1] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder." The DSM-5 removed that diagnosis and replaced it with "Gender Dysphoria," to clarify that being

39. In addition to clinically significant distress, untreated gender dysphoria can cause anxiety, depression, and self-harm, or suicidal ideation.

40. Untreated gender dysphoria often intensifies with time. The longer an individual goes without or is denied adequate treatment for gender dysphoria, the greater the risk of severe harm to the individual's health.

41. Gender dysphoria is highly treatable. As with other medical conditions, health care providers follow well-established standards of care to treat patients with gender dysphoria. The World Professional Association for Transgender Health ("WPATH"), and its predecessors, has set those standards for over four decades. *See* WPATH, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th Ver. 2011) ("WPATH Standards of Care 7").

42. WPATH is an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based health care protocols for transgender people. In September 2022, WPATH released the eight edition of the Standards of Care. *See* E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("WPATH Standards of Care 8").

43. The goal of medical treatment for gender dysphoria is to eliminate clinically

---

transgender is not itself a disorder, but that the clinically relevant condition is the dysphoria experienced by individuals whose gender identity conflicts with their assigned sex. *See* DSM-5 at 451 (noting that Gender Dysphoria "is more descriptive than the previous DSM-IV term gender identity disorder and focuses on dysphoria as the clinical problem, not identity per se.").

significant distress by helping a transgender person live in alignment with their gender identity. This treatment is sometimes referred to as "gender transition," "transition-related care," or "gender-affirming care."

44.     Gender-affirming care can involve counseling, hormone therapy, surgery, or other services as indicated.

45.     As the WPATH Standards of Care recognize, transitioning is the only effective treatment for gender dysphoria. Transitioning refers to the individualized steps that many transgender individuals take to live in a manner consistent with their gender identity, rather than their assigned sex. The health and wellbeing of transgender individuals depends on their ability to live in a manner consistent with their gender identity.

46.     Transitioning is particular to the individual, but typically includes social, legal, and medical transition.

47.     Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life. For example, social transition can include wearing attire, following grooming practices, and using pronouns consistent with that individual's gender identity.

48.     Legal transition involves steps to formally align an individual's legal identity with their gender identity, such as legally changing their name and updating the name and gender marker on their driver's license, birth certificate, or other forms of identification.

49.     Medical transition, a critical part of transitioning for many transgender individuals, includes gender-affirming care that brings the sex-specific characteristics of a transgender individual's body into alignment with their gender. Gender-affirming care can

involve mental health services, hormone therapy, surgical care, and/or other medically necessary treatments for gender dysphoria.

50.    Gender dysphoria is often heightened "when physical interventions by means of hormones and/or surgery are not available." DSM-5 at 451.

51.    The WPATH Standards of Care make clear that "[h]ormone therapy to feminize or masculinize the body" and "[s]urgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring)" are medically necessary services for many transgender individuals with gender dysphoria.[2] WPATH SOC 7 at 8-9, 33-34, 54-55.

52.    For individuals assigned male at birth, surgery may include augmentation mammoplasty, penectomy (removal of the penis), orchiectomy (removal of the testes), vaginoplasty, clitoroplasty, and/or vulvoplasty (creation of female genitalia). Id. at 57.

53.    The WPATH Standards of Care set forth criteria for providers to use to evaluate whether hormone therapy and/or gender affirming surgery are appropriate and necessary for a given individual.

54.    The criteria for genital surgery for individuals assigned male at birth are: 1) persistent, well documented gender dysphoria, 2) capacity to make a fully informed decision and to consent for treatment; 3) age of majority; 4) if significant medical or mental health concerns

---

[2] Certain transition-related procedures are sometimes referred to as "sex reassignment surgery," or the archaic and disfavored term "sex change surgery," which is now generally considered inaccurate and offensive. Under the contemporary medical and psychological understanding of gender identity, transition-related medical treatments serve to confirm, not "change," an individual's sex by bringing primary and secondary sex characteristics into alignment with the person's gender identity. As such, neither of those terms is used in this Complaint.

are present, they must be well controlled; 5) twelve continuous months of hormone therapy as appropriate to the person's gender goals; and 6) twelve continuous months of living in a gender role that is congruent with the individual's gender identity.

55.     Individuals need a referral from two mental health providers demonstrating that the criteria are met. In addition, it is recommended that the individual have regular visits with a mental health or other medical professional. *Id.* at 60-61. WPATH SOC 8 relaxes some of the criteria compared to WPATH SOC 7. For example, SOC 8 recommends only 6 months of continuous hormone therapy as opposed to twelve as a prerequisite to genital surgery. *See* WPATH SOC 8 at S129.

56.     Decades of research and clinical practice has shown that gender-affirming medical care, including surgery, can be lifesaving treatment and has a positive impact on the short- and long-term health outcomes for transgender people.

57.     The broader medical community agrees that, for many transgender individuals, surgical interventions are safe, effective, and medically necessary treatments for gender dysphoria.

58.     The American Medical Association, the Endocrine Society, the American Psychiatric Association, the American Psychological Association, the American College of Obstetrics and Gynecology, the American Academy of Family Physicians, and other major professional medical organizations recognize that gender affirming surgeries are safe and effective treatments for gender dysphoria, and that access to such treatments improves the health and well-being of transgender individuals. Each of these groups has issued statements in support of the WPATH Standards of Care. And, each of these groups has publicly

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 12

opposed prohibitions on insurance coverage for transition-related health care.

### *Federal Medicaid*

59.     Established in 1965 under Title XIX of the Social Security Act, Medicaid is a cooperative federal and state program designed to enable states to assist needy individuals "whose incomes and resources are insufficient to meet the cost of necessary medical services." *See* Medicaid Act, 42 U.S.C. § 1396-1. Title XIX is known as the Medicaid Act.

60.     States participating in Medicaid must comply with the requirements imposed by Title XIX of the Social Security Act, *see* 42 U.S.C. §§ 1396 to 1396w-6, and the implementing regulations promulgated by the United States Department of Health and Human Services ("HHS"), *see* 42 C.F.R. pts. 430 to 456.

61.     States are not required to participate in the Medicaid program, but all states do.

62.     The Medicaid Act requires each participating state to establish or designate a single state agency that is responsible for administering or supervising the administration of the state's Medicaid program. 42 U.S.C. § 1396a(a)(5).

63.     In addition, each participating state must maintain a comprehensive plan for medical assistance approved by the Secretary of Health and Human Services. *Id*. § 1396a. The plan must describe the state's program and affirm its commitment to comply with the Medicaid Act and its implementing regulations.

64.     The federal government reimburses participating states for a substantial portion of the cost of providing medical assistance.

65.     The Medicaid Act requires that participating states cover certain health care services, including inpatient and outpatient hospital services and physician services, when

medically necessary. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d. In addition, the statute gives states the option to provide other services, including prescription drugs, when medically necessary. *Id.*

66. Under the Medicaid Act, "the medical assistance made available to any individual ... shall not be less in amount, duration or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i).

67. In addition, a state "Medicaid agency may not arbitrarily deny or reduce the amount or scope of a required service ... to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).

68. States must ensure that "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b). Moreover, state Medicaid programs must provide medical assistance "in a manner consistent . . . with the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

69. The Medicaid Act mandates that states "grant an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." *Id.* § 1396a(a)(3).

70. Federal regulations construing the requirements of section 1396a(a)(3) define the process that is due to Medicaid beneficiaries. *See* 42 C.F.R. §§ 431.200 to 431.246. The regulations specifically require states to meet the due process standards set forth in *Goldberg v. Kelly,* 397 U.S. 254 (1970). *See* 42 C.F.R. § 431.205(d). They also explicitly require states to comply with the United States Constitution and Section 1557 of the Affordable Care Act and implementing regulations. *See id.* § 431.205(f).

71. Medicaid beneficiaries are entitled to notice and an opportunity for a fair hearing whenever the state takes any action, including when the state denies a claim or request for

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 14

authorization for services or benefits or does not act upon the claim "with reasonable promptness." 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.206(b), (c), 431.220(a)(1).

72.     States must provide beneficiaries with timely and adequate written notice of their hearing rights. *Goldberg*, 397 U.S. at 267-268; 42 C.F.R. §§ 431.206(b)(c). The notice must describe what action the state intends to take and the effective date of the action, the specific reasons supporting the action, and "[t]he specific regulations that support, or the change in Federal or State law that requires, the action." *Id*. § 431.210(a)-(c). The notice must also explain that the individual has a right to a fair hearing, how to obtain a hearing, that the individual is entitled to represent themselves or use legal counsel or other spokesperson, and the time frames in which the agency must take final administrative action, in accordance with 431. 244(f). *Id*. §§ 431.210(d), 431.206(b), (c)(2).

73.     If an individual does request a hearing, they must be given an opportunity to: "examine at a reasonable time before the hearing and during the hearing" the content of their case file and electronic account and all documents and records to be used at the hearing, 42 C.F.R. § 431.424(a); "[e]stablish all pertinent facts and circumstances," *id*. § 431.242(c); "[p]resent argument without undue interference," *id*. § 431.424(d); and "[q]uestion or refute any testimony or evidence, including opportunity to confront and cross-examine adverse witnesses," *id*. § 431.242(e).

74.     The hearing decision "must be based exclusively on evidence introduced at the hearing." *Id*. § 431.244(a).

75.     The hearing decision must be in writing, and it must summarize the facts and identify the regulations supporting the decision. *Id*. § 431.244(d)(1)-(2).

76.     The state Medicaid agency must ordinarily issue a final decision within 90

days of the fair hearing request, except in unusual circumstances. *Id*. § 431.244(f). Unusual circumstances exist when the beneficiary asks for a delay or fails to take a required action, or when there is an administrative or other emergency that the agency cannot control. *Id*. § 431.244(f)(4)(i). The agency must document the reasons for any delay in the beneficiary's record. *Id*. § 431.244(f)(4)(ii).

### *Idaho Medicaid*

77.     The State of Idaho participates in the federal Medicaid program.

78.     The IDHW is the designated single state department that administers Idaho Medicaid in its Division of Medicaid.

79.     The federal government reimburses Idaho for approximately 70% of the cost of providing medical assistance through its Medicaid program. *See* 86 Fed. Reg.67479, 67,481 (Nov. 26, 2021).

80.     The Idaho Medicaid program is authorized by Idaho's medical assistance statute, Idaho Code § 56-209b(1), which requires that "[m]edical assistance shall be awarded to persons as mandated by federal law" and IDHW's implementing regulations, IDAPA 16.03.09 – Medicaid Basic Plan Benefits.

81.     Idaho's medical assistance statute does not explicitly address, let alone exclude, coverage for gender affirming surgery.

82.     Under the statute, Idaho does not cover physician, hospital, or other services deemed experimental. *See* Idaho Code § 56-209d(6).

83.     In addition, Idaho does not cover "cosmetic surgery, excluding reconstructive surgery that has prior approval by the Department." IDAPA 16.03.09.390.02.b.

84.     Department of Health and Welfare Director Jeppesen was quoted in an article, dated July 22, 2022, as stating in an email that IDHW "has not approved surgical procedures for diagnoses of gender dysphoria." He was also quoted as stating: "The department also continues to have no policy related to authorizing surgeries or hormone therapies for gender dysphoria and there are no current plans to implement one." https://idahofreedom.org/idaho-medicaid-should-expressly-ban-sex-change-treatments/

85.     Defendants Jeppesen, Hamso, and IDHW have an unwritten, unstated policy that genital surgery for the treatment of gender dysphoria is cosmetic, and as a result, not medically necessary. That determination conflicts with the medical consensus that gender affirming surgery is medically necessary, reconstructive surgery.

86.     On information and belief, Idaho Medicaid does cover genital reconstruction surgery with prior approval when it is medically necessary to treat health conditions other than gender dysphoria. *See, e.g.*, IDAPA 16.03.09.422.

87.     On information and belief, transgender Idaho Medicaid recipients other than MH and TB have been denied or deterred from seeking prior authorization for surgery to treat gender dysphoria because of their knowledge or the knowledge of their medical providers that authorization would be denied on the basis that such treatment is considered cosmetic and not medically necessary by Defendants Jeppesen, Hamso, and IDHW.

88.     On information and belief, doctors have been denied authorization for medically necessary surgical procedures and have discontinued treatment for gender dysphoria as a result of Defendants Jeppesen's, Hamso's, and IDHW's actions, causing Idaho Medicaid beneficiaries to suffer physical harm and mental health distress.

### *Idaho Notice and Fair Hearing Appeals*

89.     IDHW has designated the Fair Hearing Unit within the Idaho Attorney General's Office to conduct administrative fair hearings and issues "Preliminary Decisions" in appeals from Medicaid decisions.

90.     IDHW has promulgated state regulations, Contested Case Proceedings, IDAPA 16.05.03, incorporated by reference, to govern the due process procedures used in Idaho Medicaid administrative fair hearings.

91.     The IDHW Contested Case Rules limit the authority of the hearing officer to "consider only information that was available to the Department at the time the decision was made." IDAPA 16.05.03.131.

92.     The hearing officer can remand the case to the Department only if the "appellant" shows "good cause" for not presenting additional relevant information that was not presented to the Department.  IDAPA 16.05.03.131.

93.     If an appeal is remanded to the IDHW, the hearing officer does not retain jurisdiction.  IDAPA 16.05.03.131.

94.     The hearing officer must issue a Preliminary Order not later than thirty (30) days after the case is submitted for decision.  IDAPA 16.05.03.138.

95.     Either party may file a request for review of the Preliminary Decision by the Director of IDHW not later than fourteen (14) days from the date the Preliminary Decision was mailed.  IDAPA 16.05.03.150.

### *Plaintiff MH*

96.     MH is a 21-year-old transgender woman. She has lived in Idaho her entire life.

97.     When MH was 11 years old, she started to feel deep psychological distress associated with the physical changes that were happening in her body. At the time, she did not have the words to express what she was experiencing.

98.     She developed [redacted.]

99.     MH became aware that she was transgender at age 16. She was afraid to disclose her gender identify to her family, who would not be accepting of her transgender status. As a result, MH went without any medical treatment for her gender dysphoria. Her parents objected to MH receiving counseling to address her [redacted] and

100.     After she realized that she was transgender, MH began telling a few close school friends about her gender identity and desire to transition.

101.     At age 17, MH left her family home. She went to live with a friend's family who she grew up with, the "H" family.

102.     Mr. and Mrs. H filed for guardianship of MH. During the guardianship proceeding, MH was required to live with her grandparents rather than with her parents. The guardianship proceeding was not finalized before MH turned 18 and was dismissed.

103.     In connection with the guardianship proceeding, in early 2019 a psychologist assessed MH, diagnosing her with gender dysphoria.

104.     After turning 18, MH returned to live with the H family, who were supportive of her gender identity.

105.     By that time, MH was consistently using a feminine name and female pronouns and living as a woman in all aspects of her life.

106.     MH applied for and was found eligible to receive Idaho Medicaid. In June 2019, MH was finally able to access treatment for her gender dysphoria, as well as for other conditions. She started receiving primary care and mental health services from providers at [redacted]. Her primary care provider, [redacted] DNP, PMHNP-BC, FNP, independently diagnosed MH with gender dysphoria.

107.     [Redacted], determined that MH would benefit from hormone therapy to further her gender transition and treat her gender dysphoria. In August 2019, [redacted]began prescribing hormone therapy for MH. Hormone therapy reduced MH's gender dysphoria and improved her quality of life. MH has remained on hormone therapy since August 2019.

108.     MH started to receive counseling services at [redacted]. She saw several providers there, including [redacted], LCSW, through May 2020. At that time, she also started to see [redacted], LCPC.

109.     In early 2020, MH amended her birth certificate to reflect her female sex. In June 2020, MH was able to legally change her masculine first name to a feminine first name and adopt the last name of the family who cared for her.

110.     Hormone therapy and gender affirming counseling improved but did not completely eliminate MH's gender dysphoria. She continued to experience significant distress related to her genitalia.

111.     In August 2020, MH consulted with [redacted], PA, a Physician Assistant with the [redacted] Gender Affirmation Team about receiving gender affirming surgery, specifically a penectomy, orchiectomy, and vulvoplasty. Sealed Exhibit 1, pp. 11-14.

112.     The PA concluded that MH was ready for the surgery because she had undergone appropriate counseling and preparation, was informed of the risks, benefits, and alternatives to

surgery, and could make a fully informed decision consenting to the surgery and treatment. *Id.*, p. 13.

113.    The PA found MH had been living in her gender role for one year and had continuously been on hormone therapy during this time. *Id.*

114.    The PA reviewed the WPATH criteria for vulvoplasty with MH and found MH met those criteria. *Id.*

115.    In accordance with the WPATH Standards of Care, the PA indicated that MH would need to submit two letters of support from her treating providers before she could proceed with surgery. *Id.*

116.    MH gathered letters of support from [redacted], [redacted], [redacted], and Dr. [redacted], who is board certified in family medicine and who has special training in LGBTQIA+ health care and gender-affirming care for adults. *Id.*, pp. 16-19. Dr. [redacted] started managing MH's hormone therapy in October 2020. *Id.*, p. 17. The letters indicate that MH's providers were in agreement that gender-affirming surgery was appropriate and medically necessary treatment for MH. *Id.*, pp. 16-19.

117.    Dr. [redacted] has had multiple patients who have suffered significant and consistent psychological and physical harm after being denied appropriate and medically necessary gender-affirming surgery by Idaho Medicaid. Sealed Exhibit 2.

118.    On March 10, 2021, Dr. [redacted], a surgeon with the [redacted], submitted a prior authorization request to IDHW on behalf of MH, seeking coverage for a penectomy,

orchiectomy, and vulvoplasty. Dr. [redacted] attached the PA's August 2020 assessment and the four letters of support to the request. Sealed Exhibit 1, pp. 8-14.[3]

119.     On March 26, 2021, MH received notice that Defendant Hamso, the Medical Director of the Division of Medicaid, had denied her request for prior authorization due to lack of medical necessity. *Id.*, pp. 30-32.

120.     The notice stated Defendant Hamso determined "The World Professional Association for Transgender Health's recommendation is a 12-month continuation of hormones before proceeding with surgery. May resubmit once the participant has completed 12 months of hormone therapy.ss [Susan Scheuerer]" *Id.*, p. 31.

121.     The notice did not explain the timeframes in which the agency must take final administrative action as required in 42 CFR § 431.206(b). *Id.*, p. 32.

122.     MH timely filed a request for a fair hearing with the IDHW to appeal the denial of prior authorization. *Id.*, pp. 28-29.

123.     In May 2021, MH received an orchiectomy at [redacted] that was covered by Idaho Medicaid. In seeking prior authorization for the procedure, the surgeon noted that it was indicated to treat testicular pain, as well as gender dysphoria.

124.     The orchiectomy reduced the amount of hormone therapy MH needed – specifically, she no longer has to take a testosterone blocker – but it did not obviate her need for a penectomy and vulvoplasty to treat her ongoing symptoms of gender dysphoria.

125.     On June 3, 2021, a hearing officer with the Fair Hearings Unit of the Idaho

---

[3] In the March 10, 2021, request, MH is referred to by her birth name, "MB." MH legally changed her name pursuant to a Judgment that was entered on June 17, 2020.

Attorney General's Office held a telephonic hearing lasting 20 minutes and 30 seconds. Sealed Exhibit 3 (transcript of hearing).

126.     Susan Scheuerer, the Nurse Reviewer for the Division of Medicaid, testified during the fair hearing. *Id.*, pp. 5-13.

127.     While Defendant Hamso was on the witness list, she did not appear at the hearing. Sealed Exhibit 1, p.1.

128.     Ms. Scheuerer first testified that Defendant Hamso denied prior authorization because it was unclear whether MH had completed twelve months of hormone therapy as required by the WPATH Standards of Care. Sealed Exhibit 3, p. 9, ll. 19-25.

129.     MH explained during the hearing that the records submitted by MH indicated she had completed twelve (12) months of hormone therapy which was the only reason stated in the notice for the denial of the prior authorization for the surgery. *Id.*, p. 10, l. 17 – p. 11, l. 14. The Hearing Officer asked Ms. Scheuerer what was missing from the documentation that would lead to IDHW approving the request. *Id.*, p. 12, ll. 3-9 and 14-16.

130.     Ms. Scheuerer indicated for the first time that even if it was true that MH had completed twelve (12) months of hormone therapy, the agency still would have denied the prior authorization request because Idaho Medicaid's policy considers the requested surgical procedure for transgender individuals to be cosmetic. *Id.*, p. 12, l. 17 – p. 13, l. 1.

131.     Ms. Scheuerer testified that cosmetic surgery was to improve a person's "appearance or self-esteem" similar to a request to change a body part, such as, the removal of a facial scar due to an injury, if a woman with a flat chest requested breast implants, or a request for a breast reduction for large breasts and is considered a non-covered cosmetic procedure that

was not medically necessary. *Id.*, p. 8, ll. 16-24.

132.    MH testified and presented exhibits from her treating medical and mental health providers documenting her gender dysphoria diagnosis, that she had completed the twelve months of hormone therapy, and that the requested surgery was medically necessary to treat her gender dysphoria. *Id.*, pp 10-11.

133.    Prior to the hearing, MH did not receive notice that the Division of Medicaid denied her prior authorization request because it had a policy that gender-affirming surgery needed to treat gender dysphoria was a medically unnecessary "cosmetic" procedure pursuant to Idaho's Medicaid's policy and regulations. The only reason stated in the notice sent to MH was that the surgery was denied because she had not completed 12 months of continuous hormone therapy. As a result, MH was not able to bring witnesses or submit evidence rebutting Defendants Hamso's and the IDHW's determination that the procedure was cosmetic and not medically necessary at the hearing. *Id.*, p. 13.

134.    While MH testified that extensive peer-reviewed research show that gender affirming surgery is appropriate treatment for gender dysphoria, MH stated that she "didn't bring peer-reviewed articles in because I didn't think I would need to defend the validity of a surgery that has been accepted by the majority of urologists for multiple decades." *Id.*

135.    On July 2, 2021, the hearing officer issued a Preliminary Order to Remand. Sealed Exhibit 4.

136.    The Hearing Officer found the documentation from MH's medical and mental health providers established that MH had completed 12 continuous months of hormone therapy. *Id.*, pp. 2-3, 5-6.

137.    The Hearing Officer found "Appellant [MH] referenced peer review research supporting the idea that gender affirmation surgery is medically necessary and not just cosmetic." *Id.*, p. 6.

138.    The Hearing Officer decided that MH should have another opportunity to provide "clearer documentation showing 12 continuous months of hormone therapy" however, "the hearing officer does not see how Department interpreted the documentation to mean anything else—and the Department's representative could not describe what documentation was missing or what would be needed to show that requirement was met." *Id..* p. 7.

139.    The Hearing Officer concluded the Notice of Denial letter did not provide notice of any additional basis or rule for the denial except the surgery was not medically necessary because MH had not completed 12 months of continuous hormone therapy. *Id.*, p. 5.

140.    The Hearing Officer concluded the "Department somewhat abused its discretion in this case with its emphasis on Appellant's failure to show 12 continuous months of hormone therapy when—according to the Department's testimony—even if Appellant showed 12 continuous months of hormone therapy, the surgery request would still have been denied because the Department considered the procedure cosmetic." *Id.*, p. 6.

141.    The Hearing Officer remanded the appeal, per IDAPA 16.05.03131, to the "Department for consideration if Appellant shows that there is additional relevant information that was not presented to the Department with good cause." *Id.*

142.    Defendants Jeppesen, Hamso, and IDHW use Telligen to review services requested for Idaho Medicaid members. Services are reviewed for medical necessity based on the member's medical needs. https://idmedicaid.telligen.com/wp-content/uploads/2021/11/2021-

Provider-Manual_FINAL.pdf.

143.    On July 28, 2021, Dr. [redacted] of the [redacted] sent Telligen a Pre-service Review Request Form, again attaching the PA's August 2020 assessment and the four letters of support. Sealed Exhibit 5.

144.    Since July of 2021, MH has repeatedly contacted IDHW to request an update on the status of her prior authorization request, but she has never been informed if her request had been approved or denied. At the direction of Dr. Hamso, IDHW staff repeatedly told MH they were still reviewing her request and had not yet made a decision.

145.    On October 22, 2021, Elizabeth Kriete of IDHW sent an email to Director Jeppesen, among others, stating that she had spoken with MH and told her that the decision was still pending. Sealed Exhibit 6. She also said that MH had requested the Director's phone number. *Id*.

146.    On October 22, 2021, Director Jeppesen replied in an email in which he said: "I do not think that I can speak with [MH] since this is in the appeal process and that appeal could come to me for a decision depending on how the process goes. When there is an active appeal going on, it is not appropriate for me to talk with the appellant." Sealed Exhibit 7.

147.    On November 2, 2021, at 03:16 PM, an electronic note was entered into MH's Medicaid file stating "Review is currently pending per the request of IDHW. The Department is currently determining if this is a covered benefit. All calls pertaining to this case can be referred to Dr. Hamso, Medical Director at DHSW." Sealed Exhibit 8.

148.    On November 25, 2021, MH requested a new hearing on Defendants Jeppesen's, Hamso's, and IDHW's failure to make a decision on her request with reasonable

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 26

promptness. Sealed Exhibit 9.

149.     On December 22, 2021, Dr. Hamso wrote an email to Chelsea Kidney and Kimberly Stretch in which she described a phone call with MH. Sealed Exhibit 10. Dr. Hamso said MH expressed that Medicaid still had not made a decision on her request and that she had called everybody she could but was not given an answer as to the status. *Id*. Dr. Hamso wrote: "I said that it is still pending. That she does have Medicaid, but this PA request is pending." *Id*. Dr. Hamso continued: "[MH] was clearly in tears and said I need you to find it and move it from pending to approved. I said that it was still pending and that the Department is determining if this is part of Medicaid benefits." *Id*.

150.     At the direction of Dr. Hamso, IDHW refused to provide a hearing, claiming that because her request was under review she was not entitled to a hearing. Sealed Exhibit 11 (letter from Libby Hobbs to MH dated December 23, 2021).

151.     On February 18, 2022, Telligen notified the [redacted] of its Notice of Decision for each of the 13 procedure codes included in the prior authorization request. Sealed Exhibit 12.

152.     Telligen made the Determination: "**Outcome Not Rendered**" and gave a "Rationale: Per direction from IDHW, this case was sent to the department for review." *Id*.

153.     On May 6, 2022, Defendant Hamso wrote a "Request for Information" to MH's surgeons at the [redacted] stating: "Medicaid has determined that a medical necessity decision cannot be made at this time because we do not have the necessary medical information." Sealed Exhibit 13.

154.      Defendants Jeppesen, Hamso, and IDHW have not notified MH of the final decision on her request for coverage of medically necessary surgery to alleviate her ongoing

symptoms of gender dysphoria after remand from the fair hearing appeal more than one year ago.

155.    Defendant Hamso's denial of necessary medical treatments to MH has caused significant emotional distress, including, but not limited to, heightened symptoms of gender dysphoria, [redacted], resulting from her inability to obtain medically necessary care.

156.    MH has also suffered from her inability to obtain necessary gender- affirming surgical procedures as a result of Defendants' failure to authorize medically necessary surgery to alleviate their ongoing symptoms of gender dysphoria.

157.    As a direct and proximate result of Defendants' denial of medically necessary gender-affirming care, MH's symptoms of gender dysphoria and related distress have not abated.

### Plaintiff TB

158.    Plaintiff TB is an 18 year-old transgender female. TB lives with her family in Idaho.

159.    TB has identified as a female as long as she can remember. As a child, she strongly preferred female attire and the toys, games, and activities stereotypical of the female gender, and she strongly rejected typically masculine toys, games, and activities. She has always had a strong dislike for her sexual anatomy and a strong desire for feminine sex characteristics that match her gender identity.

160.    When TB was eleven and twelve years old she had to be admitted to two mental health facilities after she attempted to take her life because of [redacted] due to not wanting to live in the world where she could not be true herself. Sealed Exhibit 18 (January 6, 2022, letter

from [redacted], LCSW), p. 3; Sealed Exhibit 20, p. 5. She is currently receiving counseling and medication for her depression.

161.     TB has lived fully as a female since 2015, including attending school.

162.     In 2016, TB legally changed her masculine first name to a feminine first name.

163.     TB was diagnosed with gender dysphoria in the spring of 2016 by Dr. [redacted], her psychiatrist in Texas. Sealed Exhibit 14.

164.     From 2016 to 2020, TB was treated for gender dysphoria by her health care providers, first in Texas and later, in Colorado.

165.     TB began taking a puberty blocker to treat her gender dysphoria in the summer of 2016. The puberty blocker was prescribed by Dr. [redacted], TB's pediatric endocrinologist in Dallas, Texas. Sealed Exhibit 15, p. 1.

166.     In 2017-18, TB completed psychotherapy as part of her treatment for gender dysphoria and in preparation for beginning hormone therapy. Dr. [redacted], TB's child psychiatrist in Colorado, found that she met the criteria for gender dysphoria, and that her decision to transition resulted in a significant reduction of her personal distress surrounding her gender identity. Sealed Exhibit 16.

167.     In early 2018, Dr. [redacted] found that TB met the eligibility and readiness criteria in the official WPATH Standards of Care for treatment of gender dysphoria, and that she was a qualified candidate for hormone therapy. *Id*. TB's pediatric endocrinologist in Colorado, Dr. [redacted], agreed. Sealed Exhibit 17. TB started hormone therapy at that time. *Id*.

168.     In early May of 2022, having reached the age of 18, TB consulted with her health care providers concerning gender affirming surgery, including physicians from the [redacted].

169.     TB's medical care providers at the [redacted] submitted a request for prior authorization for gender affirming surgeries to IDHW, stating that the requested procedures were a matter of medical necessity to treat TB's gender dysphoria.

170.     TB received a "Notice of Decision" from Telligen for each of the requested surgical procedures, the determination reached by Telligen was the same: "Outcome Not Rendered." In the "rationale" section of the Notice, again for each requested service, is the following language: "The request was forwarded to the medical care unit for review. For any further questions pertaining to this request please contact the medical care unit via email at medicalcareunit@dhw.idaho.gov." Sealed Exhibit 19.

171.     On May 31, 2022, TB sent an email to the IDHW Medical Care Unit in which she wrote: "I do not understand what 'outcome not rendered' means. Does it mean that my case is still being reviewed or does it mean that my surgery is not covered?" Sealed Exhibit 20, p. 1.

172.     On June 1, 2022, TB sent an email to the IDHW Medical Care Unit in which she wrote: "I have some questions about my case. I see its output [sic] not rendered. I called the number given to me and was told that everything was sent to your medical care unit. Can you give me an idea of how long it takes to review my case?" *Id*.

173.     On June 2, 2022, TB received an email from the IDHW Medical Care Unit that stated: "The Medical Care Unit has received your request and it is currently pending

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 30

review by the Medical Director." *Id*, p. 2.

174.    On June 2, 2022, TB replied to the IDHW Medical Care Unit: "The doctors and surgeon can write a medical necessity letter. We see him June 6th. And he will write a medical necessity letter and also send in clinic notes if needed." *Id*.

175.    On June 3, 2022, TB received an email from the IDHW Medical Care Unit that stated: "The Medical Care Unit has received your request and it is currently pending review by the Medical Director." *Id*., p. 3.

176.    On June 7, 2022, TB wrote an email to the IDHW Medical Care Unit that said: "Thank you. I just wanted to add that my surgeon wrote a letter of medical necessity for me. She said she would make sure your department received it." *Id*.

177.    TB's physicians from the surgical team with the [redacted] submitted a letter dated June 9, 2022, to IDHW requesting prior authorization for the surgery based upon medical necessity. The physicians wrote: "Our surgical team at [redacted], and four independent mental health professionals have thoroughly assessed this patient using the WPATH Standards of Care and have determined vaginoplasty to be a medically necessary procedure for [TB]. In our assessment, delay or denial of this medically necessary procedure would harm the health of this patient and put her well-being at risk." (Footnotes omitted.) Sealed Exhibit 21.

178.    The June 9, 2022, request for prior authorization for TB's gender-affirming surgery was supported by letters from TB's psychiatrist in Idaho (Sealed Exhibit 22), TB's child psychiatrist from Colorado (Sealed Exhibit 16), her licensed clinical social worker in Idaho (Sealed Exhibit 18), and her psychologist in Idaho (Sealed Exhibit 23).

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 31

179.     On June 13, 2022, TB wrote another email to the IDHW Medical Care Unit informing them that her surgeon had sent the letter of medical necessity last week. Sealed Exhibit 20, p. 3.

180.     On June 21, 2022, TB's parents wrote an email to the IDHW Medical Care Unit in which they informed IDHW that the requested surgery was a matter of life or death for TB. They also described the medical documentation that had been provided supporting the request for authorization and some of the prior medical treatment received by TB for her gender dysphoria. TB's parents closed the email as follows: "If there is anything more we can do on our part please tell us. Please help us. We have been waiting and we appreciate the time and effort you have given thus far." *Id*., p. 4.

181.     On June 22, 2022, TB wrote an email to the IDHW Medical Care Unit in which she described her history of dealing with gender dysphoria, the medical treatment she had received, and how her family supported her. *Id*., p. 5.

182.     On June 23, 2022, TB received an email from the IDHW Medical Care Unit that stated: "The Medical Care Unit has received your request and it is currently pending review by the Medical Director." *Id*., p. 6.

183.     On July 6, 2022, TB wrote an email to the IDHW Medical Care Unit in which she said: "I was hoping to hear back about my claim this week. It has taken a long time and I am wondering if I could get a time frame." *Id*.

184.     On July 13, 2022, TB received an email from the IDHW Medical Care Unit that stated: "This is still under review." *Id*.

185.     On July 22, 2022, TB wrote an email to the IDHW Medical Care Unit in

which she provided a quote stating that discrimination against transgender persons was prohibited, meaning that health care plans cannot exclude transition related care. *Id.*, p. 7.

186.    TB has not received any response to the July 22, 2022, email or any other electronic or written correspondence from Defendants Jeppesen, Hamso, and IDHW after the July 13, 2022, email described above.

187.    TB and her family members have made numerous phone calls to IDHW inquiring about the status of TB's request. The only statement made to them by IDHW representatives is that TB's request is under review.

188.    Despite the uncontroverted evidence of supporting the medical necessity for the request prior authorization of gender affirming surgery, and after multiple inquiries from TB and her family members, Defendants Jeppesen, Hamso, and IDHW have not notified TB of its decision on the request for prior authorization.

## FIRST CLAIM FOR RELIEF

### Unlawful Discrimination on the Basis of Sex in Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116

189.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

190.    Under Section 1557 of the Affordable Care Act, "an individual shall not ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title" on the basis of sex. 42 U.S.C. § 18116.

191.     Idaho Medicaid is a health program or activity receiving federal financial assistance under Section 1557 of the Affordable Care Act.

192.     Section 1557's prohibitions on sex discrimination are enforceable by MH and TB in a judicial action under 20 U.S.C. § 1683, which Section 1557 incorporates by reference. 42 U.S.C. § 18116(a).

193.     Defendants Jeppesen's, Hamso's, and IDHW's continuing policy of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria, as applied to MH and TB, violates Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving federal financial assistance.

**SECOND CLAIM FOR RELIEF**

**Violation of the Medicaid Act's Availability Requirements,<br>42 U.S.C. § 1396a(a)(10)(A)**

194.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

195.     Defendants Jeppesen's, Hamso's, and IDHW's continuing policy of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria, as applied to MH and TB, eliminates mandatory Medicaid coverage of medically necessary services, violates Medicaid's availability requirement, 42 U.S.C. § 1396a(a)(10)(A), which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

196.     MH and TB have been and continue to be injured by Defendants Jeppesen's, Hamso's, and IDHW's discriminatory policy of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria.

197.   Defendants Jeppesen's, Hamso's, and IDHW's discriminatory policy punishes vulnerable transgender individuals, including MH and TB, for being transgender and taking necessary steps to live in accordance with their gender identities.

198.   Under 42 U.S.C. § 1983, MH and TB are entitled to injunctive and prospective relief prohibiting Defendants from violating their rights under federal law.

199.   Under 42 U.S.C. § 1983, MH and TB are entitled to an award of compensatory damages against Defendant Hamso, as an individual acting under color of state law, for continuing to violate their clearly established rights under federal law.

### THIRD CLAIM FOR RELIEF

### Violation of the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B)

200.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

201.   Defendants Jeppesen's, Hamso's, and IDHW's continuing policy of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria, while authorize the same or similar surgical procedures for other Idaho Medicaid beneficiaries with different diagnoses, as applied to MH and TB, violates Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B), which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

202.   MH and TB have been and continue to be injured by Defendants' discriminatory policy of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria.

203.   Defendants Jeppesen's, Hamso's, and IDHW's discriminatory policy punishes vulnerable transgender individuals, including MH and TB, for being transgender and taking necessary steps to live in accordance with their gender identities.

204.   Under 42 U.S.C. § 1983, MH and TB are entitled to injunctive and prospective relief prohibiting Defendants from violating their rights under federal law.

205.   Under 42 U.S.C. § 1983, MH and TB are entitled to an award of compensatory damages against Defendant Hamso, as an individual acting under color of state law, for continuing to violate their clearly established rights under federal law.

### FOURTH CLAIM FOR RELIEF

#### Violation of the Equal Protection Clause of the Fourteenth Amendment

206.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

207.   Defendants Jeppesen's, Hamso's, and IDHW's policy of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria, as applied to MH and TB, impermissibly discriminates against Plaintiffs on the basis of sex and violates their right to Equal Protection under the Fourteenth Amendment to the United States Constitution.

208.   Defendants Jeppesen's, Hamso's, and IDHW's continuing policy of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria, as applied to MH and TB, impermissibly discriminates against Plaintiffs for being transgender and violates their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

209.   Defendants Jeppesen's, Hamso's, and IDHW's policy does not serve any rational, legitimate, important, or compelling state interest and only serves to prevent Plaintiffs and other

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 36

transgender Idaho Medicaid beneficiaries from obtaining medically necessary health care that will enable them to treat their gender dysphoria, complete their gender transitions, and fully live as their authentic selves.

210.    MH and TB have been and continue to be injured by Defendants' discriminatory policy of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria.

211.    Defendants Jeppesen's, Hamso's, and IDHW's discriminatory policy punishes vulnerable transgender individuals, including MH and TB, for being transgender and taking necessary steps to live in accordance with their gender identities.

212.    Under 42 U.S.C. § 1983, MH and TB are entitled to injunctive and prospective relief prohibiting Defendants Jeppesen, Hamso, and IDHW from violating their rights, privileges, or immunities under federal law.

213.    Under 42 U.S.C. § 1983, MH and TB are entitled to an award of compensatory damages against Defendant Hamso, as an individual acting under color of state law, for continuing to violate their clearly established constitutional rights.

## FIFTH CLAIM FOR RELIEF

### Violation the Medicaid Act's Due Process Requirements 42 U.S.C. § 1396a(a)(3)

214.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

215.    The Medicaid Act requires states to "grant [] an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).

216.    The federal regulations at 42 C.F.R. § 431.200, et seq., construe the statutory requirements of § 1396a(a)(3).

217.    Defendants Jeppesen's, Hamso's, and IDHW's continuing failure to provide MH with adequate notice when denying her claim for benefits under the Medicaid Act and the continuing delay or refusal to make a final decision in MH's appeal within ninety days and with reasonable promptness violates MH's rights to procedural due process under the Medicaid Act, 42 U.S.C. § 1396a(a)(3), which is enforceable by MH pursuant to 42 U.S.C. § 1983.

218.    Defendants Jeppesen's, Hamso's, and IDHW's continuing failure to make a decision on TB's request for prior authorization with reasonable promptness violates TB's rights to procedural due process under the Medicaid Act, 42 U.S.C. § 1396a(a)(3), which is enforceable by TB pursuant to 42 U.S.C. § 1983.

219.    Defendants Jeppesen, Hamso, and IDHW have a policy, pattern, and practice of failing to ensure that Idaho Medicaid beneficiaries, including MH and TB, receive adequate written notice and the opportunity for a hearing, when coverage of medically necessary surgical treatment for gender dysphoria is denied or is not acted upon with reasonable promptness.

220.    Under 42 U.S.C. § 1983, MH and TB are entitled to injunctive and prospective relief prohibiting Defendants from violating their rights under the Medicaid Act.

221.    Under 42 U.S.C. § 1983, MH and TB are entitled to an award of compensatory damages against Defendant Hamso, as an individual acting under color of state law, for continuing to violate their clearly established rights, privileges, or immunities under federal law.

## SIXTH CLAIM FOR RELIEF

### Violation of the Due Process Clause of the Fourteenth Amendment

222.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 38

223.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits any State from depriving "any person of life, liberty, or property, without due process of law."

224.    Plaintiffs have a protected interest in the Medicaid benefits guaranteed by Title XIX of the Social Security Act.

225.    Defendants Jeppesen's, Hamso's, and IDHW's continuing failure to provide MH with adequate notice when denying her claim for benefits under the Medicaid Act and the delay in making a final decision in MH's appeal violate MH's right to Due Process under the Fourteenth Amendment, which is enforceable by Plaintiff pursuant to 42 U.S.C. § 1983.

226.    Defendants Jeppesen's, Hamso's, and IDHW's continuing failure to make a decision on TB's request for prior authorization with reasonable promptness violates TB's right to Due Process under the Fourteenth Amendment, which is enforceable by Plaintiff pursuant to 42 U.S.C. § 1983

227.    Under 42 U.S.C. § 1983, MH and TB are entitled to injunctive and prospective relief prohibiting Defendants Jeppesen, Hamso, and IDHW from continuing to violate their clearly established rights, privileges, or immunities under federal law.

228.    Under 42 U.S.C. § 1983, MH and TB are entitled to an award of compensatory damages against Defendant Hamso, as an individual acting under color of state law, for continuing to violate their clearly established rights, privileges, or immunities under federal law.

## DEMAND FOR JURY TRIAL

Plaintiffs, pursuant to the Seventh Amendment to the Constitution and Fed. R. Civ. P. 38, demand a jury trial in this action.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Grant permanent injunctions prohibiting any further enforcement or application of the Defendants Defendants Jeppesen's, Hamso's, and IDHW's policy and practice, as applied to Plaintiffs, of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria because the practice impermissibly discriminates against transgender individuals on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and direct Defendants Jeppesen, Hamso, and IDHW to authorize surgery to treat gender dysphoria when medically necessary for a particular Medicaid beneficiary;

B.      Enter a declaratory judgment that Jeppesen, Hamso, IDHW and Idaho's Medicaid's practice, as applied to Plaintiffs and other persons similarity situated, of refusing to authorize medically necessary surgery to treatment gender dysphoria violates Equal Protection under the Fourteenth Amendment to the United States Constitution and Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116 because it impermissibly discriminates against transgender individuals on the basis of sex, including gender identity, sex stereotypes, and sex characteristics;

C.      Issue permanent injunctions enjoining any further and continuing violations of the due process requirements in fair hearing procedures and appeals under the IDHW Contested Case Rules in violation of Due Process under the Fourteenth Amendment to the United States Constitution and under the Medicaid Act.

D.      Award compensatory damages against Defendant Hamso, individually, for

violation of Plaintiffs' clearly established constitutional rights and their rights under the Medicaid Act in an amount that would compensate them for their injuries.

      E.     Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 or other applicable statutes; and

      F.     Award such other and further relief as the Court may deem as proper.

DATED this 29th day of September, 2022.

/s/ Howard A. Belodoff
Howard A. Belodoff

/s/ Martin C. Hendrickson
Martin C. Hendrickson

Idaho Legal Aid Services, Inc.

## VERIFICATION

MH and TB, each being duly sworn on oath, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that they have read the foregoing Complaint and know the contents thereof and believe the same to be true and correct.

DATED this 29th day of September, 2022.

/s/ MH_____

/s/ TB_____

VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 41

**SEALED EXHIBITS REDACTED**