**UNITED STATES DISTRICT COURT**
**DISTRICT OF IDAHO**

| | |
|---|---|
| MH and TB, individually,<br><br>    Plaintiffs,<br><br>    vs.<br><br>DAVE JEPPESEN, in his official capacity as the Director of the Idaho Department of Health and Welfare; DR. MAGNI HAMSO, in her official capacity as the Medical Director of the Idaho Division of Medicaid and individually; and the IDAHO DEPARTMENT OF HEALTH AND WELFARE,<br><br>    Defendants. | Case No.: 1:22-cv-00409-REP<br><br>**MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION TO DISMISS**<br><br>**(Dkt. 19)** |

Pending before the Court is Defendants' Motion to Dismiss (Dkt. 19).  Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order which grants, in part, and denies, in part, Defendants' Motion.

## I.  GENERAL BACKGROUND[1]

**A.    Gender Identity and Gender Dysphoria**

According to Plaintiffs' Complaint, each of us has an internal sense of their sex – i.e., being male or female.  Compl. at ¶ 33 (Dkt. 1).  For most, this "gender identity" tracks the sex assigned at birth based solely on a visual assessment of external genitalia, so-called "cisgender" individuals.  *Id.* at ¶ 35.  However, transgender men and women have gender identities that differ

---

[1]  The background and discussion herein is informed by Plaintiffs' Verified Complaint for Injunctive Relief, Declaratory Judgment, and Damages (Dkt. 1).  As required in evaluating a motion to dismiss for failure to state a claim, the Court takes Plaintiffs' allegations as true and draws all reasonable inferences in their favor.  *See infra*.

**MEMORANDUM DECISION AND ORDER - 1**

from their assigned sexes. *Id*. at ¶ 36. For example, a transgender man is a man who was assigned female at birth but has a male gender identity, and a transgender woman is a female who was assigned male at birth but has a female gender identity. *Id*. When a person's gender identity does not match their sex assigned at birth, gender identity is the critical determinant of that person's sex. *Id*.

For transgender individuals, the incongruence between their gender identities and assigned sexes can result in clinically-significant distress known as "gender dysphoria." *Id*. at ¶ 38. Gender dysphoria is a recognized medical condition which, if left untreated, can cause anxiety, depression, self-harm, or suicidal ideation. *Id*. at ¶¶ 38-39. Untreated gender dysphoria often intensifies with time; the longer a transgender individual goes without or is denied adequate treatment for gender dysphoria, the greater the risk of severe harm to the individual's health. *Id*. at ¶ 40.

Gender dysphoria is highly treatable and health care providers follow well-established standards of care to treat patients with gender dysphoria. *Id*. at ¶ 41. Treatment for gender dysphoria includes "gender transition," which is the process of living in a manner consistent with one's gender identity. *Id*. at ¶ 43. Transitioning is particular to the individual, but typically includes social, legal, and medical transition. *Id*. at ¶ 46.

Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life (e.g., wearing certain clothing, following particular grooming practices, and using pronouns consistent with that individual's gender identity). *Id*. at ¶ 47. Legal transition involves taking steps to formally harmonize a transgender individual's legal identity with their gender identity (e.g., changing the name and gender marker on an individual's driver's license, birth certificate, or other forms of identification). *Id*. at ¶ 48. Medical transition includes gender-affirming care that brings the sex-specific characteristics of a transgender

**MEMORANDUM DECISION AND ORDER - 2**

individual's body into alignment with their gender identity (e.g., mental health counseling, hormone therapy, surgical care, or other medically necessary treatments for gender dysphoria). *Id*. at ¶ 49.

Relevant here, medical transition care like hormone therapy to feminize or masculinize the body and surgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring) is often considered medically necessary for transgender individuals with gender dysphoria.  *Id*. at ¶¶ 51, 53.  Such care is likewise understood by the broader medical community to be safe and effective.  *Id*. at ¶¶ 56-58.

**B.      Plaintiffs MH and TB[2]**

Plaintiffs are transgender women – they were assigned male at birth but identify as female today.  *Id*. at ¶¶ 23-24, 96, 158.  Both have been diagnosed with gender dysphoria and their medical providers have recommended that they receive genital reconstruction surgeries as medically necessary treatment therefor.  *Id*. at ¶¶ 106, 116, 163, 169.  Being eligible for and enrolled in the Idaho Medicaid program, Plaintiffs submitted prior authorization requests to Defendant Idaho Department of Health and Welfare ("IDHW"),[3] seeking coverage for these procedures.  *Id*. at ¶¶ 118, 178.  IDHW, however, denied these requests (either outright or by virtue of repeated, unresolved delays).  *See infra* (citing Compl. at ¶¶ 119, 154, 188 (Dkt. 1)).

1.      <u>MH</u>

On March 10, 2021, MH sought coverage for a penectomy, orchiectomy, and vulvoplasty.  Compl. at ¶ 118 (Dkt. 1).  On March 26, 2021, the medical director for IDHW's

---

[2]  Owing to the sensitive nature of this action and its related privacy implications, on November 29, 2022, the Court permitted Plaintiffs to appear using pseudonyms.  *See* 11/29/22 DEO (Dkt. 21).

[3]  Plaintiffs allege that IDHW is the entity charged with administering Idaho's Medicaid program under Idaho Code § 56-202(a).  Compl. at ¶¶ 25, 27 (Dkt. 1)

Division of Medicaid, Defendant Dr. Magni Hamso, denied the request due to a lack of medical

necessity.  *Id*. at ¶ 119.  A single reason was given for the denial: MH's request did not satisfy

the World Professional Association for Transgender Health's ("WPATH") recommendation that

gender-affirming surgery follow 12 months of hormone therapy.  *Id*. at ¶¶ 120, 129, 133.  The

denial also indicated that MH could resubmit her request after completing the recommended 12

months of hormone therapy.  *Id*. at ¶ 120.  MH timely filed a request for a fair hearing with

IDHW to appeal the denial.  *Id*. at ¶ 122.[4]

At the June 3, 2021 hearing, the Nurse Reviewer for IDHW's Division of Medicaid,

Susan Scheuerer, testified that Dr. Hamso denied MH's request because it was unclear whether

MH completed 12 months of hormone therapy as required by the WPATH Standards of Care.

*Id*. at ¶ 128.  Later during the hearing, MH explained that the records submitted alongside her

original request confirmed that she had already completed 12 months of hormone therapy.  *Id*. at

¶¶ 129, 132.  Still, in response to subsequent questioning from the hearing officer about the

completeness of MH's request, Ms. Scheuerer testified *for the first time* that, even if MH had

completed 12 months of hormone therapy, IDHW would have denied her request anyway

because Idaho Medicaid's policy considers the requested surgical procedures for transgender

individuals to be medically unnecessary and "cosmetic."  *Id*. at ¶¶ 130-131.

MH did not call any witnesses at the hearing or submit evidence rebutting IDHW's

evolving position on the requested surgical procedures because, up to that point, her request was

denied on the basis that she had not yet completed 12 months of hormone therapy.  *Id*. at ¶ 133.

MH nonetheless testified that extensive peer-reviewed research shows that gender-affirming

---

[4]  In May 2021 (following MH's appeal of IDHW's March 26, 2021 denial), MH
received an orchiectomy that was covered by Idaho Medicaid.  Compl. at ¶ 123 (Dkt. 1).  In
seeking prior authorization for that procedure, MH's medical provider noted that it was indicated
to treat testicular pain as well as gender dysphoria.  *Id*.

**MEMORANDUM DECISION AND ORDER - 4**

surgery is accepted treatment for gender dysphoria, stating further: "I didn't bring peer-reviewed articles in because I didn't think I would need to defend the validity of a surgery that has been accepted by the majority of urologists for multiple decades." *Id*. at ¶¶ 133-134.

On July 2, 2021, the hearing officer issued a Preliminary Order to Remand. *Id*. at ¶ 135. Therein, the hearing officer found that (i) the documentation from MH's medical and mental health providers established that she had completed 12 continuous months of hormone therapy; (ii) MH referenced peer-reviewed research supporting the idea that gender-affirming surgery is medically necessary and not just cosmetic; (iii) MH should have another opportunity to provide "clearer documentation showing 12 continuous months of hormone therapy" (though questioning how IDHW "interpreted the documentation to mean anything else," and simultaneously noting how Ms. Scheuerer could not even describe what documentation was missing or what would be needed to show that the requirement was met); (iv) IDHW's March 26, 2021 denial did not provide notice of any basis for the denial other than a lack of 12 months of hormone therapy; and (v) IDHW "somewhat abused its discretion" when it would have denied MH's request regardless of whether she completed 12 months of hormone therapy. *Id*. at ¶¶ 136-140. The hearing officer then remanded MH's appeal back to IDHW for a new decision. *Id*. at ¶ 141.

Consistent with the hearing officer's direction, on July 28, 2021, MH renewed her prior authorization request to IDHW. *Id*. at ¶ 143. Despite MH's repeated requests for updates immediately thereafter, IDHW refused to formally approve or deny MH's request; rather, IDHW claimed that MH's request remained pending via an active appeal. *Id*. at ¶¶ 144-147.

On November 25, 2021, MH requested a new hearing to address IDHW's unfolding failure to promptly process her latest request. *Id*. at ¶ 148. IDHW, through Dr. Hamso, denied that request on December 23, 2021, reasoning that its ongoing review of MH's coverage request precluded any hearing. *Id*. at ¶ 150.

**MEMORANDUM DECISION AND ORDER - 5**

Finally, on May 6, 2022, Dr. Hamso wrote a "Request for Information" to MH's medical providers, stating: "Medicaid has determined that a medical necessity decision cannot be made at this time because we do not have the necessary medical information." *Id*. at ¶ 153.  To date, IDHW has not notified MH of any final decision on her renewed request for coverage of medically necessary gender-affirming surgical care to alleviate her ongoing symptoms of gender dysphoria. *Id*. at ¶ 154.  As a consequence, MH has not received complete treatment for her gender dysphoria. *Id*. at ¶ 156.

2.   TB

In May 2022, TB sought coverage for gender-affirming surgeries. *Id*. at ¶¶ 168-169.  A Notice of Decision followed on May 25, 2022, indicating that, for each of the requested surgeries, the determination was the same: "Outcome Not Rendered." *Id*. at ¶ 170.

Confused, TB reached out to IDHW's Medical Care Unit on May 31, 2022, asking: "I do not understand what 'Outcome Not Rendered' means.  Does it mean that my case is still being reviewed or does it mean that my surgery is not covered?" *Id*. at ¶ 171.  TB followed up with IDHW's Medical Care Unit on June 1, 2022, asking again: "I have some questions regarding my case.  I see its [outcome] is not rendered.  I called the number given to me and was told that everything was sent to your medical care unit.  Can you give me an idea of how long it takes to review my case?" *Id*. at ¶ 172.

On June 2, 2022, IDHW's Medical Care Unit answered, stating: "The Medical Care Unit has received your request and it is currently pending review by the Medical Director." *Id*. at ¶ 173.  Later that day, TB replied with an offer to have her medical providers provide a medical necessity letter and clinic notes, if needed. *Id*. at ¶ 174.  The next day, IDHW's Medical Care Unit reiterated that it received TB's request and "it is currently pending review by the Medical Director." *Id*. at ¶ 175.

**MEMORANDUM DECISION AND ORDER - 6**

On June 9, 2022, TB's medical providers submitted a letter to IDHW outlining the medical necessity of the requested procedures. *Id*. at ¶ 177 ("Our surgical team . . . and four independent mental health professionals have thoroughly assessed this patient using the WPATH Standards of Care and have determined vaginoplasty to be a medically necessary procedure for [TB]. In our assessment, delay or denial of this medically necessary procedure would harm the health of this patient and put her well-being at risk."). This letter was supported by additional letters from TB's psychiatrist in Idaho, her child psychiatrist from Colorado, her licensed clinical social worker in Idaho, and her psychologist in Idaho. *Id*. at ¶ 178. Status inquiries from TB and her parents followed on June 13, 21, and 22, 2022, respectively. *Id*. at ¶¶ 179-181. On June 23, 2022, IDHW's Medical Care Unit acknowledged once more that it received TB's requests and "it is currently pending review by the Medical Director." *Id*. at ¶ 182.

On July 6, 2022, TB relayed to IDHW's Medical Care Unit her frustration with the delay in processing her request and asked for a time frame to expect IDHW's decision. *Id*. at ¶ 183. On July 13, 2022, IDHW's Medical Care Unit responded only that "[t]his is still under review." *Id*. at ¶ 184.

On July 22, 2022, TB emailed IDHW's Medical Care Unit with quoted material stating that discrimination against transgender individuals is prohibited – implying that health care plans cannot exclude transition-related care. *Id*. at ¶ 185.[5] The IDHW's Medical Care Unit never responded and, to date, has not notified TB of its decision on her request for coverage of medically necessary gender-affirming surgical care to treat her gender dysphoria. *Id*. at ¶¶ 186-188. As a result, TB has not received complete treatment for her gender dysphoria. *Id*.

---

[5] Coincidentally, Plaintiffs allege that IDHW's Director, Defendant Dave Jeppesen, was quoted in a July 22, 2022 article, stating that IDHW "has not approved surgical procedures for diagnoses of gender dysphoria" and "continues to have no policy related to authorizing surgeries or hormone therapies for gender dysphoria . . . ." Compl. at ¶ 84 (Dkt. 1).

**MEMORANDUM DECISION AND ORDER - 7**

**C.      This Action and Defendants' Motion to Dismiss**

Plaintiffs bring this action to challenge Idaho Medicaid's allegedly discriminatory policies that deny transgender individuals essential and sometimes life-saving healthcare.  *Id*. at ¶ 1.  They claim that Idaho Medicaid excludes coverage for genital reconstruction surgery that is medically necessary for transgender individuals to treat the clinically-significant distress caused by gender dysphoria.  Conversely, cisgender individuals  receive coverage for genital reconstruction surgery that is medically necessary as a matter of course.  *Id*. at ¶¶ 1, 7, 85-86, 193, 195-196, 201-202, 207-208.

In turn, Plaintiffs assert the following claims against Defendants IDHW, Director Jeppesen in his official capacity, and Dr. Hamso in her official and individual capacities (for all but the Patient Protection and Affordable Care Act claim): (i) unlawful discrimination on the basis of sex in violation of section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 (First Claim for Relief); (ii) violation of the Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A) (Second Claim for Relief); (iii) violation of the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B) (Third Claim for Relief); (iv) violation of the Equal Protection Clause of the Fourteenth Amendment (Fourth Claim for Relief); (v) violation of the Medicaid Act's Due Process Requirements, 42 U.S.C. § 1396a(a)(3) (Fifth Claim for Relief); and (vi) violation of the Due Process Clause of the Fourteenth Amendment (Sixth Claim for Relief).  *Id*. at ¶¶ 189-228.

Defendants' Motion to Dismiss does not challenge each one of these claims.  It instead targets only two aspects of Plaintiffs' Complaint: (i) the viability of Plaintiffs' Equal Protection claim itself (Fourth Claim for Relief); and (ii) the extent of Dr. Hamso's individual liability given that (a) compensatory damages for emotional distress cannot be awarded under the Medicaid Act (Second, Third, and Fifth Claims for Relief), and (b) she is entitled to qualified

immunity in any event (Second, Third, Fourth, Fifth, and Sixth Claims for Relief).  Mem. ISO MTD at 3-13 (Dkt. 19-1).  Each of these arguments is addressed below.

## II.  <u>MOTION TO DISMISS STANDARD</u>

Rule 12(b)(6) permits a court to dismiss a case if the plaintiff has "failed to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A dismissal under Rule 12(b)(6) "may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotation marks and citation omitted).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" of truth of the allegations.  *Twombly*, 550 U.S. at 556.

A court evaluating a motion to dismiss must view the complaint "in the light most favorable to the plaintiff."  *Abramson v. Brownstein*, 897 F.2d 389, 391 (9th Cir. 1990).  All well-pleaded factual allegations of the complaint must be accepted as true.  *Iqbal*, 556 U.S. at 678-79.  But a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  At bottom, a "complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief."  *Id*.

When a court dismisses a complaint under Rule 12(b)(6), it should generally allow the plaintiff to file an amended complaint unless the complaint clearly "could not be saved by any

**MEMORANDUM DECISION AND ORDER - 9**

amendment." *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996), overruled on other grounds by *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007); *see also* Fed. R. Civ. P. 15(a)(2).

## III.  ANALYSIS

**A.  Whether Plaintiffs State an Equal Protection Claim**

    1.   Equal Protection Framework

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  This aspirational promise, however, must coexist with the practical reality that laws often draw lines between groups of people – classifications – advantaging some while disadvantaging others.  *Romer v. Evans*, 517 U.S. 620, 631 (1996).  The Supreme Court has attempted to reconcile this tension by developing tiers of judicial scrutiny against which a government's classification can be measured.  *Hecox v. Little*, 479 F. Supp. 3d 930, 972 (D. Idaho 2020) (citing *Latta v. Otter*, 19 F. Supp. 3d 1054, 1072-73 (D. Idaho 2014)).  "The level of scrutiny depends on the characteristics of the disadvantaged group or the rights implicated by the classification." *Latta*, 19 F. Supp. 3d at 1073; *see also infra*.

All Equal Protection cases confront the same lynchpin issue: Is the government's classification justified by a sufficient, legitimate purpose?  Chemerinsky, *Constitutional Law* § 9.1.2, at 685 (4th ed. 2011).  This question turns entirely on the type of discrimination under review and requires that a court assess (i) the government's classification, (ii) the level of scrutiny that should be applied to the classification, and (iii) whether the law or policy incorporating the classification meets the appropriate level of scrutiny.  *Id*. at 686; *see also Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017); *see also Latta*, 19 F. Supp. 3d at

**MEMORANDUM DECISION AND ORDER - 10**

1073 ("The Court's principal tasks here are to determine the form of discrimination at issue and next identify and apply the appropriate level of scrutiny.").

        *a.*      *The Government's Classification*

"Equal Protection analysis always must begin by identifying how the government is distinguishing among people" (the government's classification). Chemerinsky, *Constitutional Law* § 9.1.2, at 686; *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005) ("The first step in Equal Protection analysis is to identify the [government's] classification of groups."). To do this, a court must search for a "comparative group composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the government's challenged policy." *Roy v. Barr*, 960 F.3d 1175, 1181 (9th Cir. 2020) (internal quotation marks and citation omitted). The groups must be comprised of similarly-situated individuals who are treated differently so that the factor(s) motivating the disparate treatment can be identified. *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995). "If the two groups are similarly situated, [the court] determines the appropriate level of scrutiny and then applies it." *Roy*, 960 F.3d at 1181 (internal quotation marks and citation omitted).

Sometimes the classification is clear. For example, a law may establish the classification "on its face," meaning that the law, by its own terms, draws a distinction among similarly-situated people based on a particular characteristic. Chemerinsky, *Constitutional Law* § 9.12, at 686. In such cases, proof of both a discriminatory impact to the law and a discriminatory purpose behind it is assumed. *See, e.g.*, *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (holding "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect"); *Walker v. Gomez*, 370 F.3d 969, 973-74 (9th Cir. 2004) (when policy is suspect on its face because it considers race as a factor, the

**MEMORANDUM DECISION AND ORDER - 11**

inmate need not prove discriminatory intent); *Lovell v. Chandler*, 303 F.3d 1039, 1057 (9th Cir. 2002) (facial discrimination is "by its very terms" intentional discrimination).

Other times the classification is not so obvious – as when a law or policy appears neutral on its face – and the classification must be divined from its ultimate disparate impact and the discriminatory purpose behind it. For example, a law or policy may be facially neutral but nonetheless applied in a discriminatory way to disadvantage a particular group. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) (racially neutral law requiring a permit to operate a laundry, unless the laundry was located in a brick or stone building, applied to systematically deny Chinese applicants). Or a law or policy may be neutral on its face and applied according to its terms, but nonetheless enacted with a purpose of discriminating. *See Hunter v. Underwood*, 471 U.S. 222, 227-33 (1985) (provision of Alabama Constitution that permanently disenfranchised persons convicted of crimes involving "moral turpitude" was intended to suppress voting right of African Americans).

A plaintiff challenging a facially-neutral law or policy must establish discriminatory intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). In rare cases, the plaintiff may do so by showing a clear pattern of disparate impact unexplainable on other grounds. *Id.* (citing cases, including *Yick Wo*). In most cases, where such a clear pattern of disparate impact is lacking, the plaintiff may do so by demonstrating intentional discrimination in the historical background, the specific sequence of events, and the legislative and administrative history precipitating the law or policy. *Id.* at 268-69.

　　　　b.　　*The Levels of Scrutiny*

Once identified, the underlying nature of the classification determines the level of scrutiny applied to it. The most stringent level of review is strict scrutiny. It applies to a legislative classification that "impermissibly interferes with the exercise of a fundamental right

**MEMORANDUM DECISION AND ORDER - 12**

or operates to the peculiar disadvantage of a suspect class." *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976).

A fundamental right is generally one enshrined in the Constitution and interpreted by the Supreme Court. *Planned Parenthood v. Casey*, 505 U.S. 833, 847-48 (1992), overruled on other grounds by *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228 (2022). To that end, the Supreme Court has recognized that the Constitution protects a limited number of fundamental rights, including the right to privacy concerning consensual sexual activity and the right to marriage. *Hecox*, 479 F. Supp. 3d at 973 (collecting cases). A classification is suspect if it is directed to a discrete and insular minority group. *United States v. Carolene Prods.*, 304 U.S. 144, 152 n.4 (1938); *Abebe v. Mukasey*, 554 F.3d 1203, 1206 (9th Cir. 2009). Historically, the Supreme Court has recognized that race, alienage, and national origin are examples of suspect classes. *Cleburne*, 473 U.S. at 440-41. Classifications involving a fundamental right or a suspect class are presumed unconstitutional and will survive strict scrutiny only when the government can show the law serves a compelling purpose and that it is the least restrictive means for doing so. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973). Strict scrutiny review is so exacting that most laws subjected to this standard fail. *See Fullilove v. Klutznick*, 448 U.S. 448, 507 (1980) (Powell, J., concurring: "Indeed, the failure of legislative action to survive strict scrutiny has led some to wonder whether our review of racial classifications has been strict in theory, but fatal in fact.").

At the other end of the spectrum, a law that neither burdens a fundamental right nor targets a suspect class is subject to rational basis scrutiny. *Latta*, 19 F. Supp. 3d at 1073 (citing *Heller v. Doe*, 509 U.S. 312, 319-21 (1993)). Courts in these types of cases presume the law is valid unless the challenger can show the difference in treatment bears no rational relation to a conceivable government interest. *Id.*; *see also Cleburne*, 473 U.S. at 440 (state action is

**MEMORANDUM DECISION AND ORDER - 13**

"presumed to be valid and will be sustained if the classification drawn by the statute is rationally

related to a legitimate state interest"). "A classification does not fail rational basis review

because it 'is not made with mathematical nicety or because in practice it results in some

inequality.'" *Heller*, 509 U.S. at 321 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485

(1970)). Even so, the "State may not rely on a classification whose relationship to the asserted

goal is so attenuated as to render the decision arbitrary or irrational." *Cleburne*, 473 U.S. at 446.

For this reason, despite the deferential standard, courts "insist on knowing the relation between

the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632; *see also*

*Heller*, 509 U.S. at 321 (explaining that the classification must "find some footing in the realities

of the subject addressed by the legislation").

       In between the extremes of strict scrutiny review and rational basis review "lies a level of

intermediate scrutiny, which generally has been applied to discriminatory classifications based

on sex or illegitimacy." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). "These classifications are

considered 'quasi-suspect,' and survive heightened constitutional scrutiny only if the

[government] shows the classification is 'substantially related to an important governmental

objective.'" *Latta*, 19 F. Supp. 3d at 1074 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S.

718, 724 (1982)).[6] "Discrimination against a quasi-suspect class . . . must be supported by an

'exceedingly persuasive justification" and "not hypothesized or invented *post hoc* in response to

---

[6] Caselaw suggests that intermediate scrutiny review, like strict scrutiny review, is a
subset of heightened scrutiny review. *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1141 (D. Idaho
2018) ("If a law classifies on the basis of a suspect class or a quasi-suspect class, it is subject to
heightened scrutiny review – and, depending on the type of suspect classification, such laws are
subject to either strict scrutiny review or intermediate scrutiny review."). That said, courts
routinely equate intermediate scrutiny with heightened scrutiny. *See, e.g.*, *Hecox*, 479 F. Supp.
3d at 973 n.28 ("Statutes that discriminate on the basis of sex, a 'quasi-suspect' classification,
need to withstand the slightly less stringent standard of 'heightened' scrutiny. . . . Heightened
scrutiny is also referred to as 'intermediate scrutiny.' The Court uses the term 'heightened'
scrutiny for consistency.") (internal citation omitted).

**MEMORANDUM DECISION AND ORDER - 14**

litigation.'"  *Id*. (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)).  "The purpose of

this heightened level of scrutiny is to ensure quasi-suspect classifications do not perpetuate

unfounded stereotypes or second-class treatment."  *Id.*

Relevant here, the Ninth Circuit has held that heightened scrutiny applies to the Equal

Protection rights of transgender individuals.  *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th

Cir. 2019) ("We conclude that the 2018 Policy [banning transgender persons from military

service] on its face treats transgender persons differently than other persons, and consequently

something more than rational basis but less than strict scrutiny applies.").  Likewise, courts in

this district have held that discrimination against transgender individuals is a form of sex

discrimination subject to heightened scrutiny.  *See Barron*, 286 F. Supp. 3d at 1143-44 ("[T]o

conclude discrimination based on gender identity or transsexual status is not discrimination

based on sex is to depart from advanced medical understanding in favor of archaic reasoning.").

These courts also have recognized that transgender status is a quasi-suspect classification in and

of itself, and therefore, independently subject to heightened scrutiny.  *See id*. at 1145

("[T]ransgender people bear all of the characteristics of a quasi-suspect class and any rule

developed and implemented by the IDHW should withstand heightened scrutiny review to be

constitutionally sound."); *Hecox*, 479 F. Supp. 3d at 974-75 (adopting *both* parties' positions on

the appropriate level of scrutiny in determining that heightened scrutiny applied because the Act

in question discriminated on the basis of both sex and transgender status).

       c.     *Does the Government's Action Satisfy the Appropriate Level of Scrutiny?*

A perhaps obvious and automatic next step, the proper level of scrutiny that attaches to

the government's classification must then be applied to the law or policy being challenged.  "In

evaluating the constitutionality of a law, a court evaluates both a law's ends and its means."

Chemerinsky, *Constitutional Law* § 9.1.2, at 689.  This means that, for strict scrutiny, the ends

must be deemed compelling for a law to be upheld; for intermediate scrutiny, the ends must be

regarded as important; and for rational basis scrutiny, there just has to be a legitimate purpose.

*Id*.; *see also supra*.

In evaluating the relationship between a challenged law's ends and the means chosen to

accomplish those ends, courts consider the "fit" between the law and its objective.  *Id*. at 690.

This analysis necessarily compares the class of individuals who come within the scope of the

law's objective, and the class of individuals actually affected by the law.  A law may be

underinclusive (it does not apply to individuals who are similar to those to whom the law does

apply), overinclusive (it applies to those who do not need to be included for the government to

achieve its purpose), or both.  *Id*. at 689-90.

That a law is underinclusive and/or overinclusive does not automatically render it

unconstitutional.  What matters is the degree to which it is under- or overinclusive in light of the

law's objective and measured against the applicable level of scrutiny.  *Id*. at 690.  For example, if

strict scrutiny applies, a very close fit between inclusiveness and objective is required; if

intermediate scrutiny applies, a less close fit between inclusiveness and objective is required; if

rational basis scrutiny applies, the least close fit between inclusiveness and objective is required.

*See, e.g.*, *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014) ("Even when the

Court is not applying strict scrutiny, we still require a fit that is not necessarily perfect, but

reasonable; that . . . employs not necessarily the least restrictive means but . . . a means narrowly

tailored to achieve the desired objective.") (internal quotation marks and citation omitted).

2.    <u>Types of Challenges</u>

In alleging that a law or policy violates Equal Protection, a plaintiff can make two kinds

of challenges: facial or as-applied.  The distinction affects the plaintiff's burden of establishing

the alleged unconstitutionality of that challenged law or policy.  "A facial challenge is a claim

**MEMORANDUM DECISION AND ORDER - 16**

that the legislature has violated the Constitution, while an as-applied challenge is a claim directed at the execution of the law." *Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021), *cert. granted, judgment vacated*, 213 L. Ed. 2d 1108, 142 S.Ct. 2895 (2022), *and abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 213 L. Ed. 2d 387, 142 S.Ct. 2111 (2022).  The distinction also affects the proper scope of relief.  While "[a] successful challenge to the facial constitutionality of a law invalidates the law itself," a successful as-applied challenge invalidates "only the particular application of the law." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998); *see also Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1175 (9th Cir. 2018) (enjoining a "law in its entirety . . . would have been appropriate only if plaintiffs had prevailed on a facial challenge").

Though facial challenges "do not enjoy a neat demarcation" from as-applied challenges, facial challenges are generally understood as "ones seeking to have a statute declared unconstitutional in all possible applications." *Hecox*, 479 F. Supp. 3d at 968 n.25 (internal quotation marks and citation omitted).  For this reason, "[f]acial challenges are 'disfavored' because they: (i) 'raise the risk of premature interpretation of statutes on factually barebone records'; (ii) run contrary 'to the fundamental principle of judicial restraint'; and (iii) 'threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.'" *Id*. at 969 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (internal quotation marks and citations omitted)).

"As such, the Supreme Court has held, a 'facial challenge to a legislative Act is the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances* exists under which the Act would be valid.'" *Id*. (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added in *Hecox*)).  Said another way: the

**MEMORANDUM DECISION AND ORDER - 17**

challenged law must be unconstitutional under all circumstances.  While *Salerno's* ongoing applicability in this setting is the subject of considerable debate, the Ninth Circuit has consistently held that it remains the appropriate test for "most" facial challenges.  *Id.* at 969-70 (collecting cases); *see also Almerico v. Denney*, 378 F. Supp. 3d 920, 924-26 (D. Idaho 2019) (applying *Salerno* to bar Equal Protection claim because the Ninth Circuit adheres to *Salerno*).

Conversely, an as-applied challenge "is the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments." *Cleburne*, 473 U.S. at 447.  *Salerno's* "no set of circumstances" test does not apply to as-applied constitutional challenges.  Instead, a plaintiff must demonstrate only that the particular execution of the law or policy – as applied to the facts of his or her case – fails to satisfy the requisite level of scrutiny implicated by the law or policy.  *See supra*.

3.   Plaintiffs State An Equal Protection Claim

Plaintiffs' Equal Protection claim is anchored by their allegation that Defendants have a "policy of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria."  Compl. at ¶¶ 207-208 (Dkt. 1).[7]  Plaintiffs claim

---

[7] It bears mentioning that, at the time Plaintiffs filed their Complaint, Defendants' alleged discriminatory policy appeared to be unwritten and simply a reflection of the reasons surrounding Defendants' rejection of Plaintiffs' efforts to secure coverage for their genital reconstruction surgeries.  *Supra*.  But one day before the hearing on Defendants' Motion to Dismiss, Defendants filed a Notice of Supplemental Information that attached a May 1, 2023, letter from Idaho's Governor, Brad Little, to Director Jeppesen.  Not. of Supp. Inf. (Dkt. 33). Governor Little's letter did not contradict Plaintiffs' description of Defendants' alleged policy. If anything, it fully endorsed it and went further, stating in relevant part: "I oppose Idaho Medicaid using public funds to pay for irreversible sex reassignment surgeries, puberty blockers, or hormones for the purpose of changing the appearance of any child's or adult's sex" and "I hereby direct you and the Department of Health and Welfare to take all appropriate steps to implement a policy consistent with state and federal law excluding the same from Medicaid coverage." *Id*. at Ex. A (Dkt. 33-1).  The impact, if any, of Governor Little's letter upon Defendants' Motion to Dismiss and moving forward is uncertain and not addressed here – except to say that it supports Plaintiffs' allegations regarding an allegedly discriminatory policy in violation of the Equal Protection Clause.

**MEMORANDUM DECISION AND ORDER - 18**

that Defendants' policy operates to classify transgender people (classified group) and deny them medically necessary genital reconstruction surgery to treat gender dysphoria.  Meanwhile, cisgender individuals (similarly-situated group) routinely receive coverage for the same or similar procedures, namely medically necessary genital reconstruction surgery to treat ailments other than gender dysphoria.  *See id.* at ¶¶ 1, 7, 85-86, 193, 195-196, 201-202, 207-208.  From this disparate treatment, Plaintiffs assert both facial and as-applied Equal Protection challenges.[8]

Defendants counter that, even if their policy excludes genital reconstruction surgery for gender dysphoria, it does not violate the Equal Protection Clause.  Mem. ISO MTD at 4-6 (Dkt. 19-1).  Defendants claim that their policy does not consider gender status at all, but rather, is based on diagnosis and treatment: coverage is not excluded for transgender persons, but rather, just for genital reconstruction surgery to treat the condition of gender dysphoria.  *Id.* at 6 ("[T]he Equal Protection claim is based on an asserted denial of payment coverage from a state's social welfare program related to a particular medical condition or, in this case, medical treatment.").  Having framed the policy in this way, Defendants argue that transgender persons receive the exact same coverage as cisgender persons: neither group is covered for genital reconstruction surgery to treat gender dysphoria and both groups are covered for genital reconstruction surgery to treat other conditions.  *Id.* at 4-5; Reply ISO MTD at 3 (Dkt. 28).  They analogize this case to *Geduldig v. Aiello*, 417 U.S. 484 (1974), where the Supreme Court found no Equal Protection violation for a state social welfare program that excluded coverage for pregnancy-related costs.[9]

---

[8]  Plaintiffs' Complaint clearly asserts an as-applied challenge.  Compl. at ¶¶ 207-208 (alleging that Defendants' policy, "as applied to MH and TB, impermissibly discriminates against [them] . . . .").  And, during the hearing on Defendants' Motion to Dismiss, Plaintiffs' counsel indicated that Plaintiffs were also asserting a facial challenge.

[9]  In *Geduldig*, the plaintiff brought an Equal Protection claim based on sex discrimination because she had been denied pregnancy-related payments under California's disability insurance program.  *Geduldig*, 417 U.S. at 490-91.  The Court held that the challenged pregnancy

Just as California could constitutionally exclude from coverage the condition of pregnancy,

Idaho can constitutionally exclude from coverage the treatment of gender dysphoria with genital

reconstruction surgery, they say. Thus, Plaintiffs' Equal Protection claim fails at the

classification stage, and further analysis of Plaintiffs' facial challenge under *Salerno* or as-

applied challenge under the appropriate tier of scrutiny in unwarranted. Mem. ISO MTD at 5.

      At this stage, however, the Court must accept how Plaintiffs' allegations, and the

inferences therefrom, have framed the issue. Plaintiffs recognize that, on its face, Defendants'

policy appears gender-neutral and directed at a medical condition and treatment therefor:

coverage is excluded for genital reconstruction surgery to treat gender dysphoria. Compl. at ¶1

(Dkt. 1). Yet, exclusively transgender persons – and not cisgender persons – suffer from gender

dysphoria. *See Fain v. Crouch*, 618 F. Supp. 3d 313, 324-25 (S.D.W.V. 2022) ("[I]nherent in a

gender dysphoria diagnosis is a person's identity as transgender. In other words, a person cannot

suffer from gender dysphoria without identifying as transgender."). Courts in this district have

recognized transgender persons as their own gender-based, quasi-suspect class. *See Barron*, 286

F. Supp. 3d at 1145; *Hecox*, 479 F. Supp. 3d at 974-75. Thus, Defendants' seemingly gender-

---

exclusion was not a gender classification warranting more than rational basis review. *Id.* at 496-
97. And the program's pregnancy exclusion met rational basis review because the state had a
legitimate interest in maintaining the program's fiscal integrity and allocating funds. *Id.* at 495-
97. In a footnote, the Court explained: "The California insurance program does not exclude
anyone from benefit eligibility because of gender but merely removes one physical condition –
pregnancy – from the list of compensable disabilities. While it is true that only women can
become pregnant it does not follow that every legislative classification concerning pregnancy is a
sex-based classification. . . ." *Id.* at 496 n. 20. The Court reasoned that the "lack of identity
between the excluded disability and gender" – women fell into both the classified group
(pregnant persons) and similarly-situated group (non-pregnant persons) – demonstrated that the
exclusion did not effect gender-based discrimination. *Id.* The Court concluded that: "Absent a
showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious
discrimination against the members of one sex or the other, lawmakers are constitutionally free
to include or exclude pregnancy from the coverage of legislation such as this on any reasonable
basis, just as with respect to any other physical condition." *Id.*

**MEMORANDUM DECISION AND ORDER - 20**

neutral exclusion is not so.  *Fain*, 618 F. Supp. 3d at 327 ("[T]he exclusion [of gender-affirming

care] precludes a specific treatment that is connected to a person's sex and gender identity[.]");

*Kadel v. Folwell*, 2022 WL 3226731, at *20-21 (M.D.N.C. 2022) (same); *Boyden v. Conlin*, 341

F. Supp. 3d 979, 997-1000 (W.D. Wisc. 2018) (same); *but see Lange v. Houston Cnty.*, 499 F.

Supp. 3d 1258, 1275-76 (D. Ga. 2020).[10]  Rather, the exclusion operates to disadvantage

transgender persons – by denying coverage for genital reconstruction surgery to treat gender

dysphoria – relative to cisgender persons whose genital reconstruction surgery to treat all other

conditions applying to them is covered.  *See Fain,* 618 F. Supp. 3d at 327 ("Here, the non-

suspect class – those not seeking surgical treatment for gender dysphoria – are treated more

favorably, as their materially same surgeries are covered.  This is unlike *Geduldig*, where men

were not treated more favorably under the challenged policy.").

        According to Plaintiffs, then, Defendants' facially-neutral exclusion – causing disparate

impact between transgender and cisgender persons – would fall squarely within *Geduldig's*

pretext exception.  *See Geduldig*, 417 U.S. at 496 n.20.  This is otherwise known as proxy

discrimination:

> Proxy discrimination is a form of facial discrimination.  It arises
> when the defendant enacts a law or policy that treats individuals
> differently on the basis of seemingly neutral criteria that are so
> closely associated with the disfavored group that discrimination on

---

[10]  Also cited by Defendants in their reply briefing, *Lange* held that, under *Geduldig*, the
challenged plan that excluded coverage for genital reconstruction surgery "d[id] not facially
classify among groups at all" and was instead facially neutral.  *Lange*, 499 F. Supp. 3d at 1276.
The court granted defendants' motion to dismiss plaintiff's argument, but only to the extent that
the plan's exclusion was argued to be facially discriminatory; it left plaintiff's Equal Protection
claim intact insofar as defendants never argued that plaintiff failed to allege plausible facts
supporting an inference of discriminatory purpose involving a facially-neutral exclusion.  *Id.*; *see
also Lange v. Houston Cnty.*, 2022 WL 1812306, at *8-9 (D. Ga. 2022) (confirming as much at
the summary judgment stage and finding the issue of whether plaintiff can establish invidious
discrimination to support her Equal Protection claim as involving a disputed fact).  To date,
however, *Lange* is at odds with the majority of cases considering the issue.  *See Kadel*, 2022 WL
11166311, at *3 (collecting cases).

the basis of such criteria is, constructively, facial discrimination
against the disfavored group.  For example, discriminating against
individuals with gray hair is a proxy for age discrimination because
'the fit' between age and gray hair is sufficiently close.

*Davis v. Guam*, 932 F.3d 822, 837-38 (9th Cir. 2019) (internal quotation marks and citations

omitted); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) (citing

as an example of proxy discrimination: "A tax on wearing yarmulkes is a tax on Jews.").  Here,

just like gray hair and yarmulke-wearing, Plaintiffs' Complaint effectively alleges that

Defendants' no-surgery-for-gender-dysphoria policy is a proxy for discrimination against

transgender persons.  And that allegation, if true, effectively distinguishes this case from

*Geduldig* (where pregnancy was not a proxy for discrimination against women because men

were not comparatively advantaged).

Alternatively, Plaintiffs' Complaint plausibly supports a claim of facial gender

discrimination.  Instead of excluding coverage for an objectively identifiable physical condition

that happens to be associated with one gender (*Geduldig*), Plaintiffs here allege that Defendants'

policy excludes what is effectively a sex-change (affirming) procedure.  Whereas the *condition*

of pregnancy can be understood without reference to sex, gender, or transgender status, the

*treatment* of gender dysphoria with genital reconstruction surgery cannot.  *See Kadel v. Folwell*,

620 F. Supp. 3d 339, 379 (M.D.N.C. 2022) (North Carolina health insurance plan "excludes

*treatments* that lead or are connected to *sex* changes or modifications.  Pregnancy can be

explained without reference to sex, gender, or transgender status.  The same cannot be said of the

exclusion at issue here.") (emphasis in original); *see also, e.g., Fain,* 618 F. Supp. 3d at 327

("[T]he exclusion [of gender-affirming care] precludes a specific treatment that is connected to a

person's sex and gender identity – not just a single objectively identifiable physical condition

with unique characteristics.") (internal quotation marks omitted); *Boyden v. Conlin*, 341 F. Supp.

**MEMORANDUM DECISION AND ORDER - 22**

3d 979, 997-1000 (W.D. Wisc. 2018); *Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931, 950 (W.D. Wisc. 2018).  Accordingly, as alleged, Plaintiffs' Complaint supports a cognizable legal theory that Defendants' policy facially discriminates against transgender persons.  *See, e.g., Fain,* 618 F. Supp. 3d at 327 (holding that exclusion of coverage for transsexual surgery "discriminates on its face"); *Fletcher v. Alaska,* 443 F. Supp. 3d 1024, 1030 (D. Alaska. 2020) (holding that exclusion of coverage for gender-transition related surgery is facially discriminatory).

In sum, Plaintiffs have demonstrated that they, as transgender individuals, were treated differently than similarly-situated cisgender individuals when, pursuant to Defendants' policy, they were denied medically necessary genital reconstruction surgery to treat their gender dysphoria.  Whether framed as proxy discrimination based upon disparate impact or facial discrimination based upon the wording of the policy, Plaintiffs' allegations, and the inferences drawn therefrom, state a plausible Equal Protection claim.  *Iqbal*, 556 U.S. at 678.  At this stage, and on the record before the Court, *Geduldig* does not alter this conclusion.  The merits of Plaintiffs' claim are not resolved here.  They depend on whether Defendants' exclusion of genital reconstruction surgery under these circumstances satisfies *Salerno* and the appropriate level of scrutiny.  *Supra*.  Until then, Plaintiffs' Equal Protection claim (Fourth Claim for Relief) must be permitted to move forward.

Defendants' Motion to Dismiss is denied in this respect.

## B.   Compensatory Damages Against Dr. Hamso in Her Individual Capacity Are Not Available Under the Medicaid Act

Regarding their Medicaid Act claims (Second, Third, and Fifth Claims for Relief), Plaintiffs allege that they are entitled to an award of compensatory damages against Dr. Hamso in her individual capacity.  Compl. at ¶¶ 199, 205, 221 (Dkt. 1).  Defendants argue that such

damages are not recoverable under the Medicaid Act.  Mem. ISO MTD at 6-8 (Dkt. 19-1) (citing *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S.Ct. 1562, 1572 (2022)).  Plaintiffs ultimately agree with Defendants, admitting that they cannot recover emotional distress damages under the Medicaid Act.  Opp. to MTD. at 11-12 (Dkt. 27).  Therefore, the Second, Third, and Fifth Claims for Relief are dismissed as against Dr. Hamso in her individual capacity.

Defendants' Motion to Dismiss is granted in this respect.

## C.    Whether Dr. Hamso Is Entitled to Qualified Immunity on Plaintiffs' Constitutional Claims

Regarding their Equal Protection and Due Process claims (Fourth and Sixth Claims for Relief), Plaintiffs allege that they are entitled to compensatory damages against Dr. Hamso in her individual capacity.  Compl. at ¶¶ 213, 228 (Dkt. 1).  Defendants argue that these claims should be dismissed against her individually because she is entitled to qualified immunity.  Mem. ISO MTD at 8-12 (Dkt. 19-1).[11]

### 1.    Qualified Immunity Framework

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).  The qualified immunity inquiry involves two steps.  When a defendant asserts qualified immunity, the Court must evaluate: (i) whether the defendant violated a constitutional right; and (ii) whether the constitutional right was

---

[11]  Defendants originally argued that Dr. Hamso is also entitled to qualified immunity as to Plaintiffs' Second Claim for Relief – violation of Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A).  Mem. ISO MTD at 3, 12-13 (Dkt. 19-1).  However, because the claims against Dr. Hamso in her individual capacity for compensatory damages under the Medicaid Act are dismissed (*supra*), Defendants concede the issue is now moot.  Reply ISO MTD at 11 (Dkt. 28).

**MEMORANDUM DECISION AND ORDER - 24**

clearly established at the time of the defendant's conduct, i.e., whether the contours of the right were sufficiently well developed that a reasonable official should have known her conduct was unlawful.  *Id*.  Unless the answer to both questions is "yes," the defendant is entitled to immunity.  *Id*.  While district courts retain discretion to decide which prong of the test to tackle first, the Supreme Court has suggested that the "clearly established" prong is the most efficient starting point.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

To be clearly established, a right must be "sufficiently clear that every reasonable official would have understood that what she is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015).  While a clearly established right should not be defined at a high level of generality, it does not require precedent exactly on point either.  *Id*. at 11-12.  Rather, existing precedent must place "the statutory or constitutional question beyond debate," such that only those government officials who are either "plainly incompetent or . . . knowingly violate the law" are held liable for monetary damages.  *Id*. (quoting *al-Kidd*, 563 U.S. at 741 and *Mallet v. Briggs*, 475 U.S. 335, 341 (1986)).  There need not be a Supreme Court or circuit case "directly on point," but "existing precedent must place the lawfulness of the conduct beyond debate."  *Tobias v. Arteaga*, 996 F.3d 571, 580 (9th Cir. 2021) (alteration and internal quotation marks omitted) (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018)).

The defendant bears the burden of proving they are entitled to qualified immunity.  *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1106 (N.D. Cal. 2017) (citing *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005)).  In conducting this inquiry, however, the Court adopts the plaintiff's version of the facts.  *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014); *Easley v. City of Riverside*, 890 F.3d 851, 856 (9th Cir. 2018) (evaluating a qualified immunity summary judgment motion by drawing factual inferences in the light most favorable to the plaintiff, the nonmoving party).

**MEMORANDUM DECISION AND ORDER - 25**

Applicable here, deciding a motion to dismiss based on qualified immunity requires "[b]alancing [ ] competing rules." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018).  On the one hand, the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). On the other hand, determining whether qualified immunity applies at the motion to dismiss stage can be problematic.  *See Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018) ("Determining claims of qualified immunity at the motion to dismiss stage raises special problems for legal decision making").  The court must balance (i) the fact that a complaint suffices to survive a motion to dismiss by stating a claim to relief that is plausible on its face, with (ii) the fact that qualified immunity sets a "low bar," allowing "government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id*. (internal quotation marks and citations omitted).  These factors are naturally in tension with one another and, at this procedural juncture, depend on the allegations raised in the pleadings.

In considering qualified immunity on a motion to dismiss, the court must consider whether the operative complaint alleges sufficient facts, taken as true, to support the claim that the individual defendant's conduct violated clearly established constitutional rights of which a reasonable person would be aware in light of the specific context of the case.  *Keates*, 883 F.3d at 1234 (internal quotation marks and citation omitted).  Crucially, if the complaint "contains even one allegation of a harmful act what would constitute a violation of a clearly established constitutional right," qualified immunity will not apply (at least not at that moment) and plaintiff is entitled to go forward with their claim. *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 872 (9th Cir. 1992).  Here, the Court cannot determine, based on the allegations presented in Plaintiffs' Complaint, that Dr. Hamso is entitled to qualified immunity on Plaintiffs' constitutional claims.

**MEMORANDUM DECISION AND ORDER - 26**

2.      <u>On the Current Record, Dr. Hamso Is Not Entitled to Qualified Immunity on Plaintiffs' Equal Protection Claim</u>

Defendants argue that Dr. Hamso is entitled to qualified immunity on Plaintiffs' Equal

Protection claim because there is no constitutional violation to begin with under *Geduldig*.

Mem. ISO MTD at 10 (Dkt. 19-1) ("[C]urrent binding Supreme Court precedent determined that

denial of coverage for a particular treatment or condition under a state's social welfare program

does not violate the Equal Protection Clause when the individual has received insurance

protection equivalent to that provided to all other participants.") (citing *Geduldig*, 417 U.S. at

497).  Defendants further claim that, without a violation of constitutional right, Dr. Hamso could

not have violated a clearly established law.  Id. ("Hence, Dr. Hamso did not violate clearly

established law, even if IDHW had a policy to deny genital reconstruction surgery for

transgender individuals").

But as the above analysis demonstrates, Plaintiffs have pleaded a plausible Equal

Protection violation, *Geduldig* notwithstanding.  *Supra* (determining that Plaintiffs have alleged

that Defendants' plan facially and by proxy discriminates against them on the basis of sex and

transgender status in violation of the Equal Protection Clause).  Therefore, whether qualified

immunity is available depends on whether the Equal Protection rights at issue were clearly

established.

On that score, Plaintiffs allege that Defendants discriminated against them because they

are transgender.  The right to be free from invidious discrimination "is so well established and so

essential to the preservation of our constitutional order that all public officials must be charged

with knowledge of it."  *Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980).  "This is

especially true in Equal Protection cases because the non-discrimination principle is so clear."

*Elliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010).

**MEMORANDUM DECISION AND ORDER - 27**

More particularly, as set forth *supra,* discrimination against transgender individuals is a form of gender-based discrimination subject to intermediate scrutiny.  *Barron*, 286 F. Supp. 3d at 1143-44; *see also Bostock v. Clayton*, 140 S.Ct. 1731, 1741 (2020) (in Title VII context: "[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex.").  As well, transgender status is considered a quasi-suspect classification that is independently subject to heightened scrutiny.  *Barron*, 286 F. Supp. 3d at 1145; *see also Karnoski*, 926 F.3d at 1201 (when discrimination is based on transgender status, the court should apply an intermediate scrutiny standard, "something more than rational basis but less than strict scrutiny").  Plaintiffs have therefore sufficiently alleged a plausible violation of a clearly established constitutional right.

There is no question that there is some nuance to Plaintiffs' Equal Protection claim and Defendants' defenses thereto.  For example: To what extent is genital reconstruction surgery medically necessary? To what extent does (or now, did, owing to Governor Little's May 1, 2023 letter) IDHW provide coverage for the treatment of gender dysphoria?  Are Plaintiffs actually treated differently than cisgender individuals in this coverage-related context?  And, assuming differential treatment, does Defendants' policy satisfy the appliable level of scrutiny?  But these outstanding issues, or the absence of caselaw specifically confronting them, do not warrant qualified immunity's application here *at this stage*, especially when contrasted against Plaintiffs' allegations.  *See Wong v. United States*, 373 F.3d 952, 956-57 (9th Cir. 2004) (acknowledging the difficulty posed by deciding qualified immunity at the motion to dismiss stage where it requires a court to decide "far-reaching constitutional questions on a nonexistent factual record" and suggesting that, while government officials may raise qualified immunity on a motion to dismiss, "the exercise of that authority is not a wise choice in every case.").

**MEMORANDUM DECISION AND ORDER - 28**

As already stated, interpreting those fact-dependent allegations in Plaintiffs' favor reveals a violation of a clearly established constitutional right, rendering Dr. Hamso's qualified immunity defense premature and thus far underdeveloped.  Dr. Hamso may reassert her entitlement to qualified immunity with a more fulsome record and through a motion for summary judgment.  *See Keates*, 883 F.3d at 1235 ("[O]ur decision at the motion to dismiss stage sheds little light on whether the government actors might ultimately be entitled to qualified immunity were the case permitted to proceed, at least to the summary judgment stage and the court is presented with facts providing context for the challenged actions.") (internal quotation marks and citation omitted).  Until then, Plaintiffs' Equal Protection claim (Fourth Claim for Relief) is permitted to move forward against Dr. Hamso individually.

Defendants' Motion to Dismiss is denied in this respect.

3.      On the Current Record, Dr. Hamso Is Not Entitled to Qualified Immunity on Plaintiffs' Due Process Claim

Due process under the Fourteenth Amendment bars "any State [from] depriv[ing] a person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  Therefore, to state a procedural Due Process claim, a plaintiff must allege (i) facts showing a deprivation of a constitutionally protected life, liberty, or property interest, and (ii) a denial of adequate procedural protections.  *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 716 (9th Cir. 2011). The order of these events matter.  A plaintiff must establish the predicate life, liberty, or property interest before any procedural safeguards attach.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) ("Respondents' federal constitutional claim depends on their having had a property right in continued employment.  If they did, the State could not deprive them of this

MEMORANDUM DECISION AND ORDER - 29

property without due process."); *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) ("In procedural

due process claims, the deprivation by state action of a constitutionally protected interest in life,

liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of

such an interest without due process of law.").

In support of their Due Process claim, Plaintiffs allege a property interest in the Medicaid

benefits guaranteed by Title XIX of the Social Security Act.  Compl. at ¶ 224 (Dkt. 1).  They

further allege that Defendants failed to provide the requisite due process when denying or

delaying their claim to these benefits.  *Id*. at ¶¶ 225-226.  In response, Defendants argue that the

true property interest at issue – Plaintiffs' interest in genital reconstruction surgery – is not

clearly covered under Idaho's Medicaid policies.  Mem. ISO MTD at 10 (Dkt. 19-1) ("Idaho's

laws, rules, and policies or understandings are not sufficiently definite enough to clearly

establish that Plaintiffs have a constitutional entitlement to genital reconstruction surgery under

Idaho's Medicaid policies.").[12]  Without a clearly established right to coverage for genital

reconstruction surgery, Defendants argue that Dr. Hamso is entitled to qualified immunity on

Plaintiffs' Due Process claim.  *Id*. at 10-12.

Constitutionally protected property interests are not limited to tangible property.  *Nozzi v.*

*Hous. Auth. of L.A.*, 806 F.3d 1178, 1191 (9th Cir. 2016).  They can be created, with "their

dimensions defined by existing rules or understandings that stem from an independent source

such as state law – rules or understandings that secure certain benefits and that support claims of

entitlement to those benefits."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

---

[12]  Defendants appear to concede that Plaintiffs' Due Process claim alleges a violation of
a constitutional right (the first qualified immunity factor) given the deprivation of Plaintiffs'
*claimed* property interest in genital reconstruction surgery without due process.  Therefore, for
the purposes of Defendants' Motion to Dismiss only, the Court understands Defendants'
argument in this regard to focus solely on whether such an interest was clearly established (the
second qualified immunity factor) at the time of the alleged Due Process violation.

**MEMORANDUM DECISION AND ORDER - 30**

To have a property interest in a government benefit, "a person clearly must have more than an abstract need or desire for it.  [They] must have more than a unilateral expectation of it.  [They] must instead, have a legitimate claim of entitlement to it."  *Id*.  The Supreme Court recognizes that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).  Instead, "[a] reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms."  *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994).  If government officials have the discretion to grant or deny a benefit, that benefit is not a protected property interest.  *Ching v. Mayorkas*, 725 F.3d 1149, 1155 (9th Cir. 2013).

Defendants submit that the Medicaid statutes and regulations give states broad discretion to determine the scope of coverage for medical assistance under the Medicaid Act.  Mem. ISO MTD at 11 (Dkt. 19-1) (citing 42 C.F.R. § 440.230(d) ("The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.")).  Such discretion, according to Defendants, cuts against Plaintiffs' claim to a property interest in coverage for genital reconstruction surgery.  *Id*. at 11-12.  But this framing of the issue is too simplistic and fails to account for what Plaintiffs are truly alleging here.

Plaintiffs have alleged that they are eligible for and enrolled in the Idaho Medicaid program.  Compl. at ¶¶ 23-24 (Dkt. 1).  They further allege that they have received Medicaid benefits in the past.  *Id*. at ¶¶ 106-108, 110, 123, 167.[13]  It is well-settled that a person can have a property interest in continuing to receive government benefits.  *See, e.g.*, *Goldberg v. Kelly*, 397

---

[13]   At the hearing on Defendants' Motion to Dismiss, Plaintiffs' counsel raised some doubt about whether Medicaid covered previous hormone therapy for Plaintiffs' gender dysphoria.  That issue is not resolved here, deferring to the allegations raised within Plaintiffs' Complaint.

**MEMORANDUM DECISION AND ORDER - 31**

U.S. 254, 261-63 (1970).  And as to genital reconstruction surgery specifically, Plaintiffs have alleged that the procedures involved therein have routinely been covered *when requested by cisgender individuals* for medically necessary reasons applying to them.  Compl. at ¶¶ 1, 7, 85-86, 193, 195-196, 201-202, 207-208 (Dkt. 1); *see also, e.g.*, Opp. to MTD at 11 (Dkt. 27) ("'The same [Current Procedural Terminology ("CPT")] code or codes apply to a particular procedure regardless of whether the procedure is performed on a transgender person as part of a medical transition or on a cisgender person for some other medical reason.'") (quoting *Boyden*, 341 F. Supp. at 989-990).  This is the point of Plaintiffs' entire action against Defendants and highlights the crux of Plaintiffs' claims – the alleged arbitrary difference in treatment between transgender and cisgender individuals – independent of the particular surgical procedures themselves or the Medicaid Act's flexibility in providing coverage for the same.  *See, e.g.*, Compl. at ¶¶ 128-134 (Dkt. 1) (discussing Defendants' evolving justification for denying MH's request for genital reconstruction surgery).  These allegations, taken as true, combine to reflect Plaintiffs' legitimate claim of entitlement to coverage, not just their unilateral expectation of it.  This property interest is therefore clearly established (at least for the purposes of Defendants' Motion to Dismiss) and cannot be withheld without due process.  *Goldberg*, 397 U.S. at 261-63; *supra*.

     As with Plaintiffs' Equal Protection claim and Dr. Hamso's qualified immunity defense to it, there are similar moving parts to Plaintiffs' Due Process claim that will undoubtedly develop over time to better inform the Court's consideration of Dr. Hamso's claim to qualified immunity there.  At this point, however, Plaintiffs' fact-dependent allegations do not compel qualified immunity as a matter of law or a corresponding dismissal.  Again, this ruling should not be understood to mean that Dr. Hamso will never be entitled to qualified immunity; rather, the procedural posture of the case and the disputed facts make this a question best resolved through a

**MEMORANDUM DECISION AND ORDER - 32**

summary judgment motion.  Until then, Plaintiffs' Due Process claim (Sixth Claim for Relief) is permitted to move forward against Dr. Hamso individually.

Defendants' Motion to Dismiss is denied in this respect.

## IV.  <u>ORDER</u>

Based upon the foregoing, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss (Dkt. 19) is GRANTED, IN PART, AND DENIED, IN PART as follows:

1.     Plaintiffs have stated an Equal Protection claim (Fourth Claim for Relief).  Defendants' Motion to Dismiss is DENIED in this respect.

2.     Plaintiffs' Medicaid Act claims (Second, Third, and Fifth Claims for Relief) are dismissed against Dr. Hamso individually.  Defendants' Motion to Dismiss is GRANTED in this respect.

3.     At this time, Dr. Hamso is not entitled to qualified immunity on Plaintiffs' Equal Protection claim (Fourth Claim for Relief) and Due Process claim (Sixth Claim for Relief).  Defendants' Motion to Dismiss is DENIED in this respect.

By separate notice, the Court will request litigation and discovery plans from the parties in anticipation of a scheduling conference to discuss deadlines moving forward.

DATED:  June 20, 2023

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge