Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
1447 S. Tyrell Lane
Boise, Idaho 83706
Tel: (208) 807-2496 Fax: (208) 342-2561
howardbelodoff@idaholegalaid.org

Jane Gordon, ISB #9243
Jane Gordon Law
1004 W. Fort Street
Boise, Idaho 83702
Tel: (208) 391-4747
Jane@JaneGordonLaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

|  |  |
|---|---|
| MH, ~~and~~ TB, KB, SG, AC, BM, individually, and G Doe, by and through her parents and next friends, JANE Doe and JOHN Doe<br><br>Plaintiffs,<br><br>vs.<br><br>~~DAVE JEPPESEN~~ ALEX ADAMS, in his official capacity as the Director of the Idaho Department of Health and Welfare; Dr. MAGNI HAMSO, in her official capacity as the Medical Director of the Idaho Division of Medicaid and individually; and the IDAHO DEPARTMENT OF HEALTH AND WELFARE,<br><br>Defendants.[1] | CASE NO. 1:22-CV-409<br><br>AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED (MOTION TO SEAL FILED)**<br><br>~~DEMAND FOR JURY TRIAL~~ |

---

[1] Defendant Adams is substituted for Defendant Jeppesen, ("Former Director") in his official capacity, as his successor to the Director of the Idaho Department of Health and Welfare under Rule 25(d) of the Federal Rule of Civil Procedure.

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 1

Plaintiffs MH, TB, KB, SG, AC, BM, and G Doe, by and through Jane Doe and John Doe ("Plaintiffs" collectively) bring For theiris Amended Complaint against Defendants and, Plaintiffs allege as follows:

## INTRODUCTION

1.     Plaintiffs , bring this suit to   including seven fivesix (5) adults and one (1) minor, challenge Idaho's facially, by proxy, as applied Medicaid's discriminatory Medicaid Eexclusion Ppolicyies and the not yet effective Idaho statutes., Idaho Code § 18-8901 and § Idaho Code § 56-270, House Bill 668, 67th Leg., 2nd Sess. (Idaho 2024). ("HB 668") (Appendix 1). HB 668 will become effective on July 1, 2024.

2.     Idaho Medicaid is a health insurance program that provides medical assistance to eligible low-income individual Idahoans.

3.     Idaho Medicaid is jointly jointly funded by the federal government and the State of Idaho.

4.     The Idaho Department of Health and Welfare ("IDHW") is responsible for administering Idaho's Medicaid program.

5.     Prior to the passage of HB 668, Idaho Medicaid and IDHW had an Exclusion Ppolicy of denying or refusing to acknowledge any requests for authorization for gender-affirming care for peopletransgender individuals seeking treatment for gender dysphoria "Idaho Medicaid's Exclusion Policy ("Medicaid Exclusion Policy").

6.     TheIdaho Medicaid's eExclusion Ppolicy and HB 668that deny and exclude transgender individuals from receiving of essential, and sometimes life-saving, health medically necessary gender-affirming care to treat Plaintiffs' diagnosed gender dysphoria.

7.     The Idaho Medicaid 's Exclusion Policy and HB 668 exeludprohibit theses coverage and reimbursement for health care—specifically, genital reconstruction surgery gender-affirming care and surgeries that is are medically necessary for transgender Medicaid participants to address treat their clinically significant physical and psychological distress caused by gender dysphoria.

8.     Idaho The Medicaid Exclusion Policy Medicaid's Exclusion Policy and HB 668 prohibit coverage for gender-affirming care and surgeries known to alleviate the debilitating distress of gender dysphoria and significantly improve patients' mental health, wellbeing, and functioning.

9.     The Idaho Medicaid Exclusion Policy Medicaid's Exclusion Policy and HB 668 prohibit individuals who identify as transgender rather than with thetheir biological sex assigned at birth from receiving gender-affirming care and surgeries their medical providers and counselors have determined waisare requiredmedically necessary to treat gender dysphoria.

10.     While cCisgender Idaho Medicaid participants people are covered and reimbursed for receive the same or similar health care and surgeries to treat medical conditions other than gender dysphoria.

Gender dysphoria is the clinically significant distress that transgender individuals experience due to having a gender identity that conflicts with the sex assigned at birth.

Transgender individuals are the only persons diagnosed with gender dysphoria.

11.     Transgender individuals need gender-affirming care and surgeries to treat the symptoms caused by gender dysphoria.

12.     There is broad consensus within the medical community that gender-affirming care is a safe, effective, and medically necessary treatment for transgender individuals diagnosed with gender dysphoria.

13.     Despite this broad consensus, Defendants characterize gender-affirming care as not medically necessary to treat gender dysphoria. ~~as a matter of course~~

14.     Former Director Jeppesen and Defendants ~~Cameron~~Adams,~~ and~~ Hamso, ~~,~~ have already or will after HB 668 is fully implemented on July 1, 2024, deny the use of "public funds" and Medicaid coverage~~s~~ and reimbursements for gender-affirming care and surgeries to treat gender dysphoria because Plaintiffs' gender identities are different from their gender identity assigned at birth.~~,~~

15.     Defendants ~~Jeppesen and Adams~~Hamso~~refuse to cover the identical care., for transgender Medicaid beneficiaries, under a policy of Defendants characterize ing gender affirming surgery as "cosmetic" and not medically necessary.~~ On May 1, 2023, Governor Brad Little, filed with the Court, a letter addressed to the Former IDHW Director Jeppesen~~of the Department of Health and Welfare ("IDHW"). Dkt. 33-1 herein.~~

16.     The Governor expanded Idaho Medicaid's Eexclusion Policy to include all gender- affirming care after it came to his attention ~~the Department~~ that IDHW was "being sued for having not pre-authorized Medicaid coverage for the sex reassignment surgeries of two young adults" ~~clearly~~ referencing MH and TB. Dkt. 33-1 herein.

17.     The Governor's May 1, 2023, letter indicated "I opposed Idaho Medicaid using public funds to pay for irreversible sex reassignment surgeries, puberty blockers, or hormones for the purpose of changing the appearance of any child's or adult's sex" and directing IDHWthe

~~Department~~ to implement a policy to exclude Medicaid coverage for these medically necessary treatments. Dkt. 33-1 herein.

18.     Prior to the Governor's May 1, 2023, letter and the enactment of HB 668, Former Director~~Defendants~~ Jeppesen and Defendant Hamso ~~also~~ ~~had~~have an unwritten policy of ~~indefinitely and~~ unreasonably delaying or denying prior authorization of ~~genital reconstruction~~gender-affirming surgery and coverage determinations for transgender Idaho Medicaid ~~recipients~~participants.

~~1.~~     ~~Former Director Jeppesen and Defendants Adams and Hamso~~Defendants refused to provide coverage and reimbursement for gender-affirming care and surgical procedures to transgender Medicaid participants because the Medicaid Exclusion Policy and HB 668 characterize gender-affirming care and surgeries as "cosmetic" or "sex reassignment surgery" for the "purpose of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex."

19.     

~~2.~~20.     Defendants' ~~This~~ ~~Medicaid~~~~id's~~ ~~e~~Exclusion ~~p~~Policy and HB 668 facially, by proxy, and as applied. discriminat~~es~~ion against transgender Idaho Medicaid ~~recipients~~ participants ~~is unlawful~~ under the United States Constitution and federal law and violates the Medicaid Act's availability requirement, 42 U.S.C. § 1396a(a)(10)(A) and comparability requirement, 42 U.S.C. § 1396a(a)(10)(B)(i). ~~.~~

~~3.     Plaintiff "MH" is a 21-year-old transgender Idaho resident who receives health coverage through Idaho's Medicaid program. as established by Title XIX of the Social Security Act.~~

4.     ~~Plaintiff "TB" is an 18 year-old transgender Idaho resident who receives health coverage through Idaho's Medicaid program.~~

### HB 668's Ban of Public Funds for Gender Affirming Care is Unlawful

21.     ~~Idaho Medicaid is a health insurance program that provides medical assistance to eligible low-income individual Idahoans. Idaho Medicaid is jointly funded by the federal government and the State. The Idaho Department of Health and Welfare ("IDHW") is responsible for administering Idaho's Medicaid program.~~ The Idaho Legislature enacted HB 668 to prohibit the use of "public funds" for any gender-affirming care and surgeries that ~~was~~are medically necessary for transgender Idahoans. Idaho Code § 18-8901.

22.     ~~HB 668 was enacted by t~~The Idaho Legislature ~~enacted~~ HB 668 was enacted in response to this action in order to statutorily prohibit the use of Medicaid and public funds to ~~provide~~cover and reimburse ~~adults and children with~~ gender-affirming care and surgeries to treat transgender adults and children diagnosed with gender dysphoria. Idaho Code § 18-8901.

23.     ~~The~~ HB 668's Legislative Intent was to prohibit the use of public funds for "surgical operations and medical procedures" . . . "when used for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex, . . ." Idaho Code § 18-8901(1)(a).

24.     HB 668 incorporates the specifically prohibited gender-affirming medical care and surgical procedures identified in Idaho Code § 18-1506C(3) if provided for the purpose of attempting to alter or affirm a transgender individual's perception of their sex ~~the appearance of or affirm a transgender individual's perception of their sex~~ if that perception is inconsistent with

the transgender individual's biological sex which was assigned at birth. ~~Idaho Code § 18-8901(2).~~

25.   The prohibited gender-affirming care and surgical procedures identified in Idaho Code § 18-1506C(3) are care and surgeries that include: castration, vasectomy, hysterectomy, oophorectomy, metoidioplasty, orchiectomy, penectomy, phalloplasty, clitoroplasty, vaginoplasty, vulvoplasty, ovariectomy, or reconstruction of the fixed part of the urethra with or without metoidioplasty, phalloplasty, scrotoplasty, or the implantation of erection or testicular prostheses, ~~a~~ mastectomy, the proscription of medications including puberty-blockers (~~,~~ testosterone to a female or estrogen to a male~~,~~) and the removal of an otherwise healthy or nondiseased body part or tissue.

26.   HB 668 ~~provides exempts~~allowsexempts cisgender persons who can receive the same or similar~~to receive the prohibited~~ "surgical operations or medical interventions" that transgender individuals are prohibited from receiving if "[n]ecessary to the health of the person on whom it is performed . . . except . . . if it is for the purpose of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex." Idaho Code § 18-8901(1)-(a).

27.   HB 668 also ~~exempts~~allows "surgical operations or medical interventions" to treat injury caused by the performance of gender transition procedures. Idaho Code § 18-8901(1)-(b).

28.   HB 668 only allows "surgical operations or medical interventions" for a child or an adult born with a medically verifiable genetic disorder of sex development. Idaho Code § 18-8901(1)~~)~~-(c).

29.     The prohibition against using public funds in HB 668 applies to both minors and adults.

30.     HB 6~~8~~68 prohibits the use of public funds for~~-~~ transgender individuals diagnosed with gender dysphoria to obtain "surgical operations and medical procedures described in section 18-1506C(3), Idaho Code, for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex, . . . except exempted surgical operations and medical intervention.~~. . .~~.." Idaho Code § 18-8901(2).

~~HB 668 applies to both minors and adults.~~

31.     HB 668 provides that "[t]he "Idaho Medicaid program shall not reimburse or provide coverage for the use of the surgical operations and medical procedures described in section 18-1506C(3), Idaho Code, for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex, . . . except exempted surgical operations and medical intervention." Idaho Code § 18-8901(4).

32.     HB 668 expanded the scope of Idaho Medicaid's ~~existing discriminatory~~ ~~e~~Exclusion ~~p~~Policy by prohibiting Idaho Medicaid reimbursing or providing coverage for all gender-affirming care, prohibiting all expenditures for any ~~type of~~ gender-affirming care and surgeries from being tax deductible, ~~prohibiting Idaho Medicaid reimbursing or providing coverage for all gender-affirming care,~~ prohibiting physicians employed by tax-payer funded entities from providing gender-affirming care and surgeries in the course and scope of their government service, and prohibiting the use of any government property, ~~facilit~~facility or buildings~~e~~ to provide gender-affirming care. Idaho Code§ 18-8901(3), (5) & (6).

HB 668HB 668 expanded the scope of Idaho Medicaid's existing discriminatory exclusion policy by prohibiting all expenditures for any type of gender-affirming care from being tax deductible, directing Idaho Medicaid not to reimburse or provide coverage for all gender-affirming care, prohibiteding physicians employed by tax-payer funded entities from providing gender-affirming care in the course and scope of their government service, and prohibited ing the use of any government facilities to provide gender-affirming care. HB 668 Statement of Purpose. (Appendix 2).

HB 668 statutorily provides that Idaho Medicaid shall not reimburse or provide coverage for any gender-affirming care including the "surgical operations or medical interventions" described in Idaho Code § 18-1506C(3), except for the exempted "surgical operations or medical interventions" described in Idaho Code § 18-8901(1).

33.      HB 6868 does not prohibit Idaho Medicaid from reimbursing and covering the same or similar medical care and surgical procedures prohibited in Idaho Code § 18-1506C(3) ifwhen  theymedical care and surgical proceduresthey  treatmentsare provided to cisgender Medicaid participants.

5.      Gender dysphoria is the clinically significant distress that transgender individuals experience due to having a gender identity that conflicts with the sex they were assigned at birth.

Transgender individuals are the only persons who are diagnosed with gender dysphoria.

6.      Transgender individuals  and will need gender-affirming care to treat their symptoms caused by gender dysphoria.

7.     ~~There is broad consensus within the medical community that genital reconstruction surgery is a safe, effective, and medically necessary treatment for many transgender individuals with gender dysphoria.~~

34.     ~~Despite this broad consensus, Defendants Jeppesen's, Hamso's, and IDHW's policy is toc characterize genital reconstruction surgery as cosmetic and not medically necessary when it is performed to treat gender dysphoria. As a result, Jeppesen's, Hamso's and IDHW'sIdaho~~Defendants' Medicaid's Exclusion ~~policy~~ Policy and HB 668 ~~is to~~ unreasonably ~~delay and~~ deny ~~prior authorization to~~ cover~~age and paymentreimbursement~~ ~~offor~~ ~~genital reconstruction surgery~~gender-affirming care when it is undisputed that it is medically necessary to treat a transgender individual diagnosed with gender dysphoria, even though ~~Idaho Medicaid~~ ~~cisgender Mcdicaid~~ participants can obtain coverage and payment for~~will authorize and cover~~ the same or similar ~~surgical~~ treatments and procedures when indicated for ~~the treatment of~~other diagnosed medical conditions.

## ADULT PLAINTIFFS

## PLAINTIFF MH

35.     Plaintiff MH ("MH") is a 21-year-old transgender woman residing in Idaho. She is a participant in the Idaho Medicaid program at all times material to this Amended Complaint.

36.     ~~MH has beenhas been diagnosed with gender dysphoria. She has undergone a gender transition to live in accordance with her gender identity rather than the sex assigned at birth.~~When MH was 11 years old, she started to feel ██████████████ associated with the physical changes that were happening in her body. At the time, she did not have the words to express what she was experiencing.

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 10

37.   She developed ████████████████████████████
███████████████████████████████████████████████

38.   MH became aware that she was transgender at age 16. She was afraid to disclose her gender identify to her family, who would not be accepting of her transgender status. As a result, MH went without any medical treatment for her gender dysphoria. Her parents objected to MH receiving counseling to address her ████████████████ and the feelings she was experiencing.

39.   After she realized that she was transgender, MH began telling a few close school friends about her gender identity and desire to transition.

40.   At age 17, MH left her family home. She went to live with a friend's family who she grew up with (the "H Family").

41.   Mr. and Mrs. H filed for guardianship of MH. During the guardianship proceeding, MH was required to live with her grandparents rather than with her parents. The guardianship proceeding was not finalized before MH turned 18 and was dismissed. MH returned to live with the H family after turning 18.

42.   In connection with the guardianship proceeding, a psychologist assessed MH, diagnosing her with gender dysphoria in early 2019

43.   By that time, MH had socially tradnsitioned -- using a feminine name, female pronouns and living as a woman in all aspects of her life.

44.   ~~MH applied for and was found eligible to receive Idaho Medicaid.~~ In June 2019, after receiving Idaho Medicaid, MH was finally able to access treatment for her gender dysphoria. She started receiving primary care and mental health services from providers at

██████████████████████ ² Her primary care provider, ██████████████████████████

independently diagnosed MH with gender dysphoria.

45.    ████████████ determined that MH would benefit from hormone therapy to

further her gender transition and treat her gender dysphoria. In August 2019, ████████████

began prescribing hormone therapy for MH. Hormone therapy reduced MH's symptoms of

gender dysphoria and improved her quality of life. MH has remained on hormone therapy since

August 2019.

46.    MH received counseling services at ████████████████ she saw several

providers there, including ██████████████ through May 2020. At that time, she also

started to see ████████████

47.    In early 2020, MH amended her birth certificate to reflect her female sex. In June

2020, MH was able to legally change her masculine first name to a feminine first name and adopt

the last name of H Family.

48.    Hormone therapy and gender-affirming counseling improved but did not

completely eliminate MH's gender dysphoria. She continued to experience significant distress

related to her genitalia.

49.    In August 2020, MH consulted with ██████████████ a Physician Assistant

with the █████████████████████████████████████████████ about

---

² This unredacted Amended Complaint is being filed contemporaneously with a redacted
Amended Complaint with the redactions indicated by highlighting. In addition, all exhibits to the
unredacted Complaint are not included with the unredacted Amended Complaint but continue to
be applicable to the Amended Complaint. All exhibits from the unredacted Complaint are
included in the unredacted Amended Complaint and continue to be referred to as "Sealed Exhibit
X."

receiving gender affirming surgery. ██████████████████████████████ y. Sealed Exhibit 1, pp. 11-14.

50.    ████████ oncluded that MH was ready for the surgery because she had undergone appropriate counseling and preparation, was informed of the risks, benefits, and alternatives to surgery, and could make a fully informed decision consenting to the surgery and treatment. *Id.*, p. 13.

51.    ████████ found MH had been living in her gender role for one year and had continuously been on hormone therapy during this time. *Id.*

52.    ████████ reviewed the WPATH criteria for vulvoplasty with MH and found MH met those criteria. *Id.*

53.    In accordance with the WPATH Standards of Care, the PA indicated that MH would need to submit two letters of support from her treating providers before she could proceed with surgery. *Id.*

54.    MH gathered letters of support from ████████████████████████████████ ████████████████, who is board certified in family medicine and who has special training in LGBTQIA+ health care and gender-affirming care for adults. *Id.*, pp. 16-19. ████████ started managing MH's hormone therapy in October 2020. *Id.*, p. 17. The letters indicate that MH's providers were in agreement that gender-affirming surgery was appropriate and medically necessary treatment for MH. *Id.*, pp. 16-19.

55.    ████████ has had multiple patients who have suffered significant and consistent psychological and physical harm after being denied appropriate and medically necessary gender-affirming surgery by Idaho Medicaid. Sealed Exhibit 2.

56.    On March 10, 2021 ███████████ a surgeon with the ███████████ submitted a prior authorization request to IDHW on behalf of MH, seeking coverage for a penectomy, orchiectomy, and vulvoplasty. ███████ attached ██████'s August 2020 assessment and the four letters of support to the request. Sealed Exhibit 1, pp. 8-14.[3]

57.    MH's health care providers determined it was medically necessary that she receive genital reconstruction surgery to treat her gender dysphoria.

58.    In May 2021, MH received an orchiectomy at ███████████ that was covered by Idaho Medicaid. In seeking prior authorization for the procedure, the surgeon noted that it was indicated to treat testicular pain, as well as gender dysphoria.

——— The orchiectomy reduced the amount of hormone therapy MH needed – specifically, she no longer has to take a testosterone blocker – but it did not obviate her need for a penectomy and vulvoplasty to treat her ongoing symptoms of gender dysphoria.

59.    ——

1.    As part of her transition, MH has received gender-affirming caremedical treatment, including hormone therapy, to align her physical characteristics with her gender identity and treat her gender dysphoria. ███████████

███████████

——— MH's health care providers have recommended that she undergo genital reconstruction surgeryreceive medically necessary gender-affirming care and surgeries to alleviate her ongoing symptoms of gender dysphoria.

---

[3] In the March 10, 2021, request, MH is referred to by her birth name, "MB." MH legally changed her name pursuant to a Judgment that was entered on June 17, 2020.

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 14

60.    The discontinuance of MH's gender-affirming care would negatively affect her mental health and well-being.

61.    MH relies on Idaho Medicaid to cover the costs of ~~her health care. MH~~She does ~~not have the financial resources to pay for~~ her medically necessary gender-affirming care and ~~the~~ surger~~ies~~y ~~out-of-pocket or to obtain private health insurance to cover her medically necessary care~~.

62.    MH wants to continue receiving gender-affirming care and to undergo future surgery to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care she will not be able to continue her medical transition.

## PLAINTIFF TB

~~2.~~63.   Plaintiff TB ("TB") is an 18-year-old transgender woman residing in Idaho. She is a participant in the Idaho Medicaid program at all times material to this Amended Complaint.

64.    TB has been diagnosed with gender dysphoria. She has undergone gender transition to live in accordance with her gender identity rather than the sex assigned at birth since 2015.

65.    TB has identified as a female as long as she can remember. As a child, she strongly preferred female attire and the toys, games, and activities stereotypical of the female gender, and she strongly rejected typically masculine toys, games, and activities. She has always had a strong dislike for her sexual anatomy and a strong desire for feminine sex characteristics that match her gender identity.

66.    ~~TB has been~~ has been diagnosed ~~with gender dysphoria. She has undergone gender transition to live in accordance with her gender identity rather than the sex assigned at birth.~~ When TB was eleven and twelve years old she had to be ███████████

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 15



███████████████████ Sealed Exhibit 18 (January 6, 2022, letter from ████████████ p. 3; Sealed Exhibit 20, p. 5. She is currently receiving counseling and medication for her ████████.

67.     TB has lived fully as a female since 2015, including while attending school.

68.     In 2016, TB legally changed her ~~masculine~~ first name to a feminine first name.

69.     TB was diagnosed with gender dysphoria in the spring of 2016 by ███████████ ████████████. Sealed Exhibit 14.

70.     From 2016 to 2020, TB was treated for gender dysphoria by her health care providers, first in Texas and later, in Colorado.

71.     TB began taking a puberty blocker to treat her gender dysphoria in the summer of 2016. The puberty blocker was prescribed by █████████████████ in ██████████ Sealed Exhibit 15, p. 1.

72.     In 2017-18, TB completed psychotherapy as part of her treatment for gender dysphoria and in preparation for beginning hormone therapy. ███████████ TB's ████ ███████████████ found that she met the criteria for gender dysphoria, and that her decision to transition resulted in a significant reduction of her personal distress surrounding her gender identity. Sealed Exhibit 16.

73.     In early 2018, ██████████ found that TB met the eligibility and readiness criteria in the official WPATH Standards of Care for treatment of gender dysphoria, and that she was a qualified candidate for hormone therapy. *Id*. TB's ███████████████ in ██████████ ██████████, agreed. Sealed Exhibit 17. TB started hormone therapy at that time. *Id.*

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 16

3.      As part of her transition, MHTB has received gender-affirming caremedical treatment, including ███████████ to align her physical characteristics with her gender identity and treat her gender dysphoria.

74.      TB's gender-affirming health care providers have recommended that she receive medically necessary gender-affirming care, including surgery,undergo genital reconstruction surgery to alleviate her ongoing symptoms of gender dysphoria.

4.75.    In 2022, TB submitted a request for prior authorization for gender affirming surgery. To date, IDHW has not issued a determination on her request.

76.      TB relies on Idaho Medicaid to cover the costs of her gender-affirminghealth care and surgeries.

————TB wants to continue receiving gender-affirming care and to undergo future surgery to alleviate her ongoing symptoms of gender dysphoria. but without Medicaid coverage of gender-affirming care she will not be able to continue her medical transition.She does not have the financial resources to pay for the surgery out-of-pocket or to obtain private health insurance to cover her medically necessary care.

77.

**PLAINTIFF KB**

78.      Plaintiff MHKB ("KB") is a transgender non-binary individual residing in Idaho. They are participants enrolled in the Idaho Medicaid program at all times material to this Amended Complaint.

79.      KB has beenwashas been diagnosed with gender dysphoria. They have undergone gender transition to live in accordance with their gender identity since 2020. ;

80.      KB started to socially transition and live as a male in 2020.

81.    As part of their transition, KB ~~has received~~s medical treatment, including hormone therapy (testosterone injections), to align their physical characteristics with their gender identity and had a mastectomy ("top surgery") to treat their gender dysphoria.

82.    KB started ~~H~~TRT (testosterone shots) in June of 2021. They continue to take TRT under the guidance of ███████████

83.    KB underwent top surgery in April 26 ████████████████████████

████████████████████

84.    ~~.~~Top surgery requires a referral from a mental health professional and a referral from a treating provider verifying that the patient has been on hormone therapy for at least a year and is a good candidate for the surgery.

~~As part of their transition, KB has received medical treatment, including hormone therapy, to align their physical characteristics with their gender identity and had their breast removeda mastectomy, t ("top surgery"), to treat their gender dysphoria.~~

85.    KB's health care providers have recommended that they continue to receive medically necessary gender-affirming care (~~hormones~~TRT) and undergo further gender affirming surgery to alleviate their ongoing symptoms of gender dysphoria.

86.    The discontinuance of KB's gender-affirming care would negatively affect their mental health and well-being.

87.    KB relies on Idaho Medicaid to cover the costs of ~~her~~ their gender-affirming care.

88.    KB wants to continue receiving gender-affirming care and to undergo future surgery to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care, they will not be able to continue their medical transition.

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 18

~~They do not have the financial resources to pay for the gender-affirming care or to obtain private health insurance to cover her~~their medically necessary care.

**PLAINTIFF SG**

89.     Plaintiff SG ("SG") is a transgender woman residing in Idaho. SG began her gender transition in June 2015 in order to live in accordance with her gender identity rather than ~~the~~ her sex assigned at birth.

90.     SG is a participant in Idaho Medicaid's program at all times material to this Amended Complaint.

91.     SG has been diagnosed with gender dysphoria and suffers from severe anxiety.

92.     SG changed her name and gender marker on her driver's license in June of 2021 to live in accordance with her gender identity rather than the sex assigned at birth.

~~1.     SG has been diagnosed with gender dysphoria and suffers from severe anxiety.~~

93.     ~~SG h~~SG ~~as received~~receives medical treatment under the care of ██████ ██ to treat her ~~their~~ gender dysphoria, including hormone therapy, to align her physical characteristics with her gender identity.

94.     SG has been on ~~and off~~hormone therapy (HRT) when she could afford it over the past several years.

95.     SG's health care providers have recommended that ~~theirs~~she continue receiving medically necessary gender-affirming care to alleviate ~~their~~ her ongoing symptoms of gender dysphoria.

96.     The discontinuance of SG's gender-affirming care would negatively affect her mental health and well-being.

97.     SG presently relies on Idaho Medicaid to cover the costs of her gender-affirming care.

98.     SG wants to continue receiving gender-affirming care and to undergo future surgery to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care she will not be able to continue her medical transition. ~~SG does not have the financial resources to pay for the gender-affirming care or to obtain private health insurance to cover her medically necessary care.~~

**PLAINTIFF AC~~AC~~**

99.     Plaintiff AC ("AC") is a transgender woman who has resided in Idaho almost her entire life.

~~1.      AC began her gender transition in November of 2020, in order to live in accordance with her gender identity rather than the sex assigned at birth.~~

~~1.      AC has changed her name and gender marker on her birth certificate and driver's license.~~

100.    AC a participant in the Idaho Medicaid program at all times material to this Amended Complaint.

101.    In November 2020, AC's physician, ███████████████ ~~in November 2020~~ diagnosed her with gender dysphoria that was causing her stress and depression, and she felt trapped in a body that di~~does~~ not align with her gender.

102.    Starting in November of 2020, AC's physician proscribed hormone therapy consisting of estrogen, androgen blockers, and progesterone to align her physical characteristics with her gender identity. She is currently under the care of ███████████████

103.   AC has undergone gender transition to live in accordance with her gender identity rather than the sex assigned at birth.

104.   AC began her gender transition in November of 2020, ~~in order to live in accordance with her gender identity rather than the sex assigned at birth.~~

~~=====~~AC has legally changed her name and gender marker on her birth certificate and driver's license in order to live in accordance with her gender identity rather than the sex assigned at birth.~~.~~

~~5.~~105.

~~Starting in November of 2020, AC's physician proscribed hormone therapy consisting of Estrogen, Androgen Blockers, and Progesterone to align her physical characteristics with her gender identity and breast removal, top surgery, to treat their gender dysphoria.. She is currently under the care of~~ ███████████

106.   ~~to future surgeryher o~~The discontinuance of AC gender-affirming care would negatively affect AC's mental health and well-being.

107.   AC relies on Idaho Medicaid to cover the costs of her gender-affirming care.

108.   AC wants to continue receiving gender-affirming care and to undergo future surgery to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care will not be able to continue her medical transition.

~~PLAINTIFF AC obtained Idaho Medicaid in February of 2024, to provide coverage of the costs of her gender-affirming care. AC does not have the financial resources to pay for the gender-affirming care or to obtain private health insurance to cover her medically necessary care.~~

**BM**

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 21

109.    Plaintiff BM- ("BM") is a transgender woman residing in a small rural Idaho community.

110.    BM has been eligible for and enrolled in the Idaho Medicaid program at all times material to this Amended Complaint.

111.    BM identifies as a female and both socially and psychologically and has been living her life authentically and openly as a female for the past fifth teen (15)15 years in order to live in accordance with her gender identity rather than the sex assigned at birth.

112.    BM has received gender-affirming care to treat their gender dysphoria, including estradiol spironolactone and progesterone medications since December 29, 2021, to align her physical characteristics with her gender identity.

113.    BM changed her name and gender marker on her driver's license on October 19, 2023.

114.    BM continues to experience significant emotional and mental distress due to her body not fully aligning with her gender identity.

115.    Since September 8, 2023, BM has been assessed and has received mental health counseling. Her counselor has determined she meets the criteria for having gender dysphoria (DSM5TR: F64.0) under the standards of care of the World Professional Association for Transgender Healthcare ("WPATH") and determined "gender-affirming breast augmentation is the next appropriate step to enable BW to continue living as the true identified gender, "She/Her." BM has been diagnosed with gender dysphoria (ICD-10 F64.9).

116.    BW's counselor has determined that she understands the risks of this gender-affirming surgery and is "reasonably expected to follow pre-and post-surgical treatment recommendations responsibly."

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 22

117.    On January 25, 2024, BM's health care provider determined that breast augmentation was medically necessary to further align her body with her gender and to treat her persistent symptoms of gender dysphoria.

118.    BM has made significant progress in her transition and understands the nature of the surgery and is highly motivated to proceed.

119.    BM's health care providers have recommended that she continue receiving gender-affirming care to alleviate ~~their~~ her ongoing symptoms of gender dysphoria.

120.    On March 21, 2024, BM's physician submitted a Prior Authorization Form to Idaho Medicaid Surgery and Procedure to perform a mammoplasty surgery, CPT Code 19325.

121.    As of the date of filing, Medicaid has not authorized the surgery. Medicaid has not denied the surgery either.

122.    BM relies on Idaho Medicaid to cover the costs of ~~their~~ her gender-affirming care.

~~1.    BM changed her name and gender marker on her driver's license.~~

~~BM has been eligible for and enrolled in the Idaho Medicaid program at all times material to this Amended Complaint.~~

~~BM has been diagnosed with gender dysphoria (ICD-10 F64.9~~ ████

~~BM changed her name and gender marker on her driver's license to live in accordance with her gender identity rather than the sex assigned at birth.~~

~~BM has received gender-affirming care to treat theirher gender dysphoria, including estradiol spironolactone and progesterone medications since December 29, 2021, to align her physical characteristics with her gender identity.~~

123.   BM continues to experience significant emotional and mental distress due to her body not fully aligning with her gender identity.

~~Since September 8, 2023, BM has been assessed and has received mental health counseling. Her counselor has determined she meets the criteria for having gender dysphoria (DSM5TR: F64.0) and determined "gender-affirming breast augmentation is the next appropriate step to enable BW to continue living as the true identified gender, "She/Her."~~

~~BW's counselor has determined that she understands the risks of this gender-affirming surgery and is "reasonably expected to follow pre-and post-surgical treatment recommendation responsibly."~~

~~On January 25, 2024, BM's health care provider determined that breast augmentation to further align her body with her gender was medically necessary to treat her persistent symptoms of gender dysphoria.~~

~~1.   BM has made significant progress in her transition and understands the nature of the surgery and is highly motivated to proceed.~~

~~6.   BM's health care providers have recommended that she continue receiving gender-affirming care to alleviate their ongoing symptoms of gender dysphoria.~~

~~On March 21, 2024, BM's physician submitted a Prior Authorization Form to Idaho Medicaid Surgery and Procedure to perform a mammoplasty surgery CPT Code 19325.~~

~~Medicaid has not authorized the surgery.~~

~~7.~~   The discontinuance of BM's gender-affirming care and failure to approve ~~her~~

~~1.~~   gender-affirming surgery would negatively affect her mental health and well-being.

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 24

124.

~~BM relies on Idaho Medicaid to cover the costs of their gender-affirming care.~~

125.    BM wants to continue receiving gender-affirming care and to undergo future surgery to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care will not be able to continue her medical transition.

8.

9.     .

## CHILD PLAINTIFF

126.    Plaintiff G Doe ("G Doe") is a ~~16 year old~~16-year-old transgender child who ~~residesd~~ with her parents in Idaho ~~her entire life~~. She is the youngest of seven children in her family and has lived in Idaho her entire life. ~~.~~

127.    G Doe has been enrolled in the Idaho Medicaid program at all times material to this Amended Complaint.

128.    G Doe's parents are John Doe and Jane Doe.

129.    The Doe family is low income and relies on her father's income because her mother cannot work due to a medical disability.

130.    G Doe has been diagnosed with gender dysphoria.

131.    With her parents' consent, in May of 2020, ~~s~~G Doe began her gender transition to live in accordance with her gender identity rather than the sex assigned at birth.

132.    In December 2022, G Doe started ~~being treated by her~~treatment with her pediatric endocrinologist ███████████████████

133.    ~~her~~ G Doe's treating physician prescribed puberty blocker~~s~~ in January of 2023 and G Doe receives injections every three months.

134.    ,G Doe's health care providers have have recommendeded that she continue receiving gender-affirming care to alleviate her ongoing symptoms of gender dysphoria.

135.    G Doe relies on Idaho Medicaid to cover the costs of her gender-affirming care.

136.    G Doe's parents, John Doe and Jane Doe, rely upon Idaho Medicaid to pay for the health care for G Doe's health care needs to treat her gender dysphoria.

2.    The discontinuance of G Doe's gender-affirming care would negatively affect her mental health and well-being.

137.

3.    G Doe and G Doe's parents want to continue receiving gender-affirming care and to undergo future surgery to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care, will not be able to continue her medical transition.

138.

**Idaho Medicaid's Exclusion Policy and HB 668 cause Plaintiffs' irreparable harm**

10.    Defendants' Medicaid Exclusion Policy MH's health care providers determined it was medically necessary that she receive genital reconstruction surgery to treat her gender dysphoria. MH applied to Medicaid for prior authorization of the surgery. MH was denied authorization for failure to complete twelve (12) months of hormone therapy. MH timely appealed the denial and requested a fair hearing.

11.    Medicaid's nurse reviewer and MH testified and presented evidence during a fair hearing. The hearing officer found MH had received twelve (12) months of hormone therapy. The hearing officer asked the nurse reviewer if there was another reasons for denying MH authorization for the genital reconstruction surgery to treat her gender dysphoria. The nurse reviewer indicated it was not medically necessary because under IDHW's and Idaho Medicaid's

policy MH's request was considered cosmetic surgery. Defendants Jeppesen, Hamso, and IDHW failed to provide MH adequate notice that her request for the authorization of genital reconstruction surgery was denied because under IDHW's and Idaho Medicaid's policy it was considered a cosmetic surgery and not medically necessary.

12.     The hearing officer's decision remanded MH's request for authorization of genital reconstruction surgery to IDHW to provide MH with proper notice of the new reasons for the denial. Defendants Jeppesen, Hamso, and IDHW have unreasonably delayed and refused to take action on her request for authorization and coverage of genital reconstruction surgery. After four months had elapsed following the hearing officer's remand of the appeal, MH requested a hearing to appeal the delay. Defendants Jeppesen, Hamso, and IDHW refused to provide a hearing or allow her to appeal the denial and delay, despite the clear requirement in the Medicaid Act to make a final decision within ninety (90) days after the filing of an appeal.

13.     Seventeen (17) months have passed since MH requested authorization and coverage for surgery that her providers have determined is medically necessary. Defendants still have not provided a final decision or an opportunity for a fair hearing to challenge the denial or delay.

14.     Defendants Jeppesen's, Hamso's, and IDHW's refusal to provide MH with a final decision following the hearing officer's remand or a hearing to challenge the denial of medically necessary genital reconstruction surgery violates MH's procedural due process rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, the Medicaid Act, 42 U.S.C. §1396a(a)(3), and the Medicaid Act's implementing federal regulations, 42 CFR §§ 431.200 *et seq.*

15. TB's health care providers determined it was medically necessary that she receive genital reconstruction surgery to treat her gender dysphoria. TB, through her health care providers, applied to Idaho Medicaid for prior authorization of the surgery. Idaho Medicaid has failed or refused to either authorize the treatment or deny it, depriving TB of both the medically necessary treatment and notice and a meaningful opportunity to appeal the delay and denial.

139. Defendants Jeppesen's, Hamso's, and IDHWMedicaid's exclusion policy and HB 668's probibitionprohibition of excluding coverage and reimbursement for gender-affirming care and surgeries in order for transgender individuals to receive of genital reconstruction surgery for the treatment of their diagnosed gender dysphoria by characterizing the surgery as cosmetic is preventsing the Plaintiffs MH and TB from receiving medically necessary care.

140. Consequently, theyPlaintiffs have suffered, and are continuing to suffer, severe physical, emotional, mental, and psychological distress caused by the Defendants' denial or future denial of gender-affirming care and surgeries they need or receive to treat their gender dysphoria and to live in accordance with their gender identity rather than the sex assigned at birth.

141. Idaho Defendants' Medicaid Exclusion Policy Medicaid's Exclusion Policy and HB 668's discriminatory policy of refusing to reimburse and cover for gender-affirming care and surgeries for transgender individuals diagnosed with gender dysphoria based upon the sex assigned at birth, while cisgender individuals not diagnosed will be reimbursed and covered for the same or similar care and surgeries to treat medical conditions other than gender dysphoria knowingly inflicts serious harms on Plaintiffs and serves to reinforce messages of stigma and subjects them to second class status as citizens of the State of Idaho.

16.142.    Idaho Defendants' Medicaid Exclusion Policy  Medicaid's Exclusion Policy and HB 668's, in expressly sex-based terms, classification of gender-affirming care and surgeries as sex reassignment care and surgeries for the purpose of changing the appearance of any child's or adult's biological sex, discriminates based upon sex and transgender status by relegating transgender individuals for different treatment than cisgender individuals and serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes.

143.    Defendants' Defendants Jeppesen's, Hamso's, and IDHWIdaho Medicaid 's eExclusion pPolicy and HB 668's discriminatory policy of refusing to cover and pay for gender-affirming care and surgeriesgenital reconstruction surgery for the treatment of gender dysphoria violates Plaintiffs' civil rights under Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116 ("Section 1557"); the availability and comparability provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A) and (B); and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the due process provisions of the Medicaid Act, 42 U.S.C. § 1396a(a)(3), and implementing Regulations 42 C.F.R. § 431.200, et seq..

17.144.    Plaintiffs will suffer irreparable harm if the Defendants are allowed, pursuant to the Medicaid's Eexclusion pPolicy and HB 668, to delay, terminate, and deny the the medically necessary gender-affirming care and surgeries prescribed by their physicians and counselors to treat and relieve the symptoms of their gender dysphoria.

145.    MH and TPlaintiffs Bs seek declaratory and injunctive relief to enjoin Defendants JeppesenCameron, Hamso, and IDHW from continuing to delaying, discontinuing, or denying Plaintiffs' their medically necessary gender-affirming care and surgeries treatment, and the failureureing to provideaccord them Plaintiffs with an adequate notice and opportunity to be

heard about this delay, discontinuance or denial, ~~in~~is a violation of the United States Constitution and federal law.

146.    The balance of the equities and public interest favor granting injunctive relief because the Medicaid Exclusion and HB 668 facially, by proxy, and as applied discriminates against transgender individuals and the delay, denial and the discontinuance of medically necessary gender-affirming care for transgender individuals diagnosed with gender dysphoria will cause severe irreparable harm.——

147.    MH and~~,~~ ~~and~~ TB~~, and BM~~ also seek compensatory damages against Defendant Hamso to compensate them for the injuries arising from the delay~~ing~~ and denial of~~from being denied~~ medically necessary gender-affirming~~health~~ care and surgery because of~~coverage and~~ their transgender status and ~~being~~ discriminated~~ion~~ ~~against because MH and TB are transgender~~under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. ~~.~~

148.    ~~In addition, MH and TB~~Plaintiffs seek their reasonable attorneys' fees and costs, and such other relief, as the Court deems just and equitable.

## DEFENDANTS

149.    Defendant Adams is the successor to Defendant Jeppesen a~~is~~ ~~the~~IDHW's ~~Former~~ Director ~~of the Idaho Department of Health & Welfare ("IDHW"),~~. ~~the state department~~IDHW is the state department charged with the administration of Idaho's Medicaid program ~~to eligible people~~ under Idaho Code § 56-202(a). Defendant ~~He~~Jeppesen ~~is~~was ~~sued~~named in his official capacity for equitable relief and has been replaced by Defendant Adams, his successor in office.

150.    Defendant Dr. Hamso is an Idaho licensed physician who previously practiced internal medicine and is presently the Medical Director for ~~the~~IDHW's Division of Medicaid.

151.    Dr. Hamso is responsible for approving the surgical procedures which that require prior authorization for individuals enrolled in Idaho's Medicaid program. She has unreasonably delayed and refused MH's, and TB's, and BM's requests to authorize medically necessary genital gender-affirming reconstruction surgery.

18.152.        Dr. Hamso is sued named as a Defendant in her official capacity for equitable relief and in her individual capacity for damages.

153.    Defendant IDHW is an executive department of the government of the State of Idaho created under Idaho. Code. § 56-1002.

19.154.        Defendants' actions or omissions, pursuant to Idaho Medicaid's eExclusion Policy and HB 668, of delaying, terminating, and denying, and discontinuing discontinuing Plaintiffs' medically necessary gender-affirming care, as prescribed by their physicians and counselors to treat and relieve the symptoms of their gender dysphoria, complained of in this Amended Complaint were taken under the color of state law.

## JURISDICTION AND VENUE

20.155. This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

21.156. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–2202, 42 U.S.C. § 1983, and F.R.C.P. 65.

22.157. Venue is proper in this Court and District, under 28 U.S.C. § 1391(b), because Defendants are subject to personal jurisdiction here and because the events and omissions giving rise to this action occurred in this District.

## FACTS
### *Gender Identity and Gender Dysphoria*

23.158.        Every person's sex is multifaceted and comprised of a number of characteristics, including but not limited to chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics (physical characteristics that develop at puberty and are not directly involved in reproduction, such as hair growth patterns, body fat distribution, and muscle mass development), and most importantly, gender identity.

24.159.        Gender identity is a person's internal sense of their sex – i.e, being male or female. It is a basic part of every person's core identity and a well-established concept in medicine. Gender identity is innate, immutable, and has biological underpinnings, such as the sex differentiation of the brain that takes place during prenatal development.

25.160.        Gender identity is the most important determinant of a person's sex.

26.161.        A person's sex is usually assigned at birth based solely on a visual assessment of external genitalia. External genitalia are only one of several sex-related characteristics. For most people, these sex-related characteristics all align, and the visual assessment performed at birth serves as an accurate proxy for their gender identity.

27.162.        Transgender individuals, however, have a gender identity that is different from their assigned sex at birth. A transgender man is a man who was assigned female at birth but has a male gender identity. A transgender woman is a woman who was assigned male at birth but has a female gender identity. When a person's gender identity does not match their sex assigned at birth, gender identity is the critical determinant of that person's sex.gender.

28.163.        Some transgender individuals become aware of having a gender identity that does not match their sex assigned at birth early in childhood. For others, the onset of puberty ,and the resulting physical changes in their bodies, leads them to recognize that their gender identity is not aligned with their assigned sex.

164.   For transgender individuals, the incongruence between their gender identity and assigned sex can result in clinically significant distress known as gender dysphoria. Gender dysphoria is a serious medical condition recognized by the American Psychiatric Association. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451-53 (5th ed. 2013) ("DSM-5").[4]

29.165.   Transgender individuals are the only persons diagnosed with gender dysphoria.

30.166.   In addition to clinically significant distress, untreated gender dysphoria can cause anxiety, depression, and self-harm, or suicidal ideation.

31.167.   Untreated gender dysphoria often intensifies with time. The longer an individual goes without or is denied adequate treatment for gender dysphoria, the greater the risk of severe harm to the individual's health.

32.168.   Gender dysphoria is highly treatable. As with other medical conditions, health care providers follow well-established standards of care to treat patients with gender dysphoria. The World Professional Association for Transgender Health ("WPATH"), and its predecessors, has set those standards for over four decades. *See* WPATH, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th Ver. 2011) ("WPATH Standards of Care 7").

33.169.   WPATH is an international, multidisciplinary, professional association of

---

[4] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder." The DSM-5 removed that diagnosis and replaced it with "Gender Dysphoria," to clarify that being transgender is not itself a disorder, but that the clinically relevant condition is the dysphoria experienced by individuals whose gender identity conflicts with their assigned sex. *See* DSM-5 at 451 (noting that Gender Dysphoria "is more descriptive than the previous DSM-IV term gender identity disorder and focuses on dysphoria as the clinical problem, not identity per se.").

medical providers, mental health providers, researchers, and others, with a mission of promoting

evidence-based health care protocols for transgender people. In September 2022, WPATH

released the eighth edition of the Standards of Care. *See* E. Coleman et al., *Standards of Care for

the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health

S1 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("WPATH

Standards of Care 8").

34.170.    The goal of medical treatment for gender dysphoria is to eliminate

clinically significant distress by helping a transgender person live in alignment with their gender

identity. This treatment is sometimes referred to as "gender transition," "transition-related care,"

or "gender-affirming care."

35.171.    Gender-affirming care can involve counseling, hormone therapy, surgery,

or other services as indicated.

36.172.    As the WPATH Standards of Care recognize, transitioning is the only

effective treatment for gender dysphoria. Transitioning refers to the individualized steps that

many transgender individuals take to live in a manner consistent with their gender identity, rather

than their assigned sex at birth. The health and wellbeing of transgender individuals depends on

their ability to live in a manner consistent with their gender identity.

37.173.    Transitioning is particular to the individual, but typically includes social,

legal, and medical transition.

38.174.    Social transition entails a transgender individual living in accordance with

their gender identity in all aspects of life. For example, social transition can include wearing

attire, following grooming practices, and using pronouns consistent with that individual's gender

identity.

~~39.~~175.        Legal transition involves steps to formally align an individual's legal identity with their gender identity, such as legally changing their name and updating the name and gender marker on their driver's license, birth certificate, or other forms of identification.

~~40.~~176.        Medical transition, a critical part of transitioning for many transgender individuals, includes gender-affirming care that brings the sex-specific characteristics of a transgender individual's body into alignment with their gender. Gender-affirming care can involve mental health services, hormone therapy, surgical care, and/or other medically necessary treatments for gender dysphoria.

~~41.~~177.        Gender dysphoria is often heightened "when physical interventions by means of hormones and/or surgery are not available." DSM-5 at 451.

~~42.~~178.        The WPATH Standards of Care make clear that "[h]ormone therapy to feminize or masculinize the body" and "[s]urgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body econtouring)" are medically necessary services for many transgender individuals with gender dysphoria.[5] WPATH SOC 7 at 8-9, 33-34, 54-55.

~~2.~~        For individuals assigned male at birth, surgery may include augmentation mammoplasty (breast implants), penectomy (removal of the penis), orchiectomy (removal of the testes), vaginoplasty, clitoroplasty, and/or vulvoplasty (creation of female genitalia). *Id.* at 57.

---

[5] Certain transition-related procedures are sometimes referred to as "sex reassignment surgery," or the archaic and disfavored term "sex change surgery," which is now generally considered inaccurate and offensive. Under the contemporary medical and psychological understanding of gender identity, transition-related medical treatments serve to confirm, not "change," an individual's sex by bringing primary and secondary sex characteristics into alignment with the person's gender identity. ~~As such, neither of those terms is used in this Complaint.~~

179.

———For individuals assigned female at birth, surgery may include a mascetecomymastectomy, hysterectomy/ovariectomy, vaginectomy, scrotoplasty, and implantation of erection and/or testicu–lar prostheses. *Id.*;

43.180.

44.181.    The WPATH Standards of Care set forth criteria for providers to use to evaluate whether hormone therapy and/or gender affirming surgery are appropriate and necessary for a given individual.

45.182.    The criteria for gender-affirming genital surgery for individuals assigned male at birth are: 1) persistent, well documented gender dysphoria, 2) capacity to make a fully informed decision and to consent for treatment; 3) age of majority; 4) if significant medical or mental health concerns are present, they must be well controlled; 5) twelve continuous months of hormone therapy as appropriate to the person's gender goals; and 6) twelve continuous months of living in a gender role that is congruent with the individual's gender identity. WPATH SOC 7 at 59-61.

46.183.    Individuals need a referral from two mental health providers demonstrating that the criteria are met. In addition, it is recommended that the individual have regular visits with a mental health or other medical professional. *Id.* at 60-61. WPATH SOC 8 relaxes some of the criteria compared to WPATH SOC 7. For example, SOC 8 recommends only 6 months of continuous hormone therapy as opposed to twelve months as a prerequisite to genital surgery. *See* WPATH SOC 8 at S129.

47.184.  Decades of research and clinical practice has shown that gender-affirming

medical care, including surgery, can be lifesaving treatment and has a positive impact on the short- and long-term health outcomes for transgender people.

48.185.   The broader medical community agrees that, for many transgender individuals, surgical interventions are safe, effective, and medically necessary treatments for gender dysphoria.

49.186.        The American Medical Association, the Endocrine Society, the American Psychiatric Association, the American Psychological Association, the American College of Obstetrics and Gynecology, the American Academy of Family Physicians, and other major professional medical organizations recognize that gender gender-affirming surgeries are safe and effective treatments for gender dysphoria, and that access to such treatments improves the health and well-being of transgender individuals. Each of these groups has has issued statements in support of the WPATH Standards of Care. And, each of these groups has publicly opposed prohibitions on insurance coverage for transition-related health care.

### *Federal Medicaid Requirements Medicaid*

50.187.        Established in 1965 under Title XIX of the Social Security Act, Medicaid is a cooperative federal and state program designed to enable states to assist needy individuals "whose incomes and resources are insufficient to meet the cost of necessary medical services." *See* Medicaid Act, 42 U.S.C. § 1396-1. Title XIX is known as the Medicaid Act.

51.188.        States participating in Medicaid must comply with the requirements imposed by Title XIX of the Social Security Act, *see* 42 U.S.C. §§ 1396 to 1396w-6, and the implementing regulations promulgated by the United States Department of Health and Human Services ("HHS"), *see* 42 C.F.R. pts. 430 to 456.

~~52.~~189.        States are not required to participate in the Medicaid program, but all states do.

~~53.~~190.        The Medicaid Act requires each participating state to establish or designate a single state agency that is responsible for administering or supervising the administration of the state's Medicaid program. 42 U.S.C. § 1396a(a)(5).

~~54.~~191.        In addition, each participating state must maintain a comprehensive plan for medical assistance approved by the United States Secretary of Health and Human Services. *Id.* § 1396a. The plan must describe the state's program and affirm its commitment to comply with the Medicaid Act and its implementing regulations.

~~55.~~192.        The federal government reimburses participating states for a substantial portion of the cost of providing medical assistance.

~~56.~~193.        The Medicaid Act requires that participating states cover certain health care services, including inpatient and outpatient hospital services and physician services, when medically necessary. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d. In addition, the statute gives states ~~the option to provide other services, including prescription drugs, when medically necessary. *Id.*~~

~~57.~~194.        Under the Medicaid Act, "the medical assistance made available to any individual ... shall not be less in amount, duration or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i).

~~58.~~195.        In addition, a state "Medicaid agency may not arbitrarily deny or reduce the amount or scope of a required service ... to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).

196.        States must ensure that "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b).

59.197.        Moreover, A state's Medicaid programs must provide medical assistance "in a manner consistent . . . with the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

60.198.        The Medicaid Act mandates that states "grant an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." *Id.* § 1396a(a)(3).

199.    Federal regulations construing the requirements of section 1396a(a)(3) define the process that is due to Medicaid beneficiaries. *See* 42 C.F.R. §§ 431.200 to 431.246.

200.    The Medicaid regulations specifically require states to meet the due process standards set forth in *Goldberg v. Kelly,* 397 U.S. 254 (1970). *See* 42 C.F.R. § 431.205(d).

61.201.        They Medicaid regulations also explicitly require states to comply with the United States Constitution and Section 1557 of the Affordable Care Act and implementing regulations. *See id.* § 431.205(f).

62.202.        Medicaid beneficiaries are entitled to notice and an opportunity for a fair hearing whenever the state takes any action, including when the state denies a claim or request for authorization for services or benefits or does not act upon the claim "with reasonable promptness." 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.206(b), (c), 431.220(a)(1).

203.    States must provide Medicaid beneficiaries with timely and adequate written notice of their hearing rights. *Goldberg*, 397 U.S. at 267-268; 42 C.F.R. §§ 431.206(b)(c).

204.    The notice must describe what action the state intends to take and the effective date of the action, the specific reasons supporting the action, and "[t]he specific regulations that support, or the change in Federal or State law that requires, the action." *Id.* § 431.210(a)-(c).

63.205.        The notice must also explain that the individual has a right to a fair hearing, how to obtain a hearing, that the individual is entitled to represent themselves or use

legal counsel or other spokesperson, and the time frames in which the agency must take final

administrative action, in accordance with 431. 244(f). *Id.* §§ 431.210(d), 431.206(b), (c)(2).

64.206.    If an individual does request a hearing, they must be given an opportunity

to: "examine at a reasonable time before the hearing and during the hearing" the content of their

case file and electronic account and all documents and records to be used at the hearing, 42

C.F.R. § 431.424(a); "[e]stablish all pertinent facts and circumstances," *id.* § 431.242(c);

"[p]resent argument without undue interference," *id.* § 431.424(d); and "[q]uestion or refute any

testimony or evidence, including opportunity to confront and cross-examine adverse witnesses,"

*id.* § 431.242(e).

65.207. The hearing decision "must be based exclusively on evidence introduced at the

hearing." *Id.* § 431.244(a).

66.208. The hearing decision must be in writing, and it must summarize the facts and

identify the regulations supporting the decision. *Id.* § 431.244(d)(1)-(2).

209.    The state Medicaid agency must ordinarily issue a final decision within 90 days

of the fair hearing request, except in unusual circumstances. *Id.* § 431.244(f).

210.    Unusual circumstances exist when the beneficiary asks for a delay or fails to

take a required action, or when there is an administrative or other emergency that the agency

cannot control. *Id.* § 431.244(f)(4)(i).

67.211. The agency must document the reasons for any delay in the beneficiary's record.

*Id.* § 431.244(f)(4)(ii).

### *Idaho Medicaid Requirements*

68.212. The State of Idaho participates in the federal Medicaid program.

69.213. The IDHW is the designated single state department that administers Idaho

Medicaid in its Division of Medicaid.

70.214. The federal government reimburses Idaho for approximately 70% of the cost of providing medical assistance through its Medicaid program. *See* 86 Fed. Reg.67479, 67,481 (Nov. 26, 2021).

71.215. The Idaho Medicaid program is authorized by Idaho's medical assistance statute, Idaho Code § 56-209b(1), which requires that "[m]edical assistance shall be awarded to persons as mandated by federal law" and IDHW's implementing regulations, IDAPA 16.03.09 – Medicaid Basic Plan Benefits.

72.216. Idaho's medical assistance statute does not explicitly address, let alone exclude, reimbursement or coverage for gender-affirming care or surgery.

73.217. Under the statute, Idaho does not cover physician, hospital, or other services deemed experimental. *See* Idaho Code § 56-209d(6).

74.218. In addition, Idaho does not cover "cosmetic surgery, excluding reconstructive surgery that has prior approval by the Department." IDAPA 16.03.09.390.02.b.

75.219. Department of Health and WelfareFormer Director Jeppesen was quoted in an article, dated July 22, 2022, as stating in an email that IDHW "has not approved surgical procedures for diagnoses of gender dysphoria." He was also quoted as stating: "The department also continues to have no policy related to authorizing surgeries or hormone therapies for gender dysphoria and there are no current plans to implement one."." https://idahofreedom.org/idaho-medicaid-should-expressly-ban-sex-change-treatments/

76.220. Prior to the passage of HHB 668, FFormer Director Jeppesen and Defendants Adams, Jeppesen, Hamso, and IDHW have had an unwritten, unstated policy that genital surgery for the treatment of gender dysphoria is cosmetic, and as a result, not medically

necessary. That determination conflicts with the medical consensus that gender-affirming

surgery is medically necessary, reconstructive surgery.

~~77.~~221.        ~~On information and belief,~~ Idaho Medicaid ~~does~~ covers and reimburses the

same or similar care and ~~genital reconstruction surger~~surgical proceduresy with prior approval

when it is medically necessary to treat health conditions of cisgender individuals other than

transgender individuals with gender dysphoria.  *See, e.g.*, IDAPA 16.03.09.422.

~~78.~~222.        On information and belief, transgender Idaho Medicaid recipients other

than ~~MH and TB~~Plaintiffs have been denied or deterred from seeking prior authorization for

surgery to treat gender dysphoria because of their knowledge or the knowledge of their medical

providers that authorization would be denied on the basis that such ~~treatment~~ gender-affirming

care and surgery isare considered cosmetic and not medically necessary ~~by Defendants Jeppesen,~~

~~Hamso, and IDHW~~.

~~79.~~223.        On information and belief, IDHW denied requests for authorization from

doctors ~~have been denied authorization~~ for medically necessary gender-affirming care and

surgical procedures, forcing doctors to ~~and have~~ discontinue providing d~~treatment~~ for gender

dysphoria, as a result ~~of Defendants Jeppesen's, Hamso's, and IDHW's actions,~~ causing Idaho

Medicaid beneficiaries to suffer physical harm and mental health distress.

### Idaho Medicaid's Notice and Fair Hearing Appeals Process

~~80.~~224. IDHW ~~has~~ designated the Fair Hearing Unit within the Idaho Attorney General's

Office to conduct administrative fair hearings and issues "Preliminary Decisions" in appeals

from Medicaid decisions.

~~81.~~225. IDHW has promulgated state regulations, Contested Case Proceedings, IDAPA

16.05.03, incorporated by reference, to govern the due process procedures used in Idaho

Medicaid administrative fair hearings.

82.226. The IDHW Contested Case Rules limit the authority of the ~~Hearing~~ hearing

~~Officer~~ officer to "consider only information that was available to the Department at the time the

decision was made." IDAPA 16.05.03.131.

83.227. The hearing officer can remand the case to the Department only if the "appellant"

shows "good cause" for not presenting additional relevant information that was not presented to

the Department. IDAPA 16.05.03.131.

84.228. If an appeal is remanded to ~~the~~ IDHW, the hearing officer does not retain

jurisdiction. IDAPA 16.05.03.131.

85.229. The hearing officer must issue a Preliminary Order not later than ~~thirty (30)~~ days

after the case is submitted for decision. IDAPA 16.05.03.138.

86.230. Either party may file a request for review of the Preliminary Decision by the

Director of IDHW not later than fourteen ~~(14)~~ days from the date the Preliminary Decision was

mailed. IDAPA 16.05.03.150.

### *Idaho Medicaid Fails to Issue a Final Decision in Response to Plaintiff MH's Requests for Gender-Affirming Care and Surgery*

4.   ~~MH is a 21-year-old transgender woman. She has lived in Idaho her entire life.~~

5.   ~~When MH was 11 years old, she started to feel deep psychological distress associated with the physical changes that were happening in her body. At the time, she did not have the words to express what she was experiencing.~~

6.   ~~She developed anxiety and depression and engaged in self-harm behaviors, including cutting herself with sharp objects. MH often fantasized about castrating herself.~~

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY
JUDGMENT, AND DAMAGES **REDACTED** – Page 43

7.      ~~MH became aware that she was transgender at age 16. She was afraid to disclose her gender identify to her family, who would not be accepting of her transgender status. As a result, MH went without any medical treatment for her gender dysphoria. Her parents objected to MH receiving counseling to address her psychological distress and the feelings she was experiencing.~~

8.      ~~After she realized that she was transgender, MH began telling a few close school friends about her gender identity and desire to transition.~~

9.      ~~At age 17, MH left her family home. She went to live with a friend's family who she grew up with, the "H" family.~~

10.      ~~Mr. and Mrs. H filed for guardianship of MH. During the guardianship proceeding, MH was required to live with her grandparents rather than with her parents. The guardianship proceeding was not finalized before MH turned 18 and was dismissed.~~

11.      ~~In connection with the guardianship proceeding, in early 2019 a psychologist assessed MH, diagnosing her with gender dysphoria.~~

12.      ~~After turning 18, MH returned to live with the H family, who were supportive of her gender identity.~~

13.      ~~By that time, MH was consistently using a feminine name and female pronouns and living as a woman in all aspects of her life.~~

14.      ~~MH applied for and was found eligible to receive Idaho Medicaid. In June 2019, MH was finally able to access treatment for her gender dysphoria, as well as for other conditions. She started receiving primary care and mental health services from providers at Acacia Wellness~~

Center.[6] Her primary care provider, Deo Peppersack, DNP, PMHNP-BC, FNP, independently diagnosed MH with gender dysphoria.

15.     Ms. Peppersack, determined that MH would benefit from hormone therapy to further her gender transition and treat her gender dysphoria. In August 2019, Ms. Peppersack began prescribing hormone therapy for MH. Hormone therapy reduced MH's gender dysphoria and improved her quality of life. MH has remained on hormone therapy since August 2019.

16.     MH started to receive counseling services at Acacia Wellness Center. She saw several providers there, including Robert Hadley, LCSW, through May 2020. At that time, she also started to see Cynthia Mauzerall, LCPC.

17.     In early 2020, MH amended her birth certificate to reflect her female sex. In June 2020, MH was able to legally change her masculine first name to a feminine first name and adopt the last name of the family who cared for her.

18.     Hormone therapy and gender affirming counseling improved but did not completely eliminate MH's gender dysphoria. She continued to experience significant distress related to her genitalia.

19.     In August 2020, MH consulted with Norelle Kaylee Walzer, PA, a Physician Assistant with the University of Utah Transgender Health Program's Gender Affirmation Team about receiving gender affirming surgery, specifically a penectomy, orchiectomy, and vulvoplasty. Sealed Exhibit 1, pp. 11–14.

---

[6] This unredacted Amended Complaint is being filed contemporaneously with a redacted Amended Complaint with the Motion to Seal. Rredactions are indicated by highlighting. In addition, all exhibits to the unredacted Complaint have been redacted and are not included with the unredacted Amended Complaint but continue to applicable to the Amended Complaint. filed as Document No. 1 in this action. All exhibits from the unredacted Complaint are included in the unredacted Amended Complaint continue to be are therefore referred to as "Sealed Exhibit X."

20. The PA concluded that MH was ready for the surgery because she had undergone appropriate counseling and preparation, was informed of the risks, benefits, and alternatives to surgery, and could make a fully informed decision consenting to the surgery and treatment. *Id.*, p. 13.

21. The PA found MH had been living in her gender role for one year and had continuously been on hormone therapy during this time. *Id.*

22. The PA reviewed the WPATH criteria for vulvoplasty with MH and found MH met those criteria. *Id.*

23. In accordance with the WPATH Standards of Care, the PA indicated that MH would need to submit two letters of support from her treating providers before she could proceed with surgery. *Id.*

24. MH gathered letters of support from Ms. Peppersack, Mr. Hadley, Ms. Mauzerall, and Dr. Tara Whitaker, who is board certified in family medicine and who has special training in LGBTQIA+ health care and gender-affirming care for adults. *Id.*, pp. 16-19. Dr. Whitaker started managing MH's hormone therapy in October 2020. *Id.*, p. 17. The letters indicate that MH's providers were in agreement that gender-affirming surgery was appropriate and medically necessary treatment for MH. *Id.*, pp. 16-19.

25. Dr. Whitaker has had multiple patients who have suffered significant and consistent psychological and physical harm after being denied appropriate and medically necessary gender-affirming surgery by Idaho Medicaid. Sealed Exhibit 2.

On March 10, 2021, Dr. Kathryn Nelson, a surgeon with the University of Utah, submitted a prior authorization request to IDHW on behalf of MH, seeking coverage for a

~~penectomy, orchiectomy, and vulvoplasty. Dr. Nelson attached the PA's August 2020~~

~~assessment and the four letters of support to the request. Sealed Exhibit 1, pp. 8-14.[7]~~

~~MH's health care providers determined it was medically necessary that she~~

~~receive genital reconstruction surgery to treat her gender dysphoria.~~

~~26.~~ MH applied to Medicaid for prior authorization of ~~the~~ gender-affirming surgery. MH was denied authorization for failure to complete twelve (12) months of hormone therapy. Sealed Exhibit 1, pp. 30-32.

~~8.     MH timely appealed the denial and requested a fair hearing.~~

231.

~~27.~~232.     On March 26, 2021, MH received notice that Defendant Hamso~~, the~~ ~~Medical Director of the Division of Medicaid, had~~ denied her request for prior authorization due to lack of medical necessity. ~~-~~*Id.*, pp. 30-32.

~~28.~~233.     The notice stated Defendant Hamso determined "The World Professional Association for Transgender Health's recommendation is a 12-month continuation of hormones before proceeding with surgery. May resubmit once the participant has completed 12 months of hormone therapy.ss [Susan Scheuerer]" *Id.*, p. 31.

~~29.~~234.     The notice did not explain the timeframes in which the agency must take final administrative action as required in 42 CFR § 431.206(b). *Id.*, p. 32.

~~30.~~235.     MH timely filed a request for a fair hearing with the IDHW to appeal the denial of prior authorization. *Id.*, pp. 28-29.

---

~~[7] In the March 10, 2021, request, MH is referred to by her birth name, "MB." MH legally changed her name pursuant to a Judgment that was entered on June 17, 2020.~~

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 47

~~31.1.   In May 2021, MH received an orchiectomy at~~ ████████████
~~that was covered by Idaho Medicaid. In seeking prior authorization for the procedure, the~~
~~surgeon noted that it was indicated to treat testicular pain, as well as gender dysphoria.~~

~~32.1.   The orchiectomy reduced the amount of hormone therapy MH needed —~~
~~specifically, she no longer has to take a testosterone blocker — but it did not obviate her need for~~
~~a penectomy and vulvoplasty to treat her ongoing symptoms of gender dysphoria.~~

~~33.~~236.        On June 3, 2021, a Hearing Officer~~hearing officer~~ with the Fair Hearings

Unit of the Idaho Attorney General's Office held a telephonic hearing lasting 20 minutes and 30

seconds. Sealed Exhibit 3 (transcript of hearing).

~~34.~~237.        Susan Scheuerer, the Nurse Reviewer for the Division of Medicaid,

testified during the fair hearing. *Id.*, pp. 5-13.

~~35.~~238.        While Defendant Hamso was on the witness list, she did not appear at the

hearing. Sealed Exhibit 1, p.1.

~~36.~~239.        Ms. Scheuerer first testified that Defendant Hamso denied prior

authorization because it was unclear whether MH had completed twelve (12) months of hormone

therapy as required by the WPATH Standards of Care. Sealed Exhibit 3, p. 9, ll. 19-25.

240.   MH explained during the hearing that the records submitted by MH indicated she

had completed twelve (12) months of hormone therapy which was the only reason stated in the

notice for the denial of the prior authorization for the surgery. *Id.*, p. 10, l. 17 – p. 11, l. 14.

~~37.~~241.        The Hearing Officer asked Ms. Scheuerer what was missing from the

documentation that would lead to IDHW approving the request. *Id.*, p. 12, ll. 3-9 and 14-16.

~~38.~~242.        Ms. Scheuerer indicated for the first time that even if it was true that MH

had completed twelve (12) months of hormone therapy, the agency still would have denied the prior authorization request because Idaho Medicaid's policy considers the requested surgical procedure for transgender individuals to be "cosmetic." *Id.*, p. 12, l. 17 – p. 13, l. 1.

39.243.    Ms. Scheuerer testified that "cosmetic" surgery was to improve a person's "appearance or self-esteem" similar to a request to change a body part, such as, the removal of a facial scar due to an injury, if a woman with a flat chest requested breast implants, or a request for a breast reduction for large breasts and is considered a non-covered cosmetic procedure that was not medically necessary. *Id.*, p. 8, ll. 16-24.

40.244.    MH testified and presented exhibits from her treating medical and mental health providers documenting her gender dysphoria diagnosis, that she had completed the twelve (12) months of hormone therapy, and that the requested surgery was medically necessary to treat her gender dysphoria. *Id.*, pp 10-11.

245.    Prior to the hearing, MH did not receive notice that the Division of Medicaid denied her prior authorization request because it had a policy that gender-affirming surgery needed to treat gender dysphoria was a medically unnecessary "cosmetic" procedure pursuant to Idaho's Medicaid's policy and regulations.

41.246.    The denial notice The only reason stated in the notice sent to MH only stated was that the surgery was denied because she had not completed twelve (12) months of continuous hormone therapy. As a result, MH was not able to bring witnesses or submit evidence rebutting Defendants Hamso's and the IDHW's determination that the procedure was "cosmetic" and not medically necessary at the hearing. *Id.*, p. 13.

42.247.    While MH testified that extensive peer-reviewed research show that

gender- affirming surgery is appropriate treatment for gender dysphoria, MH stated that she

"didn't bring peer-reviewed articles in because I didn't think I would need to defend the validity

of a surgery that has been accepted by the majority of urologists for multiple decades." *Id.*

43.248.        On July 2, 2021, the Hearing Officer issued a Preliminary Order to

Remand. Sealed Exhibit 4.

44.249.        The Hearing Officer found the documentation from MH's medical and

mental health providers established that MH had completed twelve (12) continuous months of

hormone therapy. *Id.*, pp. 2-3, 5-6.

45.250.The Hearing Officer found "Appellant [MH] referenced peer review research

supporting the idea that gender affirmation surgery is medically necessary and not just

cosmetic." *Id.*, p. 6.

46.251.The Hearing Officer decided that MH should have another opportunity to provide

"clearer documentation showing 12 continuous months of hormone therapy" however, "the

hearing officer does not see how Department interpreted the documentation to mean anything

else—and the Department's representative could not describe what documentation was missing

or what would be needed to show that requirement was met." *Id.*. p. 7.

47.252.The Hearing Officer concluded the Notice of Denial letter did not provide notice

of any additional basis or rule for the denial except the surgery was not medically necessary

because MH had not completed twelve (12) months of continuous hormone therapy. *Id.*, p. 5.

48.253.The Hearing Officer concluded the "Department somewhat abused its discretion

in this case with its emphasis on Appellant's failure to show 12 continuous months of hormone

therapy when—according to the Department's testimony—even if Appellant showed 12

continuous months of hormone therapy, the surgery request would still have been denied because the Department considered the procedure cosmetic." *Id.*, p. 6.

49.254. The Hearing Officer remanded the appeal, per IDAPA 16.05.03131, to the "Department for consideration if Appellant shows that there is additional relevant information that was not presented to the Department with good cause." *Id.*

50.255.        Defendants Jeppesen, Hamso, and IDHW use Telligen to review services requested for Idaho Medicaid members. Services are reviewed for medical necessity based on the member's medical needs. https://idmedicaid.telligen.com/wp-content/uploads/2021/11/2021-Provider-Manual_FINAL.pdf.

51.256.        On July 28, 2021, ████████ of the ████████ sent Telligen a Pre-service Review Request Form, again attaching the PA's August 2020 assessment and the four letters of support. Sealed Exhibit 5.

52.257.        Since July of 2021, MH has repeatedly contacted IDHW to request an update on the status of her prior authorization request, but she has never been informed if her request had been approved or denied. At the direction of Dr. Hamso, IDHW staff repeatedly told MH they were still reviewing her request and had not yet made a decision.

53.258.        On October 22, 2021, Elizabeth Kriete of IDHW sent an email to Former Director Jeppesen, among others, stating that she had spoken with MH and told her that the decision was still pending. Sealed Exhibit 6. She also said that MH had requested the Director's phone number. *Id.*

54.259.        On October 22, 2021, Former Director Jeppesen replied in an email in which he said: "I do not think that I can speak with [MH] since this is in the appeal process and

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 51

that appeal could come to me for a decision depending on how the process goes. When there is an active appeal going on, it is not appropriate for me to talk with the appellant." Sealed Exhibit 7.

55.260.       On November 2, 2021, at 03:16 PM, an electronic note was entered into MH's Medicaid file stating "Review is currently pending per the request of IDHW. The Department is currently determining if this is a covered benefit. All calls pertaining to this case can be referred to Dr. Hamso, Medical Director at DHSW." Sealed Exhibit 8.

56.261.       On November 25, 2021, MH requested a new hearing on Defendants' Jeppesen's, Hamso's, and IDHW's failure to make a decision on her request with reasonable promptness. Sealed Exhibit 9.

262.       On December 22, 2021, Dr. Hamso wrote an email to Chelsea Kidney and Kimberliy Stretch in which she described a phone call with MH. Sealed Exhibit 10.

263.       Dr. Hamso said MH expressed that Medicaid still had not made a decision on her request and that she had called everybody she could but was not given an answer as to the status. *Id.*

57.264.       Dr. Hamso wrote: "I said that it is still pending. That she does have Medicaid, but this PA request is pending." *Id.* Dr. Hamso continued: "[MH] was clearly in tears and said I need you to find it and move it from pending to approved. I said that it was still pending and that the Department is determining if this is part of Medicaid benefits." *Id.*

58.265.       At the direction of Dr. Hamso, IDHW refused to provide a hearing, claiming that because her request was under review she was not entitled to a hearing. Sealed Exhibit 11 (letter from Libby Hobbs to MH dated December 23, 2021).

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 52

59.266.	On February 18, 2022, Telligen notified ███████████ of its

Notice of Decision for each of the 13 procedure codes included in the prior authorization request.

Sealed Exhibit 12.

60.267.	Telligen made the Determination: "**Outcome Not Rendered**" and gave a

"Rationale: Per direction from IDHW, this case was sent to the department for review." *Id.*

61.268.	On May 6, 2022, Defendant Hamso wrote a "Request for Information" to

MH's surgeons at ███████████ stating: "Medicaid has determined that a

medical necessity decision cannot be made at this time because we do not have the necessary

medical information." Sealed Exhibit 13.

269.	Defendants ~~Jeppesen, Hamso, and IDHW~~ have not notified MH of the final

decision on her request for coverage of medically necessary surgery to alleviate her ongoing

symptoms of gender dysphoria after remand from the fair hearing appeal almost two ~~more than~~

~~one~~ years ago.

270.	Defendants have unreasonably delayed and refused to take action on her request

for authorization and coverage of genital reconstruction surgery.

62.271.	Defendants refused to provide a hearing or allow her to appeal the denial

and delay, despite the clear requirement in the Medicaid Act to make a final decision within

ninety (90) days after the filing of an appeal.

63.272.	Defendant Hamso's denial of necessary medical treatments to MH has

caused significant emotional distress, including, but not limited to, heightened symptoms of

gender dysphoria, depression, and anxiety, resulting from her~~their~~ inability to obtain medically

necessary care.

64.273.      MH has also suffered from her inability to obtain necessary gender-affirming surgical procedures as a result of Defendants' failure to authorize medically necessary surgery to alleviate their ongoing symptoms of gender dysphoria.

274.   As a direct and proximate result of Defendants' denial of medically necessary gender-affirming care, MH's symptoms of gender dysphoria and related distress have not abated.

65.275.      Defendants' have refused to provide MH with a final decision following the Hhearing Oofficer's remand or a hearing after remand to challenge the denial of medically necessary genital reconstruction surgery.

*Idaho Medicaid Fails to Deny or Authorize*
***Plaintiff TB's Request for Gender-Affirming Care and Surgery***

87.   Plaintiff TB is an 18 year-18-year-old transgender female. TB lives with her family in Idaho.

88.   TB has identified as a female as long as she can remember. As a child, she strongly preferred female attire and the toys, games, and activities stereotypical of the female gender, and she strongly rejected typically masculine toys, games, and activities. She has always had a strong dislike for her sexual anatomy and a strong desire for feminine sex characteristics that match her gender identity.

89.   When TB was eleven and twelve years old she had to be admitted to two mental health facilities after she attempted to take her life ███████████████ due to not wanting to live in the world where she could not be true herself. Sealed Exhibit 18 (January 6, 2022, letter from ████████ p. 3; Sealed Exhibit 20, p. 5. She is currently receiving counseling and medication for her ███████.

90.   TB has lived fully as a female since 2015, including attending school.

91.    In 2016, TB legally changed her masculine first name to a feminine first name.

92.    TB was diagnosed with gender dysphoria in the spring of 2016 by ███████ her ████████████. Sealed Exhibit 14.

93.    From 2016 to 2020, TB was treated for gender dysphoria by her health care providers, first in Texas and later, in Colorado.

94.    TB began taking a puberty blocker to treat her gender dysphoria in the summer of 2016. The puberty blocker was prescribed by ████████████████████████ in ███████████ealed Exhibit 15, p. 1.

95.    In 2017-18, TB completed psychotherapy as part of her treatment for gender dysphoria and in preparation for beginning hormone therapy. ███████████ TB's ████████████████ found that she met the criteria for gender dysphoria, and that her decision to transition resulted in a significant reduction of her personal distress surrounding her gender identity. Sealed Exhibit 16.

96.    In early 2018, ███████found that TB met the eligibility and readiness criteria in the official WPATH Standards of Care for treatment of gender dysphoria, and that she was a qualified candidate for hormone therapy. *Id.* TB's ██████████████ ████████agreed. Sealed Exhibit 17. TB started hormone therapy at that time. *Id.*

97.276.      In early May of 2022, having reached the age of 18, TB consulted with her health care providers concerning gender-affirming surgery, including physicians from the ████████████████████████

66.277.      TB's medical care providers at the ████████████████████ submitted a request for prior authorization for gender affirming

surgeries to IDHW, stating that the requested procedures were a matter of medical necessity to treat TB's gender dysphoria.

~~98.~~278.    TB received a "Notice of Decision" from Telligen for each of the requested surgical procedures. ~~T. t~~he determination reached by Telligen was the same: "Outcome Not Rendered." In the "rationale" section of the Notice~~, again~~ for each requested service, is the following language: "The request was forwarded to the medical care unit for review. For any further questions pertaining to this request please contact the medical care unit via email at medicalcareunit@dhw.idaho.gov." Sealed Exhibit 19.

~~99.~~279.    On May 31, 2022, TB sent an email to the IDIIW Medical Care Unit in which she wrote: "I do not understand what 'outcome not rendered' means. Does it mean that my case is still being reviewed or does it mean that my surgery is not covered?" Sealed Exhibit 20, p. 1.

~~100.~~280.    On June 1, 2022, TB sent an email to the IDHW Medical Care Unit in which she wrote: "I have some questions about my case. I see its output [sic] not rendered. I called the number given to me and was told that everything was sent to your medical care unit. Can you give me an idea of how long it takes to review my case?" *Id.*

~~101.~~281.    On June 2, 2022, TB received an email from the IDHW Medical Care Unit that stated: "The Medical Care Unit has received your request and it is currently pending review by the Medical Director." *Id*, p. 2.

~~102.~~282.    On June 2, 2022, TB replied to the IDHW Medical Care Unit: "The doctors and surgeon can write a medical necessity letter. We see him June 6th. And he will write a medical necessity letter and also send in clinic notes if needed." *Id.*

~~103.~~283.         On June 3, 2022, TB received an email from the IDHW Medical Care Unit that stated: "The Medical Care Unit has received your request and it is currently pending review by the Medical Director." *Id.*, p. 3.

~~104.~~284.         On June 7, 2022, TB wrote an email to the IDHW Medical Care Unit that said: "Thank you. I just wanted to add that my surgeon wrote a letter of medical necessity for me. She said she would make sure your department received it." *Id.*

~~105.~~285.         TB's physicians from the surgical team with ███████████████ █████████████████ submitted a letter dated June 9, 2022, to IDHW requesting prior authorization for the surgery based upon medical necessity. The physicians wrote: "Our surgical team a█████████████████ and four independent mental health professionals have thoroughly assessed this patient using the WPATH Standards of Care and have determined ██████████ be a medically necessary procedure for [TB]. In our assessment, delay or denial of this medically necessary procedure would harm the health of this patient and put her well-being at risk." (Footnotes omitted.) Sealed Exhibit 21.

~~106.~~286.         The June 9, 2022, request for prior authorization for TB's gender-affirming surgery was supported by letters from TB's psychiatrist in Idaho (Sealed Exhibit 22), TB's child psychiatrist from Colorado (Sealed Exhibit 16), her licensed clinical social worker in Idaho (Sealed Exhibit 18), and her psychologist in Idaho (Sealed Exhibit 23).

~~107.~~287.         On June 13, 2022, TB wrote another email to the IDHW Medical Care Unit informing them that her surgeon had sent the letter of medical necessity last week. Sealed Exhibit 20, p. 3.

~~108.~~288.         On June 21, 2022, TB's parents wrote an email to the IDHW Medical

Care Unit in which they informed IDHW that the requested surgery was a matter of life or death for TB. They also described the medical documentation that had been provided supporting the request for authorization and some of the prior medical treatment received by TB for her gender dysphoria. TB's parents closed the email as follows: "If there is anything more we can do on our part please tell us. Please help us. We have been waiting and we appreciate the time and effort you have given thus far." *Id.*, p. 4.

~~109.~~289.       On June 22, 2022, TB wrote an email to the IDHW Medical Care Unit in which she described her history of dealing with gender dysphoria, the medical treatment she had received, and how her family supported her. *Id.*, p. 5.

~~110.~~290.       On June 23, 2022, TB received an email from the IDHW Medical Care Unit that stated: "The Medical Care Unit has received your request and it is currently pending review by the Medical Director." *Id.*, p. 6.

~~111.~~291.       On July 6, 2022, TB wrote an email to the IDHW Medical Care Unit in which she said: "I was hoping to hear back about my claim this week. It has taken a long time and I am wondering if I could get a time frame." *Id.*

~~112.~~292.       On July 13, 2022, TB received an email from the IDHW Medical Care Unit that stated: "This is still under review." *Id.*

~~113.~~293.       On July 22, 2022, TB wrote an email to the IDHW Medical Care Unit in which she provided a quote stating that discrimination against transgender persons was prohibited, meaning that health care plans cannot exclude transition related care. *Id.*, p. 7.

~~114.~~294.       TB has not received any response to the July 22, 2022, email or any other electronic or written correspondence from Former Defendant~~s~~ Jeppesen, or Defendants Hamso,

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 58

and IDHW after the July 13, 2022, email described above.

~~115.~~295.    TB and her family members have made numerous phone calls to IDHW inquiring about the status of TB's request. The only statement made to them by IDHW representatives is that TB's request is under review.

296.    Despite the uncontroverted evidence of supporting the medical necessity for the request prior authorization of gender affirming surgery, and after multiple inquiries from TB and her family members, former ~~Defendants~~ Director Jeppesen ~~and Defendants,~~ Hamso~~,~~ and IDHW did ~~have~~ not notif~~ied~~y TB of its decision on the request for prior authorization.

297.    Idaho Medicaid has failed or refused to either authorize the treatment or deny it, depriving TB of both the medically necessary treatment and notice and a meaningful opportunity to appeal the delay and denial.

~~116.   SG does not have the financial resources to pay for the gender-affirming care or to obtain private health insurance to cover her medically necessary care.~~

**FIRST CLAIM FOR RELIEF**
**Defendants Unlawfully Discriminat~~eion~~ on the Basis of Sex in Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116**

~~117.~~298.    Plaintiffs reallege and incorporate by reference all paragraphs of this Amended Complaint.

~~118.~~299.    Under Section 1557 of the Affordable Care Act, "an individual shall not ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title" on the basis of sex. 42 U.S.C. § 18116.

119.300.      Idaho Medicaid is a health program or activity receiving federal financial assistance under Section 1557 of the Affordable Care Act.

120.301.      Section 1557's prohibitions on sex discrimination are enforceable by ~~MH and TB~~Plaintiffs in a judicial action under 20 U.S.C. § 1683, which Section 1557 incorporates by reference. 42 U.S.C. § 18116(a).

302.      Defendants' Medicaid Exclusion Policy ~~Defendants 'Jeppesen's, Hamso's, and IDHW's Medicaid's continuing~~Eexclusionary pPolicy of refusing to authorize coverage and reimbursement~~payment~~ of medically necessary ~~genital reconstruction and~~ gender-affirming care and surgery for the treatment of gender dysphoria~~, as applied to MH and TB~~Plaintiffs, violates Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving federal financial assistance.

303.      HB 668's prohibition against the use of ~~p~~Public ~~f~~Funds for medical procedures if provided for the purpose of attempting to alter the appearance of or to affirm a transgender individual's perception of their sex if that perception is inconsistent with the transgender individual's biological sex which was assigned at birth violates Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving federal financial assistance.

304.      HB 668's~~ prohibitions against the use of Idaho Medicaid's for any type of gender-affirming care and surgeries ans~~ d ~~directing~~prohibit~~ing~~ition against Idaho Medicaid ~~not to~~from reimburs~~e~~ing or providing~~e~~ coverage for ~~all~~ gender-affirming care and surgeries, prohibiting physicians employed by tax-payer funded entities from providing gender-affirming care in the course and scope of their government service, prohibiting any amount paid by any entity, organization, or individual to provide gender-affirming care from being tax-deductible, and

prohibiting the use of any government land, facilities and building to provide gender-affirming care violates Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving federal financial assistance.

## SECOND CLAIM FOR RELIEF
### HB 668 ~~Violation~~ Violates ~~of~~ the Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A) and 42 U.S.C. § 1396a(a)(19)

~~121.~~305.  Plaintiffs reallege and incorporate by reference all paragraphs of this Amended Complaint.

306.  Defendants' Medicaid Exclusion Policy ~~Jeppesen's, Hamso's, and IDHW's~~ ~~eExclusionarycontinuing Ppolicy,~~ of delaying, denying, and discontinuing~~refusing to authorize~~ medically necessary ~~genital reconstruction and~~ gender-affirming care and surgery for transgender individuals diagnosed with~~the treatment of~~ gender dysphoria ~~, as applied to MH and TB,~~ eliminat~~esinges~~ mandatory Medicaid coverage of medically necessary services~~, in~~ violat~~esion of~~ Medicaid's availability requirement~~,~~. 42 U.S.C. § 1396a(a)(10)(A)~~, which is enforceable by Plaintiffs under 42 U.S.C. § 1983~~.

307.  HB 668's prohibition against the use of public funds for surgical operation and medical intervention if provided for the purpose of attempting to alter the appearance of or to affirm a transgender individual's perception of their sex if that perception is inconsistent with the transgender individual's biological sex which was assigned at birth violates Medicaid's availability requirement~~,~~. 42 U.S.C. § 1396a(a)(10)(A).

308.  HB 668's prohibition against the use of ~~Idaho Idaho~~Medicaid for reimbursement and coverage of~~for~~ gender-affirming care ~~prohibitingfromingingeall~~, prohibiting physicians employed by tax-payer funded entities from providing gender-affirming care in the course and

scope of their government service, prohibiting any amount paid by any entity, organization, or individual to provide gender-affirming care from being tax-deductible, and prohibiting the use of any state property, facilities, or buildings to provide gender-affirming care to transgender individuals for the medical condition of gender dysphoria violates Medicaid's availability requirement, 42 U.S.C. § 1396a(a)(10)(A).

122.   Defendants' Medicaid 's Exclusion Policy and HB 668's prohibitions of against providing medically necessary gender-affirming care and surgery to transgender individuals for the treatment of the medicial medical condition of gender dysphoria, is not in the best interests of Plaintiffs and violates 42 U.S.C. § 1396a(a)(19).

309.

123.

124.310.   MH and TB Plaintiffs have been and will continue to be irreparably injured by Defendants' Jeppesen's, Hamso's, and IDHW's discriminatory policy of refusing to authorize medically necessary genital reconstruction and gender-affirming care and surgery for transgender individuals who have the medical condition the treatment of gender dysphoria.

125.311.   Defendants' Jeppesen's, Hamso's, and IDHW's discriminatory Medicaid Exclusion Policy Medicaid exclusion and HB 668 policy seeks to punishes vulnerable transgender individuals, including MH and TB Plaintiffs, for being transgender and taking necessary steps to live in accordance with their gender identities rather than the sex assigned at birth.

Under 42 U.S.C. § 1983, MH and TB are entitled to injunctive and prospective relief prohibiting Defendants from violating their rights under federal law.

126.    Under 42 U.S.C. § 1983, MH and TB are entitled to an award of compensatory damages against Defendant Hamso, as an individual acting under color of state law, for continuing to violate their clearly established rights under federal law.

### THIRD CLAIM FOR RELIEF
### Medicaid's Exclusion Policy and HB 668 ~~Violation~~ Violate ~~of~~ the Medicaid Act's Comparability Requirements,
### 42 U.S.C. § 1396a(a)(10)(B) and 42 U.S.C. § 1396a(a)(19)

312.    Plaintiffs reallege and incorporate by reference all paragraphs of this Amended Complaint.

~~127.~~313.    Defendants' Medicaid~~'ds~~ Exclusion ~~p~~Policy and HB 668's prohibitions in the amount, duration, or scope of the medical assistance available to transgender individuals for the treatment of the medical condition of gender dysphoria, but authorizing and providing the same or similar care and surgical procedures ~~which is made available and provided~~ to cisgender Idaho Medicaid beneficiaries with medical conditions and diagnoses other than gender dysphoria violate~~s~~ Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B)~~(i)~~.

314.    Defendants' ~~Defendants~~Medicaid~~'s~~ Exclusion P~~p~~olicy and HB 668's prohibitions ~~of~~against ~~Jeppesen's, Hamso's, and IDHW's continuing policy of refusing to authorize~~ using public funds for medically necessary ~~genital reconstruction and~~ gender-affirming care and surgery for the treatment of transgender individuals diagnosed with gender dysphoria~~, while~~ but authoriz~~ing and provid~~ing~~e~~ ~~the same or similar surgical procedures for other Idaho Medicaid beneficiaries~~ the same or similar care and surgical procedures to cisgender Idaho Medicaid beneficiaries with a ~~different~~ diagnos~~e~~is, illness, or ~~other~~ medical condition other than gender dysphoria~~, type of illness, or medical condition, as applied to MH and TB,~~ violates Medicaid's

comparability requirement, 42 U.S.C. § 1396a(a)(10)(B)., which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

128.315.    Defendants' Medicaid Medicaid's Exclusion pPolicy and HB 668's prohibitions of against using public funds for medically necessary gender-affirming care and surgery for transgender individuals who have been diagnosed with gender dysphoria, is not in the best interests of Plaintiffs and violates 42 U.S.C. § 1396a(a)(19).

129.    MH and TBPlaintiffs have been and continue towill be injured by Defendants' Medicaid's exclusion and HB 668 prohibition of against using Medicaid discriminatory policy of refusing to authorizeto provide medically necessary genital reconstruction and gender-affirming care and surgery for the treatment of gender dysphoria.

Defendants Jeppesen's, Hamso's, and IDHW's discriminatory policy punishes vulnerable transgender individuals, including MH and TB, for being transgender and taking necessary steps to live in accordance with their gender identities.Defendants' discriminatory Medicaid exclusion and HB 668 seeks to punish vulnerable transgender individuals, including Plaintiffs, for being transgender and taking necessary steps to live in accordance with their gender identities rather than the sex assigned at birth.

316.    HB 668's prohibition against the use of public funds for medical procedures if provided for the purpose of attempting to alter the appearance of or to affirm a transgender individual's perception of their sex if that perception is inconsistent with the transgender individual's biological sex which was assigned at birth violates Medicaid's availability requirement.., 42 U.S.C. § 1396a(a)(10)(A).

317.    HB 668's prohibition against the use of Idaho Medicaid's reimbursement and coverage for any type of gender-affirming care and and prohibiting Idaho Medicaid from

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 64

reimbursing or providing ~~directing Idaho Medicaid not to reimburse or provide~~ coverage to transgender individuals for all gender-affirming care and surgeries, prohibiting physicians employed by tax-payer funded entities from providing gender-affirming care and surgeries in the course and scope of their government service, prohibiting any amount paid by any entity, organization, or individual to provide gender-affirming care or ~~sugeries~~surgeries from being tax-deductible, and prohibiting the use of any state property, facilities or building to provide gender-affirming care violates Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B).

318.    Defendants' Medicaid ~~Medicaid's E~~exclusion ~~p~~Policy and HB 668's prohibitions ~~of~~against using public funds for medically necessary gender-affirming care and surgery for transgender individuals with a diagnosis ~~the treatment~~ of gender dysphoria, is not in the best interests of Plaintiffs and violates 42 U.S.C. § 1396a(a)(19).

319.    Plaintiffs have been and will be irreparably injured by Defendants' discriminatory Medicaid Exclusion Policy ~~Exclusion pPolicy~~ and HB 668 and the ~~of~~ refusing al to authorize, reimburse, and cover medically necessary gender-affirming care and surgery for transgender individuals' ~~diagnoised~~diagnosed with gender dysphoria. ~~the treatment of gender dysphoria.~~

320.    Plaintiffs have been and will be irreparably injured by Defendants' Medicaid Exclusion Policy ~~Medicaid's eExclusion~~ and HB 668's prohibition of ~~against~~ using Medicaid to provide medically necessary gender-affirming care and surgery for transgender individuals' ~~diagnoised~~diagnosed with~~the treatment of~~ gender dysphoria.

321.    Defendants' discriminatory Medicaid ~~E~~exclusion ~~P~~policy and HB 668 seeks to punish vulnerable transgender individuals, including Plaintiffs, for being transgender and taking necessary steps to live in accordance with their gender identities rather than the sex assigned at birth.

———

———

130.    Under 42 U.S.C. § 1983, MH and TB are entitled to injunctive and prospective relief prohibiting Defendants from violating their rights under federal law.

131.    Under 42 U.S.C. § 1983, MH and TB are entitled to an award of compensatory damages against Defendant Hamso, as an individual acting under color of state law, for continuing to violate their clearly established rights under federal law.

**FOURTH CLAIM FOR RELIEF**
**Dr. Hamso's Medicaid's Exclusion Policy and HB 668 Violation Violate of the Equal Protection Clause of the Fourteenth Amendment**

132.322.    Plaintiffs reallege and incorporate by reference all paragraphs of this Amended Complaint.

133.323.    The Defendants' DefendantsMedicaid Exclusion pPolicy and HB 668's prohibitionJeppesen's, Hamso's, and IDHW's policy of refusing to authorize and use public funding for medically necessary genital reconstruction and gender-affirming care and surgery for transgender individuals diagnosed withthe treatment of gender dysphoria, facially, by proxy, and as applied, as applied to MH and TB, impermissibly and invidiously discriminates against Plaintiffs on the basis of sex and transgender status in violatesion of their right to Equal Protection under the Fourteenth Amendment to the United States Constitution.

134.    Defendants Jeppesen's, Hamso's, and IDHW's continuing policy of refusing to authorize medically necessary genital reconstruction and gender-affirming surgery for the treatment of gender dysphoria, as applied to MH and TB, impermissibly discriminates against Plaintiffs for being transgender and violates their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

~~135.~~324.     Defendants' Medicaid Exclusion Policy ~~The Medicaid exclusion~~ and HB 668's prohibition ~~Defendants Jeppesen's, Hamso's, and IDHW's policy~~ does not serve any rational, legitimate, important, or compelling state interest and only serves to pr~~event~~ohibit Plaintiffs and other transgender Idaho Medicaid ~~beneficiaries~~ participants from obtaining medically necessary health care that will enable them to treat their gender dysphoria, complete their gender transitions, and fully live as their authentic selves.

~~136.~~325.     ~~MH and TB~~Plaintiffs have ~~been~~ suffered and will suffer severe irreparable injuries~~continue to severe~~be injur~~injuries~~ proximately cause~~d~~ by Defendants' discriminatory ~~policy~~ treatment of refusing to authorize and prohibiting the use of public funds and Medicaid reimbursement and coverage for medically necessary ~~genital reconstruction and~~ gender-affirming care and surgery for transgender individuals diagnosed with ~~the treatment of~~ gender dysphoria.

~~137.~~326.     Defendants' Medicaid Eexclusion Ppolicy and HB 668 ~~Jeppesen's, Hamso's, and IDHW's discriminatory policy~~ seeks to punish~~es~~ and harm vulnerable transgender individuals~~, including MH and TB,~~ for their being transgender status and taking necessary steps to live in accordance with their gender identities rather than the sex assigned at birth.

~~138.   Under 42 U.S.C. § 1983, MH and TB are entitled to injunctive and prospective relief prohibiting Defendants Jeppesen, Hamso, and IDHW from violating their rights, privileges, or immunities under federal law.~~

~~139.~~327.     Under 42 U.S.C. § 1983, MH and TB are entitled to an award of compensatory damages against Defendant Hamso, as an individual acting under color of state law, for continuing to violate their clearly established constitutional rights under the Equal

Protection and Due Process Clauses of the Fourteenth Amendment to the United States

Constitution.

**FIFTH CLAIM FOR RELIEF**

**Defendants' Failure to Provide Notice and Fair Hearings Violate Violation the Medicaid
Act's Due Process Requirements 42 U.S.C. § 1396a(a)(3)**

140.328.      Plaintiffs reallege and incorporate by reference all paragraphs of this

Amended Complaint.

141.329.      The Medicaid Act requires states to "grant [] an opportunity for a fair

hearing before the State agency to any individual whose claim for medical assistance under the

plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).

142.330.      The federal Medicaid rRegulations at 42 C.F.R. § 431.200, et seq.,

construe the statutory requirements of 42 U.S.C. § 1396a(a)(3).

143.331.      Defendants' Jeppesen's, Hamso's, and IDHW's continuing failure to

provide MH with adequate notice when denying herhertheir claim for benefits under the

Medicaid Act and the continuing delay or refusal to make a final decision in MH's appeal within

ninety days and with reasonable promptness violates MH's rights to procedural due process

under the Medicaid Act, 42 U.S.C. § 1396a(a)(3), which is enforceable by MH pursuant to 42

U.S.C. § 1983.

144.332.      Defendants' Jeppesen's, Hamso's, and IDHW's continuing failure

continuing delay or refusal to make a final decision to make a decision on TB's and BM's

request for prior authorization with reasonable promptness and failure to provide TB and BM

with adequate notice denying herther claims for Medicaid benefits violates TB's their rights to

procedural due process under the Medicaid Act, 42 U.S.C. § 1396a(a)(3), which is enforceable by TB pursuant to 42 U.S.C. § 1983.

145.333.    Defendants ', Jeppesen, Hamso, and IDHW have a policy, pattern, and practice of failing to ensure that Idaho Medicaid beneficiariesparticipatesnts, including MH, and TB, and BM, receive adequate written notice and the opportunity for a hearing, when coverage of medically necessary care and surgical treatment for gender dysphoria is denied or is not acted upon with reasonable promptness.

146.334.    Under 42 U.S.C. § 1983, MH, and TB, and BMPPlaintiffs are entitled to injunctive and prospective relief prohibiting Defendants from violating their rights under the Medicaid Act.

147.335.    Under 42 U.S.C. § 1983, MH and TB are entitled to an award of compensatory damages against Defendant Hamso, as an individual acting under color of state law, for continuing to violate their clearly established constitutional rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, privileges, or immunities under federal law.

### SIXTH CLAIM FOR RELIEF
**Defendants' Medicaid Exclusion Policy and HB 668 Violation Violate of the Due Process Clause of the Fourteenth Amendment**

148.336.    Plaintiffs reallege and incorporate by reference all paragraphs of this Amended Complaint.

149.337.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits any State from depriving "any person of life, liberty, or property, without due process of law."

150.338.     Plaintiffs are eligible Medicaid participantes and have a protected interest in the Medicaid coverages and reimbursementsbenefits guaranteed by Title XIX of the Social Security Act.

151.339.     Defendants' Jeppesen's, Hamso's,and IDHW's continuing failure to provide MH with adequate notice when denying her claim for benefits under the Medicaid Act, and the delay in making a final decision in MH's appeal for authorization of gender-affirming surgery and to provide an opportunity for a fair hearing violates MH's right to Due Process under the Fourteenth Amendment, which is enforceable by Plaintiff pursuant to 42 U.S.C. § 1983.

152.340.     Defendants' Jeppesen's, Hamso's, and IDHW's continuing failure to provide TB and BM with adequate notice when denying hertheir claim for benefits under the Medicaid Act, to make a decision on TB's their request for prior authorization of gender-affirming care and surgery with reasonable promptness, and to provide an opportunity for a fair hearing violates TB's their right to Due Process under the Fourteenth Amendment, which is enforceable by Plaintiff pursuant to 42 U.S.C. § 1983.

153.341.     Under 42 U.S.C. § 1983, MH, and TB, and BPlaintiffsM are entitled to injunctive and prospective relief prohibiting Defendants Jeppesen, Hamso, and IDHW from continuing to violate their clearly established rights, privileges, or immunities under federal law.

154.342.     Under 42 U.S.C. § 1983, MH and TB are entitled to an award of compensatory damages against Defendant Hamso, as an individual acting under color of state law, for continuing to violate their clearly established rights, privileges, or immunities under the Equal Protection and Due Process Clauses of the Fourteenth Amendmentfederal law.

~~DEMAND FOR JURY TRIAL~~

~~Plaintiffs, pursuant to the Seventh Amendment to the Constitution and Fed. R. Civ. P. 38, demand a jury trial in this action.~~

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    ~~Grant~~ Issue a permanent injunction~~s~~ prohibiting and enjoining any further enforcement or application of ~~the~~ Defendants' ~~Defendants Jeppesen's, Hamso's,~~ and IDHW's ~~exclusionary~~ Medicaid Exclusion ~~p~~Policy and ~~all of~~ HB 668's prohibitions ~~and the prohibition practice, as applied to Plaintiffs, of against~~ against the use of Public Funds or Medicaid to ~~refusing to~~ authoriz~~ing~~e,~~e coverage and payment~~ reimburse and cover ~~for~~ medically necessary ~~genital reconstruction and~~ gender-affirming care and surgery for transgender individuals diagnosed with~~the treatment of~~ gender dysphoria because Medicaid's ~~the practice exclusion~~Exclusion Policy and HB 668's ~~all the~~ prohibitions ~~in HB 668~~ facially, by proxy and as applied, invidiously and impermissibly discriminate~~s~~ against Plaintiffs and other transgender individuals on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and ~~direct~~ order Defendants ~~Jeppesen, Hamso,~~ and IDHW to authorize and use Public Funds and Medicaid to reimburse and cover~~age and payment of~~ gender-affirming care and surgery to treat gender dysphoria when medically necessary;~~, for a particular Medicaid beneficiary;~~

~~A.~~B.    Issue a permanent injunction ~~s~~prohibiting and enjoining Defendants from enforcing ~~the application of all of~~ HB 668's prohibition~~s~~ against the use of "Public Funds" and

AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES **REDACTED** – Page 71

Idaho Medicaid's ~~expenditures for~~reimbursement and ~~the~~ coverage ~~and payment~~ of gender-affirming care and surgeries for transgender individuals and ~~enjoin~~ordering the Defendants and Idaho Medicaid ~~from not~~to reimburs~~ing or providing~~and coverage ~~for~~ gender-affirming care and surgeries for transgender individuals diagnosed with gender dysphoria~~;~~, enjoining Defendants from prohibiting~~from prohibiting~~ physicians employed by tax-payer funded entities ~~from~~to provide~~ing~~ gender-affirming care and surgeries in the course and scope of their government service~~;~~, enjoining Defendants from prohibiting any amount paid by any entity, organization, or individual to provide gender-affirming care from being tax-deductible; and enjoining Defendants from prohibiting the use of any state property, ~~government~~ facilities, and buildings to provide gender-affirming care because Medicaid's ~~e~~Exclusion and HB 668~~, facially, by proxy, and as applied, invidiously and  impermissibly discriminates against transgender individuals on the basis of sex in~~ violat~~es~~ion of the Medicaid Act's ▮▮▮▮ requirement, 42 U.S.C. § 1396a(a)(10)(A) and the Medicaid Act's ▮▮▮▮ requirement, 42 U.S.C. § 1396a(a)(10)(B)~~(i)~~; and order Defendants and IDHW to authorize, reimburse and ~~cover~~age and payment of gender-affirming care and surgery ~~for Plaintiffs and other transgender individuals diagnosed with gender dysphoria to treat gender dysphoria~~ when medically necessary for a Medicaid ~~beneficiary~~participant;

    C.    Enter a declaratory judgment that ~~Jeppesen, Hamso,~~Defendants' and IDHW's ~~and Idaho's~~ Medicaid ~~'s~~Eexclusion~~ary p~~ Policy and HB 668, ~~practice,~~ facially, by proxy, and as applied to Plaintiffs and other persons similarity situated, of refusing to authorize, reimburse and ~~cover~~age and payment of medically necessary gender-affirming care and surgery for Plaintiffs and other transgender individuals diagnosed with ~~to treatment~~ gender dysphoria violates Equal Protection under the Fourteenth Amendment to the United States Constitution and Section 1557

of the Affordable Care Act, 42 U.S.C. § 18116, because ~~it~~ they invidiously and impermissibly discriminate~~s~~ against transgender individuals on the basis of sex, including gender identity, sex stereotypes, and sex characteristics;

D.     Enter a declaratory judgment that Defendants' ~~and IDHW's~~ Medicaid eExclusion~~ary po~~ Policy and HB 668's refusal~~, facially, by proxy,~~ ~~and as applied to Plaintiffs and other persons similarity situated, of refusing~~ to authorize, reimburse and cover~~age and payment of~~ medically necessary gender-affirming care and surgery for Plaintiffs and all transgender individuals diagnosed with gender dysphoria ~~to treat gender dysphoria~~ violates the Medicaid Act's availability requirement, 42 U.S.C. § 1396a(a)(10)(A) and the Medicaid Act's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B)~~(i)~~ ███████████

███████████████████████████████████████

███████████████████

~~B.~~     Enter a declaratory judgment that Defendants violated the due process rights of Plaintiffs MB~~, and T~~SB, and BM under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Medicaid Act, 42 U.S.C. § 1396a(a)(3), and its implementing regulations, 42 C.F.R. Subpart E and

~~C.~~E.     ~~I~~issue  permanent injunctions enjoining any further and continuing violations of the due process requirements ~~in~~in the Medicaid fair hearing procedures and appeals under the IDHW Contested Case Rules in violation of Due Process Clause under the Fourteenth Amendment to the United States Constitution and ~~under~~ the Medicaid Act and Regulations~~;~~.

~~D.~~F.     Award compensatory damages against Defendant Hamso, individually, for the violation of Plaintiffs~~'~~ MH & TB's clearly established constitutional rights under the Equal

Protection and Due Process Clauses of the Fourteenth Amendment to the United States

Constitution and their rights under the Medicaid Act in an amount that would compensate them

for their injuries.

    E.G.   Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42

U.S.C. § 1988 or other applicable statutes; and

    F.H.   Award such other and further relief as the Court may deem as proper.

DATED this 4th 29th day of SeptembeJunerMay, 20222024.

                     Attorneys for Plaintiffs

                     /s/ Howard A. Belodoff
                     Howard A. Belodoff

                     /s/ Martin C. Hendrickson
                     Martin C. Hendrickson

                     Idaho Legal Aid Services, Inc.

                     /s/Jane Gordon

                     Jane Gordon Law

**VERIFICATION**

   MH and TB, each being duly sworn on oath, declare under the penalty of perjury

pursuant to 28 U.S.C. § 1746 that they have read the foregoing Complaint and know the contents

thereof and believe the same to be true and correct.

   DATED this 29th day of September, 2022.

                     /s/ MH

                     /s/ TB

LEGISLATURE OF THE STATE OF IDAHO

Sixty-seventh Legislature                    Second Regular Session - 2024

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 668

BY STATE AFFAIRS COMMITTEE

1   AN ACT
2   RELATING TO PUBLIC FUNDS FOR GENDER TRANSITION; PROVIDING LEGISLATIVE IN-
3        TENT; AMENDING TITLE 18, IDAHO CODE, BY THE ADDITION OF A NEW CHAPTER
4        89, TITLE 18, IDAHO CODE, TO ESTABLISH PROVISIONS PROHIBITING THE USE OF
5        PUBLIC FUNDS FOR GENDER TRANSITION PROCEDURES; AMENDING CHAPTER 2, TI-
6        TLE 56, IDAHO CODE, BY THE ADDITION OF A NEW SECTION 56-270, IDAHO CODE,
7        TO ESTABLISH PROVISIONS PROHIBITING THE USE OF PUBLIC FUNDS FOR GENDER
8        TRANSITION PROCEDURES; PROVIDING SEVERABILITY; AND DECLARING AN EMER-
9        GENCY AND PROVIDING AN EFFECTIVE DATE.

10  Be It Enacted by the Legislature of the State of Idaho:

11        SECTION 1. LEGISLATIVE INTENT. The Legislature finds that the surgical
12  operations and medical procedures described in section 18-1506C(3), Idaho
13  Code, when used for purposes of altering the appearance of an individual in
14  order to affirm the individual's perception of the individual's sex in a way
15  that is inconsistent with the individual's biological sex, carry substan-
16  tial risks and have known harmful effects, including irreversible physical
17  alterations and, in some cases, sterility and lifelong sexual dysfunction.

18        SECTION 2. That Title 18, Idaho Code, be, and the same is hereby amended
19  by the addition thereto of a NEW CHAPTER, to be known and designated as Chap-
20  ter 89, Title 18, Idaho Code, and to read as follows:

21                              CHAPTER 89
22                 NO PUBLIC FUNDS FOR GENDER TRANSITION

23        18-8901.   USE OF PUBLIC FUNDS FOR GENDER TRANSITION PROCEDURES PROHIB-
24  ITED. (1) For the purposes of this section, "exempted surgical operations or
25  medical interventions" means a surgical operation or medical intervention
26  that is:
27        (a)  Necessary to the health of the person on whom it is performed and is
28        performed by a person licensed in the place of its performance as a medi-
29        cal practitioner, except that a surgical operation or medical interven-
30        tion is never necessary to the health of the minor or adult on whom it is
31        performed if it is for the purpose of altering the appearance of an in-
32        dividual in order to affirm the individual's perception of the individ-
33        ual's sex in a way that is inconsistent with the individual's biological
34        sex;
35        (b)  For the treatment of any infection, injury, disease, or disorder
36        that has been caused or exacerbated by the performance of gender transi-
37        tion procedures, whether or not the procedures were performed in accor-
38        dance with state and federal law; or
39        (c)  Performed in accordance with the good faith medical decision of a
40        parent or guardian of a child or an adult born with a medically verifi-
41        able genetic disorder of sex development, including:

APPENDIX 1

1    (i)   A person with external biological sex characteristics that
2    are ambiguous and irresolvable, such as a person born having 46, XX
3    chromosomes with virilization, 46, XY chromosomes with undervir-
4    ilization, or with both ovarian and testicular tissue; or
5    (ii)  When a physician has otherwise diagnosed a disorder of sexual
6    development in which the physician has determined through genetic
7    testing that the minor or adult does not have the normal sex chro-
8    mosome structure, sex steroid hormone production, or sex steroid
9    hormone action for a male or female.
10   (2)  Public funds shall not be used, granted, paid, or distributed to any
11   entity, organization, or individual for the provision or subsidy of any sur-
12   gical operation or medical intervention described in section 18-1506C(3),
13   Idaho Code, for purposes of altering the appearance of an individual in order
14   to affirm the individual's perception of the individual's sex in a way that
15   is inconsistent with the individual's biological sex regardless of whether
16   the surgical operation or medical intervention is administered to a minor or
17   an adult, except exempted surgical operations or medical interventions.
18   (3)  Any amount paid by an entity, organization, or individual during a
19   taxable year for the provision of surgical operations or medical interven-
20   tions described in section 18-1506C(3), Idaho Code, for purposes of altering
21   the appearance of an individual in order to affirm the individual's percep-
22   tion of the individual's sex in a way that is inconsistent with the individ-
23   ual's biological sex regardless of whether the surgical operation or medi-
24   cal intervention is administered to a minor or an adult shall not be tax-de-
25   ductible, except exempted surgical operations or medical interventions.
26   (4)  The Idaho medicaid program shall not reimburse or provide coverage
27   for the use of the surgical operations or medical interventions described
28   in section 18-1506C(3), Idaho Code, for purposes of altering the appearance
29   of an individual in order to affirm the individual's perception of the indi-
30   vidual's sex in a way that is inconsistent with the individual's biological
31   sex regardless of whether the surgical operation or medical intervention is
32   administered to a minor or an adult, except exempted surgical operations or
33   medical interventions.
34   (5)  No physician or other health care professional in the course and
35   scope of employment by the state or a county or local government may pro-
36   vide the surgical operations or medical interventions described in section
37   18-1506C(3), Idaho Code, for purposes of altering the appearance of an in-
38   dividual in order to affirm the individual's perception of the individual's
39   sex in a way that is inconsistent with the individual's biological sex re-
40   gardless of whether the surgical operation or medical intervention is admin-
41   istered to a minor or an adult, except exempted surgical operations or medi-
42   cal interventions.
43   (6)  No state property, facility, or building may be used to provide
44   the surgical operations or medical interventions described in section
45   18-1506C(3), Idaho Code, for purposes of altering the appearance of an
46   individual in order to affirm the individual's perception of the individ-
47   ual's sex in a way that is inconsistent with the individual's biological
48   sex regardless of whether the surgical operation or medical intervention is
49   administered to a minor or an adult, except exempted surgical operations or
50   medical interventions.

1  (7) Any intentional violation of the provisions of this chapter by a
2  public officer or public employee shall be considered a misuse of public mon-
3  eys punishable pursuant to section 18-5702, Idaho Code.

4  SECTION 3.  That Chapter 2, Title 56, Idaho Code, be, and the same is
5  hereby amended by the addition thereto of a NEW SECTION, to be known and des-
6  ignated as Section 56-270, Idaho Code, and to read as follows:

7  56-270.  PROHIBITION ON REIMBURSEMENT AND COVERAGE. (1) Pursuant to
8  chapter 89, title 18, Idaho Code, the Idaho medicaid program shall not reim-
9  burse or provide coverage for any surgical operation or medical intervention
10  described in section 18-1506C(3), Idaho Code, for purposes of altering the
11  appearance of an individual in order to affirm the individual's perception
12  of the individual's sex in a way that is inconsistent with the individual's
13  biological sex regardless of whether the surgical operation or medical in-
14  tervention is administered to a minor or an adult, except exempted surgical
15  operations or medical interventions described in section 18-8901(1), Idaho
16  Code.
17  (2) The department of health and welfare and any other state agency who
18  provides medicaid services shall promulgate rules, subject to legislative
19  approval, directing medicaid provider agreements to contain certifications
20  that no public funds have been used in violation of section 18-8901, Idaho
21  Code.

22  SECTION 4.  SEVERABILITY. The provisions of this act are hereby declared
23  to be severable and if any provision of this act or the application of such
24  provision to any person or circumstance is declared invalid for any reason,
25  such declaration shall not affect the validity of the remaining portions of
26  this act.

27  SECTION 5.  An emergency existing therefor, which emergency is hereby
28  declared to exist, this act shall be in full force and effect on and after
29  July 1, 2024.