Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
1447 S. Tyrell Lane
Boise, ID 83706
Tel: (208) 807-2496 Fax: (208) 342-2561
howardbelodoff@idaholegalaid.org

Jane Gordon, ISB # 9243
Jane Gordon Law
1004 West Fort Street
Boise ID 83702
Tel: (208) 371-4747; Fax: (208) 807-2290
Jane@JaneGordonLaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| MH, TB, KB, SG, AC, BM, individually, and G Doe, by and through her parents and next friends, JANE Doe and JOHN Doe<br><br>Plaintiffs,<br><br>vs.<br><br>ALEX ADAMS, in his official capacity as the Director of the Idaho Department of Health and Welfare; Dr. MAGNI HAMSO, in her official capacity as the Medical Director of the Idaho Division of Medicaid and individually; and the IDAHO DEPARTMENT OF HEALTH AND WELFARE,<br><br>Defendants. | CASE NO. 1:22-CV-409-REP<br><br>MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION |

# TABLE OF CONTENTS

I.     PROCEDURAL BACKGROUND ................................................................................1

II.    PRELIMINARY STATEMENT ................................................................................2

III.    FACTUAL BACKGROUND ....................................................................................4

IV.    LEGAL STANDARD FOR SUMMARY JUDGMENT ..........................................4

V.    ARGUMENT .............................................................................................................5

    A.  The Court Should Grant the Motion for Partial Summary Judgment ..................5

    B.  The Medicaid Act's Objectives Require Medically Necessary Gender-Affirming Care Be Provided to Treat Gender Dysphoria ..................................................................9

    C.  Medicaid's Exclusion Policy and HB 668's Prohibition of Gender-Affirming Care to Treat Gender Dysphoria Violates the Medicaid Act's Availability Provision .................11

    D.  Medicaid's Exclusion Policy of Gender-Affirming Care to Treat Gender Dysphoria Violates the Medicaid Act's Comparability Requirements ................................14

    E.  The Court Should Issue a Permanent Injunction Enjoining Defendants from Violating the Medicaid Act ................................................................................................16

        1.  Medicaid Participants Will Suffer Irreparable Harm if All Gender-Affirming Care is Stopped When the Medicaid Exclusion Policy and HB 668 Become Effective on July 1, 2024 ................................................................................................17

        2.  The remedies available at law are inadequate to compensate for Plaintiffs' injury ....22

        3.  The Balance of Equities Tip in Favor of Medicaid Participants and a Permanent Injunction Is Warranted ................................................................................22

        4.  The Public Interest Is Served by the Issuance of a Permanent Injunction ..................23

        5.  The Scope of the Permanent Injunction Should Protect All Transgender Medicaid Participants ................................................................................................24

CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Alvarez v. Betlach,* 572 F. App'x 519, 520-21 (9th Cir. 2014) .................................................... 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ........................................................ 5

*Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012) ................................ 5

*Beal v. Doe*, 432 U.S. 438, 440 n.2 (1977) .................................................................. 9, 10, 12, 13

*Bontrager v. Ind. Fam. Soc. Servs. Admin.*, 697 F.3d 604, 608 (7th Cir. 2012) .......................... 13

*Bowen v. City of New York*, 476 U.S. 467, 483-84 (1986) .......................................................... 17

*Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) ........................................................ 24

*Cal. Ass'n of Rural Health Clinics v. Douglas*, 721 F.3d 1097, 1106 (9th Cir. 2013) ................ 11

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ............................................................... 5

*Cf. Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ............................................................. 22

*Chalk v. United States Dist. Court Cent. Dist.*, 840 F.2d 701, 709 (9th Cir. 1988) .................... 17

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. ____ (2022) ......................................... 22

*Davis v. Shah*, 821 F.3d 231, 258 (2d Cir. 2016) ............................................................. 14, 15, 16

*Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ......................................................... 5

*Dexter v. Kirschner*, 984 F.2d 979, 983 (9th Cir. 1992) ............................................................. 13

*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) ............... 24

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ................................................... 17

*Edmo v. Corizon, Inc.*, 935 F.3d 757, 797-8 (9th Cir. 2019) ...................................................... 17

*Ellis ex rel. Ellis v. Patterson*, 859 F.2d 52, 54 (8th Cir. 1988) .................................................. 13

*Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) ............................................... 5

*Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 10019 (W.D. Wis. 2019) ......... 12, 15

*Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992)................................................. 5

*Kadel v. Folwell*, 2024 U.S. App. LEXIS 10294, *14-15 & 76 (4th Cir. April 29, 2024)...... 13, 15

*Katie A., ex rel. Ludin v. Los Angeles Cty.*, 481 F.3d 1150, 1154 (9th Cir. 2007) ........................ 9

*M.R. v. Dreyfus*, 697 F.3d 706, 737-38 (9th Cir. 2012)................................................. 18

*Meusberger v. Palmer*, 900 F.2d 1280, 1282 (8th Cir. 1990)......................................... 13

*Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232-33 (11th Cir. 2011)................................ 13

*New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) ...................................................... 8

*Pinneke v. Preisser*, 623 F.2d 546, 550 (8th Cir. 1980) .............................................. 11

*Playboy Enters., Inc, v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002) ................................. 4

*Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996) ...................... 8

*Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990).................................................... 8

*Schweiker v. Gray Panthers*, 453 U.S. 34, 37 (1981) ................................................... 9

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) ........... 4

*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ................................................... 5

*Vista Hill Found., Inc. v. Heckler*, 767 F.2d 556, 561 (9th Cir. 1985) ................................ 11

*Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004) ............................ 8

*Watson v. Weeks*, 436 F.3d 1152, 1161 (9th Cir. 2006) ................................................ 12

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ............................................. 16

*White v. Beal*, 555 F.2d 1146, 1148 (3rd Cir. 1977)............................................. 14, 15, 16

*Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 512 (1990)............................................. 12

*Yakus v. United States*, 321 U.S. 414, 440 (1944) .................................................... 17

*Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) .......................................... 5

**Statutes**

42 C.F.R. § 440.230(a)-(c) ................................................................................... 14, 23

42 C.F.R. § 440.230(b) ................................................................................... 13

42 C.F.R. § 440.230(c) ................................................................................... 13, 14

42 C.F.R. § 440.240(b)(1) ................................................................................... 15

45 C.F.R. § 92.206(b)(4) ................................................................................... 9

42 U.S.C. § 1396a(10)(B) ................................................................................... 2, 3, 4

42 U.S.C. § 1396a(a)(10)(A) ................................................................................... passim

42 U.S.C. § 1396a(a)(10)(B) ................................................................................... 10, 14, 16

42 U.S.C. 1396a(10)(C) ................................................................................... 10, 12

42 U.S.C. § 1396a(a)(19) ................................................................................... 3, 4, 16

42 U.S.C. § 1396d(a) ................................................................................... 10, 11,23

42 U.S.C. §§ 1396 ................................................................................... 10

Idaho Code § 56-255(5)(a) ................................................................................... 12

Idaho Code § 56-270 ................................................................................... 1, 7

Idaho Code § 18-1506C(3) ................................................................................... 7

Idaho Code §18-8901 ................................................................................... 1, 2, 3, 4, 6, 7

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................... 1, 4

Fed. R. Civ. P. 56(b) ................................................................................... 7

89 Fed. Reg. 37522 (May 6, 2024) (to be codified at 45 CFR pt. 92) ................................................................................... 9

COME NOW the Plaintiffs, to file, pursuant to Fed. R. Civ. P. 56, this Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment and the issuance of a Permanent Injunction enjoining Idaho Medicaid's Exclusion Policy and the newly enacted Idaho Code §18-8901 and Idaho Code § 56-270 ("HB 668"). HB 668 prohibits Medicaid reimbursement and coverage for the provision of surgical operations and medical interventions for gender-affirming care and surgeries to treat transgender individuals diagnosed with gender dysphoria but exempts cisgender individuals from the prohibition. Medicaid will continue to reimburse and provide coverage to treat the same or similar medically necessary care for people who are not diagnosed with gender dysphoria. *See* Idaho Code §18-8901(1). HB 668 will prevent physicians and other medical providers from prescribing medically necessary treatments and counseling for all transgender patients who are Idaho Medicaid participants. Plaintiffs will suffer irreparable harm unless the Court issues a permanent injunction enjoining Medicaid's Exclusion Policy and HB 668's prohibitions by July 1, 2024.

## I.      PROCEDURAL BACKGROUND

Plaintiffs filed the Complaint on September 29, 2022. Dkt. 1. The Defendants filed a Partial Motion to Dismiss the Equal Protection and Due Process claims. Dkt. 19. The Court denied the Motion to Dismiss on June 20, 2023. Dkt. 36. The Court held:

> In sum, Plaintiffs have demonstrated that they, as transgender individuals, were treated differently than similarly-situated cisgender individuals when, pursuant to Defendants' policy, they were denied medically necessary genital reconstruction surgery to treat their gender dysphoria. Whether framed as proxy discrimination based upon disparate impact or facial discrimination based upon the wording of the policy, Plaintiffs' allegations, and the inferences drawn therefrom, state a plausible Equal Protection claim.

*Id.* at 23.

MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION – Page 1

On June 28, 2023, the Court filed a Litigation Order and Notice of Telephonic

Scheduling Conference. Dkt. 37. On July 18, 2023, Defendant Hamso filed an interlocutory

appeal from the denial of qualified immunity. Dkt. 40. On July 18, 2023, Plaintiffs filed a

Litigation Plan and Discovery Plan. Dkts. 42-43. On July 20, 2023, Defendants filed Notice

Regarding Proposed Discovery Plan, Notice of Appeal and Motion to Certify for Interlocutory

Appeal and stating they did not agree with Plaintiffs' Litigation and Discovery Plans but did not

file proposed plans. Dkt. 46. Defendants filed their Answer on July 27, 2023. Dkt. 49. On July

27, 2023, Defendants filed a Motion for Certification of Interlocutory Appeal and Stay Pending

Appeal. Dkt. 50. On August 29, 2023, Plaintiffs filed a Response opposing Certification and

Stay. Dkt. 57. On March 8, 2024, the Court denied the Motion for Certification of Interlocutory

Appeal and Stay Pending Appeal. Dkt. 63. The Court issued a Scheduling Order on June 4, 2024.

Dkt. 69.

## II. PRELIMINARY STATEMENT

Plaintiffs are participants in Idaho's Medicaid ("Medicaid") program. Plaintiffs identify

as transgender individuals diagnosed with the medical condition of gender dysphoria. Their

medical providers determined the severity of their symptoms made it medically necessary for

them to receive gender-affirming care, including surgeries. Plaintiffs are currently receiving

gender-affirming care and have applied or want to apply for prior authorization for medically

necessary gender-affirming surgery under Medicaid. Defendants previously refused to approve

Plaintiffs' surgeries under an unwritten policy that gender-affirming surgery would not be

approved ("Medicaid Exclusion Policy"). Dkt. 36 at 18 n.7. However, Idaho Governor Brad

Little issued a letter fully endorsing and memorializing the Medicaid Exclusion Policy stating:

> I oppose Idaho Medicaid using public funds to pay for irreversible sex reassignment
> surgeries, puberty blockers, or hormones for the purpose of changing the

appearance of any child's or adult's sex" and "I hereby direct you and the
Department of Health and Welfare to take all appropriate steps to implement a
policy consistent with state and federal law excluding the same from Medicaid
coverage.

Dkt. 36 at 18 n.7 (citing Dkt. 33-1 at Ex. A).

On March 27, 2024, the Governor signed HB 668 into law. Declaration of Howard

Belodoff at Exhibit 1. The Idaho Legislature enacted HB 668 in response to this action in order

to prohibit using Medicaid or public funds from covering or reimbursing gender-affirming care

to treat gender dysphoria. Idaho Code § 18-8901. HB 668 targets transgender individuals

because they are the only persons who need medically necessary treatment for the medical

condition of gender dysphoria. *See* Dkt. 36 at 20 ("Yet, exclusively transgender persons – and

not cisgender persons – suffer from gender dysphoria.) (citation omitted). Plaintiffs' Amended

Complaint contends the Medicaid Exclusion Policy and HB 668 violate the Medicaid Act's

availability requirements, 42 U.S.C. § 1396a(a)(10)(A) and 42 U.S.C. § 1396a(a)(19), and the

comparability requirements, 42 U.S.C. § 1396a(a)(10)(B) and 42 U.S.C. § 1396a(a)(19).

HB 668 prohibits the use of public funds for transgender individuals diagnosed with

gender dysphoria from obtaining "surgical operations or medical interventions" to affirm a

transgender individual's perception of their sex if that perception is inconsistent with the

transgender individual's biological sex assigned at birth. Idaho Code §18-8901(2). HB 668

exempts cisgender individuals from the prohibition against using public funds for medical

treatment for diagnoses, types of illness, and medical conditions other than gender dysphoria.

Idaho Code §18-8901(1). The Medicaid Exclusion Policy and HB 668, Idaho Code§ 18-8901(4),

prohibits Medicaid from reimbursing or providing coverage for "surgical operations or medical

interventions" to affirm an individual's perception of their sex if that perception is inconsistent

with the transgender individual's biological sex which was assigned at birth. The only

individuals affected are transgender individuals. HB 668 specifically exempts cisgender individuals from the prohibition. Idaho Code §18-8901(1).

The Medicaid Exclusion Policy and HB 668 limit the amount, duration, or scope of medical assistance and the treatment available for transgender Medicaid participants diagnosed with gender dysphoria while the same or similar medical assistance is fully reimbursed and covered for cisgender Medicaid beneficiaries who have different diagnoses, types of illness, and medical conditions other than gender dysphoria. The Medicaid Exclusion Policy's and HB 668's prohibition against using public funds and Medicaid reimbursement and coverage for medically necessary gender-affirming care violate Medicaid's availability requirement, 42 U.S.C. § 1396a(a)(10)(A) and comparability requirement, 42 U.S.C. § 1396a(a)(10)(B), is not in the best interests of Plaintiffs and violates the Medicaid Act, 42 U.S.C. § 1396a(a)(19).

### III. FACTUAL BACKGROUND

Plaintiffs incorporate by reference the Statement of Material Facts filed in support of the Motion for Partial Summary Judgment.

### IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit…. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The Court's role at summary judgment is not "to weigh the evidence or determine the truth; it may only determine whether there is a genuine issue of fact." *Playboy Enters., Inc, v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). The

Court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). The moving party has the initial burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The specific facts must be supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). The Court must "view[] the facts in the non-moving party's favor." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017). Deference to the nonmoving party has limits, and the "mere scintilla of evidence in support of the [nonmoving party's] position [is] insufficient." *Anderson*, 447 U.S. at 252.

## V.  ARGUMENT

### A. The Court Should Grant the Motion for Partial Summary Judgment

The Court should grant partial summary judgment because there are no material facts in dispute related to Plaintiffs' Medicaid claims and only presents a question of law. Defendants cannot delay this case any longer. Defendants' defend the Medicaid Exclusion Policy as not discriminatory because it was based on the diagnosis and treatment of "the condition of gender dysphoria." Dkt. 36 at 19 (quoting Dkt. 19-1 at 6). ("[T]he Equal Protection claim is based on an asserted denial of payment coverage from a state's social welfare program related to a particular medical condition or, in this case, medical treatment."). This Court observed: "the exclusion operates to disadvantage transgender persons – by denying coverage for genital reconstruction

surgery to treat gender dysphoria – relative to cisgender persons whose genital reconstruction surgery to treat all other conditions applying to them is covered." Dkt. 36 at 21.

In the interlocutory appeal to the Ninth Circuit, Defendants were even more specific that the justification and purposes of the Medicaid Exclusion Policy was to prohibit medically necessary treatments for transgender individuals diagnosed with the condition of gender dysphoria. *See* Ninth Circuit Brief for the Appellant, Dkt Entry 25 at 15 "[T]he clear import of the policy is to condition the sought-after surgeries on the **condition from which the person suffers** rather than their gender identity." (emphasis added). Declaration of Howard Belodoff at Exhibit 2. *See also Id.* at 28 ("the relevant right here is a Medicaid recipient's right to Medicaid-funded sex-reassignment surgery."); *Id.* at 40 ("Here, by contrast, the challenge is to the **denial funding for one kind of procedure for gender dysphoria: sex-reassignment surgery**.") (emphasis added). The Medicaid Act's availability and comparability requirements specifically forbid state officials from exercising unbridled discretion not to reimburse or cover medically necessary inpatient and outpatient physician services, hospital services, and any gender-affirming care and surgeries for transgender individuals who have been diagnosed with the condition of gender dysphoria. *See infra*, at 11-17.

Even without Defendants' admissions, the Court can grant partial summary judgment as a matter of law based upon the explicit prohibitions in HB 668. As of July 1, 2024, Idaho Medicaid is statutorily prohibited from reimbursing or covering "surgical operations or medical interventions" for gender-affirming care and surgeries to treat the condition of gender dysphoria as those treatments are "for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex . . . ." HB 668 at Idaho Code §18-8901(4). HB 668 specifically

exempts cisgender individuals from the prohibition on coverage for "surgical operations or medical interventions" to treat medical conditions other than gender dysphoria. *See also* HB 668 at Idaho Code § 56-270.[1] The Medicaid Exclusion Policy and HB 668 facially, by proxy, and as applied exclude all transgender Medicaid participants who will or continue to need medically necessary gender-affirming care by denying reimbursement and coverage if they suffer from the diagnosed condition of gender dysphoria in violation of the Medicaid Act.

Unless a court orders otherwise, "a party may file a motion for summary judgment at any time until 30 days after the close of discovery." Fed. R. Civ. P. 56(b). On September 29, 2022, Plaintiffs filed a Complaint contending Defendants were violating the Medicaid Act. Dkt. 1. On July 20, 2023, Defendants gave Notice they were declining to file their Litigation and Discovery Plans. Dkt. 46. The Court had to approve a Scheduling Order before the parties were allowed to conduct discovery. There is no basis to allow Defendants to further delay this action. The entry of partial summary judgment is justified because HB 668 prohibits Medicaid from reimbursing and covering all gender-affirming care. Thus, Plaintiffs' medically necessary treatment of gender-dysphoria will end on July 1, 2024. Because of the statutory language, there are no material facts at issue related to whether the Medicaid Exclusion Policy and HB 668 violate the Medicaid Act. Discovery is not necessary to establish that the Medicaid Exclusion Policy and HB 668 violate the Medicaid Act because it is solely a question of law, not of fact.

---

[1] "PROHIBITION ON REIMBURSEMENT AND COVERAGE. (1) Pursuant to 8 chapter 89, title 18, Idaho Code, the Idaho medicaid program shall not reimburse or provide coverage for any surgical operation or medical intervention described in section 18-1506C(3), Idaho Code, for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex regardless of whether the surgical operation or medical intervention is administered to a minor or an adult, except exempted surgical operations or medical interventions described in section 18-8901(1), Idaho 16 Code."

The doctrine of judicial estoppel prevents Defendants from changing the positions taken in this Court and the Ninth Circuit that Medicaid was prohibiting gender-affirming care based upon the condition and diagnosis of gender dysphoria. "'Judicial estoppel, also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.'" *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004) (quoting *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996)). "Judicial estoppel is an equitable doctrine that is intended to protect the integrity of the judicial process by preventing a litigant from 'playing fast and loose with the courts.'" *Id.* (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)) (internal quotation marks omitted). "Judicial estoppel applies to a party's stated position whether it is an expression of intention, a statement of fact, or a legal assertion." *Id.* (citation omitted). The application of judicial estoppel is a matter of discretion. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

A Court looks at several factors in applying the doctrine including: "(1) Is the party's later position 'clearly inconsistent with its earlier position?' (2) Did the party succeed in persuading a court to accept its earlier position, creating a perception that the first or second court was misled? and (3) Will the party seeking to assert an inconsistent position 'derive an unfair advantage or impose an unfair detriment on the opposing party?'" *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012) (quoting *New Hampshire,* 532 U.S. at 750-51) (internal quotation marks omitted). These factors favor applying the doctrine for purposes of summary judgment here. First, a new position would be inconsistent with Defendants' earlier positions. Second, a new position would create a perception that the Courts were misled by the earlier position. Third, Defendants would obtain an unfair advantage to Plaintiffs' detriment if summary

judgment on the Medicaid claims were delayed until after July 1, 2024, because Defendants will prohibit Medicaid from reimbursing and covering Plaintiffs' medically necessary gender-affirming care. The Court should exercise its discretion by applying judicial estoppel to prevent Defendants from taking inconsistent positions from the earlier positions taken on the Motion to Dismiss and in the Ninth Circuit appeal.

## B.  The Medicaid Act's Objectives Require Medically Necessary Gender-Affirming Care Be Provided to Treat Gender Dysphoria

Idaho, by opting to participate in the Medicaid program, "must comply with requirements imposed both by the [Medicaid] Act itself and by the Secretary of Health and Human Services." *Schweiker v. Gray Panthers*, 453 U.S. 34, 37 (1981).[2] Once a state enters the program, the state must comply with the Medicaid Act and its implementing regulations. *Katie A., ex rel. Ludin v. Los Angeles Cty.*, 481 F.3d 1150, 1154 (9th Cir. 2007) (citation omitted). Title XIX of the Social Security Act requires states participating in Medicaid to provide five general categories of medical treatment including inpatient and outpatient hospital services, lab and x-ray services, skilled nursing services, and physician services. *Beal v. Doe*, 432 U.S. 438, 440 n.2 (1977) (citing 42 U.S.C. § 1396a(a)(1)-(5)). The Act requires states to establish "reasonable standards...

___

[2] The Secretary has issued the final rules regarding section 1557 of the Affordable Care Act that prohibits discrimination in any health program or activity administered by HHS including the Centers for Medicare & Medicaid Services (CMS) that governs Medicaid. 89 Fed. Reg. 37522 (May 6, 2024) (to be codified at 45 CFR pt. 92). A Medicaid program cannot deny or limit health services "based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded" or deny or limit a health care professional from providing services if it excludes the individual from participation in or denying benefits or otherwise subjecting them to discrimination. 45 CFR § 92.206(b)(1) & (2). The Rule further prohibits Medicaid's ability to "[d]eny or limit health services sought for purpose of gender transition or other gender-affirming care that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded." 45 CFR § 92.206(b)(4).

for determining… the extent of medical assistance under the plan which… are consistent with the objectives of [Title XIX]. 42 U.S.C. § 1396a(a)(17)." *Id.*

In *Beal*, Pennsylvania limited Medicaid assistance for abortions that physicians certified were medically necessary. *Id.* Doe challenged Medicaid's medical necessity requirement for nontherapeutic abortions. *Id.* at 441-42. The Supreme Court upheld the "medically unnecessary" limitation because it comported with Medicaid's objective to furnish "medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services." *Beal*, 432 U.S. at 444 (citing 42 U.S.C. §§ 1396, 1396a(10)(C)). The Supreme Court held the Medicaid Act requires an individual's medical assistance is not less in amount, duration, or scope than medical assistance made available to other individuals under the comparability requirement in 42 U.S.C. § 1396a(10)(B). The Supreme Court held there was no violation of the comparability requirement by limiting abortions to those certified by physicians as medically necessary and excluding nontherapeutic abortions because there was a reasonable justification for excluding "medically unnecessary" nontherapeutic abortions.

The Supreme Court held a state's discretion over what services to cover did not extend to "unnecessary medical treatment." The Court held "[a]lthough serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage, it is hardly inconsistent with the objectives of the Act for a State to refuse to fund unnecessary – though perhaps desirable – medical services." *Id.* at 444-45. The Supreme Court did not give state officials the unbridled discretion to reject the opinions of physicians in order to exclude medically necessary services based on sex and transgender status or diagnosis. Just as in *Beal*, Plaintiffs' medical providers determined gender-affirming care and surgery is medically necessary to treat their gender dysphoria.

The Ninth Circuit has recognized that *Beal* held "physicians decide which abortions are medically necessary and therefore reimbursable under Medicaid." *Vista Hill Found., Inc. v. Heckler*, 767 F.2d 556, 561 (9th Cir. 1985) (citing *Pinneke v. Preisser*, 623 F.2d 546, 550 (8th Cir. 1980) ("'The decision of whether or not certain treatment or a particular type of surgery is 'medically necessary,' [and therefore reimbursable under Medicaid] rests with the individual recipient's physician and not with clerical personnel or government officials.'"). Here, Plaintiffs' physicians, who specialize in providing gender-affirming care along with Plaintiffs' mental health providers, determined whether or not gender-affirming care and surgery is medically necessary to treat Plaintiffs' gender dysphoria. *See Declaration of Misa Perron-Burdick, MD MAS* and *Declaration of Marvin-Anthony Carson Alviso, MD.* Medicaid's Exclusion Policy and HB 668 categorically and unlawfully prohibit all gender-affirming care without considering Plaintiffs' health, their physicians' determination of medical necessity, or the WPATH Standards of Care. Medicaid's Exclusion Policy and HB 668 also violate the Medicaid Act because it is inconsistent with the objective to provide required medical services to individuals who cannot pay the cost.

## C. Medicaid's Exclusion Policy and HB 668's Prohibition of Gender-Affirming Care to Treat Gender Dysphoria Violates the Medicaid Act's Availability Provision

Medicaid's Exclusion Policy and HB 668's prohibition of medically necessary treatments for gender dysphoria violate the Medicaid Act's availability requirement that requires mandatory services. *See Cal. Ass'n of Rural Health Clinics v. Douglas*, 721 F.3d 1097, 1106 (9th Cir. 2013) ("Medicaid requires state plans to cover, as a floor, various services listed in 42 U.S.C. § 1396d(a). *See* 42 U.S.C. § 1396a(a)(10)(A) (requiring state plans to cover the services listed in paragraphs (1) through (5), (17), (21) and (28)).". The availability requirement, 42 U.S.C. § 1396d(a), requires states to provide these type of mandatory medical services.

These mandatory services include, in relevant part, medically necessary: (1) inpatient

hospital services; (2) outpatient hospital services; (3) laboratory and x-ray services; (5) physician

services whether in an office, a patient's home, a hospital, or elsewhere. *Id.*[3] Congress required

states to provide medically necessary services to all persons regardless of sex and transgender

status. States do not have the discretion to violate the availability requirement's statutory

mandate. *See Watson v. Weeks*, 436 F.3d 1152, 1161 (9th Cir. 2006) ("Section 1396a(a)(10) is

also expressly worded in mandatory, not precatory terms; it obviously sets out specific

requirements for state plans.") (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 512 (1990)).

In *Alvarez v. Betlach*, the Court held 42 U.S.C. § 1396a(a)(10) and 42 C.F.R. § 440.230(d)

"prohibits states from denying coverage of 'medically necessary' services that fall under a

category covered in their Medicaid plans." *Id.* 572 F. App'x 519, 520-21 (9th Cir. 2014) (citing

*Beal v Doe*, 438 U.S. at 444). *See* 42 U.S.C. § 1396a(a)(10)(A) (requiring state plans to cover the

services listed in paragraphs (1) through (5), (17), (21) and (28)).).

Medicaid's Exclusion Policy and HB 668 violate the availability requirement because

they deny treatment to transgender Medicaid participants with the diagnosis of gender dysphoria

as not medically necessary but the same treatments are available to cisgender Medicaid

participants for other medical conditions. The court in *Flack* has held Wisconsin's Medicaid

exclusion of surgery to treat gender dysphoria violated the availability requirement because it

"fails to make covered treatments available in sufficient 'amount, duration and scope' and

discriminates on the basis of diagnosis." *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d

---

[3]Idaho's Medical Assistance Program includes the same required services as the Medicaid Act.
See Idaho Code § 56-255(5)(a) MEDICAL ASSISTANCE PROGRAM – SERVICES TO BE
PROVIDED. Declaration of Howard Belodoff at Exhibit 3.

1001, 1019 (W.D. Wis. 2019) (quoting 42 C.F.R. § 440.230(b)). The Fourth Circuit recently

affirmed the granting of summary judgment enjoining West Virginia's Medicaid's categorical

exclusion denying medically necessary gender-affirming care because it violated the availability

provision by arbitrarily denying or reducing the amount, duration, or scope of a required service

based on "the diagnosis, type of illness, or condition" of the mandatory categorical coverages.

*Kadel v. Folwell*, 2024 U.S. App. LEXIS 10294, *14-15 & 76 (4th Cir. April 29, 2024) (*en banc*)

(quoting 42 C.F.R. § 440.230(c)). The Fourth Circuit recognized that the Supreme Court held

"'serious statutory questions might be presented if a state Medicaid plan excluded necessary

medical treatment from its coverage.'" *Id.* (quoting *Beal v. Doe*, 432 U.S. 438, 444 (1977)). The

Fourth Circuit also recognized that other circuits have held medically necessary services must be

covered. *Id.* (citing *Bontrager v. Ind. Fam. Soc. Servs. Admin.*, 697 F.3d 604, 608 (7th Cir.

2012); *Ellis ex rel. Ellis v. Patterson*, 859 F.2d 52, 54 (8th Cir. 1988); *Meusberger v. Palmer*,

900 F.2d 1280, 1282 (8th Cir. 1990); *Dexter v. Kirschner*, 984 F.2d 979, 983 (9th Cir. 1992);

*Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232-33 (11th Cir. 2011)).

        The Fourth Circuit held West Virginia's Medicaid categorical exclusion violated the

availability requirement in two ways. "First, it is inconsistent with the objectives of the Act: to

provide medical assistance to people too poor to afford it." *Id.* at *77 (citation omitted). The

Court rejected the exclusion because "a state law that categorically denies coverage for a

specific, medically necessary procedure . . . is not a 'reasonable standard [] . . . consistent with

the objectives of [the Act].'" *Kadel v. Folwell*, 2024 U.S. App. LEXIS 10294 at *77. (citation

and internal quotation marks omitted). "Second, the exclusion violates the availability

requirement by 'arbitrarily den[ying] or reduc[ing] the amount, duration, or scope of a required

service . . . to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or

condition.'" *Id.* (quoting 42 C.F.R. § 440.230(c)). The Fourth Circuit held the exclusion violated the Medicaid Act's availability requirement because:

> Determinations about proper medical treatment will always be based on the patient's diagnosis. But they cannot be arbitrarily denied to a patient for whom the treatment is medically necessary based on that diagnosis alone. West Virginia's exclusion, which bars coverage of all surgeries to treat gender dysphoria, regardless of medical necessity, does just that.

*Id.* at 77-78. Medicaid's Exclusion Policy and HB 668 violates the availability requirement for the same reasons: they arbitrarily deny coverage because the diagnosis is gender dysphoria and unreasonably and intentionally disregard the medical necessity of the treatment.

### D. Medicaid's Exclusion Policy of Gender-Affirming Care to Treat Gender Dysphoria Violates the Medicaid Act's Comparability Requirements

The Medicaid Act's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B), requires a state's medical assistance: "(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual," and "(ii) shall not be less in the amount, duration, and scope than the medical assistance made available to individuals not described in subparagraph (A)." The services in a state's Medicaid plan "must be sufficient in amount, duration, and scope to reasonably achieve its purpose;" and required services may not be reduced in the amount, duration, or scope because of "diagnosis, type of illness, or condition."42 C.F.R. § 440.230(a)-(c).

Courts have applied the comparability requirement to prohibit states from providing services to some but not others based solely on their medical diagnoses. *See White v. Beal*, 555 F.2d 1146, 1148 (3rd Cir. 1977); *Davis v. Shah*, 821 F.3d 231, 258 (2d Cir. 2016). In *White*, the Third Circuit enjoined a Pennsylvania Medicaid policy that covered eyeglasses for individuals with eye disease or pathology, but not for those with ordinary refractive errors. *Id.*, 555 F.2d at 1148. In *Davis*, the Second Circuit struck down a New York policy that denied Medicaid

services based on the "nature of their medical conditions," holding that the comparability requirement "prohibits discrimination among individuals with the same medical needs stemming from different medical conditions." *Id.*, 821 F.3d at 256, 258. New York's Medicaid only covered prescription orthopedic footwear and inserts to treat diabetes, or to treat growth issues in children. *Id.* at 240. New York also limited Medicaid coverage of compression stockings to individuals with pregnancy-related conditions or venous stasis ulcers. *Id.* at 241. The court found those limitations violated the comparability requirement because New York offered an unequal scope of benefits to beneficiaries with an equal medical need for the services. *Id.* at 256. Similarly, in *Flack v. Wisconsin Dept of Health Services*, the Court held the availability and comparability requirements "require that states make offered services sufficiently available to treat beneficiaries without discriminating based on diagnosis." *Flack*, 395 F.Supp.3d at 1019. Here, Idaho Medicaid has no discretion to exclude treatment of transgender Medicaid participants with the "condition" of gender dysphoria, similar to the policies in *White*, *Davis*, and *Flack*, because the exclusion impermissibly denies coverage "based upon etiology rather than need for the service." *White*, 555 F.2d at 1151.

The Fourth Circuit in *Kadel v. Folwell* held that West Virginia's Medicaid categorical exclusion violated the Medicaid Act's comparability requirement because states must ensure the services available to individuals are "'equal in amount, duration, and scope for all beneficiaries within the group.'" *Id.* at 78. (quoting 42 C.F.R. § 440.240(b)(1)). The Fourth Circuit relied upon the Second Circuit's reasoning that allowing a state to deny Medicaid services "'that it provides to others with the exact same medical needs simply by defining such services—however arbitrarily—as aimed at treating only some medical conditions would risk swallowing the comparability provision whole." *Id.* at 79 (quoting *Davis v. Shah*, 821 F.3d at 257). The Court

held West Virginia could not escape "the comparability requirement by defining the relevant services as services aimed at treating only some medical conditions (i.e., non-gender dysphoria conditions) any more than it can get around the Equal Protection Clause by doing so." *Id.* at 80 (citing *White v. Beal*, 555 F.2d 1146, 1151 (3d Cir. 1977) ("We find nothing in the federal statute that permits discrimination based upon etiology rather than need."). Medicaid's Exclusion Policy and HB 668 violate the comparability requirement for the same reasons.

E.    **The Court Should Issue a Permanent Injunction Enjoining Defendants from Violating the Medicaid Act**

Plaintiffs request permanent injunctive relief enjoining Defendants' judicially admitted violations of the Medicaid Act. A permanent injunction is necessary because the Medicaid Exclusion Policy and HB 668, as of July 1, 2024, will prohibit all transgender Medicaid participants from receiving medically necessary gender-affirming care in violation of the Medicaid Act's availability requirement, 42 U.S.C. § 1396a(a)(10)(A), comparability requirement, 42 U.S.C. § 1396a(a)(10)(B), and 42 U.S.C. § 1396a(a)(19). The physical and psychological irreparable harm the discontinuance or cessation of gender-affirming care would cause to this especially vulnerable population would be incalculable and cannot be rectified by a subsequent remedy issued by the Court. *See Declaration of Misa Perron-Burdick, MD MAS* and *Declaration of Marvin-Anthony Carson Alviso, MD.* There is no justifiable reason to delay the issuance of a final judgment and a permanent injunction enjoining Defendants from violating the Medicaid Act.

"[T]the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "[T]he court 'balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction.'" *Id.* (quoting

*Yakus v. United States*, 321 U.S. 414, 440 (1944)). "[A] permanent injunction is appropriate

where: (1) a plaintiff has suffered an irreparable injury; (2) remedies available at law are

inadequate to compensate for that injury; (3) considering the balance of the hardships between

the parties, a remedy in equity is warranted; and (4) 'the public interest would not be disserved

by a permanent injunction.'" *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### 1. Medicaid Participants Will Suffer Irreparable Harm if All Gender-Affirming Care is Stopped When the Medicaid Exclusion Policy and HB 668 Become Effective on July 1, 2024.

Plaintiffs and other similarly situated transgender Medicaid participants are receiving

medically necessary gender-affirming care prescribed by their physicians to treat their diagnosed

gender dysphoria. Gender dysphoria is a serious medical condition that causes significant

distress, anxiety, depression, as well as serious incidents of self-harm, including self-mutilation,

suicide attempts, and suicide. *See Declaration of Marvin-Anthony Carson Alviso, MD* ("*Dr.*

*Alviso Dec.*"), ¶ 21. Gender-affirming care and surgeries are necessary to alleviate the symptoms

of gender dysphoria. *See Dr. Alviso Dec.*, ¶¶ 13, 21, 26, 38. The prohibition of gender-affirming

care will cause irreparable harm. *See Dr. Alviso Dec.*, ¶ 43. Delayed access to medically

necessary healthcare services is sufficient to establish irreparable harm. *Bowen v. City of New*

*York*, 476 U.S. 467, 483-84 (1986) (finding denial of benefits caused irreparable injury by

exposing plaintiffs to "severe medical setbacks or hospitalization"). The Ninth Circuit has found

the denial of gender-confirming surgery and the accompanying psychological distress and risk to

physical health constituted irreparable harm. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 797-8 (9th

Cir. 2019). The Ninth Circuit has held that serious psychological harm and physical harm and

suffering, constitute irreparable injury. *See, Chalk v. United States Dist. Court Cent. Dist.*, 840

F.2d 701, 709 (9th Cir. 1988) (plaintiff's "emotional stress, depression and reduced sense of

well-being" constituted irreparable harm and "his injury is emotional and psychological—and immediate. Such an injury cannot be adequately compensated for by a monetary award after trial."). The Ninth Circuit has held that Medicaid beneficiaries' access to medically necessary care outweighs budgetary concerns. *See*, *M.R. v. Dreyfus*, 697 F.3d 706, 737-38 (9th Cir. 2012).

Dr. Loren Schechter, Plaintiffs' Expert, has years of professional experience in providing gender-affirming care to persons diagnosed with gender-dysphoria. Expert Declaration of Loren S. Schechter, M.D. at ¶ 7-15. Dr. Schechter "was a contributing author to the Seventh Version of the World Professional Association for Transgender Health's ("WPATH") Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People ("Standards of Care").[4] *Id.* at ¶ 9. This includes "clinical experience of over 28 years of caring for transgender patients, including adolescents and young adults," review of peer-reviewed literature and research and attending professional conferences on treating gender dysphoria. *Id.* at ¶ 18. "Gender dysphoria is a serious medical condition, defined by the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) published by the American Psychiatric Association as 'a difference between one's experienced/expressed gender and assigned gender, and significant distress or problems functioning.'" *Id.* at ¶ 21. "Without treatment gender dysphoria can lead to debilitating anxiety and depression, as well as serious incidents of self-harm, including self-mutilation, suicide attempts, and suicide." *Id.* "Appropriate medical care can help alleviate gender dysphoria." *Id.* at ¶ 22.

It is Dr. Schechter's "professional opinion, supported by the prevailing consensus of the medical community, that procedures used to treat gender dysphoria are medically necessary

---

[4] E. Coleman et al. (2012). Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, Int'l J. of Transgenderism, 13(4): 165-232, 201 doi: 10.1080/15532739.2011.700873 58.

treatments for many transgender people; these procedures are properly considered as medically necessary, and are not cosmetic in nature; and these procedures are safe and effective treatments for gender dysphoria." *Id.* at ¶ 23. "As indicated in the Standards of Care, medically necessary gender affirming treatments include mental health care, puberty suppression, hormone therapy, and various surgical procedures to align a person's primary and/or secondary sex characteristics with the person's gender identity." *Id.* at ¶ 25. "The Endocrine Society—the leading professional organization devoted to research on hormones and the clinical practice of endocrinology—has also issued clinical guidelines for the treatment of transgender people.  The guidelines indicate that for transgender people, gender-confirming surgeries often are necessary and effective treatments."[5] *Id.* at ¶ 27.

"The broader medical community, including the American Medical Association, American Academy of Pediatrics, American Psychological Association, American Psychiatric Association, American College of Obstetricians and Gynecologists, American Academy of Family Physicians, and World Health Organization, recognize that gender-confirming surgeries are standard, appropriate, and often necessary treatments for individuals with gender dysphoria." *Id.* at ¶ 28. "The medical community and insurance providers recognize a distinction between surgery that is medically necessary, and cosmetic surgery, which generally is not. No particular procedure is inherently cosmetic or inherently medically necessary; rather, the underlying diagnosis determines whether the procedure is considered cosmetic or medically necessary." *Id.* at ¶ 32.

---

[5] Wylie C Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clin. Endocrinology & Metabolism 3869 (2017).

It is Dr. Schechter's "professional opinion, based on decades of clinical experience, as well as a substantial body of peer-reviewed research, that standard medical surgical treatments for gender dysphoria are effective when performed in accordance with the Standards of Care." *Id.* at ¶ 42. Peer-reviewed studies and peer-reviewed literature find "that in appropriately selected individuals, gender confirmation surgery is effective at improving quality of life, overall happiness, and sexual functioning in transgender women who are diagnosed with gender dysphoria." *Id.* at ¶ 43. It is Dr. Schechter's "professional medical opinion that the contention that gender-confirming surgeries are experimental is unsupported by the professional medical consensus and prevailing standards of care for treating gender dysphoria, and is inconsistent with mainstream medical standards." at ¶ 46. "To the contrary, the prevailing consensus of the medical community recognizes that procedures used to treat gender dysphoria are reconstructive, not experimental, and are medically necessary." *Id.* at ¶ 46.

"Gender-affirming surgical care is not considered experimental when it uses accepted techniques and has demonstrative benefits." *Id.* at ¶ 47. "The techniques used in gender affirming care are employed in other surgeries and are well-established. For example, urethroplasties, orchiectomies, skin grafts, and mastectomies are all accepted techniques for congenital, oncological, and traumatic conditions. They are not experimental simply because they are applied to the well-established diagnosis of gender dysphoria." *Id.* at ¶ 47. "Gender-affirming surgery has been performed for decades, utilizes accepted surgical techniques, and yields demonstrated benefits for patients. In addition, gender-affirming surgeries are: 1) part of the core curriculum in plastic surgery resident education; and 2) a component of both the written and oral board exams in plastic surgery. [Dr. Schechter has] given presentations at multiple professional societies—including, the American Society of Plastic Surgeons, American Association of Plastic

Surgeons, American Society for Reconstructive Microsurgery, American College of Surgeons—and none of those societies consider gender-affirming surgery experimental. In the disclosures required to give presentations of this kind there is no requirement that they be called experimental. It is widely accepted by professional surgical societies that gender-affirming surgeries are not experimental. Indeed, gender-affirming surgery is part of the standard resident education in plastic surgery and, it is included in both the written and oral exams (in order to obtain board certification). *Id.* at ¶ 48.

"The quality of the evidence supporting gender-affirming surgeries is comparable to that supporting many surgeries and clinical procedures. Prospective, randomized, double-blind, placebo-controlled studies cannot be used to evaluate many clinical procedures." *Id.* at ¶ 50. "The withholding of medically necessary care that would be required for such a comparison would be considered unethical. As such, in many situations, clinicians cannot conduct a study that uses a control group who is deprived of the treatment being studied. As noted in Dhejne et al. 2011, 'the nature of sex reassignment precludes double blind randomized controlled studies of the result.'"[6] *Id.* "In 2014, an impartial adjudicative board in the United States Department of Health & Human Services ("HHS") concluded, based on decades of studies, that surgical care to treat gender dysphoria is safe, effective, and medically necessary." *Id.* at ¶ 52. "As a result, the Centers for Medicare & Medicaid Services (CMS) within HHS started covering surgical care for gender dysphoria and continues to provide that coverage, including for patients in [Dr. Schechter's] practice." *Id.* "All available research—as well as [his] own clinical experience—

---

[6] Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. PloS one, 6(2), e16885. https://doi.org/10.1371/journal.pone.0016885 ("Given the nature of sex reassignment, a double blind randomized controlled study of the result after sex reassignment is not feasible.").

indicates that very few patients experience regret when gender-confirming surgery is provided in accordance with the WPATH Standards of Care and by a qualified surgeon." *Id.* at ¶ 53. *See also* ¶ 53- ¶ 57. Medicaid participants will suffer irreparable harm if Medicaid can prohibit them from receiving medically necessary gender-affirming care to treat their gender dysphoria.

**2.      The remedies available at law are inadequate to compensate for Plaintiffs' injury**

There is no monetary remedy for emotional distress damages caused by Defendants' violations of the Medicaid Act. *See* Dkt. 19-1 at 6-8 (citing *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. ____ (2022)). The irreparable injuries caused by the physical and emotional harm suffered by the discontinuance, delay, or denial of gender-affirming care and surgeries cannot compensate for the physical and psychological damages that Plaintiffs and other transgender Medicaid participants will suffer if the Medicaid Exclusion Policy and HB 688 become effective on July 1, 2024. Only permanent injunctive relief preventing the harm is adequate. *Cf. Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), rev'd and remanded on other grounds, 562 U.S. 134, 131 S.Ct. 746, 178 L.Ed.2d 667 (2011).

**3.      The Balance of Equities Tip in Favor of Medicaid Participants and a Permanent Injunction Is Warranted**

The balance of equities tips in Plaintiffs' favor because the irreparable harm caused by the unnecessary physical and emotional suffering from the discontinuance, delaying and denying of gender-affirming care to treat gender dysphoria can only be avoided by enjoining the violations of Medicaid's availability and comparability requirements. There are no justifications for a categorical ban on medically necessary treatment for Medicaid participants with a diagnosis

of gender dysphoria when the same and similar treatments are available to cisgender Medicaid participants with medical conditions other than gender dysphoria. The prohibitions of gender-affirming care and surgery do not meet the needs of Medicaid's transgender participants or the objectives of the Medicaid Act. Medicaid is prohibited from providing treatment to some but not others based solely on their medical diagnoses even if the medical condition and treatment is not related to gender-affirming care or the diagnosis of gender dysphoria. *See Declaration of Misa Perron-Burdick, MD* MAS. Federal law prohibits states from reducing required services in the amount, duration, or scope because of "diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(a)-(c). The hardship on Medicaid participants outweighs any perceived hardship of requiring Defendants to continue to provide gender-affirming care to Medicaid participants as required by the Medicaid Act.

### 4.    The Public Interest Is Served by the Issuance of a Permanent Injunction

The public interest is served by enjoining the government's violation of Medicaid participants' rights under the Medicaid Act. Congress sought to protect Medicaid participant's rights to receive mandatory medically necessary services under the availability requirement listed in 42 U.S.C. § 1396d(a). *See* 42 U.S.C. § 1396a(a)(10)(A) (requiring state plans to cover the services listed in paragraphs (1) through (5), (17), (21) and (28)). The comparability requirement prohibits States from providing services to some but not others based solely on their medical diagnoses. There is no public interest in allowing Defendants to circumvent and violate established federal statutes and regulations and the case law by allowing Medicaid to prohibit gender-affirming care to treat transgender Medicaid participants diagnosed with gender dysphoria when cisgender Medicaid participants can continue to receive the same or similar treatments for other medical conditions.

MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION – Page 23

5.    **The Scope of the Permanent Injunction Should Protect All Transgender Medicaid Participants**

Plaintiffs request the Court issue a permanent injunction enjoining Defendants' enforcement of the Medicaid Exclusion Policy and HB 668's prohibitions against providing Plaintiffs and all other Medicaid participants with medically necessary gender-affirming care and surgeries. While injunctive relief is generally limited to the named plaintiffs, "'an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit - even if it is not a class action - *if such breadth is necessary to give prevailing parties the relief to which they are entitled*.'" *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) (emphasis in original). In *Easyriders*, the Ninth Circuit held that, while there were only fourteen named plaintiffs, a statewide injunction was appropriate to extend injunctive relief to other members of Easyriders. *Id.* at 1052. Similarly, all Medicaid participants, not just the named Plaintiffs, need the Court's protection from the irreparable harm caused by the discontinuance, delay, and denial of their medically necessary gender-affirming care in violation of the Medicaid Act. The Medicaid Exclusion and HB 668 were expressly and intentionally implemented on a statewide basis to prohibit transgender Medicaid participants from receiving medically necessary gender-affirming care knowing it would cause them irreparable harm and would subject them to second class status. Without a permanent injunction enjoining the enforcement of the Medicaid Exclusion Policy and HB 668, similarly situated transgender Medicaid participants will needlessly suffer the physical and psychological distress caused by gender-dysphoria and be denied other types of medically necessary medical care simply because they have been diagnosed with gender dysphoria. *See Dr. Perron-Burdick Dec.* and *Dr. Alviso Dec.*

MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION – Page 24

## CONCLUSION

Plaintiffs respectfully request this Court issue a permanent injunction enjoining

Defendants' enforcement of the Medicaid Exclusion Policy and HB 668.

Dated this 11th day of June, 2024.

_/s/ Jane Gordon_                                       _/s/ Howard A. Belodoff_
Attorney for Plaintiff                                 Attorney for Plaintiffs