Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
1447 S. Tyrell Lane
Boise, ID 83706
Tel: (208) 807-2496 Fax: (208) 342-2561
howardbelodoff@idaholegalaid.org

Jane Gordon, ISB # 9243
Jane Gordon Law
1004 West Fort Street
Boise ID 83702
Tel: (208) 371-4747; Fax: (208) 807-2290
Jane@JaneGordonLaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| MH, TB, KB, SG, AC, BM, individually, and G Doe, by and through her parents and next friends, JANE Doe and JOHN Doe,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>ALEX ADAMS, in his official capacity as the Director of the Idaho Department of Health and Welfare; Dr. MAGNI HAMSO, in her official capacity as the Medical Director of the Idaho Division of Medicaid and individually; and the IDAHO DEPARTMENT OF HEALTH AND WELFARE,<br><br>　　　Defendants. | CASE NO. 1:22-CV-409-REP<br><br>DECLARATION OF HOWARD BELODOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

Howard Belodoff declares, under penalty of perjury, and states as follows:

1.　I am counsel of record for the Plaintiffs in the above-entitled matter and have personal knowledge of the matters set forth herein.

DECLARATION OF HOWARD BELODOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT– Page 1

2. I certify that the Exhibits attached hereto are true and correct copies of the same.

3. Attached as Exhibit 1 is a letter signed by Idaho Governor Brad Little addressed to the prior Director of the Department and Health and Welfare, Dave Jeppesen, dated May 1, 2023, clarifying whether Idaho Medicaid provides coverage for gender-affirming care. Dkt. 33-1.

4. Attached as Exhibit 2 are pages from the Ninth Circuit Brief for the Appellant, Dkt Entry 25, in this matter, including the Cover, Table of Index, pages 15, 28 and 40 and the signature page.

5. Attached as Exhibit 3 is a copy of Idaho Code § 56-255(5)(a) MEDICAL ASSISTANCE PROGRAM – SERVICES TO BE PROVIDED.

DATED: June 11, 2024.

                                                IDAHO LEGAL AID SERVICES, INC.

                                                */s/ Howard A. Belodoff*
                                                Howard A. Belodoff

                                                Attorney for Plaintiffs

**Governor Brad Little**

State Capitol :: Boise, Idaho 83720
(208) 334-2100 :: gov.idaho.gov

May 1, 2023

Director Dave Jeppesen
Department of Health and Welfare
P.O. Box 83720
Boise, Idaho 83720

Dear Director Jeppesen,

On April 4, 2023, I signed into law House Bill 71, The Vulnerable Child Protective Act, prohibiting children from being provided irreversible sex reassignment surgeries, puberty blockers, or hormones for the purpose of changing the appearance of a child's sex. Additionally, I have previously stated publicly my position that hardworking taxpayers should not be forced to pay for an adult's sex reassignment surgery, especially when evidence exists that such procedures are neither medically necessary nor in the best interest of the patient's mental health.

It has come to my attention that you and the Department of Health and Welfare are currently being sued for having not pre-authorized Medicaid coverage for the sex reassignment surgeries of two young adults. I further understand it has been alleged that it is unclear whether Idaho Medicaid provides coverage for such procedures.

To be clear, I oppose Idaho Medicaid using public funds to pay for irreversible sex reassignment surgeries, puberty blockers, or hormones for the purpose of changing the appearance of any child's or adult's sex. Consistent with House Bill 71, and my stated policy preference as to adults, I hereby direct you and the Department of Health and Welfare to take all appropriate steps to implement a policy consistent with state and federal law excluding the same from Medicaid coverage.

Sincerely,

Brad Little
Governor of Idaho

**EXHIBIT A**

EXHIBIT 1

No. 23-35485

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

M.H., T.B.,

*Plaintiffs-Appellees,*

v.

DR. MAGNI HAMSO, in her official capacity as the Medical Director of the Idaho Division of Medicaid and individually,

*Defendant-Appellant,*

AND

DAVE JEPPESEN, in his official capacity as the Director of the Idaho Department of Health and Welfare; IDAHO DEPARTMENT OF HEALTH AND WELFARE,

*Defendants.*

On Appeal from the United States District Court for the District of Idaho
Case No. 1-22-cv-00409-REP, Hon. Raymond Edward Patricco, Jr.

## BRIEF FOR THE APPELLANT

| | |
|---|---|
| RAUL R. LABRADOR<br>*Attorney General*<br>JOSHUA N. TURNER<br>*Acting Solicitor General*<br>AARON M. GREEN<br>JAMES E.M. CRAIG<br>IDAHO OFFICE OF<br>THE ATTORNEY GENERAL<br>P.O. Box 83720<br>Boise, ID 83720<br>(208) 334-2400<br>josh.turner@ag.idaho.gov | GENE C. SCHAERR<br>JOHN J. NIELSEN<br>SCHAERR \| JAFFE LLP<br>1717 K Street NW, Suite 900<br>Washington, DC 20006<br>(202) 787-1060<br>gschaerr@schaerr-jaffe.com |

*Counsel for Defendant-Appellant Dr. Magni Hamso, in her official capacity as the Medical Director of the Idaho Division of Medicaid and individually*

DECEMBER 27, 2023

**EXHIBIT 2**

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ....................................................................................... iv

INTRODUCTION ........................................................................................................ 1

STATEMENT OF JURISDICTION ............................................................................. 2

ISSUES FOR REVIEW ................................................................................................ 3

    A.    JURISDICTION. ............................................................................................ 3

    B.    FAILURE TO STATE AN EQUAL PROTECTION CLAIM. ................................... 3

    C.    QUALIFIED IMMUNITY ON EQUAL PROTECTION CLAIM. .............................. 4

    D.    QUALIFIED IMMUNITY ON DUE PROCESS CLAIM. ........................................ 4

STATEMENT OF THE CASE ..................................................................................... 5

    A.    ALLEGED FACTS. ........................................................................................ 5

    B.    PROCEEDINGS. ........................................................................................... 6

    C.    MOTION TO DISMISS. .................................................................................. 6

    D.    RULING. ...................................................................................................... 7

SUMMARY OF THE ARGUMENT ............................................................................ 9

    A.    THIS COURT HAS JURISDICTION. ................................................................ 9

    B.    PLAINTIFFS FAILED TO STATE AN EQUAL PROTECTION CLAIM. ................. 9

    C.    DR. HAMSO IS ENTITLED TO QUALIFIED IMMUNITY ON THE EQUAL PROTECTION CLAIMS. ........................................................................................................... 10

    D.    DR. HAMSO IS ENTITLED TO QUALIFIED IMMUNITY ON THE DUE PROCESS CLAIMS. ........................................................................................................... 10

STANDARD OF REVIEW ........................................................................................ 11

ARGUMENT .............................................................................................................. 12

    I.    THIS COURT HAS JURISDICTION TO DECIDE BOTH THE QUALIFIED IMMUNITY ISSUES AND WHETHER PLAINTIFFS HAVE A VALID EQUAL PROTECTION CLAIM. ........................................................................................................... 12

    II.    PLAINTIFFS DID NOT STATE A VALID EQUAL PROTECTION CLAIM BOTH BECAUSE THE SURGERY EXCLUSION HERE DOES NOT APPLY BASED ON GENDER, AND PLAINTIFFS DID NOT PLEAD PROXY DISCRIMINATION. .......... 14

III. ALTERNATIVELY, DR. HAMSO IS ENTITLED TO QUALIFIED IMMUNITY ON THE EQUAL PROTECTION CLAIMS BECAUSE NO BINDING CASE GAVE HER FAIR NOTICE THAT IT WAS CLEARLY ILLEGAL TO DENY COVERAGE FOR THE REQUESTED SURGERIES, AND THE EXTANT PRECEDENT ON THE STATES' AUTHORITY UNDER MEDICAID AND ON TRANSGENDER RIGHTS WAS MIXED. ..................19

    A. The district court defined the asserted equal-protection right at much too high a level of generality. ..................20

    B. There is no controlling authority or other consensus on the limits of State discretion to regulate the medical procedures funded by Medicaid generally, let alone these specific procedures. ..................29

    C. There is no controlling authority or other consensus on the full extent of individuals' rights to receive coverage for particular gender-dysphoric treatments under Medicaid. ..................32

IV. THE DISTRICT COURT ERRED BY DENYING QUALIFIED IMMUNITY TO DR. HAMSO ON PLAINTIFFS' DUE PROCESS CLAIMS GIVEN THE LACK OF PROPERTY INTEREST IN A SURGERY THAT HAS NOT BEEN COVERED UNDER IDAHO LAW. ..................41

CONCLUSION ..................44

STATEMENT OF RELATED CASES ..................46

CERTIFICATE OF COMPLIANCE ..................47

175-77. Thus, they conclude, they are being discriminated against on the basis of their transgender status. ER-175-76, ER-180.

The conclusion does not follow from the premise. Even reading the complaint in the light most favorable to Plaintiffs, the clear import of the policy is to condition the sought-after surgeries on the *condition* from which the person suffers rather than their gender identity. That is, a transgender person has the same access that a cisgender person has to genital-reconstruction surgery to treat conditions other than gender dysphoria—say, congenital defects, cancer, or traumatic injury. Thus, the policy does not discriminate on the basis of gender identity, and Plaintiffs have failed to state a valid equal-protection claim.

It is no answer on this point to say that only transgender people suffer from gender dysphoria. ER-182 at n.1; ER-079; ER-008.[4] *Geduldig* shows why. There, California had excluded pregnancy from its definition of "disability" in its workers' compensation statute. *Geduldig*, 417 U.S. at 486. Several women brought suit, claiming

---

[4] While no minors are involved in this case, there is a wide body of evidence showing a high desistance rate among those with childhood-onset gender dysphoria. *See* William Byne et al., *Gender Dysphoria in Adults: An Overview and Primer for Psychiatrists*, 18 Focus 336, 340 (2020), https://tinyurl.com/2nt4rauk (explaining that "the majority of those diagnosed with GID in early or early middle childhood 'desisted,' meaning that they subsequently identified as their birth-assigned gender and did not meet criteria for GID"); Jon Brooks, *The Controversial Research on 'Desistance' in Transgender Youth*, KQED (May 23, 2018), https://tinyurl.com/5n6kh7n2 (explaining that studies put desistance rate at "anywhere from 65 to 94 percent"); *see also Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1217 (11th Cir. 2023) (discussing desistance testimony). That is, a cisgender person (at least in youth) can temporarily suffer gender dysphoria.

15

result of this alleged policy, Plaintiffs allege that the requested surgeries were not authorized as of May 2022. ER-202 ¶ 156; ER-207 ¶ 188.[7] They characterize the "policy of refusing to authorize [sex reassignment surgery] for the treatment of gender dysphoria" as sex and transgender discrimination in violation of the Equal Protection Clause. ER-208 ¶193.

But these facts, even taken as true and in the light most favorable to M.H. and T.B., do not establish a violation of a clearly established right. Given the specificity requirement for clearly established rights, the relevant right here is a Medicaid recipient's right to *Medicaid-funded* sex-reassignment surgery. But in fact, there is no such right. At no point—not at the motion to dismiss stage, nor in the Court's order, nor even in their response to the pending motion to certify other questions for interlocutory appeal—have M.H. and T.B. cited a single binding case showing a clearly established right to sex-reassignment surgery funded by Medicaid. That is because there is none. Nor is there other circuit or lower-court consensus on it. *See Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (2017) (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). And that is sufficient to entitle Dr. Hamso to qualified immunity.

---

[7] The possible relevant dates for the challenged decision in this case span from March 2021 (when M.H. was denied coverage for lack of medical necessity, ER-062) to May 2022 (when T.B. sought approval, ER-065-67). Dr. Hamso uses the latter.

fund a procedure through Medicaid is "state regulation in the social and economic field." *Id.* at 986-87 (citing *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)). Consequently, the Court found that Arizona's decision to fund one procedure rather than another was rational and was not an equal protection violation.

Armed with this authority, at a minimum, Dr. Hamso had no indication in 2022 that denial of Medicaid funding for one set of treatments for a single condition could constitute an equal protection violation. Both *Geduldig* and *Dexter* analyzed equal protection claims at the level of *treatment* before looking at whether a protected class was potentially affected, and consequently both utilized rational basis as the standard of review.

Here, by contrast, the challenge is to the denial *funding* for one kind of procedure for gender dysphoria: sex-reassignment surgery. No Ninth Circuit case in 2022 held that denial of this procedure, much less the denial of government funding, violates equal protection. No Ninth Circuit case even came close to putting Dr. Hamso on notice that the alleged conduct in 2022 violated M.H. and T.B.'s equal protection or due process rights. And ultimately Dr. Hamso would have been reasonable in relying on, at a minimum, *Geduldig* and *Dexter* in the absence of other elaboration in this Court or the Supreme Court on whether equal protection required funding for a particular treatment for a particular disease. As a result, far short of placing the issue "beyond debate," as required to breach qualified immunity, the law gave Dr. Hamso ample grounds for not

dismiss the claims against Dr. Hamso in her personal capacity, and to dismiss the equal protection claims for failure to state a claim.

December 27, 2023

Respectfully submitted,

*s/ Gene C. Schaerr*
GENE C. SCHAERR
JOHN J. NIELSEN
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

RAUL R. LABRADOR
*Attorney General*
JOSHUA N. TURNER
*Acting Solicitor General*
AARON M. GREEN
JAMES E.M. CRAIG
IDAHO OFFICE OF THE
ATTORNEY GENERAL
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
josh.turner@ag.idaho.gov

*Counsel for Defendant-Appellant*

 # Idaho Statutes

Idaho Statutes are updated to the website July 1 following the legislative session.

```
                              TITLE 56
                    PUBLIC ASSISTANCE AND WELFARE
                              CHAPTER 2
                        PUBLIC ASSISTANCE LAW
```
         56-255.  MEDICAL ASSISTANCE PROGRAM — SERVICES TO BE PROVIDED. (1) The department may make
payments for the following services furnished by providers to participants who are determined to
be eligible on the dates on which the services were provided. Any service under this section
shall be reimbursed only when medically necessary within the appropriations provided by law and
in accordance with federal law and regulation, Idaho law and department rule. Notwithstanding
any other provision of this chapter, medical assistance includes the following benefits specific
to the eligibility categories established in section 56-254(1), (2) and (3), Idaho Code, as well
as a list of benefits to which all Idaho medicaid participants are entitled, defined in
subsection (5) of this section.
         (2)  Specific health benefits and limitations for low-income children and working-age
adults with no special health needs include:
         (a)  All services described in subsection (5) of this section;
         (b)  Early and periodic screening, diagnosis and treatment services for individuals under
         age twenty-one (21) years, and treatment of conditions found; and
         (c)  Cost-sharing required of participants. Participants in the low-income children and
         working-age adult group are subject to the following premium payments, as stated in
         department rules:
              (i)    Participants with family incomes equal to or less than one hundred thirty-
              three percent (133%) of the federal poverty guideline are not required to pay
              premiums; and
              (ii)   Participants with family incomes above one hundred thirty-three percent (133%)
              of the federal poverty guideline will be required to pay premiums in accordance with
              department rule.
         (3)  Specific health benefits for persons with disabilities or special health needs
include:
         (a)  All services described in subsection (5) of this section;
         (b)  Early and periodic screening, diagnosis and treatment services for individuals under
         age twenty-one (21) years, and treatment of conditions found;
         (c)  Case management services as defined in accordance with section 1905(a)(19) or section
         1915(g) of the social security act; and
         (d)  Long-term care services, including:
              (i)    Nursing facility services, other than services in an institution for mental
              diseases, subject to participant cost-sharing;
              (ii)   Home-based and community-based services, subject to federal approval, provided
              to individuals who require nursing facility level of care who, without home-based
              and community-based services, would require institutionalization. These services
              will include community supports, including options for self-determination or family-
              directed, which will enable individuals to have greater freedom to manage their own
              care within the determined budget as defined by department rule; and
              (iii)  Personal care services in a participant's home, prescribed in accordance with
              a plan of treatment and provided by a qualified person under supervision of a
              registered nurse;
         (e)  Services for persons with developmental disabilities, including:
              (i)    Intermediate care facility services, other than such services in an
              institution for mental diseases, for persons determined in accordance with section
              1902(a)(31) of the social security act to be in need of such care, including such
              services in a public institution, or distinct part thereof, for persons with
              intellectual disabilities or persons with related conditions;
              (ii)   Home-based and community-based services, subject to federal approval, provided
              to individuals who require an intermediate care facility for people with
              intellectual disabilities (ICF/ID) level of care who, without home-based and
              community-based services, would require institutionalization. These services will
              include community supports and options for self-directed or family-directed
              services, which will enable individuals to have greater freedom to manage their own
              care within the determined budget as defined by department rule. The department
              shall allow budget modifications only when needed to obtain or maintain employment

                                           **EXHIBIT 3**

or when health and safety issues are identified and meet the criteria as defined in department rule; and
    (iii) Developmental disability services for children and adults shall be available based on need through state plan services or waiver services as described in department rule. The department shall develop a blended rate covering both individual and group developmental therapy services;
(f) Home health services, including:
    (i) Intermittent or part-time nursing services provided by a home health agency or by a registered nurse when no home health agency exists in the area;
    (ii) Home health aide services provided by a home health agency; and
    (iii) Physical therapy, occupational therapy or speech pathology and audiology services provided by a home health agency or medical rehabilitation facility;
(g) Hospice care in accordance with section 1905(o) of the social security act;
(h) Specialized medical equipment and supplies;
(i) Medicare cost-sharing, including:
    (i) Medicare cost-sharing for qualified medicare beneficiaries described in section 1905(p) of the social security act;
    (ii) Medicare part A premiums for qualified disabled and working individuals described in section 1902(a)(10)(E)(ii) of the social security act;
    (iii) Medicare part B premiums for specified low-income medicare beneficiaries described in section 1902(a)(10)(E)(iii) of the social security act; and
    (iv) Medicare part B premiums for qualifying individuals described in section 1902(a)(10)(E)(iv) and subject to section 1933 of the social security act; and
(j) Nonemergency medical transportation.

(4) Specific health benefits for persons over twenty-one (21) years of age who have medicare and medicaid coverage include:
(a) All services described in subsection (5) of this section, other than if provided under the federal medicare program;
(b) All services described in subsection (3) of this section, other than if provided under the federal medicare program;
(c) Other services that supplement medicare coverage; and
(d) Nonemergency medical transportation.

(5) Benefits for all medicaid participants, unless specifically limited in subsection (2), (3) or (4) of this section, include the following:
(a) Health care coverage including, but not limited to, basic inpatient and outpatient medical services, and including:
    (i) Physicians' services, whether furnished in the office, the patient's home, a hospital, a nursing facility or elsewhere;
    (ii) Services provided by a physician or other licensed practitioner to prevent disease, disability and other health conditions or their progressions, to prolong life, or to promote physical or mental health; and
    (iii) Hospital care, including:
        1. Inpatient hospital services other than those services provided in an institution for mental diseases;
        2. Outpatient hospital services; and
        3. Emergency hospital services;
    (iv) Laboratory and x-ray services;
    (v) Prescribed drugs;
    (vi) Family planning services and supplies for individuals of child-bearing age;
    (vii) Certified pediatric or family nurse practitioners' services;
    (viii) Emergency medical transportation;
    (ix) Behavioral health services, including:
        1. Outpatient behavioral health services that are appropriate, delivered by providers that meet national accreditation standards and may include community-based rehabilitation services and case management; and
        2. Inpatient psychiatric facility services whether in a hospital, or for persons under the age of twenty-two (22) years in a freestanding psychiatric facility as permitted by federal law;
    (x) Medical supplies, equipment, and appliances suitable for use in the home;
    (xi) Physical therapy and speech therapies combined to align with the annual medicare caps; and
    (xii) Occupational therapy to align with the annual medicare cap;
(b) Primary care medical homes;
(c) Dental services and medical and surgical services furnished by a dentist in accordance with section 1905(a)(5)(B) of the social security act;

    (d) Medical care and any other type of remedial care recognized under Idaho law, furnished by licensed practitioners within the scope of their practice as defined by Idaho law, including:

        (i) Podiatrists' services based on chronic care criteria as defined in department rule;

        (ii) Optometrists' services based on chronic care criteria as defined in department rule;

        (iii) Chiropractors' services, limited to six (6) visits per year; and

        (iv) Other practitioners' services, in accordance with department rules;

    (e) Services for individuals with speech, hearing and language disorders as defined in department rule;

    (f) Eyeglasses prescribed by a physician skilled in diseases of the eye or by an optometrist;

    (g) Services provided by essential providers, including:

        (i) Rural health clinic services and other ambulatory services furnished by a rural health clinic in accordance with section 1905(l)(1) of the social security act;

        (ii) Federally qualified health center (FQHC) services and other ambulatory services that are covered under the plan and furnished by an FQHC in accordance with section 1905(l)(2) of the social security act;

        (iii) Indian health services;

        (iv) District health departments; and

        (v) The family medicine residency of Idaho and the Idaho state university family medicine residency; and

    (h) Physician, hospital or other services deemed experimental are excluded from coverage. The director may allow coverage of procedures or services deemed investigational if the procedures or services are as cost-effective as traditional, standard treatments.

History:

[56-255, added 2006, ch. 278, sec. 1, p. 857; am. 2007, ch. 200, sec. 5, p. 614; am. 2009, ch. 34, sec. 4, p. 99; am. 2010, ch. 235, sec. 46, p. 585; am. 2011, ch. 164, sec. 9, p. 468; am. 2012, ch. 190, sec. 1, p. 510; am. 2013, ch. 25, sec. 1, p. 46; am. 2014, ch. 62, sec. 1, p. 147; am. 2014, ch. 109, sec. 1, p. 316; am. 2018, ch. 182, sec. 1, p. 397.]

How current is this law?