Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
1447 S. Tyrell Lane
Boise, ID 83706
Tel: (208) 807-2496 Fax: (208) 342-2561
howardbelodoff@idaholegalaid.org

Jane Gordon, ISB # 9243
Jane Gordon Law
1004 West Fort Street
Boise ID 83702
Tel: (208) 371-4747; Fax: (208) 807-2290
Jane@JaneGordonLaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| MH, TB, KB, SG, AC, BM, individually, and G Doe, by and through her parents and next friends, JANE Doe and JOHN Doe,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>ALEX ADAMS, in his official capacity as the Director of the Idaho Department of Health and Welfare; Dr. MAGNI HAMSO, in her official capacity as the Medical Director of the Idaho Division of Medicaid and individually; and the IDAHO DEPARTMENT OF HEALTH AND WELFARE,<br><br>　　　Defendants. | CASE NO. 1:22-CV-409-REP<br><br>SUPPLEMENTAL MEMORANDUM IN RESPONSE TO ORDER RE: MOTION FOR EXPEDITED BRIEFING AND FOR A TEMPORARY RESTRAINING ORDER TO PRESERVE THE STATUS QUO (Dkt. 93) |

　　　COME NOW Plaintiffs, by and through their counsel, Howard A. Belodoff, Idaho Legal

Aid Services, Inc. and Jane Gordon, Jane Gordon Law, to file a Supplemental Memorandum in

response to the Court's Memorandum Decision and Order ("Order") dismissing Plaintiffs

Motion for a Temporary Restraining Order Without Prejudice. Dkt. 93. Plaintiffs are filing Declarations in support of this Supplemental Memorandum.

## I. PRELIMINARY STATEMENT

The Court's Order properly frames the legal issues for issuing a temporary restraining order. The Court identified that the "critical" elements, that a party must establish under the standard or "sliding scale" "approach is the likelihood of irreparable harm in the event the status quo is not preserved." Order at 4.

> "[T]he basic function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits. . . . *Where no new harm is imminent, and where no compelling reason is apparent, the district court was not required to issue a preliminary injunction against a practice which has continued unchallenged for several years.*"

Order at 6 (quoting *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985)) (cleaned up) (emphasis in original).

Plaintiffs MH and TB filed the initial Complaint to challenge the unwritten Medicaid Exclusion Policy preventing them from receiving medically necessary genital reconstruction surgeries. The Court recognized "[b]oth have been diagnosed with gender dysphoria and their medical providers have recommended that they receive **genital reconstruction surgeries as medically necessary treatment therefor**." Dkt. 36 at 3 (citing Dkt. 1 at ¶¶ 106, 116, 163, 169) (emphasis added). "Idaho's medical assistance statute does not explicitly address, let alone exclude, coverage for gender affirming surgery." Dkt. 1 at ¶ 8. The Complaint alleged "Defendants Jeppesen, Hamso, and IDHW have an unwritten, unstated policy that genital surgery for the treatment of gender dysphoria is cosmetic, and as a result, not medically necessary." *Id.* at ¶ 85 (*See also* Dkt. 36 at 8 n.5). "MH applied for and was found eligible to

receive Idaho Medicaid." Dkt. 1 at ¶ 106. "In August 2019, [redacted] began prescribing hormone therapy for MH. Hormone therapy reduced MH's gender dysphoria and improved her quality of life. MH has remained on hormone therapy since August 2019." *Id.* at ¶ 107. "In May 2021, MH received an orchiectomy at [redacted] that was covered by Idaho Medicaid. In seeking prior authorization for the procedure, the surgeon noted that it was indicated to treat testicular pain, as well as gender dysphoria." *Id.* at ¶ 123. MH appealed the denial of prior authorization for surgery. The Hearing Officer found "the documentation from MH's medical and mental health providers established that she had completed 12 continuous months of hormone therapy; . . ." Dkt. 36 at 5. At the fair hearing, the nurse reviewer testified, "IDHW would have denied her request anyway because Idaho Medicaid's policy considers the requested surgical procedures for transgender individuals to be medically unnecessary and 'cosmetic.'" Dkt. 36 at 4 (citing Dkt. 1 at ¶¶ 130-131). TB also requested prior authorization for gender-affirming surgeries. Dkt. 36 at 6 ("In May 2022, TB sought coverage for gender-affirming surgeries. *Id.* at ¶¶ 168-169.").

HB 668's enactment inflicts a new imminent and severe harm on transgender individuals diagnosed with gender dysphoria which their physicians have determined requires medically necessary care not just "**genital reconstruction surgeries.**" HB 668 targets Plaintiffs as transgender Medicaid participants who will be irreparably harmed as of July 1, 2024, because they will no longer receive Medicaid reimbursement and coverage for gender-affirming care. At the time the initial Complaint was filed, Medicaid covered and reimbursed other types of gender-affirming care (such as hormone treatment) and continued to do so. *See* Memorandum in Support of Defendants' Motion to Dismiss ("Plaintiffs are eligible for Medicaid in Idaho and have been receiving Medicaid benefits that include payment coverage for treatments related to their gender

dysphoria."). Dkt. 19-1 at 2.[1] All Medicaid coverage and reimbursement for gender-affirming care will completely end on July 1, 2024, unless the Court issues a temporary restraining order to preserve the status quo.

Plaintiffs' Supplemental Memorandum will address the key questions the Court posited in its Order "whether (i) there are specific Medicaid benefits that each Plaintiff is currently receiving despite the Medicaid Exclusion Policy, which (ii) will no longer be available once HB 668 goes into effect.

### A. The Verified Amended Complaint Alleges the Status Quo of Plaintiffs and Supports the Issuance of a Temporary Restraining Order Pending a Decision on the Merits

The Verified Amended Complaint includes allegations specific to each adult and child Plaintiff. Dkt. 86 at 7 (¶ 35 to ¶ 138). The allegations show that Medicaid was covering and reimbursing their gender affirming care in the form of hormone treatments, pharmaceuticals, diagnostics, and treatment plans. This includes, in relevant part, the following:

**PLAINTIFF MH:**

> 45. _____ determined that MH would benefit from hormone therapy to further her gender transition and treat her gender dysphoria. In August 2019, _____ began prescribing hormone therapy for MH. Hormone therapy reduced MH's symptoms of gender dysphoria and improved her quality of life. <u>MH has remained on hormone therapy since August 2019</u>.
> …
> 58. In May 2021, MH received an orchiectomy at _____ that was covered by Idaho Medicaid.

---

[1] During the May 2, 2023 hearing on Defendants' Motion to Dismiss, Defendants' Counsel argued that Medicaid would continue to provide other types of gender-affirming care other than surgery. "**the fact is here that the State doesn't discriminate on that level because it does provide treatment for gender dysphoria.** Plaintiffs' Complaint specifically alleges that they have received Medicaid benefits, that those Medicaid benefits have included treatment for gender dysphoria that includes -- that included hormone blockers at the time and so this is a situation where the State is providing care." Transcript at p. 20 lines 5-12 (emphasis added). *See* Declaration of Howard Belodoff In Support Of Motion For A Temporary Restraining Order To Preserve The Status Quo.

…

60. The discontinuance of MH's gender-affirming care would negatively affect her mental health and well-being.

…

62. MH wants to continue receiving gender-affirming care . . . to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care she will not be able to continue her medical transition.

**PLAINTIFF TB:**

63. …She is a participant in the Idaho Medicaid program at all times material to this Amended Complaint.

…

73. In early 2018, _____ found that TB met the eligibility and readiness criteria in the official WPATH Standards of Care for treatment of gender dysphoria, and that she was a qualified candidate for hormone therapy... TB started hormone therapy at that time.

74. TB's gender-affirming care providers have recommended that she receive medically necessary gender-affirming care, including surgery, to alleviate her ongoing symptoms of gender dysphoria.

…

76. TB relies on Idaho Medicaid to cover the costs of her gender-affirming care.
. . .

**PLAINTIFF KB**

78. Plaintiff KB ("KB") is a transgender non-binary individual residing in Idaho. They are participants enrolled in the Idaho Medicaid program at all times material to this Amended Complaint.

…

81. …KB receives medical treatment, including hormone therapy (testosterone injections), to align their physical characteristics with their gender identity and had a mastectomy ("top surgery") to treat their gender dysphoria.

82. KB started TRT (testosterone shots) in June of 2021. They continue to take TRT under the guidance of _____.

…

85. KB's health care providers have recommended that they continue to receive medically necessary gender-affirming care (TRT)…

86. The discontinuance of KB's gender-affirming care would negatively affect their mental health and well-being.

87. KB relies on Idaho Medicaid to cover the costs of their gender-affirming care.

88. KB wants to continue receiving gender-affirming care and to undergo future surgery to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care, they will not be able to continue their medical transition.

…

**PLAINTIFF SG**

90. SG is a participant in Idaho Medicaid's program at all times material to this Amended Complaint.

…

93. SG receives medical treatment under the care of _____ to treat her gender dysphoria, including hormone therapy, to align her physical characteristics with her gender identity.

…

95. SG's health care providers have recommended that she continue receiving medically necessary gender-affirming care to alleviate her ongoing symptoms of gender dysphoria.

96. The discontinuance of SG's gender-affirming care would negatively affect her mental health and well-being.

97. SG presently relies on Idaho Medicaid to cover the costs of her gender-affirming care.

98. SG wants to continue receiving gender-affirming care and to undergo future surgery to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care she will not be able to continue her medical transition.

…

**PLAINTIFF AC**

100. AC a participant in the Idaho Medicaid program at all times material to this Amended Complaint.

…

102. Starting in November of 2020, AC's physician proscribed hormone therapy consisting of estrogen, androgen blockers, and progesterone to align her physical characteristics with her gender identity...

…

106. The discontinuance of AC gender-affirming care would negatively affect AC's mental health and well-being.

107. AC relies on Idaho Medicaid to cover the costs of her gender-affirming care.

108. AC wants to continue receiving gender-affirming care and to undergo future surgery to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care will not be able to continue her medical transition.

…

**PLAINTIFF BM**

110. BM has been eligible for and enrolled in the Idaho Medicaid program at all times material to this Amended Complaint.

…

112. BM has received gender-affirming care to treat their gender dysphoria, including estradiol spironolactone and progesterone medications since December 29, 2021, to align her physical characteristics with her gender identity.

…

114. BM continues to experience significant emotional and mental distress due to her body not fully aligning with her gender identity.

…

119. BM's health care providers have recommended that she continue receiving gender-affirming care to alleviate her ongoing symptoms of gender dysphoria.

…

122. BM relies on Idaho Medicaid to cover the costs of her gender-affirming care.

123. BM continues to experience significant emotional and mental distress due to her body not fully aligning with her gender identity.

124. The discontinuance of BM's gender-affirming care…would negatively affect her mental health and well-being.

125. BM wants to continue receiving gender-affirming care…to alleviate her ongoing symptoms of gender dysphoria but without Medicaid coverage of gender-affirming care will not be able to continue her medical transition.

…

**PLAINTIFF G DOE**

127. G Doe has been enrolled in the Idaho Medicaid program at all times material to this Amended Complaint.

…

132. In December 2022, G Doe started treatment with her pediatric endocrinologist at _____.

133. G Doe's treating physician prescribed puberty blockers in January of 2023 and G Doe receives injections every three months.

134. G Doe's health care providers have recommended that she continue receiving gender-affirming care to alleviate her ongoing symptoms of gender dysphoria.

135. G Doe relies on Idaho Medicaid to cover the costs of her gender-affirming care.

136. G Doe's parents ==rely upon Idaho Medicaid to pay for the health care G Doe needs== to treat her gender dysphoria.

137. The discontinuance of G Doe's gender-affirming care would negatively affect her mental health and well-being.

138. . . . ==without Medicaid coverage of gender-affirming care, [G Doe] will not be able to continue her medical transition.==

The Amended Complaint to a large degree addresses the Court's questions including that each Plaintiff is a Medicaid participant and is currently receiving gender-affirming care through Medicaid. *See* Amended Complaint Paragraphs: MH [44, 45 &61], TB [63 & 73], KB [81 & 82], SG [90 & 93], AC [100, 102 & 107], BM [110 & 112], and G Doe [127 & 133]. The Verified Complaint alleges that without Medicaid reimbursing and covering gender-affirming care each Plaintiff is currently receiving they will no longer be able to receive it. *See* Amended Complaint Paragraphs: MH [62], TB [76], KB [87 & 88], SG [97 & 98], AC [108], BM [112 & 125] G Doe [136 & 138]. The status quo for each Plaintiff, who are Medicaid participants, is to continue to have their gender-affirming care as prescribed by their doctors to treat gender dysphoria reimbursed and covered by Medicaid the same as cisgender Medicaid participants with other medical conditions. The status quo is continuing Medicaid coverage and reimbursement for Plaintiffs' hormone treatments, pharmaceuticals, exams and diagnostics, and treatment plans.

### B. Plaintiffs' Declarations and Physician Declarations Establish that on July 1, 2024, Medicaid Will Cease to Reimburse and Cover Medically Necessary Gender Affirming Care That Transgender Medicaid Participants Would Be Able to Receive But For HB 668

Plaintiffs are submitting their own Declarations and Declarations from Physicians who provide gender-affirming care to transgender Medicaid participants. The Declarations describe the irreversible and irreparable harm transgender individuals who receive gender-affirming care to treat gender dysphoria will suffer after July 1, 2024, if HB 668's prohibitions against Medicaid reimbursing and covering gender-affirming care become effective. The Court should issue a temporary restraining order to preserve the status quo ordering Medicaid to continue to reimburse and cover gender-affirming care as it did up until July 1, 2024.

Dr. Joseph Neil Ragan is a physician who provides medical treatment and gender affirming care to Medicaid participants. Declaration of Joseph Neil Ragan, MD at ¶ 5. He has prescribed hormone treatments to Medicaid participants that Medicaid has always covered and reimbursed for gender affirming hormone treatment. *Id.* at ¶ 6. His patients who are Medicaid participants will no longer have Medicaid to cover and reimburse their gender affirming hormone treatments. *Id.* at ¶ 7. The clinic where he works, Health West, will no longer be offering any gender affirming care or transgender care starting July 1, 2024 because of HB 668. *Id.* at ¶ 8 and Exhibit A. Dr. Ragan and all Health West providers are prohibited from providing *any* treatment for gender affirming care starting July 1, 2024, despite being able to prior to July 1, 2024.

Medicaid participants are already cut off from their gender affirming hormone treatments in anticipation of the July 1, 2024 cutoff date, and will be cut off from their gender affirming hormone treatments. *Id.* at ¶ 9 and Ex. A. Involuntarily cutting people off from their medical

treatment causes distressing effects; without hormones, an individual who identifies as female will lose her feminine bodily characteristics and begin to appear more masculine. *Id.* at ¶ 11. An individual who identifies as male will appear more feminine and menstruation will restart. *Id.* This is physically and mentally distressing to a transgender person; causing anxiety, depression, and possible suicidality. *Id.* at ¶ 11.

Generally, only a small minority of transgender patients taking hormone therapy choose to discontinue those medications. The majority of transgender patients find the medications greatly beneficial to their mental and physical health. *Id.* at ¶ 12. If the transgender patient has undergone surgery to remove their gonads (ovaries or testies), stopping hormone treatments will cause medium term and long term serious adverse effects. *Id*. at 14. This affects MH, who had an orchiectomy in May 2021 and must take estrogen to avoid bone loss and osteoporosis. See Amended Complaint Dkt. 86 ¶¶ 58-61. It is against medical standards of care to withhold gender affirming hormone therapy from adult patients who identify as transgender. *Id.* ¶ 15.

KB declares that they rely on Medicaid to provide coverage for the gender affirming care they receive at Full Circle Health. Declaration of KB at ¶¶ 3-4. Medicaid pays for their weekly hormone therapy including testosterone cypionate injections. *Id.* at ¶ 5. If HB 668 goes into effect on July 1, 2024, Medicaid will stop reimbursing and covering their gender-affirming care because it will be prohibited and they have no insurance or funds to pay to continue their treatment of gender dysphoria. *Id.* at ¶¶ 6-11. If KB's testosterone injections are discontinued or denied, KB will suffer emotional distress and physical harm caused by their gender dysphoria. *Id.* at ¶¶ 12-13. This includes mental instability, increased anxiety, depression and disorientation. *Id.* at ¶ 14.

Plaintiff AC declares she is a Medicaid participant who relies on Medicaid to cover her medical treatment, including her gender affirming care. Declaration of Plaintiff AC at ¶¶ 3 & 6. AC's physicians at Health West have prescribed hormone therapy to treat her gender dysphoria. *Id.* at ¶¶ 4-5. Medicaid has covered her gender-affirming care prior to July 1, 2024 and she cannot afford to pay for continued treatment or different insurance to pay for her care. *Id.* at ¶¶ 6-10. If AC's hormone treatments are discontinued, she will suffer emotional distress and physical harm from her gender dysphoria. *Id.* at ¶¶ 11-14 & 17. Health West Inc. sent AC a letter indicating they will not be able to provide her gender-affirming care any longer because of HB 668's restrictions on "Medicaid reimbursement and the use of state-funded facilities for these services." *Id.* at ¶ 16. Health West's letter states: "Starting July 1, 2024, Health West will no longer provide medical gender affirming care, including prescriptions, prescription refills, injection services, and other related medical-based gender affirming care." *Id.*

Plaintiff Jane Doe on behalf of her child GM declares GM is a Medicaid participant who relies on Medicaid to cover her gender-affirming care. Declaration of Plaintiff Jane Doe on Behalf of Her Child GM at *Id.* at ¶ 3. Medicaid provides the coverage for GM to receive Lupron injections to stop puberty from progressing and estrogen patches and Eligard injections as of May 2024. *Id.* at ¶¶ 5-8. GS relies on Medicaid to cover her hormone treatment because the family cannot afford to pay the cost or afford private insurance. *Id.* at ¶¶ 10-12. GS is anxious about losing her gender-affirming care because she will suffer emotional distress and physical harm caused by her gender dysphoria. *Id.* at ¶s 9 & 12. If GS's hormone treatments are discontinued or delayed it will cause the progress she has made in her gender identity transition will stop and she will regress. *Id.* at ¶ 14. "GM's anxiety and depression have been increasing since the Idaho Legislature passed HB 668 because it would take effect on July 1, 2024." *Id.* at ¶

15. Stopping her hormone treatments would be a major setback in her gender affirming care and it would cause her dysphoria to worsen along with her mental health." *Id.* at ¶ 16. St. Luke's Regional Medical Center sent her a letter stating GM that Medicaid would no longer pay for her gender-affirming care. *Id.*

Dr. Perron-Burdick provides medical care to Medicaid participants. Supplemental Declaration of Misa Perron-Burdick, MD at ¶¶ 3-4. Medicaid has covered and reimbursed gender-affirming care for her patients. *Id.* at ¶ 5. One of her patients "applied for prior authorization for a hysterectomy. The hysterectomy was not for gender affirming reasons, but for medical treatment of his dysmenorrhea." *Id.* at ¶ 6. The patient was denied prior authorization because the "hysterectomy was for gender affirming care". *Id.* at ¶ 7. Dr. Perron-Burdick has received Medicaid's prior authorization for hysterectomies for cisgender patients with the exact same complaints and indications, but without the diagnosis of gender dysphoria. *Id.* at ¶ 8.

Dr. Alviso provides medical care to Medicaid participants. Supplemental Declaration of Marvin-Anthony Carson Alviso, MD at ¶¶ 3, 5 & 6. Dr. Alviso received an email from Dr. Hamso who is a Defendant and the Medical Director of Idaho Medicaid. *Id.* at ¶ 4. Defendant Hamo indicated "Idaho Medicaid will be implementing HB 668 in accordance with the law on 7/1/24." *Id.* at Exhibit A. Dr. Alviso states his gender affirming patients suffering from gender dysphoria will "exhibit distress in the form of anxiety, feeling hopeless, depression, tearfulness, avoidance, substance abuse, and even suicide. Treatment delays exacerbate symptoms, increasing distress." *Id.* at ¶ 5. Dr. Alviso indicates his Medicaid patients will be hurt "by abruptly taking away their ability to seek medical care. It is harmful both physically and mentally to suddenly stop many types of gender-affirming care, including hormone therapy." *Id.* at ¶ 6.

## CONCLUSION

The forgoing establishes that each Plaintiff is currently receiving Medicaid benefits, despite the Medicaid Exclusion Policy, that will no longer be available if HB 668 goes into effect on July 1, 2024. Plaintiffs and physicians who provide gender-affirming care have established that if HB 668 goes into effect transgender Medicaid participates will suffer irreversible and irreparable emotional and physical harm. A temporary restraining order is necessary to preserve the status quo until the Court can rule on the pending Motion for Partial Summary Judgment.

DATED: June 28, 2024.

IDAHO LEGAL AID SERVICES, INC.

/s/ Howard A. Belodoff
Howard A. Belodoff

JANE GORDON LAW

/s/ Jane Gordon
Jane Gordon

Attorneys for Plaintiffs