UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| MH, TB, KB, SG, AC, BM, individually, and G Doe, by and through her parents and next friends, JANE Doe and JOHN Doe,<br><br>Plaintiffs,<br><br>vs.<br><br>ALEX ADAMS, in his official capacity as the director of the Idaho Department of Health and Welfare; DR. MAGNI HAMSO, in her official capacity as the Medical Director of the Idaho Division of Medicaid and individually; and the IDAHO DEPARTMENT OF HEALTH AND WELFARE,<br><br>Defendants, | Case No.: 1:22-cv-00409-REP<br><br>**ORDER RE: PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN RESPONSE TO ORDER RE: MOTION FOR EXPEDITED BRIEFING AND FOR A TEMPORARY RESTRAINING ORDER TO PRESERVE THE STATUS QUO**<br><br>**(Dkt. 95)** |

Pending before the Court is Plaintiffs' "Supplemental Memorandum in Response to Order Re: Motion for Expedited Briefing and for a Temporary Restraining Order to Preserve the Status Quo" (Dkt. 95).[1]  Given time constraints, and because oral argument would not significantly aid its decision-making process at this time, the Court will decide Plaintiffs' latest request on the existing briefing.  For the reasons discussed below, the Court grants that request and will issue a limited temporary restraining order until further notice.

## I. BACKGROUND

Plaintiffs are transgender individuals – they have gender identities that differ from their assigned sexes at birth.  Each has been diagnosed with gender dysphoria and their medical

---

[1] Given the urgent nature of Plaintiffs' filings, the Court will interpret their latest submission as support for, and itself, a Renewed Motion for Temporary Restraining Order.  *See* Renewed Mot. for TRO at 13 (Dkt. 95) ("A temporary restraining order is necessary to preserve the status quo until the Court can rule on the pending Motion for Partial Summary Judgment.").

**MEMORANDUM DECISION AND ORDER - 1**

providers have recommended that they receive gender-affirming care as medically-necessary treatment. Relevant here, Plaintiffs are also Idaho Medicaid beneficiaries. They bring this action to challenge (i) Idaho Medicaid's original policy of denying gender-affirming care for transgender individuals seeking treatment for gender dysphoria (the "Medicaid Exclusion Policy"), and now via their Amended Complaint (ii) the more-recently enacted Idaho Code §§ 18-8901 and 56-270 (collectively "HB 668") which goes into effect on July 1, 2024 and formally prohibits the expenditure of state funds – to include Medicaid payments – for that same gender-affirming care. At bottom, they contend that, while the Medicaid Exclusion Policy and HB 668 exclude coverage for gender-affirming care that is medically necessary for transgender individuals to treat the clinically-significant distress caused by gender dysphoria, cisgender individuals (those whose gender identities correspond to their natal sex) receive coverage for the same or similar heath care as a matter of course.

Plaintiffs (at first just MH and TB and only as to the Medicaid Exclusion Policy (*see infra*) (discussing later enaction of HB 668 and subsequent Amended Complaint with additional Plaintiffs)) originally asserted the following claims against Defendants Idaho Department of Health and Welfare ("IDHW"); Dave Jeppesen, IDHW's then-director, in his official capacity; and Dr. Magni Hamso, the medical director for IDHW's Division of Medicaid, in her official and individual capacities (for all but the Patient Protection and Affordable Care Act claim): (i) unlawful discrimination on the basis of sex in violation of section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 (First Claim for Relief); (ii) violation of the Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A) (Second Claim for Relief); (iii) violation of the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B) (Third Claim for Relief); (iv) violation of the Equal Protection Clause of the Fourteenth Amendment (Fourth Claim for Relief); (v) violation of the Medicaid Act's Due

**MEMORANDUM DECISION AND ORDER - 2**

Process Requirements, 42 U.S.C. § 1396a(a)(3) (Fifth Claim for Relief); and (vi) violation of the Due Process Clause of the Fourteenth Amendment (Sixth Claim for Relief).  Compl. at ¶¶ 189-228 (Dkt. 1).

On November 25, 2022, Defendants moved to dismiss Plaintiffs' Complaint in two respects.  First, Defendants challenged the viability of Plaintiffs' Equal Protection claim (Fourth Claim for Relief) by arguing that Idaho's Medicaid program provides "equal coverage to Plaintiffs as to other recipients."  Mem. ISO MTD at 3-6 (Dkt. 19-1).  Second, Defendants challenged Dr. Hamso's individual liability by arguing that (i) compensatory damages for emotional distress cannot be awarded under the Medicaid Act as a matter of law (Second, Third, and Fifth Claims for Relief), and (ii) she is entitled to qualified immunity in any event (Second, Third, Fourth, Fifth, and Sixth Claims for Relief).  *Id*. at 6-13.[2]

On June 20, 2023, the Court granted in part and denied in part Defendants' Motion to Dismiss.  *See generally* 6/20/23 MDO (Dkt. 36).  As to Plaintiffs' Equal Protection claim (Fourth Claim for Relief), the Court determined that Plaintiffs, as transgender individuals, sufficiently alleged that they were treated differently than similarly-situated cisgender individuals when,

---

[2] It bears mentioning that, at the time MH and TB filed their original Complaint (Dkt. 1), Defendants' policy relating to the treatment of gender dysphoria was unwritten and appeared to be simply a reflection of the reasons surrounding Defendants' rejection of MH's and TB's efforts to secure coverage for their prescribed genital reconstruction surgeries.  But one day before the May 2, 2023 hearing on Defendants' Motion to Dismiss, Defendants filed a Notice of Supplemental Information that attached a May 1, 2023 letter from Idaho Governor, Brad Little, to IDHW's then-Director Jeppesen.  Not. of Supp. Inf. (Dkt. 33).  Governor Little's letter did not contradict this unwritten policy.  If anything, it fully endorsed it and went even further, stating: "I oppose Idaho Medicaid using public funds to pay for irreversible sex reassignment surgeries, puberty blockers, or hormones for the purpose of changing the appearance of any child's or adult's sex" and "I hereby direct you and the Department of Health and Welfare to take all appropriate steps to implement a policy consistent with state and federal law excluding the same from Medicaid coverage."  *Id*. at Ex. A (Dkt. 33-1).  The state of any Medicaid coverage for gender-affirming care following Governor Little's letter is not fully known.  Regardless, Defendants' underlying policy and Governor Little's subsequent letter represent the component parts of the challenged Medicaid Exclusion Policy.

**MEMORANDUM DECISION AND ORDER - 3**

pursuant to Defendants' Medicaid Exclusion Policy, they were denied medically-necessary genital reconstruction surgery to treat their gender dysphoria. *Id*. at 18-23. Defendants' Motion to Dismiss was therefore denied in this respect. *Id*. at 33.

As to Plaintiffs' claims against Dr. Hamso individually, the Court determined that compensatory damages against her in her individual capacity are not available under the Medicaid Act. *Id*. at 23-24. Defendants' Motion to Dismiss was therefore granted in this respect and Plaintiffs' Second, Third, and Fifth Claims for Relief against Dr. Hamso individually were dismissed. *Id*. at 33. However, the Court determined that Dr. Hamso is not entitled to qualified immunity at this time on Plaintiffs' Equal Protection claim (Fourth Claim for Relief) and Due Process claim (Sixth Claim for Relief). *Id*. at 24-32. Defendants' Motion to Dismiss was therefore denied in these respects. *Id*. at 33.

On July 18, 2023, Dr. Hamso appealed the Court's denial of her Motion to Dismiss under qualified immunity. Not. of Appeal (Dkt. 40). Seven days later, Defendants filed a Motion for Certification of Interlocutory Appeal and Stay Pending Appeal. Mot. for Interloc. Appeal (Dkt. 50). Defendants requested therein that (i) the Court certify the remainder of its June 20, 2023 Memorandum Decision and Order under 28 U.S.C. § 1292(b), and (ii) stay all proceedings pending appeal. *Id*. The Court denied those requests on March 8, 2024. *See generally* 3/8/24 MDO (Dkt. 63) (revisiting *Geduldig's* potential application, the applicable level of scrutiny, and possible due process protections). Dr. Hamso's appeal remains pending.

On March 27, 2024, Governor Little signed HB 668 into law. HB 668 effectively memorializes and implements the previously-unwritten Medicaid Exclusion Policy by prohibiting the use of public funds (including Medicaid payments) for any gender-affirming care to treat gender dysphoria. *See, e.g.*, I.C. § 18-8901(2) ("Public funds shall not be used, granted, paid, or distributed to any entity, organization, or individual for the provision or subsidy of any

**MEMORANDUM DECISION AND ORDER - 4**

surgical operation or medical intervention described in section 18-1506C(3), Idaho Code,[3] for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex regardless of whether the surgical operation or medical intervention is administered to a minor or an adult, except for exempted surgical operations or medical interventions.[4]"); *id*. at § 18-8901(4) (same as applied to "Idaho [M]edicaid program"). HB 668 goes into effect on July 1, 2024.

On June 4, 2024, Plaintiffs sought leave to amend their Complaint to (i) name Director Jeppesen's successor, Alex Adams, as a Defendant; (ii) add five additional Plaintiffs (KB, SG, AC, BM, and G Doe, by and through her parents); and (iii) officially bring HB 668 into the orbit of their existing claims, alongside the Medicaid Exclusion Policy itself. *See* Mem. ISO Mot. to Am. at 5 (Dkt. 70-2) ("HB 668 was not in effect when the Plaintiffs filed the initial Complaint. HB 668 is scheduled to go into effect on July 1, 2024. The amendment would not be futile since

---

[3] Under Idaho Code § 18-1506C(3), "[a] medical provider shall not engage in any of the following practices upon a child for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex: (a) [p]erforming surgeries that sterilize or mutilate, or artificially construct tissue with the appearance of genitalia that differs from the child's biological sex, including castration, vasectomy, hysterectomy, oophorectomy, metoidioplasty, orchiectomy, penectomy, phalloplasty, clitoroplasty, vaginoplasty, vulvoplasty, ovariectomy, or reconstruction of the fixed part of the urethra with or without metoidioplasty, phalloplasty, scrotoplasty, or the implantation of erection or testicular prostheses; (b) [p]erforming a mastectomy; (c) [a]dministering or supplying the following medications that induce profound morphologic changes in the genitals of a child or induce transient or permanent infertility: (i) [p]uberty-blocking medication to stop or delay normal puberty; (ii) [s]upraphysiological doses of testosterone to a female; or (iii) [s]upraphysiological doses of estrogen to a male; or (d) [r]emoving any otherwise healthy or nondiseased body part or tissue." I.C. § 18-1506C(3).

[4] "Exempted surgical operations or medical interventions" include treatments that are understood to be "[n]ecessary to the health of the person on whom it is performed and is performed by a person licensed in the place of its performance as a medical practitioner." I.C. § 18-8901(1)(a). Critically, however, "a surgical operation or medical intervention is never necessary to the health of the minor or adult on whom it is performed if it is for the purpose of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex." *Id*.

**MEMORANDUM DECISION AND ORDER - 5**

similar underlying facts support the same legal claims as alleged in the initial Complaint. The new Plaintiffs are asserting similar allegations concerning the Defendants' refusal to provide medically necessary gender-affirming care and reimbursement under the Medicaid Act and Equal Protection Clause."). Defendants did not oppose Plaintiffs' amendment efforts and, on June 14, 2024, the Court granted Plaintiffs' request. 6/14/24 DEO (Dkt. 82). Plaintiffs filed their Amended Complaint on June 17, 2024. Am. Compl. (Dkt. 86).

That same day, Plaintiffs also filed a "Motion for Partial Summary Judgment and for a Permanent Injunction" (the "Motion for Partial Summary Judgment") (Dkt. 87). Therein, Plaintiffs argue that, as a matter of law, the Medicaid Exclusion Policy and HB 668 violate the Medicaid Act's Availability and Comparability Requirements, 42 U.S.C. §§ 1396a(a)(10)(A) & (B), are not in the best interests of Plaintiffs, and violate 42 U.S.C. § 1396a(a)(19) (Plaintiffs' Second and Third Claims for Relief). Mem. ISO MPSJ at 5, 7 (Dkt. 87-1) ("The Court should grant partial summary judgment because there are no material facts in dispute related to Plaintiffs' Medicaid claims and only presents a question of law. . . . Discovery is not necessary to establish that the Medicaid Exclusion Policy and HB 668 violate the Medicaid Act because it is solely a question of law, not of fact."). They in turn seek a permanent injunction enjoining enforcement of the Medicaid Exclusion Policy and HB 668 statewide. *Id*. at 24. Plaintiffs' Motion for Partial Summary Judgment remains pending.[5]

---

[5] The deadline for Defendants to respond to it is unclear. The Advisory Committee Notes to Rule 56 indicate that, "[i]f a motion for summary judgment is filed before a responsive pleading is due from a party affected by the motion, *the time for responding to the motion is 21 days after the responsive pleading is due*." 2008 Adv. Comm. Notes to Fed. R. Civ. P. 56 (emphasis added). Defendants have not yet responded to Plaintiffs' Amended Complaint. To be sure, on June 14, 2024, Defendants moved to extend the time for them to respond to Plaintiffs' Amended Complaint to July 31, 2024. *See* Mot. for Ext. of Time to Ans. (Dkt. 80). Plaintiffs recently opposed that request. *See* Resp. to Mot. for Ext. of Time to Ans. (Dkt. 94). Thus, the deadlines for Defendants' responses to Plaintiffs' Amended Complaint and Motion for Partial Summary Judgment remain uncertain at this time.

**MEMORANDUM DECISION AND ORDER - 6**

On June 24, 2024, Plaintiffs filed a "Motion for Expedited Briefing to Respond to the Motion for Partial Summary Judgment and for a Permanent Injunction and for a Temporary Restraining Order" (the "Motion for Temporary Restraining Order") (Dkt. 92). They moved not only to expedite the briefing on their Motion for Partial Summary Judgment, but also for a temporary restraining order under Rule 65(b) "to preserve the status quo by enjoining the effective date of the newly-enacted HB 668[ ] while the Court considers the Motion for Partial Summary Judgment." Mot. for TRO at 2 (Dkt. 92). The Court denied that request the next day, questioning the extent of Plaintiffs' claimed irreparable harm once HB 668 goes into effect on July 1, 2024, when the same (or at the very least similar) prohibitions on gender-affirming care have existed under the Medicaid Exclusion Policy since this action began in September 2022:

> Plaintiffs' argument in this respect logically tracks. The problem, however, is when the status quo – what a temporary restraining order is intended to preserve until a court has an opportunity to pass on the action's merits – is more closely examined here. That status quo is the *current* policy in Idaho for processing Medicaid claims relating to gender-affirming care for the treatment of gender dysphoria. Indeed, that is what this action was initially premised upon, wholly independent of HB 668 and thus, untethered to its July 1, 2024 enforcement date. In other words, the status quo is reflected in the existing Medicaid Exclusion Policy which, according to Plaintiffs, *already* harms Plaintiffs by denying medically-necessary gender-affirming care (but to which Plaintiffs never previously sought injunctive relief during the approximately 20-month pendency of this case). That HB 668 memorializes and finally implements the Medicaid Exclusion Policy only supports this point.
>
> What this highlights is that, unless Plaintiffs are now receiving care (notwithstanding the Medicaid Exclusion Policy) that HB 668 will prohibit as of July 1, 2024, there is no imminent irreparable harm that will be avoided by a temporary restraining order. Absent this requisite harm, there is no basis for a temporary restraining order.
>
> These interrelated and overlapping aspects of Plaintiffs' case frame the Court's current perspective of this discrete point and drive its present analysis on that issue. Perhaps there is more to it than the Court can readily discern from either Plaintiffs' briefing or their Amended Complaint – again, that being whether (i) there are specific Medicaid benefits that each Plaintiff is currently receiving despite the Medicaid Exclusion Policy,

**MEMORANDUM DECISION AND ORDER - 7**

>  which (ii) will no longer be available once HB 668 goes into effect. Until this is more clearly demonstrated, a temporary restraining order cannot issue.

6/25/24 MDO at 5-6 (Dkt. 93) (emphasis in original, internal citations omitted).

Then, on June 28, 2024, Plaintiffs filed the at-issue "Supplemental Memorandum in Response to Order Re: Motion for Expedited Briefing and for a Temporary Restraining Order to Preserve the Status Quo" (the "Renewed Motion for Temporary Restraining Order"). This latest filing seeks to address the Court's June 24, 2024 Order and its fundamental concern about whether Plaintiffs themselves are *currently* receiving Medicaid benefits that will end on July 1, 2024 under HB 668. *See generally* Renewed Mot. for TRO at 4-12 (Dkt. 95). Pointing to allegations made in their Amended Complaint and additional declarations, Plaintiffs argue in no uncertain terms that "[t]he status quo for each Plaintiff, who are Medicaid participants, *is to continue to have their gender-affirming care as prescribed by their doctors to treat gender dysphoria reimbursed and covered by Medicaid* the same as cisgender Medicaid participants with other medical conditions" and, in particular, that *"the status quo is continuing Medicaid coverage and reimbursement for Plaintiffs' hormone treatments, pharmaceuticals, exams and diagnostics, and treatment plans." Id*. at 8 (emphasis added). Owing to time constraints, Defendants did not respond.

## II. DISCUSSION

A temporary restraining order and a preliminary injunction generally serve the same purpose of "preserv[ing] the status quo ante litem pending a determination of the action on the merits." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980); Fed. R. Civ. P. 65. Both are extraordinary remedies and should not be awarded as a matter or right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

**MEMORANDUM DECISION AND ORDER - 8**

In general, the showing required for a temporary restraining order and a preliminary injunction are the same. A plaintiff seeking either "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id*. at 20. "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Alternatively, relief is also appropriate under the "sliding scale" approach when "serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor," combined with a likelihood of irreparable injury and a showing that the order would serve the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal quotation marks omitted); *see also Nat'l Urban League v. Ross*, 484 F. Supp. 3d 802, 805 (N.D. Cal. 2020) (applying sliding scale approach for temporary restraining order). In this context, "'serious questions' refer to questions that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023) (internal quotation marks and citations omitted).

Although the standard for obtaining a temporary restraining order and a preliminary injunction is identical, they serve fundamentally different purposes. "The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1008-09 (D. Or. 2019) (internal quotation marks and citations omitted); *see also Arizona Recovery Hous. Ass'n v. Arizona Dep't of Health Servs.*, 462 F. Supp. 3d 990, 996 (D. Ariz. 2020) ("The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered, while

**MEMORANDUM DECISION AND ORDER - 9**

the purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction hearing may be held."). Hence, "[a] key difference between a temporary restraining order and a preliminary injunction is its respective duration." *Dudley v. Boise State Univ.*, 2022 WL 17551104 at *3 (D. Idaho 2022). Preliminary injunctions remain in force throughout the litigation, whereas provisional temporary restraining orders are traditionally more limited in time – "restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer." *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974). So, despite important overlap, issuing a temporary restraining order is not designed to replace the "thorough consideration contemplated by full proceedings pursuant to a preliminary injunction." *Oby v. Clear Recon Corp.*, 2016 WL 3019455 at *1 (E.D. Cal. 2016).

With these considerations in mind, a temporary restraining order is appropriate to preserve the status quo pending a more complete review of the circulating issues.

*First*, Plaintiffs' ability to demonstrate "a likelihood of success on the merits, or serious questions going to the merits, is the most important element" of injunctive relief. *Perlot v. Green*, 609 F. Supp. 3d 1106, 1126 (D. Idaho 2022) (citing *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)); *but see* Fed. R. Civ. P. 65(b)(1)(A) (discussing issuance of a temporary restraining order without notice to the adverse party upon showing of "immediate and irreparable injury, loss, or damage," without reference to eventual success on the merits). In the context of a preliminary injunction, this showing "is only *preliminary* because the parties have typically not engaged in any discovery by the time a preliminary injunction is filed." *Roe v. Critchfield*, 2023 WL 5146182, at *4 (D. Idaho 2023) (emphasis in original). A temporary restraining order that precedes a preliminary injunction (and, like here, often takes place without input from all parties) "is even more removed from the merits and substance of the case." *Id*.

**MEMORANDUM DECISION AND ORDER - 10**

"Said another way, at this point the Court is effectively tasked with trying to make a pre-preliminary call on the prospects of Plaintiffs' claims." *Id*.

Here, Plaintiffs anchor their claim to eventual success on the merits (for the purposes of securing a temporary restraining order) to their pending Motion for Partial Summary Judgment. *See* Mem. ISO Mot. for TRO at 11 (Dkt. 92-1) ("Plaintiffs are likely to succeed on the merits of their Motion for Partial Summary Judgment and have raised serious questions of law on the merits."). There, Plaintiffs argue that, as a matter of law, the Medicaid Exclusion Policy and HB 668 violate (i) the Medicaid Act's Availability Requirement (Second Claim for Relief), 42 U.S.C. § 1396a(10)(A),[6] by denying coverage for medically necessary treatments for gender dysphoria, and (ii) the Medicaid Act's Comparability Requirement (Third Claim for Relief), 42 U.S.C. § 1396a(10)(B),[7] because the same treatment is covered for other diagnoses. Mem. ISO MPSJ at 9-16 (Dkt. 87-1). The presumptive through-line in these claims is that the gender-affirming care prescribed by Plaintiffs' medical providers – yet precluded from coverage by the Medicaid Exclusion Policy and HB 668 – is in fact medically necessary.

On that point, Plaintiffs offer up the declarations of three medical providers who discuss the established standards of care to treat individuals with gender dysphoria – which include the gender-affirming care at play in this litigation – and how withholding such care can be harmful. *See generally* Perron-Burdick, Alviso, & Schecter Decls. (Dkts. 87-4 to 87-6). This evidence is compelling, though the Court recognizes that Defendants have not been heard on the issue. Still,

---

[6] The Medicaid Act's Availability Requirement requires states to make covered treatment available in sufficient "amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b). But states can "place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d).

[7] The Medicaid Act's Comparability Requirement requires "services available to any individual" be provided in "equal . . . amount, duration, and scope for all beneficiaries . . . ." 42 C.F.R. §§ 440.240(a) & (b).

**MEMORANDUM DECISION AND ORDER - 11**

this one-sided snapshot can be read to suggest Plaintiffs' eventual success on their Medicaid-related claims when also considering the Court's denial of Defendants' Motion to Dismiss vis à vis Plaintiffs' Equal Protection claim.  At the very least, Defendants' anticipated conflicting evidence regarding the medical necessity of Plaintiffs' prescribed gender-affirming care, coupled with the current hot-button nature of transgender care across the county, amount to serious questions going to the merits of those claims, and which require more deliberative investigation.

*Second*, while Plaintiffs' first attempt at securing a temporary restraining did not clearly demonstrate anticipated irreparable harm if HB 668 goes into effect (*supra*), they have since remedied that concern to the Court's present satisfaction.  To be clear, the problem was not whether Plaintiffs (i) were participants in the Idaho Medicaid program, or (ii) were prescribed certain gender-affirming care by their medical providers, or (iii) received gender-affirming care, or (iv) need Medicaid coverage for their gender-affirming care.  This is all understood.  Rather, the issue was whether these same "dots" were sufficiently connected in a way that revealed that, even in the face of the existing Medicaid Exclusion Policy, Plaintiffs still had been receiving Medicaid benefits for their gender-affirming care, and that those same Medicaid benefits will end on July 1, 2024.  The distinction is subtle, but nonetheless critical when weighing Plaintiffs' request for a temporary restraining order against the burden for securing one.  That is, if Plaintiffs were already not receiving gender-affirming care because of the Medicaid Exclusion, there is no need to now upend the status quo in light of HB 668.

The ambiguity that previously existed is resolved for the time-being.  It appears clear that certain Plaintiffs *are* receiving gender-affirming care, that *is currently* being covered by Medicaid, but that *will* end on July 1, 2024 with HB 668.  *See, e.g.*, Pl. KB's Decl. ISO Mot. for TRO at ¶¶ 3-8 (Dkt. 95-5) (Medicaid currently covering to-be-ceased gender-affirming care); Pl. AC's Decl. ISO Mot. for TRO at ¶¶ 3-9 (same); Pl. G. Doe's Decl. ISO mot. for TRO at 3-8

**MEMORANDUM DECISION AND ORDER - 12**

(Dkt. 95-3) (same). Though other Plaintiffs' situations are less obviously clear (but still involve the reasonable inference of gender-affirming care currently covered under Medicaid),[8] any residual doubt is neutralized by Plaintiffs' counsel's straightforward claim that "each Plaintiff is a Medicaid participant and is currently receiving gender-affirming care through Medicaid" and that "[t]he Court should issue a temporary restraining order to preserve the status quo ordering Medicaid to continue to reimburse and cover gender-affirming care as it did up until July 1, 2024." Renewed Mot. for TRO at 8-9 (Dkt. 95). That HB 668 will bring an end to coverage for this care – again, care that Plaintiffs and their medical providers claim to be medically necessary – effectively puts an end to that care and likely causes Plaintiffs immediate, irreparable harm. *See M.R. v. Dreyfus*, 697 F.3d 706, 733 (9th Cir. 2012) (loss of medically necessary services demonstrates likelihood of irreparable injury); *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed and/or complete lack of necessary treatment).

*Third*, because Plaintiffs have shown a degree of likelihood (or at least serious questions going to the merits) that the Medicaid Exclusion Policy and HB 668 violate the Medicaid Act's Availability and Comparability Requirements (*supra*), their interest in HB 668 going into effect on July 1, 2024, and what that means for their medical care moving forward, is significant. Defendants' comparative interests in HB 668 not applying to Plaintiffs are unknown and,

---

[8] For example, Plaintiffs only allege that Plaintiff MH "is a participant in the Idaho Medicaid program," "has remained on hormone therapy since August 2019," and that, "without Medicaid coverage of gender-affirming care, she will not be able to continue her medical transition." Am. Compl. at ¶¶ 35, 45 & 62 (Dkt. 86). They similarly state that Plaintiff TB "is a participant in the Idaho Medicaid program," started hormone therapy in early 2018, and "relies on Idaho Medicaid to cover the costs of her gender-affirming care." *Id*. at ¶¶ 63, 73, & 76. And that Plaintiff SG is "a participant in Idaho Medicaid's program," "receives medical treatment . . . to treat her gender dysphoria," and that she "relies on Idaho Medicaid to cover the costs of her gender-affirming care." *Id*. at ¶¶ 90, 93, & 97. And finally that Plaintiff BM "is enrolled in the Idaho Medicaid program," "has received gender-affirming care to treat their gender dysphoria," and "relies on Idaho Medicaid to cover the costs of her gender-affirming care." *Id*. at ¶¶ 110, 112, & 122.

**MEMORANDUM DECISION AND ORDER - 13**

potentially, their interests are not even at odds with Plaintiffs' interests in this setting. That is to say that there is no evidence before the Court that Defendants, other than following the directives they may be bound to follow, have any separate and distinct interest in how gender-affirming care is covered under Medicaid in the abstract, or how that may (or may not) apply to any targeted temporary restraining order here. These unknowns, contrasted against Plaintiffs clear interests in maintaining what they believe to be medically-necessary treatment for their gender dysphoria, tips the balance of equities in Plaintiffs' favor at this time.

Relatedly, *fourth*, there is unquestionably a public interest in following the laws enacted by an elected state legislature. But that interest is not absolute, particularly when those laws themselves are legally problematic. *See, e.g.*, *Poe v. Labrador*, 2023 WL 8935065, at *1 (D. Idaho 2023) (relating to court decisions that apply the Fourteenth Amendment to strike down legislative enactments: "Critics say such decisions are anti-democratic and frustrate the will of the people as expressed by their elected legislature. And they are right. But that is precisely how our constitutional democracy is supposed to work. The authors of the Fourteenth Amendment fully understood and intended that the amendment would prevent state legislatures from passing laws that denied equal protection of the laws or invaded the fundamental rights of the people."). Such may be the case here and, as a result, this factor cuts in favor of a temporary restraining order under the circumstances.

A temporary restraining order is therefore appropriate. But, conscious of the Supreme Court's recent instruction pertaining to the scope of injunctive relief, the Court emphasizes that the temporary restraining order applies only to suspend HB 668's application with respect to Plaintiffs' gender-affirming care. *Labrador v. Poe*, 144 S.Ct. 921, 922-28 (2024). Moreover, the Court is satisfied that Defendants face no realistic likelihood of injury resulting from the issuance of temporary injunctive relief. Accordingly, Plaintiffs need not post any bond as a condition of

**MEMORANDUM DECISION AND ORDER - 14**

obtaining injunctive relief under Federal Rule of Civil Procedure 65(c). *Jorgensen v. Cassidy*, 320 F.3d 906, 919 (9th Cir. 2003).

### III.  ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiffs' "Supplemental Memorandum in Response to Order Re: Motion for Expedited Briefing and for a Temporary Restraining Order to Preserve the Status Quo" (Dkt. 95) is understood to be a renewed request for a temporary restraining order and correspondingly a Renewed Motion for Temporary Restraining Order. That request is GRANTED insofar as HB 668 is temporarily suspended as to Plaintiffs' gender-affirming care until the Court has an opportunity to pass on the merits of a preliminary injunction.[9] To that end, the Court considers Plaintiffs' Renewed Motion for Temporary Restraining Order (Dkt. 95), along with their original Motion for Temporary Restraining Order (Dkt. 92),[10] as also requesting preliminary injunctive relief. Defendants are therefore ordered to respond to Plaintiffs' Motion for Temporary Restraining Order (Dkt. 92) and Plaintiffs' Renewed Motion for Temporary Restraining Order (Dkt. 95) on or before July 5,

---

[9] The Court will not issue a temporary restraining order suspending HB 668's application to Plaintiffs' gender-affirming care until after the Court resolves Plaintiffs' Motion for Partial Summary Judgment, as Plaintiffs request. That is not the purpose of a temporary restraining order. *See W. Watersheds Project*, 391 F. Supp. 3d at 1008-09 (temporary restraining order precedes consideration of the merits of a preliminary injunction). Additionally, doing so could impermissibly extend the temporary restraining order indefinitely, depending on how long it takes to fully brief and resolve Plaintiffs' Motion for Partial Summary Judgment. Therefore, unless Defendants consent to extend the temporary restraining order as Plaintiffs request (or something else takes place), the Court intends to conduct a preliminary injunction hearing to consider whether the temporary restraining order should be converted to a more enduring preliminary injunction. *See Arizona Recovery Hous. Ass'n*, 462 F. Supp. 3d at 996 (preliminary injunction preserves the status quo until a final judgment on the merits can be rendered).

[10] Though not completely settled here, in light of this Memorandum Decision and Order, the Court may re-institute Plaintiffs' Motion for Temporary Restraining Order (Dkt. 92) on the docket for the purposes of understanding the full scope of Plaintiffs' arguments and any briefing in response thereto.

**MEMORANDUM DECISION AND ORDER - 15**

2024, and Plaintiffs shall reply on or before July 8, 2024.  A preliminary injunction hearing will be set thereafter.

This Temporary Restraining Order takes effect on July 1, 2024 and, unless otherwise dissolved, extended by this Court or by agreement of the parties, expires on July 15, 2024.

DATED:  June 29, 2024

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge

MEMORANDUM DECISION AND ORDER - 16