Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
1447 S. Tyrell Lane
Boise, ID 83706
Tel: (208) 807-2323 Fax: (208) 342-2561
howardbelodoff@idaholegalaid.org

Jane Gordon, ISB # 9243
Jane Gordon Law
1004 West Fort Street
Boise ID 83702
Tel: (208) 371-4747; Fax: (208) 807-2290
Jane@JaneGordonLaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

|  |  |
|---|---|
| MH, TB, KB, SG, AC, BM, individually, and G Doe, by and through her parents and next friends, JANE Doe and JOHN Doe,<br><br>     Plaintiffs,<br><br>vs.<br><br>ALEX ADAMS, in his official capacity as the Director of the Idaho Department of Health and Welfare; Dr. MAGNI HAMSO, in her official capacity as the Medical Director of the Idaho Division of Medicaid and individually; and the IDAHO DEPARTMENT OF HEALTH AND WELFARE,<br><br>     Defendants. | CASE NO. 1:22-CV-409-REP<br><br>MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

COME NOW Plaintiffs, by and through their counsel, Howard A. Belodoff, Idaho Legal

Aid Services, Inc. and Jane Gordon, Jane Gordon Law, pursuant to Fed. R. Civ. Proc. 65(a) &

(b), to respectfully move this Court for a Temporary Restraining Order ("TRO") to preserve the

status quo until the Court can consider the issuance of a Preliminary Injunction. *See* Dkt. 96 at 9-

10.[1] Plaintiffs, transgender Medicaid participants, seek relief ordering Idaho Medicaid to cover and reimburse the continuation of their medically necessary, potentially life saving, gender-affirming treatments, as prescribed by their physicians, for their diagnosed gender dysphoria, because the same treatments continue to be covered and reimbursed for cisgender Medicaid participants with medical conditions other than gender dysphoria. *Id.* at 8.[2] The Court previously granted a TRO until a preliminary injunction hearing could be set in this action. *Id.* at 15-16. The Court understood that Plaintiffs were pursuing a preliminary injunction and scheduled a preliminary injunction hearing for July 18, 2024. Dkt. 111. Prior to the time set for the hearing, Defendants filed a Response to Plaintiff's [sic] Renewed Motion for Temporary Restraining Order [Dkt. 95]. Defendants also filed a Declaration from the Deputy Director of Medicaid indicating Defendants were not "immediately ending all of Plaintiffs' medications following H.B. 668's implementation." Dkt. 103 at 13. Defendants further represented "for those Medicaid patients already on 'sex reassignment' medications, H.B. 668 allows for the continued prescription of the medications, in serially reduced dosages to safely taper those patients off the medication." *Id.* (citing Dkt. 103 Charron Decl., ¶ 5).

Ms. Charron sent Medicaid providers a MEDICAID INFORMATION RELEASE MA24-19, dated July 16, 2024, entitled Gender Transition Services. *See* Declaration of Jane Gordon at Exhibit 1. She indicated that Idaho Medicaid would "cover up to ninety (90) additional days of hormone therapy for gender transition to facilitate tapering as needed." Thereafter, Plaintiffs

---

[1] Given the Court's extensive involvement in this case, Plaintiffs will not repeat the full procedural history and the factual allegations previously discussed by the parties and the Court. *See* Dkts. 92-1 at 3-9 and 96 at 11-.

[2] The Verified Amended Complaint includes allegations specific to each adult and child Plaintiff. Dkt. 86 at 7- (¶ 35 to ¶ 138).

notified the Court that a hearing on the preliminary injunction was not necessary at that time and requested the Court alternatively set a deadline ordering Defendants to respond to the Motion for Partial Summary Judgment under the Medicaid Act because the Charron RELEASE removed the immediate need for a preliminary injunction. Dkt. 117 at 16 (citing Dkt. 111). Plaintiffs reserved their right to later seek preliminary injunction. *Id.* Plaintiffs made the decision **not** to proceed with the hearing at that time "because a preliminary injunction will only protect the named Plaintiffs and Defendants would probably file an interlocutory appeal further delaying a decision on summary judgment. *See Labrador v. Poe*, 144 S.Ct. 921, 922-28 (2024)." *Id.* at 16-17.

There have been two recent developments related to merits of this case. First, Judge Nye, in an 8th Amendment challenge to the constitutionality of HB 668, on behalf of incarcerated transgender persons in the custody of the Idaho Department of Corrections, granted a preliminary injunction and a request for class certification. *See Robinson v. Labrador*, Case No. 1:24-cv-00306-DVN (September 3, 2024) at Dkt. 58.[3] The Court certified a class of those prisoners "who are, or will be diagnosed with gender dysphoria" and enjoined Idaho Code § 18-8901's prohibition on the use of public funds for purposes of providing hormone therapy. *Id.* at 2 & 24-25. Second, the Ninth Circuit issued a Memorandum decision affirming the Court's order denying Defendant Hamso qualified immunity for the Fourteenth Amendment Equal Protection claim in this case. *See M.H. v. Hamso,* No. 23-35485 9th Circuit (September 6, 2024) at Dkt.125. The Memorandum is binding precedent as the law of the case. *See* Ninth Circuit Rule 36-3. The Memorandum held the law was clearly established that Plaintiffs had a right to be treated equally

---

[3] The Court in *Robinson* granted a TRO on July 1, 2024, "concluding that Plaintiffs had raised serious question going to the merits" to preserve the status quo until a hearing held on July 15, 2024. Dkt. 13. The Court continued the TRO until a second hearing on August 2, 2024. At the second hearing the Court took under advisement the request for a preliminary injunction and requested further briefing on class certification. *Robinson*, Dkt. 58 at 3.

and the same as non-transgender Medicaid beneficiaries when seeking Medicaid coverage for the same medically necessary surgeries and classifications on the basis of transgender status and sex was subject to heightened scrutiny. Dkt. 125 at 4-5. The Court further determined the sex discrimination in this case was distinct from the Supreme Court's decision in *Geduldig v. Aiello*. *Id.* at 5 (citing *Geduldig*, 417 U.S. 484 (1974)). These two decisions support the issuance of a preliminary injunction at this time under Plaintiffs' claims under the Medicaid Act and Equal Protection.

**I.**     **The Court Should Issue a Temporary Restraining Order to Preserve the Status Quo Pending a Decision on the Motion for a Preliminary Injunction**

The grounds for the issuance of a temporary restraining order are the same as a preliminary injunction. *All. for the Wild Rockies v. Higgins*, 2023 U.S. Dist. LEXIS 162875 at *16 (D. Idaho 2023). A plaintiff "'must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "'When the government is a party, these last two factors merge.'" *Id.* (quoting *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)). This Court has recognized relief is also available under a "sliding scale" approach for temporary restraining orders when "serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor, combined with a likelihood of irreparable injury and a showing that the order would serve the public interest." Dkt. 96 at 9. (cleaned up). Serious questions in the temporary restraining order context "'refer to questions that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation.'" *Id.* (quoting *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023).

The fundamental purpose of a temporary restraining order is to preserve an existing situation in status quo, which is "the legally relevant relationship *between the parties* before the controversy arose." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (emphasis in original). "[T]emporary restraining orders are traditionally more limited in time – "restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer." Dkt. 96 at 10 (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974)). "The preservation of the status quo in the meantime is, indeed, the archetypal use of a temporary restraining order." *Alliance For the Wild Rockies*, Lexis 162875 at *20 (quoting *Roe v. Critchfield*, 2023 U.S. Dist. LEXIS 140737, at *4 (D. Idaho 2023) ("issuing temporary restraining order to 'preserv[e] the status quo pending a more complete review'"). Here, a temporary restraining order is necessary to prevent irreparable harm and preserve the status quo until the Court can conduct a hearing and decide whether a Preliminary Injunction is warranted. Dkt. 96 at 9-10. *See Oby v. Clear Recon Corp.*, 2016 WL 3019455 at *1 (E.D. Cal. 2016) (A temporary restraining order is not designed to replace the "thorough consideration contemplated by full proceedings pursuant to a preliminary injunction.").

The status quo for Plaintiffs is to preserve their Medicaid coverage and reimbursement so they can continue to access their prescribed medically necessary gender-affirming hormone treatments, pharmaceuticals, exams and diagnostics, and treatment plans for their diagnosed gender dysphoria after HB 668's ninety (90) day implementation period expires and Defendants begin enforcing the public and Medicaid funding prohibitions while cisgender Medicaid participants are "exempted" from the prohibitions and can continue to receive the same or similar "surgical operations and medical procedures" for conditions other than gender dysphoria. *See*

Idaho Code § 18-8901(1). Plaintiffs rely upon Medicaid to reimburse and cover their gender-affirming treatments prescribed by their doctors to treat gender dysphoria. *See* Dkt. 86, Verified Amended Complaint at ¶s: MH [44, 45 &61], TB [63 & 73], KB [81 & 82], SG [90 & 93], AC [100, 102 & 107], BM [110 & 112], and G Doe [127 & 133]. The Verified Complaint alleges that without Medicaid reimbursing and covering gender-affirming care each Plaintiff who is currently receiving treatment of gender dysphoria will no longer be able to receive it. *Id.* at ¶s: MH [62], TB [76], KB [87 & 88], SG [97 & 98], AC [108], BM [112 & 125] G Doe [136 & 138]. The majority of their gender-affirming treatment is hormone therapy, which requires daily and weekly medications. Forcing the sudden discontinuance of daily and weekly medications is physiologically and psychologically harmful and cruel for transgender individuals.

### A.  Likelihood of Success on the Merits

Plaintiffs are likely to succeed on the merits of their challenge to the Medicaid Exclusion Policy and HB 668 under the "Medicaid Act's Availability Requirement (Second Claim for Relief), 42 U.S.C. § 1396a(10)(A),6 by denying coverage for medically necessary treatments for gender dysphoria, and the Medicaid Act's Comparability Requirement (Third Claim for Relief), 42 U.S.C. § 1396a(10)(B),7 because the same treatment is covered for diagnoses other than gender dysphoria. Dkt. 96 at 11 (citing Dkt. 87-1 at 9-16). Plaintiffs are also likely to succeed on their Equal Protection Claim (Fourth Claim for Relief) that the Medicaid Exclusion Policy and HB 668 discriminates on the basis of transgender status and sex. The Court has previously recognized Plaintiffs' Equal Protection claim, "coupled with the current hot-button nature of transgender care across the country, amount to serious questions going to the merits of those claims and which require more deliberative investigation." Dkt. 96 at 12.

### 1.  Plaintiffs are likely to succeed on the merits of their Equal Protection claim

The unwritten Medicaid Exclusion Policy prohibits "the use of public funds (including Medicaid payments) for any gender-affirming treatment gender dysphoria." Dkt. 96 at 4 (citations omitted). Plaintiffs seek a preliminary injunction to prevent the ceasing of Medicaid coverage and reimbursement for gender-affirming treatment of their diagnosed gender dysphoria as provided for in the Medicaid Exclusion Policy and HB 668. Idaho Code §§ 18-18-8901 and 56-270. The Ninth Circuit in *MH* v. *Hamso* found: "[a]s alleged, the policy of treating certain surgeries as "cosmetic" only when treating gender dysphoria creates a classification on the basis of transgender status and sex, which was clearly subject to heightened scrutiny under binding circuit precedent." *Id.* at 5 (citing *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019)). The Ninth Circuit's decision was based upon Defendants' admission at oral argument that "by singling out gender dysphoria as the only non-covered condition, the policy exclusively burdens transgender beneficiaries relative to cisgender beneficiaries, **regardless of individual circumstances or medical necessity**." *Id.* (emphasis added). The Court found the sex discrimination in this case was distinguishable from the Supreme Court's decision in *Geduldig v. Aiello*. *Id.* at 5 (citing *Geduldig*, 417 U.S. 484 (1974)). The Ninth Circuit recognized that: "[a]t the time of Dr. Hamso's coverage denials, a 'robust consensus' of district court decisions evaluating the same or similar exclusionary polices across the country also put her on notice of Plaintiffs' Equal Protection rights in the healthcare coverage context." *Id.* at 5-6.

Defendants previously relied upon *Geduldig* as a justification for the discriminatory treatment on the basis of transgender status and sex, between the medically necessary treatments covered and reimbursed for transgender beneficiaries diagnosed with gender dysphoria and the medical treatments covered and reimbursed for cisgender Medicaid beneficiaries with other

medical condition. Dkt. 36 at 19 ("Defendants claim that their policy does not consider gender status at all, but rather, is based on diagnosis and treatment: coverage is not excluded for transgender persons, but rather, just for genital reconstruction surgery to treat the condition of gender dysphoria."). The Court noted that "Defendants argue that transgender persons receive the exact same coverage as cisgender persons: neither group is covered for genital reconstruction surgery to treat gender dysphoria and both groups are covered for genital reconstruction surgery to treat other conditions." *Id.* at 19. "Yet, exclusively transgender persons – and not cisgender persons – suffer from gender dysphoria. *See Fain v. Crouch*, 618 F. Supp. 3d 313, 324-25 (S.D.W.V. 2022) ('[I]nherent in a gender dysphoria diagnosis is a person's identity as transgender. In other words, a person cannot suffer from gender dysphoria without identifying as transgender.')." *Id.* at 20.[4] The Ninth Circuit's decision, affirming the Court's denial of qualified immunity on Equal Protection, establishes Plaintiffs are likely to succeed on the merits and alternatively there are serious questions on the merits being raised for the issuance of a preliminary injunction against HB 668 which effectively memorializes and implements the previously-unwritten Medicaid Exclusion Policy.

Plaintiffs are likely to succeed on the merits because the Idaho Federal District Court and the Ninth Circuit have upheld the issuance of preliminary injunctions against Idaho statutes with explicit classifications against transgender individuals because they constituted facial and proxy discrimination on the basis of transgender status and sex in violation of Equal Protection. The

---

[4] *See also* Dkt. 63 at 7-10 Memorandum Decision and Order "Defendants' plan does not merely exclude a gender-neutral physical condition from coverage, it excludes treatments for a condition that cannot be understood without reference to sex, gender, or transgender status. At bottom, the inherent nuance between the different classifications here and in *Geduldig* represents a classic "apples to oranges" comparison that precludes *Geduldig's* application as a matter of law to bar Plaintiffs' case." *Id.* at 8.

Court in *Poe v. Labrador* addressed the constitutionality of the Idaho Vulnerable Child

Protection Act's ("Act"), Idaho Code 18-1506C, prohibition of gender-affirming treatments of

gender dysphoria for adolescents diagnosed with gender dysphoria. 2023 U.S. Dist. LEXIS

229332 *7 (D. Idaho Dec. 26, 2023) (Appeal pending). In *Poe*, two transgender minors and their

parents sought a preliminary injunction enjoining the Act's prohibition on the use of puberty

blockers, hormones and other treatments under the Equal Protection Clause and the Due Process

Clause. *Id.* The Act, as provided in § 3, banned "certain medical treatments of (and only if) those

treatments are provided 'for the purpose of attempting to alter the appearance of or affirm the

child's perception of the child's sex *if that perception is inconsistent with the child's biological*

*sex*.'" *Id.* at *39 (HB 71 § (3) (emphasis in original).

The *Poe* state defendants, similar to the present case, contended the Act "does not

classify on the basis of transgender status but, instead, simply regulates a treatment for a

particular diagnosis—gender dysphoria." *Id.* at *40. The Court found, under a heightened

scrutiny standard, the Act "explicitly classifies on the basis of transgender status." *Id.* at 38-39.

The Court also held the Act "discriminates by proxy, as only transgender people seek treatment

for gender dysphoria." *Id.* at 40. The Court held the Act's discrimination on the basis of

transgender status was a form of sex discrimination. *Id.* (citing *Hecox v. Little*, 79 F.4th 1009,

1026 (9th Cir.2023) Amended *Hecox v. Little*, 2024 U.S. App. LEXIS 13929 (9th Cir. June 7,

2024)). The Court concluded the Act also "classifies on the basis of gender nonconformity

because it effectively prohibits transgender minors from taking medications or undergoing

treatments due to their gender nonconformity." *Id.* at 40-41 (citing generally *Bostock v. Clayton*

*Cnty.*, 140 S. Ct. 1731, 1742-42, 1746, 207 L. Ed. 2d 218 (2020). Because the Act only bans

treatments "'for the purpose of attempting to alter appearance of or affirm the child's perception

of the child's sex if that perception is inconsistent with the child's biological sex'. . . 'the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law' it 'discriminates on the basis of sex.'" *Id.* at 41. The Court found the state did not show the Act's "discrimination on the basis of sex and transgender status 'serve important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Poe* at *48 (quoting *United States v. Virginia*, 518 U.S. 515, 524 (1996)).

The Court's analysis in *Poe* is directly applicable to the Plaintiffs' challenges to HB 668 and the Medicaid Exclusion Policy because they classify on the basis of transgender status and discriminate on the basis of sex for the same reasons as the Act. HB 668 declares that "a surgical operation or medical intervention is **never necessary** to the health of the minor or adult on whom it is performed if it is for the **purpose of altering the appearance** of an individual in order **to affirm the individual's perception of the individual's sex** in a way that is **inconsistent with the individual's biological sex.**" Idaho Code § 18-8901(1)(a) (emphasis added). HB 668 facially and by proxy explicitly discriminates on the basis of transgender status and sex because it declares all treatments of the condition of gender dysphoria, which only afflicts transgender individuals, are never medically necessary and bans treatments for the purpose of altering the appearance of an individual that is inconsistent with their biological sex. HB 668 cannot be applied without considering an individual's sex assigned at birth and their gender identity if it conflicts with their sex assigned at birth. HB 668 specifically targets transgender status and sex because it exempts "surgical operations or medical interventions" if performed on non-transgender individuals with medical conditions other than gender dysphoria or if needed

because of "the performance of gender transition procedures" or "a medically verifiable genetic disorder of sex development." Idaho Code § 18-8901(1)(a)-(c).

HB 668's bans the use of "public funds" and Medicaid reimbursement and coverage for "surgical operations or medical interventions" in Idaho Code § 18-1506C. This is the same statute that Judge Winmill held discriminated on the basis of transgender status and sex in *Poe*. The state cannot show HB 668 survives the demanding standards under heightened scrutiny since the asserted objectives are pretextual because the same treatments for minors and adults are safe and effective for cisgender individuals for medical conditions other than gender-affirming treatment of gender dysphoria.

Judge Winmill in *Poe* further found:

"the weight of the evidence shows not only that gender-affirming medical care delivered in accordance with WPATH and Endocrine Society guidelines is helpful and necessary for some adolescents, but also that withholding such care is harmful. As plaintiffs' experts have explained, allowing gender dysphoric youth to go untreated can increase the risk of anxiety, depression, self-harm, and suicidality." *Poe* at *45.

The Court held because the *Poe* plaintiffs had shown the likelihood of success on their equal protection and due process claims it enjoined the Act. Plaintiff G Doe is not protected from discrimination under *Poe* because the Supreme Court limited the scope of the preliminary injunction to the named plaintiffs and continues to need injunctive relief because HB 668's ban on treatment of gender dysphoria applies to her as a transgender minor and prevents her from being able to seek medical care outside of Idaho. *See Labrador v. Poe*, 144 S.Ct. 921, 922-28 (2024).

Plaintiffs are also likely to succeed on the merits because of the Ninth Circuit's amended decision in *Hecox v. Little*, 2024 U.S. App. LEXIS 13929 (9th Cir. June 7, 2024). The Court held the Fairness in Women's Sports Act, Idaho Code §§ 33-6201-06's ban on transgender women

and girls participating in student athletics violated the Equal Protection Clause. The Court

reviewed a preliminary injunction enjoining the Act because it discriminated on the basis of sex

and transgender status. *Id.* at *9. The Court found transgender individuals can experience gender

dysphoria as defined by "Diagnostic and Statistics Manual of Mental Disorders (DSM-5-TR) as

a condition where patients experience '[a] marked incongruence between one's

experienced/expressed gender and assigned gender, . . .' that 'is associated with clinically

significant distress or impairment in social, occupation, or other important areas of functioning.'"

*Id.* at *11-12. The Court further noted that "[f]or over thirty years, medical professionals have

treated individuals experiencing gender dysphoria following the protocols laid out in the

Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming

People (Version 7), which were developed by the World Professional Association for

Transgender Health (WPATH)." *Id.* at *12.

The *Hecox* Court reviewed whether the district court abused its discretion by finding that

plaintiffs were likely to succeed on the merits of their equal protection challenge. *Id.* at *22. The

Court found "[t]he plain language of section 33-6203 bans transgender women from

'biologically female' teams." They further found the statutory purpose to exclude transgender

girls from girl's sport teams "discriminates on the basis of transgender status." *Id.* at *30. The

Court additionally held the statute facially discriminates and its "use of 'biological sex' functions

as a form of '[p]roxy discrimination'" *Id.* at *31-32 (citations omitted). The Court held that

"heightened scrutiny applies to laws that discriminate on the basis of transgender status,

reasoning that gender identity is at least a 'quasi-suspect class.'" *Id.* at *35 (citing *Karnoski v.*

*Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019)). The Court recognized that "discrimination on

the basis of transgender status is a form of sex-based discrimination" and is subject to heightened

scrutiny. *Id.* at \*36 (citing *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020) ("The Supreme Court recently held in the Title VII context that 'it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex.'"). Further, the Court held "discrimination against transgender individuals constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Id.* at \*36-37 (internal quotation marks and citations omitted). The Court concluded that the statute likely would not survive heightened scrutiny. *Id.* at \*38.[5] The equal protection and heightened scrutiny analysis in *Poe* and *Hecox* establishes Plaintiffs are likely to succeed on the merits and supports the issuance of a temporary restraining order and preliminary injunction enjoining HB 668 for violations of the Equal Protection Clause.

The Fourth Circuit recently considered a nearly identical equal protection and Medicaid Act challenge to West Virginia's Medicaid policy, regardless of medical necessity, of excluding gender-affirming surgery while covering other gender-affirming treatments for gender dysphoria. *See Kadel v. Folwell*, 2024 U.S App. LEXIS 10294 (4th Cir. April 29, 2024). Similar to Idaho, West Virginia Medicaid covered the same surgical procedures when treating non-gender dysphoria diagnoses. *Id* at \*13 & 25-26. The Court held the coverage exclusions facially discriminate on the basis of sex and gender identity and violated the Medicaid Act. *Id* at \*15. The Court found the diagnosis of gender dysphoria is inextricable from transgender status. *Id.* at \*47. "[T]herefore, treatment for gender dysphoria, is unique to transgender individuals in order to conclude that the exclusions use gender dysphoria as a proxy for transgender identity." *Id.*

---

[5] The Court found the district court the balance of equities and public interest favored granting a preliminary injunction. *Id.* at \*58-59

*49. The Court also held the exclusion of gender-affirming surgeries was "textbook sex discrimination" for two reasons. *Id.* at 56. "For one, we can determine whether some patients will be eliminated from candidacy for these surgeries solely from knowing their sex assigned at birth. And two, conditioning access to these surgeries based on a patient's sex assigned at birth stems from gender stereotypes about how men or women should present." *Id.* at 56 (citing *Bostock*, 140 S. Ct. at 1742-49). The Court rejected the contention there was a genuine dispute about whether the treatments were medically necessary when the exclusions language forecloses "medical coverage based on a patient's choice to diverge from sex stereotypes." *Id.* at *62 n.27. HB 668 also discriminates on the basis of sex stereotypes because all gender-affirming care is never medically necessary based upon the sex assigned at birth and the gender identity of the Medicaid participant.[6] *Kadel* establishes Plaintiffs are likely to succeed on the merits of their Equal Protection claim.

### 2. Plaintiffs are likely to succeed on the merits of their Medicaid Act claim

A state must comply with the Medicaid Act and its implementing regulations. *Katie A., ex rel. Ludin v. Los Angeles Cty.*, 481 F.3d 1150, 1154 (9th Cir. 2007). The Medicaid Act's Availability Provision requires states to provide a list of mandatory services. *See Cal. Ass'n of Rural Health Clinics v. Douglas*, 721 F.3d 1097, 1106 (9th Cir. 2013) ("Medicaid requires state plans to cover, as a floor, various services listed in 42 U.S.C. § 1396d(a). *See* 42 U.S.C. § 1396a(a)(10)(A) (requiring state plans to cover the services listed in paragraphs (1) through (5), (17), (21) and (28))."). The Act's Availability Provision requires states to cover services in

---

[6] HB 668 declares that "a surgical operation or medical intervention is never necessary to the health of the minor or adult on whom it is performed if it is for the purpose of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex." Idaho Code § 18-8901(1)(a).

sufficient "amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b). The Medicaid Exclusion Policy and HB 668 violate the Availability Provision because they categorically deny treatment as not medically necessary to transgender Medicaid participants with a diagnosis of gender dysphoria but the same treatments are available to cisgender persons for other medical conditions. *Kadel* held West Virginia's Medicaid violated the Availability Provision by barring "coverage of all gender-affirming medical treatments for gender dysphoria, regardless of medical necessity." *Id.* at *78

The Medicaid Act's Comparability Provision, 42 U.S.C. § 1396a(a)(10)(B), requires the state's medical assistance: "(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual," and "(ii) shall not be less in the amount, duration, and scope than the medical assistance made available to individuals not described in subparagraph (A)." Courts have applied the Comparability Provision to prohibit states from providing services to some but not others based solely on their medical diagnoses. The Comparability Provision ensures that services available . . . are "equal in amount, duration, and scope for all beneficiaries within the group." 42 C.F.R. § 440.240(b)(1). *Kadel* held West Virginia cannot get around the comparability requirement by defining the relevant services as services aimed at treating only some medical conditions (i.e., non-gender dysphoria conditions) any more than it can get around the Equal Protection Clause by doing so. *Id.* at *80 (citing *White v. Beal*, 555 F.2d 1146, 1151 (3d Cir. 1977) ("We find nothing in the federal statute that permits discrimination based upon etiology rather than need."). The Court held that West Virginia's exclusion policy violated Medicaid's comparability requirement. *Id.* at *80. Similarly, HB 668 violates the Medicaid's comparability requirement by excluding the coverage of gender dysphoria while cisgender Medicaid participants with non-gender dysphoria conditions are

covered and reimbursed. Plaintiffs are likely to succeed on the merits of their Medicaid Act claims.[7]

### B.  Plaintiffs Will Suffer Irreparable Harm From HB 668

"For transgender individuals, the incongruence between their gender identities and assigned sexes can result in clinically-significant distress known as 'gender dysphoria.'" Dkt. 36 (citing Dkt. 1 Compl. at ¶ 38 [162]).[8] "Gender dysphoria is a recognized medical condition which, if left untreated, can cause anxiety, depression, self-harm, or suicidal ideation." *Id*. at ¶¶ 38-39 [164&166]." "Untreated gender dysphoria often intensifies with time; the longer a transgender individual goes without or is denied adequate treatment for gender dysphoria, the greater the risk of severe harm to the individual's health." *Id*. at ¶ 40 [167]. Gender dysphoria is highly treatable and health care providers follow well-established standards of care to treat patients with gender dysphoria." *Id*. at ¶ 41 [168]. "Medical transition includes gender-affirming care that brings the sex-specific characteristics of a transgender individual's body into alignment with their gender identity (e.g., mental health counseling, hormone therapy, surgical care, or other medically necessary treatments for gender dysphoria)." *Id*. at ¶ 49 [176].[9]

---

[7] *See also Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 10019 (W.D. Wis. 2019) (plaintiffs are entitled to summary judgment because the "Challenged Exclusion fails to make treatments available in sufficient "'amount, duration and scope' and discriminates on the basis of diagnosis.") (quoting 42 C.F.R. § 440.230(b)).

[8] The paragraph numbers in brackets ([ ]) correspond to the identical paragraphs in the Amended Verified Complaint. Dkt. 86.

[9] "[M]edical transition care like hormone therapy to feminize or masculinize the body and surgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring) is often considered medically necessary for transgender individuals with gender dysphoria. *Id*. at ¶¶ 51 & 53 [178 & 181]. Such care is likewise understood by the broader medical community to be safe and effective. *Id*. at ¶¶ 56-58 [184-186]." Dkt. 36 at 3.

Dr. Loren Schechter, Plaintiffs' expert, has years of professional experience in providing gender-affirming care to persons diagnosed with gender-dysphoria. Dkt. 87-6 at ¶ 7-15. Dr. Schechter states that: "[g]ender dysphoria is a serious medical condition, defined by the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) published by the American Psychiatric Association as 'a difference between one's experienced/expressed gender and assigned gender, and significant distress or problems functioning.'" *Id.* at ¶ 21. "Without treatment gender dysphoria can lead to debilitating anxiety and depression, as well as serious incidents of self-harm, including self-mutilation, suicide attempts, and suicide." *Id.* "Appropriate medical care can help alleviate gender dysphoria." *Id.* at ¶ 22. "[M]edically necessary gender-affirming treatments include mental health care, puberty suppression, hormone therapy, and various surgical procedures to align a person's primary and/or secondary sex characteristics with the person's gender identity." *Id.* at ¶ 25.

"The World Professional Association for Transgender Health ("WPATH") publishes clinical practice guidelines—known as Standards of Care for the Health of Transgender and Gender Diverse People—relevant to the evaluation and treatment of gender dysphoria." *Poe v. Labrador*, 2023 U.S. Dist. LEXIS 229332, *14 (D. Idaho Dec.26,2023)[10]. Dr. Schechter indicated "[t]he Endocrine Society—the leading professional organization devoted to research on hormones and the clinical practice of endocrinology—has issued clinical guidelines for the treatment of transgender people." Dkt. 87-6 at ¶ 27. "The guidelines indicate that for transgender

---

[10] Plaintiffs in *Poe* challenged Idaho's Vulnerable Child Protection Act, Idaho Code 18-1506C, which prohibits transgender children from receiving gender-affirming treatments. The Act's treatment prohibitions are specifically incorporated into HB 663, Idaho Code § 18-8901 and § 56-270.

people, gender-confirming surgeries often are necessary and effective treatments." *Id.* at ¶ 27.[11]

"Most significantly, the standards of care published in the WPATH and Endocrine Society

guidelines are accepted by every major medical organization in the United States." *Poe* at \*16.

This includes the American Medical Association, American Academy of Pediatrics, American

Psychological Association, American Psychiatric Association, American College of

Obstetricians and Gynecologists, American Academy of Family Physicians, and World Health

Organization, recognize that gender-confirming surgeries are standard, appropriate, and often

necessary treatments for individuals with gender dysphoria." Dkt. 87-6 at ¶ 28. *See also Poe* at

\*16. These professional medical associations represent thousands of health care providers and

establish that Plaintiffs will suffer irreparable harm if Medicaid stops reimbursing and covering

medically necessary gender-affirming care to treat gender dysphoria.[12]

     Dr. Joseph Neil Ragan is a board-certified family physician who provides medical

treatment and gender-affirming care to Idaho Medicaid participants. Declaration of Joseph Neil

---

[11] The WPATH Standards of Care provides medically necessary gender-affirming treatments include mental health care, puberty suppression, hormone therapy, and various surgical procedures to align a person's primary and/or secondary sex characteristics with the person's gender identity. Standards of Care at S18, S128. Dkt. 87-6 at ¶ 25.

[12] The Court in *Poe* made several findings that are relevant to the Plaintiffs' medically necessary gender-affirming treatments that apply to HB 668 and the Medicaid Exclusion Policy. *Poe* at \*17 (": (1) the medical treatments banned by HB 71 have a long history of safe use in minors for various conditions and are supported by medical evidence that has been subjected to rigorous study; (2) the medications and procedures used in gender-affirming medical care (such as puberty blockers, hormones, and mastectomies) are used to treat cisgender adolescents for other purposes; (3) gender-affirming medical care raises risks comparable to risks associated with other types of medical care families are free to seek for minors; (4) gender-affirming medical care improves the wellbeing of some adolescents with gender dysphoria, and delaying or withholding such care can be harmful, potentially increasing depression, anxiety, self-harm, and suicidal ideation; and (5) adolescents with gender dysphoria are unlikely to later identify as their birth sex.").

Ragan, MD at ¶ 2. He practiced medicine in the Navy for 26 years before practicing emergency medicine in Arkansas. *Id.* at ¶ 3. Since 2013, he has been a family physician at the Idaho State University Family Medicine residency and its outpatient clinic operated by Health West Community Care Center. *Id.* at ¶ 4. He has prescribed medically necessary gender-affirming treatments to patients diagnosed with gender dysphoria. *Id.* at ¶ 5. He is familiar with the standards of care for prescribing medically necessary gender-affirming medical treatment including the: Endocrine Society, American Psychiatric Association, American Psychological Association and the World Professional Association for Transgender Health. *Id.* at ¶ 6-7.

Many of his patients who receive gender-affirming treatment rely on Idaho Medicaid to cover and reimburse their medical coverage. *Id.* at ¶ 8. These patients will not have coverage and reimbursement for gender-affirming hormone treatments due to HB 668's prohibition. *Id.* at ¶ 9. As a physician, who worked in a Health West clinic, HB 668 prevents him from providing gender-affirming treatment to his transgender patients because it is located on state facilities. *Id.* at ¶ 10. The Idaho Medicaid participants who have received gender-affirming treatment are being denied their prescriptions and their hormone therapy because of HB 668. *Id.* at ¶ 11.

Before recommending gender-affirming treatment to patients, he completes a physical and mental health assessment and a detailed medical, psychiatric, surgical, family, and social history, including how they realized their gender identity did not correspond to their sex assigned at birth. *Id.* at ¶ 14. Before prescribing hormone therapy to a patient, he discusses alternatives, risks, benefits, and impacts on the patients physical and mental health. *Id.* at ¶ 15. He determines whether gender-affirming surgery is appropriate for a patient by considering the risks versus the benefits of the specific surgery including complications and benefits before making a referral to a qualified gender-affirming surgeons. *Id.* at ¶ 16.

MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION – Page 19

In Dr. Ragan's professional opinion, involuntarily cutting people off from their hormone treatment will cause distressing effects on transgender patients because without hormones an individual who identifies as female will lose her feminine bodily characteristics and begin to appear more masculine. *Id.* at ¶ 17. A transgender individual who identifies as male will appear more feminine and menstruation will restart. *Id.* This is physically and mentally distressing to a transgender person and will cause anxiety, depression, and possible suicidality which will impact their family and performance at work. *Id.* Only a very small minority of his transgender patients taking hormone therapy choose to discontinue those medications. *Id.* at ¶ 18. The majority of his transgender patients find the medications are greatly beneficial to their mental and physical health. *Id.* The reversal of the masculinizing and feminizing effects of the medications will result in rapid onset of menstruation in a transgender man and gradual regression of breast growth in a transgender woman. *Id.* Transgender individuals who have had their natal gonads (ovaries or testes) removed will suffer medium and long term serious adverse effects from stopping hormone treatments. These effects include, but are not limited to, osteoporosis, fractures, fatigue, and muscle loss. *Id.* at 19. In Dr. Ragan's professional opinion, it against medical standards of care to withhold cross-sex hormone therapy from adult patients who identify as transgender, who are capable of making their own medical decisions, and who have no medical contraindications to the use of these medications. *Id.* at 20.

Dr. Ragan is aware that dozens of transgender individuals who have not been able to find healthcare providers in their communities who can prescribe cross-hormones to treat gender dysphoria because they are affiliated with a state-funded organization. Health West Community Health Center, where he works, is affiliated with Idaho State University. Health West Community Center has been by far the primary source of gender-affirming treatment in southeast

Idaho. *Id.* at 22. Health West Community Health Center is no longer allowed to provide and has discontinued providing gender treatments because the clinic receives state funding under HB 668. *Id.* These patients are struggling to find alternative sources of transgender treatment in their community most are forced to drive long distances and/or get care through online sources. *Id.* If Medicaid coverage and reimbursement is cut off many of Dr. Ragan's Idaho Medicaid patients will have to pay out of pocket for cross-sex hormones. *Id.* at 24. This will be difficult because they are typically low income. *Id.* at 24. Dr. Ragan was providing gender-affirming care to over 300 transgender and gender-nonconforming adults, the majority of whom are on cross-sex hormone treatment, and more than half of whom are covered by Idaho Medicaid prior to the enactment and implementation of HB 668. *Id.* 24. In Dr. Ragan's professional opinion, physicians who have no training and experience in providing gender-affirming treatment to transgender patients are qualified to diagnosis gender dysphoria and determine whether gender-affirming treatment is medically necessary for a patient. *Id.* at 25.

Plaintiffs MH and BM have submitted Declarations in Support of the Motion. MH and BM are currently enrolled in Idaho Medicaid. They have been receiving treatments for their diagnosed gender dysphoria for many years. Idaho Medicaid has covered and reimbursed the cost of their treatments. HB 668's prohibitions against Medicaid covering and reimbursing gender-affirming treatment will result in the discontinuance of their prescribed medications and the denial of surgeries determined by their physicians to be medically necessary after a full assessment of their medical and mental health condition. They cannot pay for the cost of their treatments without Medicaid coverages and reimbursements. The hormones they have been taking for many years have greatly improved their lives with no adverse effects. The discontinuance of their medications will cause their feminization transitions will deteriorate and

result in physical and psychological harms including pain, loss of energy and strength, anxiety, depression, and intrusive thoughts caused by untreated gender dysphoria that degrades their health, quality of life and can be life-threatening.

Plaintiffs request the Court consider the previously filed declarations by Dr. Alviso, Dkts 87-5 & 95-6[13] and Dr. Perron-Burdick, Dkts. 87-4 & 95-7, and Plaintiffs KB[14], AC[15], and Jane Doe[16], Dkts. 95-3, 95-5, & 95-5 in support of this Motion.

---

[13] Dr. Alviso indicated that "Withholding or discontinuing effective medical treatment from individuals suffering from gender dysphoria will cause serious harm and will result in unnecessary distress to [ ] patients with gender dysphoria." *Id.* at ¶ 27. "The impact of restricting access to gender-affirming care cannot be overstated. It can lead to worsened mental health outcomes and increased rates of depression, anxiety, and suicide among transgender individuals." *Id.* at ¶ 38. "Forcing transgender individuals to discontinue these medically necessary treatments will cause significant harm. . . ." *Id.* at ¶ 42.

[14] Plaintiff KB relies on Medicaid to provide coverage for the gender-affirming care they receive at Full Circle Health. Declaration of KB at ¶¶ 3-4. Medicaid pays for their weekly hormone therapy including testosterone cypionate injections. *Id.* at ¶ 5. If HB 668 goes into effect Medicaid will stop reimbursing and covering their gender-affirming care because it will be prohibited and they have no insurance or funds to pay to continue their treatment of gender dysphoria. *Id.* at ¶¶ 6-11. If KB's testosterone injections are discontinued or denied, KB will suffer emotional distress and physical harm caused by their gender dysphoria. *Id.* at ¶¶ 12-13. This includes mental instability, increased anxiety, depression and disorientation. *Id.* at ¶ 14.

[15] Plaintiff AC is a Medicaid participant who relies on Medicaid to cover her gender-affirming treatment for gender dysphoria. Declaration of Plaintiff AC at ¶¶ 3 & 6. If Plaintiff AC's hormone treatments are discontinued, she will suffer emotional distress and physical harm from her gender dysphoria. *Id.* at ¶¶ 11-14 & 17. Health West Inc. sent AC a letter indicating they will not be able to provide her gender-affirming care any longer because of HB 668's restrictions on "Medicaid reimbursement and the use of state-funded facilities for these services." *Id.* at ¶ 16.

[16] Plaintiff Jane Doe on behalf of her child GM GS is a Medicaid participant who relies on Medicaid to cover her hormone treatment because the family cannot afford to pay the cost or afford private insurance. *Id.* at ¶¶ 10-12. GS is anxious about losing her gender-affirming care because she will suffer emotional distress and physical harm caused by her gender dysphoria. *Id.* at ¶s 9 & 12. If GS's hormone treatments are discontinued or delayed it will cause the progress she has made in her gender identity transition will stop and she will regress. *Id.* at ¶ 14. "GM's anxiety and depression have been increasing since the Idaho Legislature passed HB 668. . . ." *Id.* at ¶ 15. Stopping her hormone treatments would be a major setback in her gender-affirming care and would cause her dysphoria to worsen along with her mental health." *Id.* at ¶ 16.

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hecox* at 857 (cleaned up). *Cf. Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), rev'd and remanded on other grounds, 562 U.S. 134, 131 S.Ct. 746, 178 L.Ed.2d 667 (2011). Since the Medicaid Policy Exclusion and HB 668 are likely to declared discriminatory on the basis of transgender status and sex in violation of Equal Protection and violate the Medicaid Act, Plaintiffs have met their burden of showing irreparable harm. There is no adequate remedy in the absence of a preliminary injunction for these specific harms. Plaintiffs need not demonstrate that irreparable injury is inevitable, but only that it "is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Plaintiffs' Medicaid benefits for gender affirming treatment will permanently end at the expiration of the 90-day period if HB 668 goes into full effect. Plaintiffs will be irreparably harmed because they will no longer be allowed to rely upon Idaho Medicaid coverage and reimbursement to pay for their prescribed medically necessary treatments for gender dysphoria. The irreparable injury is inevitable and imminent. [17] *See Edmo* at 798 (deprivation of one's "constitutional right to adequate medical care is sufficient to establish irreparable harm.")

Delayed access to medically necessary healthcare services is sufficient to establish irreparable harm. *Bowen v. City of New York*, 476 U.S. 467, 483-84 (1986) (finding denial

---

[17] Hormone therapy for the treatment of gender dysphoria: (i) to significantly reduce hormone production associated with the person's sex assigned at birth and, thereby, the secondary sex characteristics of the individual's sex assigned at birth; and (ii) to replace circulating sex hormones associated with the person's sex assigned at birth with feminizing or masculinizing hormones, using the principles of hormone replacement treatment developed for hypogonadal patients (i.e., non-transgender males born with insufficient testosterone or non-transgender females born with insufficient estrogen). *See* Hembree et al. The Journal of Clinical Endocrinology & Metabolism, Volume 94, Issue 9, 1 September 2009, Pages 3132–3154. https://academic.oup.com/jcem/article/94/9/3132/2596324

of benefits caused irreparable injury by exposing plaintiffs to "severe medical setbacks or hospitalization"). The Ninth Circuit has found the denial of gender-confirming surgery and the accompanying psychological distress and risk to physical health constitute irreparable harm. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 797-8 (9th Cir. 2019). The Ninth Circuit has held that serious psychological harm and physical harm and suffering constitute irreparable injury. *See, Chalk v. United States Dist. Court Cent. Dist.*, 840 F.2d 701, 709 (9th Cir. 1988) (plaintiff's "emotional stress, depression and reduced sense of well-being" constituted irreparable harm and "his injury is emotional and psychological—and immediate. Such an injury cannot be adequately compensated for by a monetary award after trial."). *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) ("pain, infection, amputation, medical complications, and death" constitute irreparable harm). *See also Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed and/or complete lack of necessary treatment). The Ninth Circuit has further held that Medicaid beneficiaries' access to medically necessary care outweighs budgetary concerns. *See M.R. v. Dreyfus*, 697 F.3d 706, 737-38 (9th Cir. 2012).

There is no monetary remedy for emotional distress damages caused by Defendants' violations of the Medicaid Act. *See* Dkt. 19-1 at 6-8 (citing *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. ____ (2022)). The irreparable injuries caused by the physical and emotional harm suffered by the discontinuance, delay, or denial of gender-affirming treatment cannot compensate for the physical and psychological damages Plaintiffs and other transgender Idaho Medicaid participants will suffer if the Medicaid Exclusion Policy and HB 668 are fully effective.

### C.  Balance of Equities and Public Interest

The balancing of the harms concerns the burdens or hardships if Plaintiffs request for an injunction is denied, and those to the Defendants if the injunction is issued. *See Winter*, 555 U.S. at 24-31. The "public interest" analysis mostly concerns the injunction's "impact on non-parties rather than parties." *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003) (citation omitted). "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). The balance of harm and the public interest strongly favors the issuance of a temporary restraining order and a preliminary injunction. The discontinuance of medically necessary treatments for gender dysphoria, as identified in Plaintiffs' Declarations, will cause severe psychological distress and risk future suicidality and self-harm. Because Plaintiffs have shown a likelihood that HB 668 and the Medicaid Exclusion Policy violate the Constitution, they have also established that both the public interest and the balance of equities favor preventing the violation of constitutional rights. *Poe* at *59 (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Defendants will suffer minimal harm from the continuation of the Idaho Medicaid coverage and reimbursement for medically necessary treatments to transgender Idaho Medicaid participants that had been previously covered and reimbursed because the same medical treatments will continue to be covered and reimbursed for cisgender Medicaid participants with conditions other than gender dysphoria. Defendants will not suffer harm from being prevented from discriminating on the basis of transgender status and sex in violation of the Equal Protection Clause and the Medicaid Act. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up).

## II.     THE BOND SHOULD BE WAIVED

Plaintiffs seek to enjoin unconstitutional and illegal conduct by state officials and a governmental entity. There is no risk of monetary harm to Defendants if they are eventually found to be wrongfully enjoined. A bond is neither appropriate nor necessary under Federal Rule of Civil Procedure 65(c) and should be waived. *See* Dkt. 96 at 14 (citing *Jorgensen v. Cassidy,* 320 F.3d 906, 919 (9th Cir. 2003)).

## III.     CONCLUSION

Plaintiffs request the Court grant a temporary restraining order to preserve the status quo until a hearing can be held on a preliminary injunction.

DATED: September 26, 2024.

IDAHO LEGAL AID SERVICES, INC.

/s/ Howard A. Belodoff
Howard A. Belodoff

JANE GORDON LAW

/s/ Jane Gordon
Jane Gordon
Attorneys for Plaintiffs