Howard A. Belodoff, ISB # 2290
Law Office of Howard Belodoff, PLLC
1004 W. Fort St.
Boise, ID 83702
Tel: (208) 331-3378; Fax: (208) 947-0014
hbelodoff@hotmail.com

Jane Gordon, ISB # 9243
Jane Gordon Law
1004 West Fort Street
Boise, ID 83702
Tel: (208) 371-4747; Fax: (208) 807-2290
Jane@JaneGordonLaw.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**DISTRICT OF IDAHO**

MH, KB, SG, AC, BM, individually, and G Doe, by and through her parents and next friends, JANE Doe and JOHN Doe,

Plaintiffs,

vs.

JULIET CHARRON, et al.

Defendants.

CASE NO. 1:22-CV-409-REP

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

I. The Scientific and Medical Consensus Supports Treatment of Transgender Individuals ........ 1

II. Medicaid's and the Governor's Policies and HB 668 Were Motivated by Animus Towards and the "Bare Desire to Harm" Transgender Idahoans in Violation of Equal Protection ........ 7

1. Review of Animus in United States Supreme Court Decisions under Equal Protection ........ 7

2. The Presence of Animus Violates Equal Protection Even Under Rational Basis Review ........ 10

3. Evidence of Unconstitutional Animus and Impermissible Invidious Discrimination ........ 14

4. Idaho Statutes Evidence Animus and a "Bare Desire to Harm" Transgender Idahoans ........ 18

III. The Breadth and Character of HB 668's Funding Prohibitions and Penalties are Illegitimate ........ 24

IV. Idaho's Policies and Statutes Use Proxies/Pretexts for Invidious Discrimination ........ 26

V. Medicaid's Policy and HB 668, Facially and As Applied, Violate Equal Protection Under Heightened Scrutiny or Rational Basis Review ........ 29

VI. Plaintiffs' Constitutional Right to Due Process Was Violated ........ 34

VII. Defendant Hamso Is Not Entitled to Qualified Immunity on the Equal Protection Claim ........ 37

VIII. Defendants Waived the Affirmative Defense of the Eleventh Amendment Immunity ........ 38

## I. THE SCIENTIFIC AND MEDICAL CONSENSUS SUPPORTS TREATMENT OF TRANSGENDER INDIVIDUALS

In 2022, the American Psychiatric Association published the "DSM-V-TR" revising DSM-IV's criteria for gender dysphoria. Declaration of Meredithe McNamara, MD, MSC, ("Dec. MacNamara"), p19. The critical element of gender dysphoria is the presence of "clinically significant distress or impairment in social, occupational, or other areas of functioning." resulting from the incongruence between an individual's gender identity and birth-assigned sex. *Id. See also: Declaration of Jane Gordon*, "Dec. JG," Exhibit 1, ("DSM-V-TR") at 512-513. "Gender dysphoria should be distinguished from simple nonconformity to stereotypical gender role behavior by the strong desire to be of another gender than the assigned one and by the extent and pervasiveness of gender-variant activities and interests." DSM-V-TR at 519.[1] Transgender persons differ from persons with a gender nonconformity which is not itself a mental disorder:

> Gender dysphoria should be distinguished from simple nonconformity to stereotypical gender role behavior by the strong desire to be of another gender than the assigned one and by the extent and pervasiveness of gender-variant activities and interests....Given the increased openness of gender-diverse expressions by individuals across the entire range of the transgender spectrum, it is important that the clinical diagnosis be limited to those individuals whose distress and impairment meet the specified criteria."

*Id*. *See also Talbott v. United States*, 2026 U.S. App. LEXIS 15605 at *15 (D.C. Cir. June 1, 2026) (citation omitted).

Gender dysphoria causes significant distress, anxiety, depression, as well as serious incidents of self-harm, including self-mutilation, suicide attempts, and suicide. *See* Declaration of *Loren S. Schechter, M.D.* ("*Dec. Schecter*"); *Dec. McNamara*; *Declaration of Dr. Alviso, MD* ("*Dec. Alviso*"); *Declaration of Joseph Ragan, MD* ("*Dec. Ragan*") ¶ 10-11. The research and

[1] Recent studies on gender identity point to a physical etiology. The DSM-5-TR section entitled "Genetic and physiological," explicitly discusses the genetic and, possibly, the hormonal contributions to gender dysphoria. DSM-V-TR at 517. *Dec. McNamara* 19.

evidence establish that medical treatment is necessary to alleviate the symptoms and adverse effects. *Dec. Schechter*; *Dec. McNamara*; *Dec. Alviso* at ¶¶ 14, 21-22, 25. *Dec. JG*, Ex. 2.[2]

Dr. Schechter, Dr. McNamara, Dr. Alviso, and Dr. Ragan have actual clinical experience providing treatment to hundreds of transgender persons. *Dec. Schechter* ¶¶ 7-15; *Dec. McNamara* ¶ 12; *Dec. Alviso* at ¶7; *Dec. Ragan* at ¶6. Dr. Schechter and Dr. McNamara have authored and reviewed peer-reviewed studies, conducted research, and attended professional conferences on treating transgender persons. *Dec. Schecter* ¶ 18, *Dec. McNamara* ¶¶ 5-23. Dr. Schechter "was a contributing author to the Seventh Version of the World Professional Association for Transgender Health's ("WPATH") Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People ("Standards of Care").[3] *Dec. Schecter* ¶ 9. It is Dr. Schechter's and Dr. McNamara's opinions, that the procedures used to treat symptoms of gender dysphoria are effective and safe, and not cosmetic. *Dec. Schecter* ¶ 23 & *Dec. McNamara* 6-8. Dr. Schechter's opinions are based on a substantial body of peer-reviewed research that surgical treatments are effective when performed in accordance with the WPATH Standards of Care. *Dec. Schecter* ¶ 42.

National and international professional medical authorities including the WPATH and Endocrine Society have established standards of care. *Dec. Schecter* ¶ 41, *Dec. McNamara* 6-8, *Dec. JG*, Ex. 3, *Deposition of Magni Hamso* ("*Hamso Dep.*"), 214:18-215:5 & 235:19-21.[4] The scientific and medical consensus of professional medical associations supports treatment under

[2] *See*: A Critical Review of the June 2022 Florida Report on the Medical Treatment of Gender Dysphoria, filed in *Decker v. Marstiller*, Case No. 4:22-cv- 00325, Dkt. 11-1 at 83-110, filed in support of Motion for Preliminary Injunction.

[3] *See*: https://wpath.org/publications/soc8/.

[4] The State of Idaho "agree[d] that the appropriate benchmark regarding treatment for gender dysphoria is WPATH Standards of Care. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 766 (9th Cir. 2019).

the standards of care of the WPATH and the Endocrine Guidelines. *Dec. McNamara* 6-8. The Endocrine Society, the leading international professional organization of endocrinologist devoted to research on hormones and the clinical practice of endocrinology, has issued clinical guidelines for the treatment of transgender individuals.[5] *Id. See, Edmo v. Corizon, Inc.,* 935 F.3d 757, 769 (9th Cir. 2019*)*. The Ninth Circuit recognized "the broad medical consensus in the area of transgender health care requires providers to individually diagnose, assess, and treat individuals' gender dysphoria…" *Id.*at 769 (quoting *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018)). [6] The WPATH Standards and Endocrine Guidelines are considered the standards for medical necessity. *Hamso Dep.* 214:18-215:5 & 235:19-21. These standards are widely accepted by every American medical association and are recognized by the American Psychiatric Associations. *Edmo* at 769. "Accepted standards of care and practice within the medical community are highly relevant in determining what care is medically acceptable and unacceptable." *Edmo* at 786.

The WPATH-8 Standards and the Endocrine Guidelines are based upon systematic peer reviewed literature and the opinions of over one hundred experts using the best available science and expert opinions. *Dec. McNamara* 6-8. The WPATH Standards and Endocrine Guidelines indicate that for transgender individuals, medications and surgeries are often necessary and effective treatments."[7] *Dec. Schecter* ¶ 27. Defendants' experts are not qualified to offer reliable or relevant opinions based upon reviews of others. *See, Daubert v. Merrell Dow*

---

[5] *See*: https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence

[6] The Ninth Circuit found that gender-affirming care "can and should include GCS [gender confirmation surgery] when medically necessary. Failure to follow an appropriate treatment plan can expose transgender individuals to a serious risk of psychological and physical harm." *Edmo* at 771.

[7] Wylie C Hembree et al., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, *The Journal of Clinical Endocrinology & Metabolism*, Volume 102, Issue 11, 1 November 2017, Pages 3869–3903, https://doi.org/10.1210/jc.2017-01658. Dec. JG, Ex. 2.

*Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). They criticize and distort the scientific evidence that is not substantiated by independent research and by peer reviewed studies from hundreds of well qualified experts who treat transgender patients. *Dec. McNamara* 27-40.[8] A robust body of scientific research demonstrates that transitioning medications provide effective treatment and improve the mental health of transgender individuals. *Id*. at 6-8.[9] Clinical practice guidelines endorse transitioning medications when medically necessary after a consultative, informative process with an interdisciplinary team of mental health providers and physicians. *Id*. According to the American Medical Association:

> [A]n established body of medical research demonstrates the effectiveness and medical necessity of mental health care, hormone therapy and sex reassignment surgery as forms of therapeutic treatment for many people diagnosed with GID…Health experts in GID, including WPATH, have rejected the myth that such treatments are "cosmetic" or "experimental" and have recognized that these treatments can provide safe and effective treatment for a serious health condition.

Dec. JG, Ex. 4. Resolution: 122 (A-08) AM. MED. ASS'N, Removing Financial Barriers To Care For Transgender Patients 1 (2008).[10]

Plaintiffs' treating physicians and experts, who are well qualified and have significant experience treating transgender patients, as well as Dr. Hamso, agree that gender-affirming treatment is medically necessary under the WPATH standards. *Dec. Alviso*, ¶¶ 14-19, *Hamso Dep.* 235:19-21. This Court should credit the physicians who evaluated Plaintiffs and their

---

[8] Defendants' experts' opinions are based upon a mischaracterization of the outcomes of studies. *Dec. McNamara* 27-40.

[9] Courts have excluded defense expert opinions that WPATH's recommendations are not scientifically based and are political. *Kadel v. Falwell*, 620 F. Supp 3d 339 (M.D.N.C. 2022) (affirming the rejection of experts who, although medical professionals, did not demonstrate an expertise in treating transgender individuals and merely relied on reading non-peer reviewed literature and subjective opinions to supported their views. (vacated on other grounds, *Kadel v. Folwell*, 2025 U.S. App. LEXIS 25141, (4th Cir. Sept. 23, 2025). *Cf. Poe v. Labrador*, 2024 U.S. Dist. LEXIS 8648*15 (D. Idaho Jan. 2024) the court gave weight to plaintiffs' experts compared to defendants' experts who had minimal experience treating transgender patients. Appeal dismissed by 2025 U.S. App. LEXIS 16933 (9th Cir. June 18, 2025).

[10] *See* http://www.tgender.net/taw/ama_resolutions.pdf.

experts' opinions based on their relevant experience treating transgender patients under recognized standards of care and guidelines.[11] Defendants' experts have no or minimal experience treating transgender patients, only offer personal opinions on areas of medicine and science without any specific expertise based upon literature reviews of others, non-peer reviewed articles, and their own "letters and self-published articles." *See* Motions in Limine to exclude experts Cantor Phd. and Dr. Laidlaw.

"The quality of the evidence supporting gender-affirming surgeries is comparable to that supporting many surgeries and clinical procedures. Prospective, randomized, double-blind, placebo-controlled studies cannot be used to evaluate many clinical procedures." *Dec. Schecter* ¶ 50; *Dec. McNamara* 22-24. "As noted in Dhejne et al. 2011, 'the nature of sex reassignment precludes double blind randomized controlled studies of the result.'" *Dec. Schecter* ¶ 50.[12] The withholding of medically necessary care would be considered unethical. *Id.*, *Dec. Ragan* ¶¶ 11, 19; *Dec. Alviso*, ¶ 32; *Dec. McNamara* 19-20, and *Dec. Rolynn* at ¶¶ 7 & 12 [Dkt. 153-3]. Defendants' experts' reliance on non-peer reviewed evidence on minors from European countries conflicts with clinical research and do not recommend a total ban on gender-affirming care. *Dec. McNamara* 44-53.[13]

"All available research—as well as [his] own clinical experience—indicates that very few patients experience regret when gender-confirming surgery is provided in accordance with

---

[11] *See Edmo*, at 788 (citing Fed. R. Evid. 702). "Such experience lends itself to fundamental knowledge of whether GCS is necessary and the potential risks of providing or foregoing the surgery. Edmo's experts have the requisite experience; the State's experts do not. For that reason alone, the district court did not clearly err in crediting the opinions of Edmo's experts over those of the State."

[12] *See* Dhejne et al. 2011, "'the nature of sex reassignment precludes double blind randomized controlled studies of the result.'". Long-term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden. PloS one, 6(2), e16885. https://doi.org/10.1371/journal.pone.0016885. *Dec. Schecter* ¶ 50.

[13] The Cass Review concurs with WPATH Standards of Care and the Endocrine Guidelines. *Dec. McNamara* 45-47.

the WPATH Standards of Care by a qualified surgeon." *Dec. LS* at ¶ 53.[14] *See also* ¶¶ 54-57. "In 2014, an impartial adjudicative board in the United States Department of Health & Human Services ("HHS") concluded, based on decades of studies, that surgical care to treat gender dysphoria is safe, effective, and medically necessary." *Id.* ¶ 52. "As a result, the Centers for Medicare & Medicaid Services (CMS) within HHS started covering surgical care for gender dysphoria and continues to provide that coverage, including for patients in [Dr. Schechter's] practice." *Id. See also Dec. McNamara* 15-16 (n.35).

The prevailing standard of care for treatment of gender dysphoria is medically necessary when recommended by treating providers if it is consistent with the WPATH Standards of Care. *Dec. LS* ¶¶ 3, 23, 32-37. Medicaid's policy excluding transgender participants from receiving treatments by characterizing it as "cosmetic" or "experimental" "conflicts with the medical consensus that treatment is medically necessary" and definitively establishes they are safe and effective. *Id.* at ¶ 60. Decades of research and clinical practice has shown that gender-affirming medical care, including surgery, can be lifesaving treatment and has a positive impact on the short- and long-term health outcomes for transgender people. *Dec. Schecter* ¶ 43. No evidence-based research demonstrates psychotherapy alone is an effective treatment for gender dysphoria. *Dec. McNamara* 20-22. Transitioning medications have been safely used for decades and their side effects are well known and comparable to side effects of many commonly used medications. *Id.* at 16-19. Medicaid covers off label use of hormone medications without a prior authorization because they are considered safe and effective. *Hamso Dep.* 206:17-207:9 & 217:3-6.[15]

[14] Adolescents with gender dysphoria persist in their cross-gender identification. *Id.* ¶¶ 64-65. No valid research supports any evidence that peer influence increases rates of gender dysphoria. *Id.* at ¶¶ 66-67.

[15] *See*: Ten Common Questions (and Their Answers) About Off-label Drug Use Wittich, Christopher M. et al. Mayo Clinic Proceedings, Volume 87, Issue 10, 982 – 990; https://www.mayoclinicproceedings.org/article/S0025-196(12)00683-0/fulltext

Withholding transitioning medications is harmful. *Dec. McNamara* 19-20. Peer-reviewed research on transgender health indicates that transgender people who are visibly gender nonconforming will experience more discrimination and worse health outcomes than those whose appearance matches their gender identity. Dkt 6-2, Declaration of Benjamin Larsen, PhD. Accordingly, gender conforming surgeries can reduce the discrimination, mistreatment, and harassment that transgender people suffer for being visibly gender nonconforming. DSM-5-TR at 519.

## II. MEDICAID'S AND THE GOVERNOR'S POLICIES AND HB 668 WERE MOTIVATED BY ANIMUS TOWARDS AND THE "BARE DESIRE TO HARM" TRANSGENDER IDAHOANS IN VIOLATION OF EQUAL PROTECTION

A law violates the Equal Protection if motivated by animus or a "bare desire to harm" because animus cannot be a legitimate governmental interest even under rational basis review. *See Romer v. Evans*, 517 U.S. 620, 634 (1996). In *United States v. Skrmetti*, the Court found Tennessee's prohibition for all minors to receive medical treatment was based upon a diagnosis of gender dysphoria not sex or transgender status. *Id.,* 605 U.S. 495, 518-19 (2025). The Court did not consider whether the statute was based on animus. *Id.,* at 516. Here, Idaho Medicaid's unwritten policy and the Governor's exclusion policy ("Policies") and HB 668 target transgender status with a diagnosis of gender dysphoria. *Skrmetti* found plaintiffs did not argue the prohibitions on minors were "mere pretexts designed to effect an invidious discrimination against transgender individuals." *Id.,* at 519. Plaintiffs are seeking summary judgment on whether HB 668 facially and "as applied" was adopted based upon animus and the "bare desire to harm" adult transgender Idahoans and whether the Policies and HB 668 is a pretext and proxy for anti-transgender invidious discrimination in violation of Equal Protection.

### 1. *Review of Animus in United States Supreme Court Decisions under Equal Protection*

"The guarantee of 'equal protection of the laws is a pledge of the protection of equal

laws.'" *Romer*, at 633-34 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)). Equal protection prohibits states from placing people into different classes and treating them unequally for reasons "wholly unrelated" to permissible government objectives. *Reed v. Reed*, 404 U.S. 71, 76 (1971). "'Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.'" *Romer*, at 633 (quoting *Sweatt v. Painter*, 339 U.S. 629, 635 (1950)). The Supreme Court has determined if a legislature's goal is to target a group of individuals, the classification is not rationally related to a legitimate government purpose. *Romer,* at 633. S*ee also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("[Discriminatory purpose] implies that the decisionmaker...selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.")

The Supreme Court has used evidence of animus to invalidate the statutory exclusion of unrelated persons from food stamp eligibility finding the "bare desire to harm" a politically unpopular group cannot constitute a legitimate governmental interest. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973). The government argued the classification was based on the "rational" belief that it was necessary to limit funding to unrelated persons in a household because they were more likely to commit fraud. The Court found evidence of animus because the legislative history showed the purpose of the law was a pretext to prevent "hippies" from receiving food stamps. *Id.* at 534. Similarly, the "rational" for the Policies and HB 668, to prohibit the use of "public funds" by transgender persons, was imposed without any evidence on the actual amount of public funds spent to treat transgender persons, closely follows *Moreno's* funding limitation which the Supreme Court found to be evidence of animus.

The Supreme Court in *Cleburne* v. *Cleburne Living Center, Inc* invalidated a local zoning ordinance which selectively required group homes for persons with mental disabilities to submit

a special use application while other types of multiple occupancy dwellings were exempt. *Cleburne*, 473 U. S. 432, 447 (1985). The Court held a "state may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* at 446-47 (citing *Zobel v. Williams*, 457 U.S. 55, 61-63 (1982)). The classification on multiple use housing, predicated on discriminatory animus, was never legitimate because the Government has no legitimate interest in exploiting "mere negative attitudes, or fear" toward a disfavored group. *Id.* at 448. The Court rejected the asserted interest in avoiding negative reactions of property owners and other rationales as illegitimate, finding the "underinclusive" policy evidenced unconstitutional "irrational prejudice" that violated equal protection. *Id.* at 449-50. The risks and harmful effect rationales for HB 668 are similarly "underinclusive" and pretextual because it only prohibits funding for a small subset of Medicaid eligible transgender Idahoans who do not have private insurance or financial resources to pay for their treatments with no actual cost justification for the prohibition on public funding.[16]

In *United States v. Windsor*, the Supreme Court invalidated the Defense of Marriage Act ("DOMA"), which excluded same-sex marriages from the definition of "marriage" under federal law. *Id.*, 570 U.S. 744 (2013). The inference of animus was created by DOMA's structure and practical effect as well as direct evidence of animus in the legislative history and statutory text. *Id.* at 770-71. The Court found DOMA violated equal protection because the "principal effect is to identify a "subset" of state-sanctioned marriages to make them unequal. The Court held DOMA had no legitimate purpose except to "disparage and to injure." *Id.* at 775. In *Trump v. Hawaii*, the Court reaffirmed its animus precedent, by explaining that when a court cannot

[16] HB 668 asserts the alleged justification for the funding prohibitions and non-medical penalties was the "substantial risks" and "known harmful effects, including irreversible physical alterations and, in some cases, sterility and lifelong sexual dysfunction." HB 668's justifications were pretextual, arbitrary, and irrational because it imposes a broad and undifferentiated disability on a small subset of transgender Idahoans alone. HB 668, Section 1.

"'discern a relationship'" between a challenged policy and a legitimate state interest or when the policy is "'inexplicable by anything but animus'" the governmental action is incompatible with equal protection. *Id.*, 585 U.S. 667, 706 (2018). Similarly, HB 668 purpose was to "disparage and to injure" transgender Medicaid participants and is inexplicable by anything but animus.

***2. The Presence of Animus Violates Equal Protection Even Under Rational Basis Review***

Rational basis review does not mean no review. Numerous Supreme Court cases have invalided laws under rational basis review if motivated by animus or a bare desire to harm even when the law is not entitled to heightened scrutiny review. *Romer*, at 634 ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare...desire to harm a 'politically unpopular group cannot constitute a legitimate governmental interest.'" (quoting *Moreno*, 413 U.S. at 534). The Supreme Court has long recognized that animus and the "bare desire to harm" identifiable persons violates equal protection.[17] In *Romer*, the Court noted: "One century ago, the first Justice Harlan admonished this Court that the Constitution 'neither knows nor tolerates classes among citizens.'" *Id.* at 623 (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (dissenting opinion)).

*Romer* invalidated a Colorado constitutional amendment that repealed local ordinances prohibiting "discrimination on the basis of homosexual, lesbian or bisexual orientation, conduct, practices or relationships." *Id.* at 624 (citation modified). The amendment operated to repeal and forbid all laws or policies which prohibited discrimination by "nullif[ying] specific protection for this targeted class in...insurance, health and welfare services..." *Id.* at 629. Colorado tried to justify the discrimination by contending the primary rational of the amendment was to respect

[17] *See Yick Wo*, at 373-74. ("Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.").

citizens who have "personal or religious objections to homosexuality" and to "conserve resources to fight discrimination against other groups." *Id.* at 635. The Court held "[a] law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Id.*

*Romer* determined the "amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and...invalid form of legislation." *Id.* at 632. The amendment raised "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected" and "inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it." *Id.* at 634-35. The Court held "we cannot accept the view that Amendment 2's prohibition on specific legal protections does no more than deprive homosexuals of special rights. To the contrary, the amendment imposes a special disability upon those persons alone." *Id.* at 631. Colorado, "by state decree...put [homosexuals] in a solitary class with respect to transactions and relations in both the private and governmental spheres" and "withdraws from homosexuals, but no others, specific legal protection from the injuries caused by discrimination…" *Id.* at 627. Similar to Colorado, HB 668's "'sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests.'" *Skremetti,* at 523 (quoting *Romer* at 632). The 2026 Idaho Legislature enacted HB 557 to prohibit local governments from enforcing existing antidiscrimination ordinances protecting gender identify and sexual orientation which were beyond the state law. [18] *See Dec. JG*, Ex. 6. HB 557 was not

[18] The Idaho Human Rights Act, Idaho Code §§ 67-5901 et seq, excludes sexual orientation and gender identify from the protected classes. HB 557 was directed at Boise, Sandpoint, Idaho Falls, Moscow, Lewiston, Meridian, Ketchum,

voted on by the Idaho Senate because it was held in Senate State Affairs. *Id.* The Legislature has refused to consider statutes designed to protect transgender Idahoans from discrimination while passing statutes demonizing and criminalizing transgender persons' basic human activities. *Dec. JG* ¶ 8.

HB 668's structural and practical effect create an "underinclusive" "subset of state-sanctioned" Medicaid funding prohibitions alleged "to conserve resources" and non-medical penalties on "Gender Transition" that evidence illegitimate animus and irrational prejudice. HB 668 classifies public funds as "exempt" to allow unrestricted medical care for cisgender Idahoans but excludes a small subset of transgender Idahoans who experience "clinically significant distress" resulting in depression, anxiety, suicidality, and death. HB 668's "over inclusive" non-medical penalties, regardless of any use of public funds, targets transgender Idahoans and their healthcare providers, evidence animosity for the purpose of inflicting harm. There are no legitimate governmental justifications for limiting tax deductions, penalizing doctors or health professionals' for rendering medical necessary treatments, imposing barriers on transgender person's access to public property, facilities, or buildings, and making violations of HB 668 a felony offense. *See* Idaho Code § 18-8901 (2), (3), (5), (6), & (7).

HB 668's non-medical penalties evidence animus because they chill and deter transgender patients and their providers from associating in violation of the First Amendment. "[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social,

---

Hailey, Bellevue, Driggs, Victor, Pocatello, and Coeur d'Alene because they had adopted ordinances protecting against discrimination based upon gender identity and sexual orientation. The House passed HB 557 by a vote of 53-16-1. *Dec. JG*, Ex. 6. Representative Skaug was the Legislative Contact for both HB 557 and HB 668. *Dec. JG*, Exs. 6, 7. The Statement of Purpose for HB 557 listed Joel Fischer, Public Policy Director of Idaho Family Policy Center as a non-legislative contact. *Id.* This Policy Center promulgates anti-transgender legislation.

economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (984) (collecting cases).[19] The First Amendment "restricts the ability of the State to impose liability on an individual solely because of his association with another." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918-19 (1982). It has long been "established that guilt by association alone is an impermissible basis upon which to deny First Amendment rights." *Healy v. James*, 408 U.S. 169, 186 (1972) (citation modified). "When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *Americans for Prosperity Found. v. Becerra*, 594 U.S. 595, 609 (2021) (quoting *NAACP v. Button*, 371 U. S. 415, 433 (1963). HB 668 violates the First Amendment's right to association because it serves to harass and intimidate healthcare providers for the purpose of deterring Plaintiffs' right to associate with their providers to receive medically necessary treatment.

Medicaid previously determined Plaintiffs could receive medically necessary treatment prescribed by their medical providers without funding prohibitions. HB 668's exclusion of "Gender Transition" for all "surgical operations and medical interventions" and non-medical penalties evidence animus because they far exceed Tennessee's and West Virgina's statutory prohibitions. Tennessee's ban in SB1on treatment of gender dysphoria only applied to minors. *Skrmetti* at 505-06.[20] The Supreme Court noted that "SB1 does not restrict the administration of

[19] HB 668 resulted in the federally funded Health West terminating treatment of over 300 transgender patients. *Dec. Ragan* ¶ 6.

[20] *Skrmetti* found SB1 incorporates two classifications: "First, SB1 classifies on the basis of age. Healthcare providers may administer certain medical treatments to individuals ages 18 and older but not to minors. Second, SB1 classifies on the basis of medical use." *Id.* at 511. The Court held "[c]lassifications that turn on age or medical use are subject to only rational basis review." *Id.*

puberty blockers or hormones to individuals 18 and over." *Id.* at 507. Here, Defendants seek to expand *Skrmetti* from minors to adults. *Skrmetti*'s justification for prohibiting puberty blockers and hormone treatments for minors do not apply to adults.[21] In *Anderson v. Crouch*, West Virginia prohibited Medicaid funded gender affirming surgical treatments but did not prohibit gender affirming hormonal treatments and did not have non-medical penalties. *Id*., 169 F.4th 474, 480-81 (4th Cir. 2026).[22] The Idaho Legislature in HB 668 was not presented with any cost justifications because Medicaid could not document the minimal expenditures for hormonal medications. The only testimony at hearing was based on alleged costs to the California Department of Corrections to deliver treatment to prisoners. *Dec. JG,* Ex. 7.

Idaho legislators illegitimately prohibited the use of public funds and imposed non-medical and criminal penalties for the purpose of making it more difficult for transgender people to obtain needed treatments and also to reside in Idaho. The chosen means of using prohibitions on public funds and the non-medical and criminal penalties are not legitimate governmental interests even under rational basis review. The Legislature has targeted gender identity by criminalizing basic human activities. These statutes were designed to punish and discriminate against transgender Idahoans. The enactment of HB 668, combined with a series of anti-transgender legislation, is direct evidence of unconstitutional animus.

### 3. *Evidence of Unconstitutional Animus and Impermissible Invidious Discrimination*

Direct or indirect evidence of animus discredits and undermines any presumption of

[21] The Court found "there is limited data on the optimal timing of sex transition treatment or the long-term physical, psychological, and neurodevelopmental outcomes in **youth**;" the "understanding of gender identity development in **adolescence** is continuing to evolve;" "**minors** lack the maturity to fully understand and appreciate these consequences and may later regret undergoing the treatments;" and the "guidelines regarding sex transition treatments for **minors** had changed substantially in recent years." *Skrmetti*, at 504-506 (citation modified (emphasis added).

[22] "West Virginia's Medicaid plan only excludes sex-change surgeries from coverage. It does not exclude other treatments for gender dysphoria, like therapy and hormonal treatments." *Id.* at 481 n.2.

judicial deference to a legitimate governmental interest. “When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.” *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Direct evidence is not required but can be proved by bias in the legislative record or by inference in a statute’s text, statements of state officials, or “a series of actions taken for invidious purposes.” *Id.* at 267-68. Silence or lack of objection in the wake of such animus, can also evidence animus.[23] The Supreme Court has recognized a state “may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic.” *City of Cleburne*, at 448. “‘Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.’” *Id.* (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)).

HB 668 “public funds” justification was used as a pretext/proxy to harm transgender Idahoans because no Medicaid data for the cost of the treatments was presented to or known by Legislators. Defendants admitted “IDHW does not maintain a list of participants with a diagnosis of gender dysphoria.” *Dec. JG*, Ex. 9 (Response to Interrogatory No. 31). Medicaid did not know the number of transgender Medicaid participants receiving treatment for gender dysphoria. *Id.* (Response to Interrogatory No. 32). Medicaid’s best estimate is the number of “prior-authorized treatment under the diagnostic code for gender dysphoria.” *Id.* The number of prior-authorized “surgeries for all fiscal years 2020 through passage of HB 668 is zero.” *Id.* HB 668 was enforced against 57 transgender Medicaid participants who applied for tapering of their medications. *Id.* The cost of public funding for medication is trivial compared to FY2024 and FY2025

---

[23] In *Masterpiece Cakeshop Ltd. v. Colo. C.R. Comm’n*, animus toward religion surfaced at a government commission’s hearings and the record showed no objection to hostile comments from other commissioner. *Id.*, 584 U.S. 617, 636 (2018).

appropriations for Medicaid. [24] *Dec. JG*, Ex. 10. The actual amount Idaho funds for treatment of transgender Medicaid participants is reduced by 69.72% because of Idaho's Federal Matching Assistance Percentage (FMAP).[25]

HB 668's justifications are "underinclusive" because only Medicaid transgender Idahoans are prohibited from obtaining medical and surgical treatments. Non-Medicaid transgender and Medicaid cisgender individuals can continue to receive the same medical and surgical treatments despite the justifications. HB 668 is also grossly "underinclusive" because "Gender Transition" procedures are declared to be "never necessary" while the same "surgical intervention and medical treatments" are afforded to cisgender Idahoans as medically necessary. HB 668's prohibitions targeted transgender persons because it is not enforced "[f]or the treatment of any infection, injury, disease, or disorder that has been caused or exacerbated by the performance of gender transition procedures" which would only apply to transgender persons. I.C. §18-1901(1)(b). The non-medical penalties are over "inclusive" because they discriminate against all transgender Idahoans without any direct relationship to Medicaid or public funds. "When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 618 (1985).

As in *Yick Wo, Moreno, Romer, Cleburne, Hunter, Windsor,* and *Trump*, the Policies and HB 668 and other Idaho statutes are rooted in animus motivated by the "bare desire to harm" transgender Idahoans by subjecting them to invidious discrimination. The animus first emerged

---

[24] Idaho's FY 2024 appropriation for the Division of Medicaid was $4,558,104,000, of which about $3,058,795,800 was from federal funding. FY 2025 was $4,710,390,700 with $3,038,778,800 from federal funding. Dec. JG Ex. 9.

[25] *See*: https://www.congress.gov/crs-product/R43847#_Toc194592204. Federal Medical Assistance Percentage: The federal government's share of most Medicaid service costs is determined by the FMAP rate, which varies by state and is determined by a formula set in statute. The FMAP rate is used to reimburse states for the federal share of most Medicaid expenditures. Idaho's rate in FY2024 was 69.72 and in FY 2026 is 66.91. *Dec. JG* Ex. 10.

during MH's fair hearing. On March 26, 2021, Dr. Hamso's notice of denial of MH's surgical authorization relied upon the WPATH Standard of Care policy requiring 12 months of continuous hormone therapy. *Dec. MH* ¶ 45. Dr. Hamso testified that after completing 12 months of hormone therapy, MH would have qualified for surgery based upon the WPATH Standards. *Hamso Dep.* 225:23-226:4.[26] The Hearing Officer determined, based upon MH's medical records, she had completed the WPATH criteria for surgery. *Dec. MH* ¶¶ 60-66. Medicaid's nurse reviewer then asserted (for the first time and without prior notice) the surgery was a non-covered "cosmetic" procedure to improve a person's "appearance or self-esteem." *Id.* at ¶¶ 55 & 55. Dr. Hamso testified MH's surgery was not cosmetic. *Hamso Dep.* 226:22-227:3. The Hearing Officer's July 2, 2021, decision held the Department had abused its discretion because MH had completed the 12 continuous months of hormone therapy and remanded the appeal to Dr. Hamso to approve the prior authorization. *Dec. MH* ¶¶ 61-66. MH constantly contacted Medicaid during the subsequent three years to determine whether Dr. Hamso had approved or denied her surgery. *Dec. MH* ¶¶ 67-75. On November 2, 2021, Medicaid's staff was instructed that all calls pertaining to MH's request were to be referred to Dr. Hamso. *Dec. JG*, Ex. 3.1. On November 25, 2021, MH requested a new fair hearing for the failure to make a decision with reasonable promptness. *Dec. MH* ¶¶ 25. Dr. Hamso denied MH a fair hearing and dismissed MH's appeal claiming she was not entitled to a hearing. *Id*. at ¶ 72. On December 22, 2021, MH called Dr. Hamso directly. In tears, begged her to remove the request from pending. *Id*. at ¶ 71. The only notice Dr. Hamso provided to MH was the "policy was still pending." *Id*. at ¶ 71 & 73. Dr. Hamso never provided MH with a policy nor made a decision after the remand until August

---

[26] Dr. Hamso testified as Medicaid's Medical Director and only physician who would make the decision on surgical authorizations if there if there was not a published coverage criteria. *Hamso Dep*. 227:4-19.

2024. *Id.* at ¶ 75. After HB 668's effective date, MH's request for surgery was no longer pending and was denied. *Hamso Dep*. 114:15-17, 218:9-10, 239:19-25 *Dec. MH* ¶ 75. Defendants' three year delay during the constitutionally required fair hearing process caused MH to suffer physical and emotional injuries for over three years including anxiety, stress, depression, suicidality and self-harm. *Dec. MH*.[27]

The three years "still pending" excuse was a ruse to prevent MH from receiving Medicaid authorization because Medicaid's cosmetic policy and the Governor's transgender policy prohibited MH from receiving the surgery. [28] MH's request was kept pending without recourse for three years because she was transgender. The same surgeries (penectomy, orchiectomy, and vulvoplasty vulvoplasty) were covered for cisgender Medicaid participants without a specific policy. Dec. JG, Ex. 10. This caused MH to suffer physical and emotional self-harm and evidences animus and the "bare desire to harm. *Dec. MH*. [29] Invidious discrimination motivated by animus is not a legitimate state interest deserving of deference under rational basis review.

***4. Idaho Statutes Evidence Animus and a "Bare Desire to Harm" Transgender Idahoans***

HB 668 specifically targets the gender identity of transgender Idahoans, not a medical condition or a diagnosis of gender dysphoria. HB 668 is titled "Gender Transition" and the words "transgender" or "gender dysphoria" are not used. Medicaid's unwritten policy and the Governor's policy, HB 668, and other legislation taken together are "'soaked in animus and

---

[27] The DSM-5-TR currently indicates the critical element of a diagnosis of gender dysphoria is the presence of "clinically significant distress" which can result in depression, anxiety, self-harm, suicidality and death if untreated. DSM-5-TR at 519.

[28] Medicaid had no written policy excluding gender-affirming care when MH applied for surgical authorization. On May 1, 2023. the Governor issued a Medicaid policy prohibiting "sex-reassignment surgeries, puberty blockers, or hormones for the purpose of changing the appearance of any child's or adult's sex." Dkt. 33-1 and *Dec. JG,* Ex. 7.

[29] Idaho recognizes that symptoms such as anxiety, severe headaches, occasional suicidal thoughts, sleep disorders, and fatigue are sufficient for the physical requirement for a negligent infliction of emotional distress claim. *See Czaplicki v. Gooding Joint Sch. Dist. No. 231*, 775 P.2d 646, 646 (1989); *Cook v. Skyline Corp.*, 13 P.3d 857, 866 (2000).

dripping with pretext.'" *Talbott at* * 7 (quoting *Talbott v. United States*, 775 F. Supp. 3d 283, 326 (D.D.C. 2025)). HB 668's pretextual/proxy invidious discrimination targeting transgender Idahoans is reinforced by the exemptions for cisgender Medicaid participants and the treatment of "any infection, injury, disease, or disorder that has been caused or exacerbated by the performance of gender transition procedures..." I.C. §18-8901(1)(a) & (b). The prohibitions on funding and penalties are not directed to specific treatments but "who" would be covered and "who" receives public funding. The "who" the Legislature sought to target were the gender identity of transgender Idahoans based upon animus and desire to harm an unpopular group.

Unlike in Tennessee and West Virginia, Idaho crafted HB 668 not to protect transgender Idahoans from harm but to purposefully punish them by using punitive policies, financial disincentives, and criminal penalties to deprive them of receiving medically necessary treatments.[30] A treatment for the purpose of altering the appearance inconsistent with their biological sex would "not be considered medically necessary if the person were not transgender." *Hamso Dep.* 212:15-24. HB 668 does not apply to cisgender adults who are not transgender and do not need to transition. The extent of the funding prohibitions and non-medical penalties, "raise the inevitable inference that the disadvantages imposed were born of animosity toward the class of persons affected" and "outrun and belie any legitimate justifications that may be claimed for it." *Romer*, at 634-35.[31]

The evidence of pretextual/proxy invidious discrimination is unmistakable given the financial penalties imposed on private entities, organizations, and individuals who treat

[30] Dr. Hamso, Medicaid medical director, testified that in her professional opinion gender affirming treatments are medically necessary because untreated gender dysphoria can result in an increased risk of severe mental illness and a 50% increase in rates of suicide. *Hamso Dep*. 186:12-15 & 188:24-189:1. As Medicaid's only physician she was not allowed to determine medical necessity. *Id.* 113:1-6 & 114:18-23.

[31] Dr. Hamso was unaware of any policy excluding treatment of gender dysphoria prior to HB 668. *Hamso Dep*. 209:3-6.

transgender Idahoans. HB 668 singles out transgender patients by making the cost of treatment non-tax deductible. IC § 18-8901(3).[32] HB 668 penalizes and prohibits transgender Idahoans from receiving medically necessary treatment under internationally standards of care from health care professionals, in the course and scope of employment by state, county or local governments. IC §18-8901(5).[33] Additionally, no state property, facility, or building can be used to treat tax paying transgender Idahoans regardless of cost. IC §18-8901(6). These bad faith prohibitions and penalties serve to intimidate and retaliate against health care professionals who treat transgender Idahoans. *See Dec. Ragan* ¶¶ 12-13.

HB 668 violates equal protection because it is used to deny transgender Idahoans medical care unrelated to their gender identity. Dr. Burdick was denied Medicaid authorization for a hysterectomy needed by transgender man to treat diagnosed dysmenorrhea, painful periods, unrelated to their transgender status. *Declaration of Dr. Burdick* ("*Dec. Burdick*") [Dkt. 87-4]. Dr. Burdick has been granted authorization to perform hysterectomies for cisgender patients with the same indications of dysmenorrhea and painful periods. *Id.* Medicaid CPT codes allow payment. *Dec. JG*, Ex. 10. Plaintiff BM was denied Spironolactone prescribed for hypertension not for gender dysphoria. *Dec. BM* ¶ 39; *Hamso Dep.* 216:11-24. AC was forced to stop counseling because of HB 668. *Dec. AC* ¶ 24. AC, BM, and Dr. Burdick's patient had qualifying diagnoses that needed treatment but were denied because of their transgender status in violation of equal protection. *See Pritchard v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646, 671 (9th Cir.

[32] In 2011, the U.S. Tax Court held that gender dysphoria "is a serious, psychologically debilitating condition" within the meaning of the Tax Code and that the costs of hormone therapy and gender reassignment surgery are deductible and not cosmetic surgery. *O'Donnabhain v. Comm'r*, 134 T.C. 34, 62 (2010). The IRS issued an Action on Decision in which it acquiesced to the Tax Court decision. *O'Donnabhain*, 2011-47 I.R.B. 789 (IRS ACQ 2011).

[33] The statutory penalties criminally punish state employees who violate the exclusions by subjecting them to misdemeanor and felony prosecution which includes imprisonment and fines for misuse of public funds and termination. Idaho Code §18-8901(7) (citing I.C. § 18-5702).

2025).

HB 668 had deleterious effect on over 300 Medicaid and non-Medicaid transgender patients being treated by Dr. Ragen's Health West clinic at Idaho State University in Pocatello. *See* https://www.isu.edu/clinics/family-medicine/ and *Dec. Ragan* ¶¶ 12-13. Dr. Ragan, after serving in the Navy for 26 years, is a physician employed by Health West's low-cost clinic. *Id.* at ¶¶ 3 & 4. Health West was the only clinic in eastern Idaho that provided transgender individuals with treatment at no or reduced cost. *Id.* at ¶¶ 6 & 8 , *Dec. AC* ¶¶ 23 & 24, and *Dec. SG* ¶¶ 16-18. HB 668 required Health West to stop treating transgender patients. *Dec. Ragan* ¶ 8. The Chief Medical Officer of Health West, in response to "political forces," determined that HB 668 required the discontinuance of treatment to transgender patients at all its locations in Idaho, Utah, and Wyoming due to the risks to its funding streams and the viability of the organization as a whole. Dkt. 95-1, p5. Dr. Rolynn resigned from Health West to open her own practice to serve the hundreds of transgender patients who were cut off from treatment by HB 668. Dkt. 153-3 at ¶¶ 7 & 12. Many Medicaid transgender patients, who could not afford the medications, regular office visits, and laboratory monitoring, suffered a decline in their mental and physical health after HB 668 became effective. *Dec. Ragan* ¶¶ 10 & 11, *Dec. Alviso* ¶¶ 22, 32-33, 64.

HB 668's sponsors Representatives Young and Skaug, only speculated and hypostasized on the amount of public funds that would be saved. HB 668's Statement of Purpose only states: "While specific savings are difficult to quantify, as a result of lack of data regarding current expenditures for the medical and surgical interventions, it is anticipated there will be financial savings." *Dec. JG*, Ex. 7. The legislators' intent in voting for HB 668 was to invidiously discriminate against transgender Idahoans not to save public funds. HB 668 forced MH, AC, and

BM to temporarily leave Idaho so they could continue receiving medical treatment.[34] *BM Cf. Yick* Wo at 374 (displacement of 200 Chinese businesses from San Francisco evidenced animus). The Legislature enacted HB 668 by a vote in the House of 58-11-1 and in the Senate of 26-8-1, despite overwhelming opposing public testimony. *Dec. JG*, Ex. 7.

The Governor's policy is direct evidence of animus and invidious discrimination against transgender Idahoans. The Governor retaliated against MH and TB by indicating Defendant Jeppesen was "being sued for not having pre-authorized Medicaid coverage for the sex reassignment surgeries of two young adults.[35]I further understand it has been alleged that it is unclear whether Idaho Medicaid provides coverage for such procedures." *Dec. JG*, Ex. 8. The Governor's policy targeted transgender Idahoans because he "oppose[d] Idaho Medicaid using funds...for the purpose of changing the appearance of any child's or adult's sex." *Id.*

Animus can be shown by the other legislative actions targeting and codifying inequality and dehumanizing transgender Idahoans. *See Village of Arlington Heights*, 429 U.S. at 266-68. The 2024 Legislature enacted HB 421, in conjunction with HB 668, to revise the statutory definitions of "male" and "female" and "sex" and "gender" in I.C. § 73-114 and to amend to I.C. 39-245A by defining "sex" on a birth certificate. *Dec. JG* Ex. 11. HB 421's legislative intent declares: "(1) In human beings, there are two, sexes: male and female." Idaho does not consider transgender Idahoans to be "human beings." The statute defines "sex" to mean "an individual's biological sex, either male or female." I.C. § 73-114(2)(n). The definitions of "male" and "female" are based upon a "reproductive system" that produces eggs or sperm for "fertilization"

---

[34] Plaintiffs hope to return to Idaho if they could continue to receive the medically necessary treatment they were receiving prior to the enactment of HB 668. *Dec. MH* ¶ 98, *Dec. AC* ¶ 34 and *Dec. BM* ¶ 51.

[35] Dr. Hamso testified MH's and TB's personal health information could be disclosed because Medicaid is part of the Executive Branch. *Hamso Dep*. 232:2-5 & 12-13. The Governor's office does not approve Medicaid's prior authorizations. *Hamso Dep*. 233:3-5.

to exclude transgender persons. *Id.* at (2)(c) & (g).[36] The statutory definition of "gender" only refers to male and females, which is a synonym for "sex" and is not "considered a synonym for gender identity, an internal sense of gender, experienced gender, gender expression, or gender role." *Id.* at (2)(d).

HB 421's amendments were designed to erase transgender status from Idaho statutes and to prevent transgender persons from changing their official documents to reflect their gender identity. HB 421 targeted transgender status by invading their privacy and endangering their safety by forcing transgender persons to disclose their sex assigned at birth. *See Roe v. Critchfield*, 137 F.4th 912, 932 (9th Cir. 2025) (collecting cases).[37] The Legislature's definitions of "sex, male, and female" and the exclusion of "gender identity" evidences animus and the desire to harm transgender Idahoans by depriving them of basic equalities under Idaho law. The Legislative Intent expressed in HB 421 declared that transgender Idahoans were not "human beings" so they can be singled out for unequal rights and treatment.[38] *Dec. JG*, Ex. 12. The Legislature's findings of "material facts" in I.C. § 39-245A prohibiting the use of gender identity on birth certificates references the equal protection clause, the "biologically based definition of sex" and the antitransgender "society for evidenced based-gender-medicine" is evidence of

---

[36] In *Latta v. Otter* the Ninth Circuit rejected Idaho's argument that "procreative capacity" was a justification for discrimination in a law that distinguished between opposite-sex and same-sex couples' ability to marry. "Whether facial discrimination exists 'does not depend on why' a policy discriminates, 'but rather on the explicit terms of the discrimination.'" *Id.*, 771 U.S. F.3d 456, 467-68 (9th Cir. 2014) *cert. denied* 576 U.S. 1083 (2015) (Mem) (quoting *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Johnson Controls,* 499 U.S. 187, 199 (1991)).

[37] In 2024, the legislature amended the law governing birth certificate amendments. I.C. § 39-245A(d)(4). The amendment limited the ability of transgender persons to change the sex on a birth certificate. In 2025, Defendants successfully moved to dissolve an injunction so the Department could reinstate its once-existing policy prohibiting transgender persons from changing the sex on their birth certificates based on I.C. § 73-104(1)(n). *See F.V. and Martin v. Charron,* Case No. 1:17-cv-000170-CWD.

[38] *See* HB 421 (2024) Amending Idaho Code §73-114, "Section 1. LEGISLATIVE INTENT. It is the intent of the Legislature to recognize the following: (1) In human beings, there are two, and only two, sexes: male and female; (2) Every individual is either male or female; (3) an individual's sex can be observed or clinically verified at or before birth…" *Dec. JG* at Ex. 12.

targeting transgender persons.[39] HB 421's statutory definitions and legislative findings are direct evidence of animus and pretextual/proxy invidious discrimination against transgender Idahoans.[40]

## III. THE BREADTH AND CHARACTER OF HB 668'S FUNDING PROHIBITIONS AND PENALTIES ARE ILLEGITIMATE

The sheer breadth and character of HB 668's deprivation of the constitutional rights, unlike the statutes in Tennessee and West Virginia, raises substantial inferences of animus and pretextual/proxy invidious discrimination.[41] HB 668 declares all adult "gender transition procedures" are "never necessary."[42] HB 668, facially and as applied, only excludes adult transgender Medicaid beneficiaries from obtaining healthcare based on their gender identity. Prior to HB 668, Medicaid's medical necessity determination was the same for transgender and cisgender participants regardless of gender identity. *Hamso Dep.* 215:6-16. HB 668's lack of data and cost evidence for gender transition and the medical exemptions demonstrate that any alleged harmful effects of the treatments were pretextual/proxy discrimination. If HB 668 was actually motivated by the alleged harms of gender transition than the medical prohibitions should have

---

[39] *See*: https://transdatalibrary.org/organization/society-for-evidence-based-gender-medicine/ ("SEGM's materials present a plausible veneer of professionalism that can be confusing for the average person who encounters them. A report from Yale School of Medicine found "the group appears to be nothing more than a website; it does not appear to hold meetings, screen its members, or publish a journal. The original content on the website includes statements unsupported by any citations. When the content does provide citations, they are often unreliable or misleading.")

[40] HB 264, I.C. § 67-9801 et seq., evidences further animus against transgender individuals. The statute establishes a private right of action for declaratory and injunctive relief plus attorney fees if a "covered entity" provided permission to or failed to prohibit a person of the opposite sex from using changing rooms or restrooms or failed to prohibit a person of the opposite sex from sharing sleeping quarters. I.C. § 67-9803.

[41] Dr. Hamso testified prior to HB 668 Medicaid did not have a separate preauthorization list for transgender participants and cisgender and transgender Medicaid participants. *Hamso Dep.* 203:3-7. Each participant had access to the array of covered benefits and Medicaid did not track who was cisgender or transgender. *Id.*, at 203:14-17. All coverage exclusions of cisgender and transgender Medicaid participants were the same prior to HB 668. *Id.*, at 204:14-15.

[42] Dr. Hamso testified that HB 668 applied to all treatments of transgender Medicaid participants even if the treating physician determined the treatment was medically necessary. *Id.* at 211:24-212:7.

included all adult transgender Idahoans not just Medicaid transgender participants.[43] HB 668 finds the same treatments are not harmful and are medically necessary for cisgender persons because they confirm a person's sex assigned at birth. The "underinclusive" and "overinclusive" classifications based upon alleged harms in HB 668 demonstrates unconstitutional animus. The "fit" between HB 668 and the governmental object was fabricated to justify pretextual/proxy invidious discrimination based upon transgender status.[44] *See* Dkt. 36 at 16.

The depth and breathe of Idaho's statutes targeting transgender Idahoans are reminiscent of the legal prohibitions in the Chinese Exclusion Act of 1882, Pub. L. 47–126, and the "Black Code laws" that restricted the rights of black Americans from equal treatment during the Jim Crow era. *See also Romer,* 517 U.S. at 634 (citing *Davis v. Beason*, 133 U.S. 333, 347 (1890)) (where the Court approved an Idaho territorial statute denying Mormons the right to vote and to hold office). Idaho's policies and statutes convey a moral disapproval that is built upon a foundation of irrational prejudice towards transgender Idahoans whose gender identity does not match their sex assigned at birth. HB 668's "underinclusive" and "overinclusive" funding prohibitions and penalties are not legitimate governmental objectives designed to save public funds or to protect transgender adults. They were borne out of a bare desire to harm and an intent to invidiously discriminate against a few adult transgender Idahoans who previously received treatment from Medicaid that cisgender Idahoans may seek and obtain without constraint.

The justifications underlying Idaho's policies and statutes are pretextual and mere proxies for invidious discrimination rather than to protect transgender Idahoans from the "substantial

---

[43] Dr. Hamso testified gender transition is when receiving medical care to transition from biological sex to their preferred sex and gender identity or sex assigned at birth. *Id.* at 214:11-17.

[44] Dr. Hamso testified she was unaware of any instance where Medicaid applied HB 668's "for the purposes of altering the appearance that is inconsistent with the individual's biological sex" except to transgender persons. *Hamso Dep.* 212:15-21.

risks" and "known harmful effects, including irreversible physical alterations and, in some cases, sterility and lifelong sexual dysfunction." *See* HB 668 Section 1. A classification grounded in animus inflicts "immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it." *Romer*, 517 U.S. at 635. "[N]o legitimate purpose overcomes the purpose and effect to disparage and to injure." *Windsor*,133 S. Ct. at 2696. Courts have an independent constitutional duty to review legislative findings when constitutional rights are at stake. *Roe*, 137 F.4th at 921(citing *Gonzales v. Carhart*, 550 U.S. 124, 165-66 (2007) (quoting *Latta*, 771 F.3d at 469) ("'Unsupported legislative conclusions as to whether particular policies will have societal effects...have not been afforded deference by the Court.'"). The purposes of HB 668 and HB 421 were to pretextually and invidiously discriminate against transgender Idahoans by statutorily declaring they are not "human beings" and to deny their existence "in the complied laws and rules and policies of the state of Idaho…" I.C. § 73-114. *Cf. Romer*, 517 U.S. at 629 ("Amendment 2 also operates to repeal and forbid all laws or policies providing specific protections to gays or lesbians from discrimination by every level of Colorado government.") "'[D]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.'" *Romer*, at 633 (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928). No legitimate justification for this irrational prejudice can justify the animus. "Respect for this principle explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare." *Romer*, at 633.

## IV. IDAHO'S POLICIES AND STATUTES USE PROXIES/PRETEXTS FOR INVIDIOUS DISCRIMINATION

Idaho's Policies and HB 668 were proxies designed as pretexts to invidiously discriminate

against transgender Idahoans.[45] Proxy discrimination is a "form of facial discrimination" which arises from a "policy that treats individuals differently on the basis of seemingly neutral criteria." *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019) (quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013)).[46] "[B]y its very terms, facial discrimination is 'intentional.'" *Lovell v. Chandler*, 303 F.3d 1039, 1057 (9th Cir. 2002). "[N]o greater proof of mental state [is] necessary" because "intentional discrimination" is "synonymous with discrimination resulting in 'disparate treatment,'" as opposed to "disparate impact." *Id.* (citation modified). *See* Dkt. 36 at 21-22. "Notably, proxy discrimination does not require an exact match between the proxy category and the...classification for which it is a proxy." *Pritchard* at 672 (citing *Davis* at 838). "Instead, 'the crucial question is whether the proxy's 'fit' is 'sufficiently close' to make a discriminatory inference plausible.'" *Id.* (quoting *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 959 (9th Cir. 2020)).

Discriminatory intent can simply be shown by "direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Pac. Shores* 730 F.3d at 1158.[47] The Policies and HB 668's public funds prohibition and penalties for gender transition

---

[45] The Ninth Circuit in *Pritchard* found that in *Skrmetti* "no party had 'argued that [the statute's] prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals.' and it 'decline[d] to find' that the statute discriminated against transgender individuals for that reason." *Id.*,159 F.4th at 671-72 (citing *Skremetti*, 145 S. Ct. at 1833-34).

[46] For example, "discriminating against individuals with gray hair is a proxy for age discrimination because 'the fit between age and gray hair is sufficiently close.'" *Pac. Shores*, 730 F.3d at 1160 n.23 (quoting *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992).

[47] *See also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed."); *Rice v. Cayetano*, 528 U.S. 495, 496 (2000) (the purpose and operation of the classification was discriminatory and "[a]ncestry can be a proxy for race"); *Hunter v. Underwood*, 471 U.S. 222, 227 (1985) (Alabama's constitution's facially neutral disenfranchisement of all convicted persons was for the purpose of discriminating against blacks who were convicted at a higher rate than white voters who were also disenfranchised.

that are only enforced against transgender Medicaid participants plausibly causes a disparate treatment between transgender and cisgender persons that “would fall squarely within *Geduldig’s* pretext exception.” *See* Dkt. 36 at 21-23 (quoting *Geduldig*, 417 U.S. at 496 n.20). There is a sufficiently close fit between transgender status and: (1) the Governor’s Policy prohibiting “sex reassignment surgeries for two young adults;” (2) I.C. § 18-8901(1)(a) is titled “PUBLIC FUNDS FOR GENDER TRANSITION”; (3) the statutory text stating “surgical operation or medical intervention is never necessary...if it is for the purpose of altering the appearance of an individual in order to affirm the individual’s perception of the individual’s sex in a way that is inconsistent with the individual’s biological sex;” (4) the exemptions for persons seeking to reverse transition treatments and for cisgender Idahoans seeking similar medical treatments for other conditions; (5) the inclusion of non-medically penalties, criminal sanctions, and restrictions on healthcare providers who treat transgender Idahoans; (6) the reliance upon the antitransgender views of political groups and experts who have no actual experience treating transgender persons; (7) the amendment of the statutory definitions of “human beings” in I.C. § 73-114; (8) the lack of data to justify HB 668 based upon the actual costs of treatments; (9) the amendment of I.C. § 39-245A defining “sex” to prohibit gender identity on a birth certificate which protected the privacy and safety of transgender persons; (10) the attempt to prohibit local ordinances protecting transgender persons from discrimination; and (11) the restrictions on the use of public and private bathrooms. HB 668 cannot be justified without animus nor applied without proxies. Recently, the Ninth Circuit rightly observed: “The fit between transgender people and people suffering from gender dysphoria is strong. The Ninth Circuit has held that gender dysphoria comes from "marked incongruence between [the patient's] experienced/expressed gender and assigned gender.” *Pritchard*, 159 F.4th at 672.

HB 668 funding prohibitions and penalties for gender transition are sufficiently close proxies to transgender status so as to be facial and "as applied" discrimination.[48] Defendants cannot escape the use of proxies to discriminate contending HB 668 applies to others not just transgender Idahoans.[49] The Ninth Circuit has characterized the willingness to "overdiscriminate" as a "grotesque scenario" and not the law. *Pac. Shores*, 730 F.3d at 1159 ("A willingness to inflict collateral damage by harming some, or even all, individuals from a favored group in order to successfully harm members of a disfavored class does not cleanse the taint of discrimination; it simply underscores the depth of the defendant's animus.") (citations omitted). The wording of a facially neutral law by using the proxy label of "Public Funds for Gender Transition" instead of "Public funds for Transgender Status" is just as facially discriminatory. The Policies and HB 668, whether based upon animus, the bare desire to harm a disfavored group or invidious discrimination, uses proxies/pretexts based upon transgender status and gender identity.

## V. MEDICAID'S POLICY AND HB 668, FACIALLY AND AS APPLIED, VIOLATE EQUAL PROTECTION UNDER HEIGHTENED SCRUTINY OR RATIONAL BASIS REVIEW

In *Skrmetti*, the Court did not consider whether Tennessee's' SB1 was based upon animus. *Id.* at 516. HB 668 is distinguishable from SB1 because it targets a small subset of the adult transgender population by imposing funding prohibitions and non-medical penalties. HB 668's alleged cost justifications, without any data, to protect a subset of 57 transgender Medicaid Idahoans from the harm caused by "physical alterations...sterility and lifelong sexual

[48] Dr. Hamso was unaware of any policy excluding treatment of gender dysphoria prior to HB 668. *Hamso Dep*. 209:3-6. A treatment would "not be considered medically necessary if the person were not transgender." *Id.* 212:21-24.

[49] The Ninth Circuit has recognized: "Discriminatory laws, policies, or actions will often have negative effects (whether intended or not) on individuals who do not belong to the disfavored group. This does not, however, change the fact that such laws, policies, or actions are discriminatory when they are undertaken for the purpose of harming protected individuals." *Pac. Shores*, 730 F.3d at 1159.

dysfunction" are pretextual given the Legislature's continuing efforts to strip transgender Idahoans of their legal rights, to statutorily define them as not "human" and to banish them from public and private bathrooms, schools and buildings.[50] HB 668's "underinclusive" medical justifications are inapplicable to the vast majority of non- Medicaid transgender Idahoans.[51] The Legislature and Medicaid does not apply the same harms to exclude treatments of cisgender persons with other conditions.[52] HB 668's pretextual medical prohibitions and non-medical penalties, were enacted without any individualized evaluation of medical necessity, any medical testimony, or data and cost justification.[53] The "underinclusive" pretextual medical harms do not "fit" the purported cost and medical objectives. HB 668's pretextual prohibitions and penalties inflict substantial harm on transgender Medicaid participants, who have rates of suicidality and suicide attempts ranging from 30% to 80% compared to similarly situated persons with other mental health disorders. *See* DSMV-TR at 519.

*Skrmetti* did not address whether heighten scrutiny applies to animus or pretextual/proxy invidious discrimination. *Id.* at 516 ("we do not subject the law to heightened review unless it was motivated by an invidious discriminatory purpose, see *Personnel Administrator of Mass.*, 442 U. S., at 271-274; *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U. S. 252, 264-266 (1977). No such argument has been raised here."). Heightened scrutiny applies to

---

[50] Dr. Hamso testified that the effects of puberty blocker and hormones are not irreversible and not for the purpose of changing the person's appearance. *Hamso Dep*. 117:20-23.

[51] The UCLA School of Law Williams Institute, August 2025, estimated Idaho had 9,600 adult transgender persons, (aged 18+). https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Aug-2025.pdf

[52] Several common medications and treatments including for chemotherapy, antidepressants, alpha-blocker, opioids, testosterone, ketoconazole, anti-epilepsy, antiretrovirals, antibiotics, steroids, blood pressure such as spironolactone, acid reflex, gout, ulcers, may cause sterility and sexual dysfunction but are not prohibited if medically necessary. https://health.clevelandclinic.org/can-drugs-lower-sperm-count.

[53] Dr. Hamso testified prior to HB 668 Medicaid paid for hormonal medications with an FDA-approved indication or an indication listed in the compendia. Hormones for gender dysphoria were listed in the compendia, and so those were covered even without an FDA-approved indication and it was commonly utilized that way. *Hamso Dep*. 205:22-207:9.

HB 668 because first, it is rooted in animus and irrational prejudice against the gender identity of transgender Idahoans. Second, because HB 668 uses pretexts/proxies, facially and "as applied", to treat transgender and cisgender individuals in disparate ways depending on their sex assigned at birth and gender identity. The scope of HB 668's medical prohibitions and non-medical penalties and the vast array of other Idaho anti-transgender statutes, in contrast to *Skrmetti,* evidences an illegitimate discriminatory purpose to demean and stigmatize transgender Idahoans because of their gender identity. Idaho statutes, in all contexts declare: the expressed purpose of Idaho's Policies and HB 668, in tandem with other Idaho statutes, comprehensively deny the existence of transgender persons from conception to virtually all aspects of life, not merely to regulate a discrete medical treatment. Unlike *Skrmetti*, Idaho's statutory schemes convey a moral disapproval and "bare desire to harm" transgender Idahoans because of their gender identity. HB 668 exempts Medicaid funding for cisgender persons with other conditions needing the same medical treatments regardless of any adverse effects or to treat injuries caused or exacerbated by gender transition procedures.[54] Conversely, in *Skrmetti*, Tennessee did "not regulate any other behavior in which minors might engage for the purpose of expressing their gender identity…and the statutory "restrictions apply only to the treatment available to minors. Once individuals reach the age at which they are able to make informed decisions about medical care, the law imposes no restrictions." *Skrmetti*, 605 U. S. at 563 (Alito, J., concurring).

Since 2024, the Legislature has passed an onslaught of privately enforceable anti-transgender legislation banning and criminalizing gender identity from the public square that evidences the bare desire to harm transgender Idahoans. In 2025, HB 352 prohibited public

---

[54] For example, a cisgender female can receive a hysterectomy and transgender male cannot even though the procedures are identical and it will cause "irreversible physical alterations" and "sterility." HB 668 Section 1. *Dec. Burdick* ¶¶ 7-9, 19.

schools from instructing students on sexual orientation and gender identity from kindergarten to grade 12. *See* I.C. § 33-6001(5).[55] The Legislature's effort to repress transgender persons was also evident when it enacted HB 561 to prevent the City of Boise from displaying the Pride Flag. *See* I.C. § 67-2303A.[56]

In 2026, the Legislature passed HB 752 which criminalized "knowingly and willfully enter[ing] a restroom or changing room in a government-owned building or place of public accommodation...that is designated for use by the opposite biological sex." *See* I.C. § 18-4117(1). The prohibition on the use of bathroom applied to private business. A violation was punishable as a misdemeanor but a second conviction was a felony. *Id.* Transgender persons challenged HB 752's "reasonableness" and "dire need" exceptions for bathrooms and the phase "designated for use by the opposite sex," under the Due Process Clause. *See Jackson-Edney v. Labrador*, 2026 U.S. Dist. LEXIS 135397 *22 (D. Idaho June 16, 2026). The Court held HB 752 was unconstitutionally vague under the Due Process Clause because it failed to provide sufficient standards for law enforcement. *Id.* at *27-29.

HB 668's funding prohibitions and non-medical penalties, facially and "as applied", do not meet any level of scrutiny because of animus and pretextual/proxy invidious discrimination. *See* Dkt. 36 at 10-18. The Ninth Circuit has held that heightened scrutiny applies to transgender status. *Roe*, 137 F.4th at 922 (citing *Doe v. Horne*, 115 F.4th 1083, 1107 (9th Cir. 2024); *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019) (per curiam)). If a law "discriminates based on transgender status, either purposefully or on its face, heightened scrutiny applies." *Doe*

[55] In 2026, HB 516 amended I.C. § 33-6001(5) to delete the language: "or in a manner that is not age appropriate or developmentally appropriate for students in accordance with state standards."

[56] The Legislature passed House Joint Memorial No. 17 seeking to overturn the Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. 644 (2015), which recognized same-sex marriage. Dec JG, Ex. 17.

*v. Horne*, 115 F.4th at 1102. *Roe* was a facial challenged to Idaho's S.B. 1100 which required public school students to only use multi-occupancy restrooms and "changing facilities" designated for their sex assigned at birth. *Roe*, 137 F.4th at 919 n.2. The Court held to withstand heightened scrutiny, classifications must serve "important governmental objectives and must be substantially related to achievement of those objectives." *Id.* at 922 (citation modified). The policy must have "a close and substantial bearing on the governmental objective in question." *Id.*[57] "The justification must be genuine, not hypothesized or invented post hoc in response to litigation." *Id.*[58]

Idaho's Policies and statutes banning and penalizing transgender Idahoans at all level of government and in "public accommodations" fails the "close means-end fit" test that heightened scrutiny requires for discriminatory classifications. *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017).[59] Defendants have not met their burden of showing an "exceedingly persuasive justification" or "important governmental objectives" that is served by discriminating against transgender Idahoans. *United States v. Virginia* ("VMI"), 518 U.S. 515, 533 (1996) (citation modified). Pretextual/proxy invidious discrimination "must be supported by an exceedingly persuasive justification and not hypothesized or invented post hoc in response to litigation." Dkt.

---

[57] S.B. 1100 required schools to provide a single-occupancy facility to a student who, for "any reason, is unwilling or unable to use a multi-occupancy restroom or changing facility designated for the person's sex." *Id.* at 920. Students could recover $5.000 for a violation. *Id.* HB 668 contains no exceptions for the funding prohibition or the non-medical penalties.

[58] Defendants invented, without evidence, a new post hoc justification for HB 668 contending transgender participants can receive "psychotherapy" which is an effective treatment for gender dysphoria. Dkt. 217-1 at 8. HB 668 does not use this justification and restricts funding of all "medical interventions" to treat gender dysphoria. Plaintiffs received counseling, as required by WPATH, but it did not alleviate their symptoms. *Dec. MH* ¶¶ 16, 20; *Dec. KB* ¶¶ 10, 14, 22; *Dec. AC* ¶ 7; *Dec. SG* ¶ 21; There are no evidence-supported studies finding "psychotherapy" alone is effective to treat gender dysphoria. *Dec. McNamara* 20-22 & 39-40; *Dec. McNamara Rebuttal* at 23.

[59] Courts evaluating similar policies and statutes targeting transgender people for discrimination have found them to be unconstitutional under heightened scrutiny. *See Doe v. Snyder*, 28 F.4th 103, 113 n.5 (9th Cir. 2022).

36 at 14-15 (citation modified).[60] HB 668 fails to meet either because the funding prohibition and penalties did not serve important government objectives. The cost and medical justifications were invented post hoc in response to the Complaint. HB 668's cost justification was hypothesized and not genuine because they were not based upon actual data and cost evidence from Medicaid participants. "[A] state may not protect the public fisc by drawing an invidious distinction between classes of its citizens.'" *Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 263 (1974). The medical justifications are not applied to the overwhelming number of transgender and cisgender Idahoans who may continue to access treatment. HB 668 fails to provides even minimal justifications bearing on the governmental objectives.

HB 668 cannot even withstand rational basis review. The classification is not rationally related to a legitimate state interest because it was motivated by animus and a desire to harm. Transgender Idahoans are "human being" and cannot be statutorily erased from Idaho law or society. HB 668 and the cavalcade of unrelenting anti-transgender legislation demonstrate the stated justifications to protect their health from harm and the costs were not based upon a diagnosis of gender dysphoria. The fabricated cost and medical justifications were pretextual proxies and the non-legitimate interests were to harm not protect. "A state cannot so deem a class of persons a stranger to its laws." *Romer*, at 635.

## VI. PLAINTIFFS' CONSTITUTIONAL RIGHT TO DUE PROCESS WAS VIOLATED

Plaintiffs had a legitimate entitlement under federal and state law to continue to receive Medicaid that was protected by the Due Process Clause. "The right to due process is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest...it may not constitutionally authorize the deprivation of such an

[60] Dr. Hamso testified that Medicaid did not require prior authorization for hormonal medication because the risks and costs were low enough it was unnecessary administrative burden for providers. *Hamso Dep*. 202:4-6

interest, once conferred, without appropriate procedural safeguards." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (citation modified). A legitimate entitlement is created "and [its] dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 577 (1972). *See also K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 972 (9th Cir. 2015) (citation modified) ("Because [Medicaid] participants have a legitimate claim of entitlement to this benefit under Idaho law, they have a property interest in continuing to receive it."). Idaho law entitled Medicaid recipients to receive "reasonable notice and opportunity for a fair hearing" to appeal the denial and the delay in making a decision. [61]

A Medicaid recipient is entitled to timely and adequate notice detailing the reasons for a denial of benefits and a meaningful opportunity to confront adverse witnesses and to present evidence. *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). The opportunity to be heard must be both "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, (1976). These fundamental elements of due process are meaningless if there is no right to a timely decision on the merits.[62] Defendants violated due process by failing to provide adequate notice of the reasons for denying MH's prior authorization and delaying for three-year after the fair hearing rejected the previous denial to issue a decision until HB 668 became effective.[63] *Dec.*

---

[61] I.C. § 56-216 provides: "APPEAL AND FAIR HEARING. An applicant or recipient aggrieved because of the state department's **decision or delay** in making a decision shall be entitled to appeal to the state department in the manner prescribed by it and shall be afforded reasonable notice and opportunity for a fair hearing by the state department." (emphasis added). Repealed by S.L. 2025, ch. 82, § 46, effective July 1, 2025.

[62] The Supreme Court has recognized "[o]nce a [termination] has been imposed, the [employee's] interest in a speedy resolution of the controversy becomes paramount. ... [i]t would seem as much in the State's interest as [the employee's] to have an early and reliable determination [of the issue]." *Barry v. Barchi*, 443 U.S. 55, 64 (1979).

[63] This Court found that Defendants appeared to concede the claimed violation of a constitutional right to due process. Dkt. 36 at 30 n.12. ("Defendants appear to concede that Plaintiffs' Due Process claim alleges a violation of a

*MH* ¶¶ 41-75.

Inherent in the guarantee of a meaningful hearing is the right to a timely decision. The lack of a speedy resolution may result in a denial of due process. *Loudermill*, 470 U.S. at 547 ("At some point, a delay in the post-termination hearing would become a constitutional violation."); *FDIC v. Mallen*, 486 U.S. 230, 242 (1988) (there is a point at which an unjustified delay in completing a post-deprivation proceeding would become a constitutional violation). A decision must be made within ninety (90) days of the request for fair hearing, whether the decision is final or remanded to the agency. *Lisnitzer v. Zucker*, 983 F.3d 578, 585-86 (2d Cir. 2020). MH attempted to appeal the delay but Dr. Hamso informed her the delay could not be appealed and was dismissed. *Dec. MH* ¶¶ 70-72. Dr. Hamso testified there was no policy for dismissing an appeal after remand due to a delay. *Hamso Dep.* 229:14-21.

The first Medicaid policy prohibiting cosmetic surgeries was unwritten until the Governor's letter. Medicaid kept a new policy "still pending" for three-years to prevent MH and other transgender Plaintiffs from receiving treatment. *Id*., at 218:4-10. A prior authorization determination usually takes days or few weeks and Dr. Hamso was not aware of a request for surgery taking more than a year. *Id*., at 95:13-23, 228:18-21. Medicaid's policy was to require preauthorization for surgeries but only requests from transgender participants required a separate policy. *Id*. The Governor and Legislature do not authorize surgeries. Prior to HB 668, Dr. Hamso, never saw a policy so a decision could not be made. *Id*., at 211:3-4 & 220:16-17. The Governor's letter was the Policy until HB 668. MH received a written denial after HB 668 became effective. *Dec. MH* ¶75. Plaintiffs did not receive the basic due process requirements of reasonable notice,

---

constitutional right (the first qualified immunity factor) given the deprivation of Plaintiffs' claimed property interest in genital reconstruction surgery without due process.").

a meaningful opportunity to be heard, the meaningful right to appeal the delay, and a final decision within 90 days of filing her appeal or after the remand.

Defendants claim that HB 668 supplanted the past policy that denied due process and is moot except for BM. Dkt. 217-1 at 18 n. 8. Defendants confuse the merits of the equal protection claim and the procedural protections guaranteed by constitutional due process. "Parties whose rights are to be affected are entitled to be heard." *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863). HB 668 contains no procedural protections guaranteeing a proper notice, a meaningful opportunity to appeal, and a timely decision. Due Process requires Defendants to "establish written standards and regulations" to ensure fairness and to "avoid the risk of arbitrary decision making. *K.W. v. Armstrong*, 2023 U.S. Dist. LEXIS 149626 *16 (D. Idaho 2023) (citation modified). HB 668 does not address the failure to provided MH notice of the actual reasons for the denial, the opportunity to be heard at a meaningful time and manner, a timely decision after remand, or the dismissal of MH's appeal of the delay. The "voluntary cessation" of illegal conduct does not deprive a federal court of its power to determine the legality of the practice. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation modified). The test is "stringent" and "[t]his heavy burden applies to a government entity that voluntarily ceases allegedly illegal conduct" to prove there is no expectation the wrong will be repeated. *White v. Lee*, 227 F.3d 1214, 1243-44 (9th Cir. 2000). Defendants have failed to show policies correcting or preventing the wrongs so the Due Process claim is far from moot.

## VII. DEFENDANT HAMSO IS NOT ENTITLED TO QUALIFIED IMMUNITY ON THE EQUAL PROTECTION CLAIM

In evaluating qualified immunity on summary judgment, the Court adopts Plaintiffs' version of the facts. Dkt. 36 at 25.[64] Plaintiffs' rights under Equal Protection based on animus;

[64] Plaintiffs accept and incorporate the Court's Qualified Immunity Framework. Dkt. 36 at 24-25.

pretextual/proxy invidious discriminatory; and transgender status were violated and clearly established not withstanding *Skrmetti and Geduldig*.[65] "'The right to be free from pretextual/proxy invidious discrimination 'is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it.' *Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980)." Dkt. 36 at 27.

## VIII. DEFENDANTS WAIVED THE AFFIRMATIVE DEFENSE OF THE ELEVENTH AMENDMENT IMMUNITY

"Sovereign immunity is quasi-jurisdictional in nature. It may be forfeited where the state fails to assert it and therefore may be viewed as an affirmative defense." *Arizona v. Bliemeister*, 296 F.3d 858, 861 (9th Cir. 2002) (citing *Hill v. Blind Indus. & Servs*., 179 F.3d 754, 760 (9th Cir. 1999). Sovereign immunity must be raised "early in the proceedings" to provide "fair warning" to the plaintiff. *Hill*, 17[illegible] its Eleventh Amendment immunity by conduct that is inco[illegible] that immunity.'" *Arizona* at 861. Defendants have engaged in [illegible]ntent to preserve sovereign immunity by belatedly raising a s[illegible]xtensive proceedings on the merits. *Johnson v. Rancho Santiago Cmty. College Dist.*, 623 F.3d 1011, 1021 (9th Cir. 2010). The Complaint was filed on September 29, 2022. Dkt. 1. Defendants filed a motion to dismiss without raising sovereign immunity. Dkt. 36. On June 17, 2024, an Amended Complaint was filed. Dkt. 86. On September 18, 2024, Defendants notified Plaintiffs of its sovereign immunity defense. Dec. JG, Ex. 14. On September 23, 2024, Plaintiffs notified Defendants it had been waived. *Id.* Defendants did not file a motion to dismiss but proceeded to litigate on the merits.

[65] Dr. Hamso's counsel conceded that "by singling out gender dysphoria as the only non-covered condition, the policy exclusively burdens transgender beneficiaries relative to cisgender beneficiaries, regardless of individual circumstances or medical necessity." *M.H. v. Hamso*, 2024 U.S. App. LEXIS 22699 *5 (9th Cir. 2024) vacated and remanded for further consideration in light of *United States v. Skrmetti*, 605 U. S. ___, (2025). *Hamso v. M.H.,* 145 S. Ct. 2840; 2025 LEXIS 2580*1 (June 30, 2025)

Defendants' delay in asserting sovereign immunity, after extensively litigating for nearly four years, including appeals to the Ninth Circuit Court and United States Supreme Court, is unjustifiable because "such conduct undermines the integrity of the judicial system" and establishes the Defendants waived any immunity defense. *Hill*, 179 F.3d at 756.

DATED: August 31, 2026.

/s/ Howard A. Belodoff

/s/ Jane Gordon
Attorneys for Plaintiffs