AMERICAN MEDICAL ASSOCIATION HOUSE OF DELEGATES

Resolution: 122
(A-08)

Introduced by: Resident and Fellow Section, Massachusettes Medical Society, California Medical Association, Medical Society of the State of New York

Subject: Removing Financial Barriers to Care for Transgender Patients

Referred to: Reference Committee A

---

Whereas, The American Medical Association opposes discrimination on the basis of gender identity[1] and

Whereas, Gender Identity Disorder (GID) is a serious medical condition recognized as such in both the Diagnostic and Statistical Manual of Mental Disorders (4th Ed., Text Revision) (DSM-IV-TR) and the International Classification of Diseases (10th Revision),[2] and is characterized in the DSM-IV-TR as a persistent discomfort with one's assigned sex and with one's primary and secondary sex characteristics, which causes intense emotional pain and suffering;[3] and

Whereas, GID, if left untreated, can result in clinically significant psychological distress, dysfunction, debilitating depression and, for some people without access to appropriate medical care and treatment, suicidality and death;[4] and

Whereas, The World Professional Association For Transgender Health, Inc. ("WPATH") is the leading international, interdisciplinary professional organization devoted to the understanding and treatment of gender identity disorders,[5] and has established internationally accepted Standards of Care [6] for providing medical treatment for people with GID, including mental health care, hormone therapy and sex reassignment surgery, which are designed to promote the health and welfare of persons with GID and are recognized within the medical community to be the standard of care for treating people with GID; and

Whereas, An established body of medical research demonstrates the effectiveness and medical necessity of mental health care, hormone therapy and sex reassignment surgery as forms of therapeutic treatment for many people diagnosed with GID; [7] and

Whereas, Health experts in GID, including WPATH, have rejected the myth that such treatments are "cosmetic" or "experimental" and have recognized that these treatments can provide safe and effective treatment for a serious health condition;[7] and

Whereas, Physicians treating persons with GID must be able to provide the correct treatment necessary for a patient in order to achieve genuine and lasting comfort with his or her gender, based on the person's individual needs and medical history;[8] and

Whereas, The AMA opposes limitations placed on patient care by third-party payers when such care is based upon sound scientific evidence and sound medical opinion;[9, 10] and

PLAINTIFF'S EXHIBIT 5

Whereas, Many health insurance plans categorically exclude coverage of mental health, medical, and surgical treatments for GID, even though many of these same treatments, such as psychotherapy, hormone therapy, breast augmentation and removal, hysterectomy, oophorectomy, orchiectomy, and salpingectomy, are often covered for other medical conditions; and

Whereas, The denial of these otherwise covered benefits for patients suffering from GID represents discrimination based solely on a patient's gender identity; and

Whereas, Delaying treatment for GID can cause and/or aggravate additional serious and expensive health problems, such as stress-related physical illnesses, depression, and substance abuse problems, which further endanger patients' health and strain the health care system; therefore be it

RESOLVED, That the AMA support public and private health insurance coverage for treatment of gender identity disorder (Directive to Take Action); and be it further

RESOLVED, That the AMA oppose categorical exclusions of coverage for treatment of gender identity disorder when prescribed by a physician (Directive to Take Action).

Fiscal Note: No significant fiscal impact.

## References


1. AMA Policy H-65.983, H-65.992, and H-180.980
2. Diagnostic and Statistical Manual of Mental Disorders (4th ed.. Text revision) (2000) ("DSM-IV-TR"), 576-82, American Psychiatric Association; International Classification of Diseases (10th Revision) ("ICD-10"), F64, World Health Organization. The ICD further defines transsexualism as "[a] desire to live and be accepted as a member of the opposite sex, usually accompanied by a sense of discomfort with, or inappropriateness of, one's anatomic sex, and a wish to have surgery and hormonal treatment to make one's body as congruent as possible with one's preferred sex." ICD-10, F64.0.
3. DSM-IV-TR, 575-79
4. Id. at 578-79.
5. World Professional Association for Transgender Health: http://www.wpath.org. Formerly known as The Harry Benjamin International Gender Dysphoria Association.
6. The Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity Disorders, Sixth Version (February, 2001). Available at http://wpath.org/Documents2/socv6.pdf.
7. Brown G R: A review of clinical approaches to gender dysphoria. J Clin Psychiatry. 51(2):57-64, 1990. Newfield E, Hart S, Dibble S, Kohler L. Female-to-male transgender quality of life. Qual Life Res. 15(9):1447-57, 2006. Best L, and Stein K. (1998) "Surgical gender reassignment for male to female transsexual people." Wessex Institute DEC report 88; Blanchard R, et al. "Gender dysphoria, gender reorientation, and the clinical management of transsexualism."J Consulting and Clinical Psychology. 53(3):295-304. 1985; Cole C, et al. "Treatment of gender

dysphoria (transsexualism)." Texas Medicine. 90(5):68-72. 1994; Gordon E. "Transsexual healing: Medicaid funding of sex reassignment surgery." Archives of Sexual Behavior. 20(1):61-74. 1991; Hunt D, and Hampton J. "Follow-up of 17 biologic male transsexuals after sex-reassignment surgery." Am J Psychiatry. 137(4):432-428. 1980; Kockett G, and Fahrner E. "Transsexuals who have not undergone surgery: A follow-up study." Arch of Sexual Behav. 16(6):511-522. 1987; Pfafflin F and Junge A. "Sex Reassignment. Thirty Years of International Follow-Up Studies after Sex Reassignment Surgery: A Comprehensive Review, 1961-1991." IJT Electronic Books, available at http://www.symposion.com/ijt/pfaefflin/1000.htm; Selvaggi G, et al. "Gender Identity Disorder: General Overview and Surgical Treatment for Vaginoplasty in Male-to-Female Transsexuals." Plast Reconstr Surg. 2005 Nov;116(6):135e-145e; Smith Y, et al. "Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals." Psychol Med. 2005 Jan; 35(1):89-99; Tangpricha V, et al. "Endocrinologic treatment of gender identity disorders. " Endocr Pract. 9(1):12-21. 2003; Tsoi W. "Follow-up study of transsexuals after sex reassignment surgery." Singapore Med J. 34:515-517. 1993; van Kesteren P, et al. "Mortality and morbidity in transsexual subjects treated with cross-sex hormones." Clin Endocrinol (Oxf). 1997 Sep;47(3):337-42; World Professionals Association for Transgender Health Standards of Care for the Treatment of Gender Identity Disorders v.6 (2001).

8. The Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity Disorders, at 18.
9. Id.
10. AMA Policy H-120.988

**Relevant AMA policy**

**H-65.983 Nondiscrimination Policy**

The AMA opposes the use of the practice of medicine to suppress political dissent wherever it may occur. (Res. 127, A-83; Reaffirmed: CLRPD Rep. 1, I-93; Reaffirmed: CEJA Rep. 2, A-05)

**H-65.992 Continued Support of Human Rights and Freedom**

Our AMA continues (1) to support the dignity of the individual, human rights and the sanctity of human life, and (2) to oppose any discrimination based on an individual's sex, sexual orientation, race, religion, disability, ethnic origin, national origin or age and any other such reprehensible policies. (Sub. Res. 107, A-85; Modified by CLRPD Rep. 2, I-95; Reaffirmation A-00; Reaffirmation A-05)

**H-180.980 Sexual Orientation as Health Insurance Criteria**

The AMA opposes the denial of health insurance on the basis of sexual orientation. (Res. 178, A-88; Reaffirmed: Sub. Res. 101, I-97)

**H-120.988 Patient Access to Treatments Prescribed by Their Physicians**

The AMA confirms its strong support for the autonomous clinical decision-making authority of a physician and that a physician may lawfully use an FDA approved drug product or medical device for an unlabeled indication when such use is based upon

sound scientific evidence and sound medical opinion; and affirms the position that, when the prescription of a drug or use of a device represents safe and effective therapy, third party payers, including Medicare, should consider the intervention as reasonable and necessary medical care, irrespective of labeling, should fulfill their obligation to their beneficiaries by covering such therapy, and be required to cover appropriate "off-label" uses of drugs on their formulary. (Res. 30, A-88; Reaffirmed: BOT Rep. 53, A-94; Reaffirmed and Modified by CSA Rep. 3, A-97; Reaffirmed and Modified by Res. 528, A-99; Reaffirmed: CMS Rep. 8, A-02; Reaffirmed: CMS Rep. 6, A-03; Modified: Res. 517, A-04)

**REVISED**

# STATEMENT OF PURPOSE

## RS32985 / H0557

The Uniformity in Local Antidiscrimination Ordinances Act would prevent local governmental entities, such as counties and cities, from enacting ordinances that impose some antidiscrimination requirements beyond what is required by state law. Idaho currently prohibits certain forms of discrimination in employment, housing, education, and public accommodations on the basis of race, color, religion, sex, age, disability, or national origin.

This legislation would preempt burdensome local ordinances and bring these regulations into alignment with state law. Under the legislation, the Attorney General may seek injunctive relief against a local governmental entity that violates the provisions of the law. Businesses, property owners, and residents would also have standing to challenge antidiscrimination ordinances which exceed what state law allows.

# FISCAL NOTE

This legislation causes no increase or decrease in revenue, or additional expenditure of funds at the state or local level of government; therefore, this legislation has no fiscal impact.

**Contact:**

Representative Bruce D. Skaug
(208) 332-1000
Joel Fischer, Public Policy Director of Idaho Family Policy Center
(208) 260-5844
Senator Todd M. Lakey
(208) 332-1000

**DISCLAIMER: This statement of purpose and fiscal note are a mere attachment to this bill and prepared by a proponent of the bill. It is neither intended as an expression of legislative intent nor intended for any use outside of the legislative process, including judicial review (Joint Rule 18).**



PLAINTIFF'S EXHIBIT 6

# 2026 Legislation

## HOUSE BILL 557

The status of each bill, resolution, proclamation, and memorial is updated when the offices of the Secretary of the Senate and the Chief Clerk of the House publish the un-official daily journals and should not be deemed official. The official bill actions are located in the final journal, which are maintained by the offices of the Secretary of the Senate and the Chief Clerk of the House. **The daily journals are published at the end of each legislative day.**

Full Bill Information

**Individual Links:**

Bill Text
Statement of Purpose / Fiscal Note
Legislative Co-sponsors

H0557 .................................................................................. by LOCAL GOVERNMENT COMMITTEE

COMMISSION ON HUMAN RIGHTS – Adds to existing law to provide for uniformity in local government antidiscrimination ordinances.

01/29 Introduced, read first time, referred to JRA for Printing

01/30 Reported Printed and Referred to Local Government

02/03 Reported out of Committee with Do Pass Recommendation, Filed for Second Reading

02/04 Read second time; Filed for Third Reading

02/05 Read Third Time in Full – **PASSED - 53-16-1**
**AYES** – Alfieri, Barbieri, Beiswenger, Bingham, Boyle, Bruce, Burgoyne, Cannon, Cayler, Cornilles, Crane(12), Crane(13), Dygert, Ehardt, Ehlers, Erickson, Furniss, Garner, Hall(Stone), Harris, Hawkins, Healey, Hill, Holtzclaw, Hostetler, Leavitt, Marmon, Mendive, Mickelsen, Miller, Mitchell, Monks, Palmer, Petzke, Pickett, Pohanka, Price, Rasor, Raybould, Raymond, Redman, Scott, Shepherd, Shirts, Skaug, Tanner(13), Tanner(14), Vander Woude, Veile, Weber, Wheeler, Wisniewski, Mr. Speaker
**NAYS** – Berch, Cheatum, Church, Egbert, Fuhriman, Galaviz, Gannon, Green, Handy, Haws, Manwaring, Mathias, McCann, Nelsen, Rubel, Sauter
**Absent** – Thompson
**Floor Sponsor - Skaug**
Title apvd - to Senate

02/06 Received from the House passed; filed for first reading

Introduced, read first time; referred to: State Affairs

LEGISLATURE OF THE STATE OF IDAHO

Sixty-eighth Legislature Second Regular Session - 2026

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 557

BY LOCAL GOVERNMENT COMMITTEE

AN ACT

RELATING TO THE COMMISSION ON HUMAN RIGHTS; AMENDING CHAPTER 59, TITLE 67, IDAHO CODE, BY THE ADDITION OF A NEW SECTION 67-5913, IDAHO CODE, TO PROVIDE FOR UNIFORMITY IN LOCAL GOVERNMENT ANTIDISCRIMINATION ORDINANCES; PROVIDING SEVERABILITY; AND DECLARING AN EMERGENCY AND PROVIDING AN EFFECTIVE DATE.

Be It Enacted by the Legislature of the State of Idaho:

SECTION 1. That Chapter 59, Title 67, Idaho Code, be, and the same is hereby amended by the addition thereto of a NEW SECTION, to be known and designated as Section 67-5913, Idaho Code, and to read as follows:

67-5913. UNIFORMITY IN LOCAL GOVERNMENT ANTIDISCRIMINATION ORDINANCES. (1) The legislature finds and determines that:

(a) Local governments and political subdivisions of the state maintain their authority at the pleasure of the state, and the state may restrict the scope of power wielded by local governments and preempt the ordinances and policies promulgated by local governments;

(b) Through their local ordinances and policies, many municipal corporations and subdivisions in the state of Idaho have expanded antidiscrimination regulations beyond those adopted by the Idaho legislature;

(c) Market entry and economic growth are hindered by an incongruous patchwork of antidiscrimination ordinances. Consistent and uniform requirements offer stability to businesses, organizations, and employers that results in increased economic activity and market expansion;

(d) Local government antidiscrimination ordinances are frequently weaponized to coerce persons engaged in business to choose either to violate their sincerely held moral, philosophical, and religious beliefs or to leave the market altogether; and

(e) The Idaho legislature has a legitimate governmental interest in providing consistent and uniform antidiscrimination regulations in every community across the state by preempting local government antidiscrimination policies that modify, supplement, or expand on state antidiscrimination law.

(2) A local governmental entity shall not promulgate or enforce any ordinance, resolution, policy, regulation, or decree that implements any antidiscrimination practice, standard, definition, or provision pertaining to employment, housing, educational institutions, or public accommodations that modifies, supplements, or expands on:

(a) The provisions of this chapter; or

(b) Other discriminatory practices recognized by state law, provided that the local governmental entity may prohibit such discrimination only to the extent recognized by the state.

(3) Nothing in this section shall be construed to require any local governmental entity to violate any applicable provisions of state or federal law.

(4) The provisions of this section preempt any ordinance, resolution, policy, regulation, or decree enacted or adopted by any local governmental entity within the state in violation of subsection (2) of this section, including any such ordinance, resolution, policy, regulation, or decree enacted or adopted prior to the effective date of this section.

(5) The attorney general shall have a cause of action to seek injunctive relief against any local governmental entity that has violated the requirements of this section. A cause of action pursuant to this subsection shall seek injunctive relief that is sufficient to prevent the defendant local governmental entity from violating the requirements of this section.

(6)(a) Any person who is engaged in business or who owns real property within the limits of a local governmental entity may bring a civil action against such local governmental entity if such local governmental entity fails to comply with this section.

(b) A plaintiff who prevails in an action brought under this subsection shall be entitled to:

(i) Obtain declaratory and equitable relief sufficient to bring the local governmental entity into compliance with the requirements of this section;

(ii) Recover damages from the local governmental entity; and

(iii) Recover reasonable attorney's fees and costs from the local governmental entity.

(7) For the purposes of this section, "local governmental entity" means any city, county, municipality, or other political subdivision or administrative unit of the state or of a city, county, or municipality.

SECTION 2. SEVERABILITY. The provisions of this act are hereby declared to be severable and if any provision of this act or the application of such provision to any person or circumstance is declared invalid for any reason, such declaration shall not affect the validity of the remaining portions of this act.

SECTION 3. An emergency existing therefor, which emergency is hereby declared to exist, this act shall be in full force and effect on and after July 1, 2026.