## STATEMENT OF PURPOSE

### RS31528 / H0668

The proposed legislation ensures taxpayer dollars are not used to provide medical treatment or surgeries for the purpose of changing the appearance of a person's sex in a way that is not consistent with their biological sex; that such expenditures are not tax deductible; that Idaho medicaid shall not reimburse or provide coverage for such expenditures; stipulating that physicians employed by tax-payer funded entities shall not provide such treatments or surgeries in the course and scope of their government service; stipulating that government facilities may not be used for the provision of such treatments or surgeries; These medical and surgical interventions can cause irreversible physical alterations; and some render the patient sterile or with lifelong sexual dysfunction, while others mutilate healthy body organs. This legislation also provides for exemptions for the funding of medically necessary uses of these drugs and procedures.

## FISCAL NOTE

There is no cost to any level of government in Idaho associated with this legislation. While specific savings are difficult to quantify, as a result of lack of data regarding current expenditures for these medical and surgical interventions, it is anticipated there will be financial savings.

**Contact:**
Representative Julianne Young
(208) 332-1000
Representative Bruce D. Skaug
(208) 332-1000

**DISCLAIMER: This statement of purpose and fiscal note are a mere attachment to this bill and prepared by a proponent of the bill. It is neither intended as an expression of legislative intent nor intended for any use outside of the legislative process, including judicial review (Joint Rule 18).**



PLAINTIFF'S EXHIBIT 7

LEGISLATURE OF THE STATE OF IDAHO

Sixty-seventh Legislature Second Regular Session - 2024

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 668

BY STATE AFFAIRS COMMITTEE

AN ACT

RELATING TO PUBLIC FUNDS FOR GENDER TRANSITION; PROVIDING LEGISLATIVE INTENT; AMENDING TITLE 18, IDAHO CODE, BY THE ADDITION OF A NEW CHAPTER 89, TITLE 18, IDAHO CODE, TO ESTABLISH PROVISIONS PROHIBITING THE USE OF PUBLIC FUNDS FOR GENDER TRANSITION PROCEDURES; AMENDING CHAPTER 2, TITLE 56, IDAHO CODE, BY THE ADDITION OF A NEW SECTION 56-270, IDAHO CODE, TO ESTABLISH PROVISIONS PROHIBITING THE USE OF PUBLIC FUNDS FOR GENDER TRANSITION PROCEDURES; PROVIDING SEVERABILITY; AND DECLARING AN EMERGENCY AND PROVIDING AN EFFECTIVE DATE.

Be It Enacted by the Legislature of the State of Idaho:

SECTION 1. LEGISLATIVE INTENT. The Legislature finds that the surgical operations and medical procedures described in section 18-1506C(3), Idaho Code, when used for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex, carry substantial risks and have known harmful effects, including irreversible physical alterations and, in some cases, sterility and lifelong sexual dysfunction.

SECTION 2. That Title 18, Idaho Code, be, and the same is hereby amended by the addition thereto of a NEW CHAPTER, to be known and designated as Chapter 89, Title 18, Idaho Code, and to read as follows:

CHAPTER 89
NO PUBLIC FUNDS FOR GENDER TRANSITION

18-8901. USE OF PUBLIC FUNDS FOR GENDER TRANSITION PROCEDURES PROHIBITED. (1) For the purposes of this section, "exempted surgical operations or medical interventions" means a surgical operation or medical intervention that is:

(a) Necessary to the health of the person on whom it is performed and is performed by a person licensed in the place of its performance as a medical practitioner, except that a surgical operation or medical intervention is never necessary to the health of the minor or adult on whom it is performed if it is for the purpose of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex;

(b) For the treatment of any infection, injury, disease, or disorder that has been caused or exacerbated by the performance of gender transition procedures, whether or not the procedures were performed in accordance with state and federal law; or

(c) Performed in accordance with the good faith medical decision of a parent or guardian of a child or an adult born with a medically verifiable genetic disorder of sex development, including:

(i) A person with external biological sex characteristics that are ambiguous and irresolvable, such as a person born having 46, XX chromosomes with virilization, 46, XY chromosomes with undervirilization, or with both ovarian and testicular tissue; or

(ii) When a physician has otherwise diagnosed a disorder of sexual development in which the physician has determined through genetic testing that the minor or adult does not have the normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action for a male or female.

(2) Public funds shall not be used, granted, paid, or distributed to any entity, organization, or individual for the provision or subsidy of any surgical operation or medical intervention described in section 18-1506C(3), Idaho Code, for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex regardless of whether the surgical operation or medical intervention is administered to a minor or an adult, except for exempted surgical operations or medical interventions.

(3) Any amount paid by an entity, organization, or individual during a taxable year for the provision of surgical operations or medical interventions described in section 18-1506C(3), Idaho Code, for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex regardless of whether the surgical operation or medical intervention is administered to a minor or an adult shall not be tax-deductible, except exempted surgical operations or medical interventions.

(4) The Idaho medicaid program shall not reimburse or provide coverage for the use of the surgical operations or medical interventions described in section 18-1506C(3), Idaho Code, for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex regardless of whether the surgical operation or medical intervention is administered to a minor or an adult, except exempted surgical operations or medical interventions.

(5) No physician or other health care professional in the course and scope of employment by the state or a county or local government may provide the surgical operations or medical interventions described in section 18-1506C(3), Idaho Code, for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex regardless of whether the surgical operation or medical intervention is administered to a minor or an adult, except exempted surgical operations or medical interventions.

(6) No state property, facility, or building may be used to provide the surgical operations or medical interventions described in section 18-1506C(3), Idaho Code, for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex regardless of whether the surgical operation or medical intervention is administered to a minor or an adult, except exempted surgical operations or medical interventions.

(7) Any intentional violation of the provisions of this chapter by a public officer or public employee shall be considered a misuse of public moneys punishable pursuant to section 18-5702, Idaho Code.

SECTION 3. That Chapter 2, Title 56, Idaho Code, be, and the same is hereby amended by the addition thereto of a NEW SECTION, to be known and designated as Section 56-270, Idaho Code, and to read as follows:

56-270. PROHIBITION ON REIMBURSEMENT AND COVERAGE. (1) Pursuant to chapter 89, title 18, Idaho Code, the Idaho medicaid program shall not reimburse or provide coverage for any surgical operation or medical intervention described in section 18-1506C(3), Idaho Code, for purposes of altering the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex regardless of whether the surgical operation or medical intervention is administered to a minor or an adult, except exempted surgical operations or medical interventions described in section 18-8901(1), Idaho Code.

(2) The department of health and welfare and any other state agency who provides medicaid services shall promulgate rules, subject to legislative approval, directing medicaid provider agreements to contain certifications that no public funds have been used in violation of section 18-8901, Idaho Code.

SECTION 4. SEVERABILITY. The provisions of this act are hereby declared to be severable and if any provision of this act or the application of such provision to any person or circumstance is declared invalid for any reason, such declaration shall not affect the validity of the remaining portions of this act.

SECTION 5. An emergency existing therefor, which emergency is hereby declared to exist, this act shall be in full force and effect on and after July 1, 2024.

**Please be advised that this is an electronic reproduction of Legislative proceedings and does not represent the official record of committee actions that are contained in the committee minute books in the Legislative Library. This media is intended for personal, educational or research purposes only and should not be used for commercial or political purposes.**



MINUTES

# HOUSE JUDICIARY, RULES & ADMINISTRATION COMMITTEE

| | |
|---|---|
| **DATE:** | Thursday, March 07, 2024 |
| **TIME:** | 1:30 PM or UPON ADJOURNMENT |
| **PLACE:** | Room EW42 |
| **MEMBERS:** | Chairman Skaug, Vice Chairman Scott, Representatives Ehardt, Young, Cannon, Erickson, Alfieri, Allgood, Dixon(24), Gallagher, Garner, Handy, Lambert, Sauter, Wroten, Gannon, Mathias (Church), Achilles |
| **ABSENT/ EXCUSED:** | None |
| **GUESTS:** | The sign-in sheet will be retained in the committee secretary's office; following the end of session the sign-in sheet will be filed with the minutes in the Legislative Library. |

**Chairman Skaug** called the meeting to order at 1:30pm.

**H 668:** **Rep. Young** and **Dr. Lynn Teague** presented **H 668** regarding no public funds for gender transition.

Committee inquired regarding testimony from Idaho physicians, inclusion of medications on the previous bill, and application of state insurance.

**John Collins, Sandra Eaton, Sidney Fetzer, Tony Oxsen, Hallie Fetzer, Stephanie Fetzer, Brandon Shippy**, and **Thad Butterworth** testified **in support**.

Committee inquired regarding post-surgery follow-up care.

**Isaac Craghtten, Julianne Donnelly Tzul**, ACLU of Idaho, **Erin Love McDermott, Celeste Terra, Merrick Collins**, TransHoming Project, **David Kociol, Karen Hansen, Marvin Alviso, AlexaLynn Fill, Mistie Tolman**, Planned Parenthood Alliance Advocates, **Nikson Matthews,** and **Katie Gentry** testified **in opposition**.

Committee inquired regarding authority of parents in the lives of their children, satisfaction of those who received gender transition treatments, tax-payer responsibility, frequency of post-surgery regret, input from patients who had surgeries over seven years ago, application to other elective surgeries, average age of patients beginning hormone treatments, reproductive health side-effects, perceived threatened rights, perceived differences in treatment of different groups, definition of "medical necessity", definition of "dysphoria," average length of treatment plan, description of current insurance interactions, and available psychological help.

**Chairman Skaug** put the committee at ease at 3:03pm.

**Chairman Skaug** reconvened the meeting at 3:18pm.

Committee inquired regarding language of legislation, impacted health-care plans, and application to other state-funded entities.

**MOTION:** **Rep. Scott** made a motion to send **H 668** to the floor with a **DO PASS** recommendation.

**SUBSTITUTE MOTION:** **Rep. Achilles** made a substitute motion to send **H 668** to General Orders.

**ROLL CALL VOTE ON SUBSTITUTE MOTION:** **Rep. Achilles** requested a roll call vote. **Chairman Skaug** requested the roll call vote be in reverse order of seniority. **Substitute motion failed with a vote of 3 AYE and 15 NAY. Voting in favor** of the motion: **Reps. Achilles, Church, Gannon. Voting in opposition** to the motion: **Reps. Wroten, Sauter, Lambert, Handy, Garner, Gallagher, Dixon (24), Allgood, Alfieri, Erickson, Cannon, Young, Ehardt, Scott, Skaug.**

**VOTE ON ORIGINAL MOTION:** **Original motion carried by voice vote. Reps. Achilles, Gannon, and Church** requested to be recorded as voting **NAY**. **Rep. Young** will sponsor the bill on the floor.

**MOTION:** **Rep. Wroten** made a motion to approve the March 5, 2024 meeting minutes. **Motion carried by voice vote.**

**ADJOURN:** There being no further business to come before the committee, the meeting adjourned at 3:45pm.

____________________________
Representative Skaug
Chair

____________________________
Nancy Conrad
Secretary

Please be advised that this is an electronic reproduction of Legislative proceedings and does not represent the official record of committee actions that are contained in the committee minute books in the Legislative Library. This media is intended for personal, educational or research purposes only and should not be used for commercial or political purposes.



MINUTES

# SENATE STATE AFFAIRS COMMITTEE

**DATE:** Thursday, March 14, 2024

**TIME:** 8:15 A.M.

**PLACE:** Room WW55

**MEMBERS PRESENT:** Chairman Guthrie, Vice Chairman Bernt, Senators Winder, Anthon, Harris, Toews, Wintrow, and Ruchti

**ABSENT/ EXCUSED:** Senator Lee

**NOTE:** The sign-in sheet, testimonies and other related materials will be retained with the minutes in the committee's office until the end of the session and will then be located on file with the minutes in the Legislative Services Library.

**CONVENED:** **Chairman Guthrie** called the meeting of the Senate State Affairs Committee (Committee) to order at 8:15 a.m.

**WELCOME:** **Chairman Guthrie** welcomed all to the Committee meeting.

**MINUTES APPROVAL:** **Senator Harris** moved to approve the Minutes of March 1, 2024. **Senator Bernt** seconded the motion. The motion carried by **voice vote.**

**H 691** **STATE GOVERNMENT - Amends and adds to existing law to provide that notice of intent prior to an agreement taking effect shall be required in certain instances. Representative Gannon** stated that **H 691** required a 30 day notice to commit the State to $25 million or more in expenditures, or to commit the State to property values of $25 million or more. He remarked that **H 691** was approved by the treasurer's office, the Department of Administration, the comptroller's office, the State board, and legislative committees. He remarked that **H 691** allowed affected groups 30 days to give input to large expenditures. He stated that requests for proposals, emergency expenditures, legal settlements, Idaho Transportation Department projects (which complied with their bid process), and expenditures authorized by the Legislature were exempt. He stated that **H 691** was not retroactive.

A letter in support of **H 691** from the Idaho Department of Administration and the League of Women Voters appears in Attachment 1.

**DISCUSSION:** **Senator Winder** asked if notice would be required if a nondisclosure agreement (NDA) was in place. **Representative Gannon** replied that the notice form was general, and details were not required. **Senator Winder** inquired who the notice would be given to. **Representative Gannon** replied the notice would be given to all legislators and the media by e-mail.

**Representative Allgood** remarked that the process of giving notice did not put a burden on the agencies. He stated that notice was given to the correspondence list contained in the legislative directory and the county where the project took place.

**Senator Winder** asked if a public entity entered into an NDA and it was not yet finalized, did **H 691** protect them during negotiation, or was notice required after negotiation. **Representative Allgood** replied that most of those projects had legislative approval prior to the agreements. He remarked that a notice would be published at some point during the process, and no project was exempted unless directly referenced in **H 691**.

| | |
|---|---|
| | **Senator Winder** asked if **H 691** targeted the University of Idaho/University of Phoenix deal. **Representative Gannon** replied that it did not. **Senator Winder** stated that Representative Allgood implied that the project must be pre-approved to enter into the NDA. **Senator Gannon** replied that it did not. He stated that the notice was filed only once a decision was made. He remarked that it did not impact negotiations, only decisions. |
| **MOTION:** | **Senator Ruchti** moved to send **H 691** to the floor with a **do pass** recommendation. **Senator Winder** seconded the motion. The motion carried by **voice vote**. |
| **H 665** | **PUBLIC MONEY INVESTMENTS - Adds to existing law to require the State Treasurer to compile and prepare a report of state moneys invested in a foreign adversary. Representative Ehlers** stated that taxpayer dollars or State investment funds should not be used to fund foreign adversaries. He remarked that **H 665** was the first step in this effort, in that it required a report to be provided to the State treasurer's office by June 30, 2024. He remarked that by January 1, 2024, this report would be presented to the Legislature. He stated that exports and trade were not affected. |
| **DISCUSSION:** | **Senator Winder** asked if the treasurer's office supported **H 665**. **Representative Ehlers** responded that the treasurer's office supported **H 665**. |
| **MOTION:** | **Senator Harris** moved to send **H 665** to the floor with a **do pass** recommendation. **Senator Winder** seconded the motion. The motion carried by **voice vote**. |
| **H 646** | **COUNTIES - Amends existing law to revise the boundaries of Benewah County, Bonner County, Clearwater County, Kootenai County, Latah County, and Shoshone County. Representative McCann** stated that **H 646** fixed the north-south main boundary line that affected six counties. She remarked that the boundary lines were set in 1863, when Idaho was a territory. She stated that surveys were all different. She remarked that the Latah county surveyor collaborated for seven years with all six counties and established a new boundary line. She stated that the counties had signed letters of support to establish the boundaries. She remarked that **H 646** was critical so that the counties could pursue further development. She noted that the fiscal note of $60,000 funded the surveyors that established the boundary lines. |
| **DISCUSSION:** | **Senator Harris** asked if any state lines were impacted. **Representative McCann** replied that no state lines were impacted.<br><br>**Senator Winder** asked if surveyors had approved the boundaries in **H 646. Represenative McCann** replied that they had. |
| **MOTION:** | **Senator Harris** moved to send **H 646** to the floor with a **do pass** recommendation. **Senator Wintrow** seconded the motion. The motion carried by **voice vote**. |
| **H 630** | **COUNTIES - Amends existing law to revise the boundaries of Cassia County and Minidoka County. Representative Pickett** stated that **H 630** related to the boundary of Cassia and Minidoka counties. He remarked that two definitions existed for the boundary, with some parcels or islands located in the Snake River belonging to neither county. He remarked that **H 630** made a uniform definition of the boundary and had the approval of both county commissions. |

| | |
|---|---|
| **MOTION:** | **Senator Anthon** moved to send **H 630** to the floor with a **do pass** recommendation. **Senator Harris** seconded the motion. The motion carried by **voice vote**. |
| **H 645** | **SCHOOL DISTRICT BOARDS OF TRUSTEES - Amends existing law to revise provisions regarding school board recall elections, vacancies, and quorums. Representative Sauter** stated that **H 645** was a school board operations bill. He remarked that in his district, there were issues with the superintendant, and two school board members were recalled. He stated that after two school board members were recalled, the board did not comprise a quorum and could not conduct business. He remarked that under **H 645**, school board transactions still occurred when the majority of the school board members were present. He remarked that the vacancy started when the county clerks certified the election, and voting was suspended from the day that the election was called up to 10 days. He remarked that the recalled members could not make high level decisions within that window. He remarked that he had worked with school board associations, school superintendent associations, the Department of Education, and the Secretary of State. |
| **DISCUSSION:** | **Senator Anthon** asked for clarification that if someone was subject to a recall election and the election was not yet certified, then the board member would not vote on financial obligations or contractual obligations within the 10 day window. **Representative Sauter** replied that was the case. **Senator Anthon** asked him to clarify that if someone won a recall election but the results had not been certified yet, then they did not participate in financial decisions. **Representative Sauter** replied that yes, that person was suspended from high level decisions. |

**Senator Harris** asked if other elected officials operated this way. **Representative Sauter** replied no. He remarked that **H 645** only focused on school boards.

**Senator Toews** stated that it made sense that a judge would make this kind of decision on a case-by-case basis, but **H 645** took away a duly elected official's ability to do their job. **Representative Sauter** replied that there was a one to ten day period. He stated that there was plenty of time for duly elected officials to make decisions. He remarked that **H 645** targeted a very specific problem. **Senator Toews** asked if the recalled member's duties were suspended whether or not they were recalled. **Representative Sauter** replied that there was a significant number of signatures to trigger a recall election. He remarked that the cooling off period was only 7 to 10 days, and the board was still fully functional and only future decisions were impacted.

**Chairman Guthrie** asked if the recalled member could still be present to establish a quorum while the other board members made the big decisions. **Representative Sauter** replied that **H 645** only prevented the recalled member from participating in high level votes.

**Senator Anthon** remarked that the Senate passed **S 1239**, relating to quorums, as amended, and asked if there was interplay between **S 1239** and **H 645. Representative Sauter** replied that **H 645** was more comprehensive. He stated that there was more than just a quorum issue that needed to be addressed. **Senator Anthon** asked why **H 645** did not address other boards. **Representative Sauter** replied that **H 645** only focused on school boards.

| | |
|---|---|
| **TESTIMONY:** | **Brooke Ramsey**, West Bonner County School District, testified in support of **H 645**. She focused on the portion of **H 645** that prohibited recalled board members from engaging in new contractual or financial obligations from the day of the election until certification. She remarked that recalled board members attempted actions that resulted in financial hardship for the district, and a restraining order was necessary. She stated that **H 645** only paused high level decisions for 7 to 10 days. She stated that **H 645** was beneficial for small communities.<br><br>Written testimony appears in Attachment 2. |
| **DISCUSSION:** | **Senator Wintrow** asked if this had happened before and how it was dealt with. **Brooke Ramsey** stated that it had not happened. She remarked that the board reached out to State agencies, and all had difficulty interpreting the code. She stated that the board had to get a restraining order. She remarked that the board could take no action for three months, and the situation was very chaotic.<br><br>**Representative Sauter** stated that **H 645** was an important bill for his district. |
| **MOTION:** | **Senator Winder** moved to send **H 645** to the floor with a **do pass** recommendation. **Sentator Ruchti** seconded the motion. |
| **SUBSTITUTE MOTION:** | **Senator Toews** moved to send **H 645** to the **14th Order of Business** for possible amendment. **Senator Harris** seconded the motion. |
| **DISCUSSION:** | **Senator Toews** remarked that he was concerned with unintended consequences. He recommended that **H 645** be more closely examined so that duly elected officials did not have their powers removed. He stated that this could result in a switch in the majority position.<br><br>**Senator Winder** remarked that **H 645** provided a pause on major issues. He stated this was a targeted effort, and he supported the original motion.<br><br>**Senator Toews** stated that the pause should apply to the entire board, and not just to the person recalled. He remarked that gamesmanship could occur at the local level. He recommended an amendment delaying big decisions by all board members. |
| **ROLL CALL VOTE:** | **Chairman Guthrie** called for a roll call vote on the substitute motion. **Vice Chairman Bernt and Senators Anthon, Harris, and Toews** voted aye. **Chairman Guthrie and Senators Winder, Wintrow, and Ruchti** voted nay. The motion failed. |
| **ROLL CALL VOTE:** | **Chairman Guthrie** called for a roll call vote on the original motion. **Chairman Guthrie, Vice Chairman Bernt, and Senators Winder, Harris, Wintrow, and Ruchti** voted aye. **Senators Anthon and Toews** voted nay. The motion carried. |
| **H 666** | **ABORTION - Amends existing law to prohibit abortion providers from furnishing materials of instruction relating to sex education curricula. Representative Skaug** stated that **H 666** prohibited any individual or organization that was a provider of abortion from furnishing any materials or instruction relating to sex education marketing materials. He stated that legislation enacted in 2021 prohibited the use of public tax dollars for public schools and universities for the promotion of abortion. He remarked that **H 666** closed a loophole in that law and prohibited an individual or organization from providing materials or providing instruction in schools for free. **Representative Skaug** yielded to David Ripley.<br><br>**David Ripley**, Executive Director, Idaho Chooses Life, remarked that **H 666** |

protected children and prevented individuals or organizations who promoted abortion from providing sex education in schools. He remarked that there were organizations that sought to move a social and sexual agenda targeted towards children disguised as healthcare services. He remarked that the most important piece of **H 666** protected organizations from enticing children into relationships with organizations with radical agendas. He remarked that **H 666** did not prohibit viewpoints from being presented in a public school setting, nor did it prevent doctors who had provided an abortion from presenting.

**DISCUSSION:** **Senator Ruchti** asked where the exemption was that permitted a doctor who had performed an abortion to present in a public school classroom. **Mr. Ripley** replied that a doctor who performed an abortion to save a life did not become an abortion provider. **Senator Ruchti** stated that he did not see that language in **H 666**. He remarked that he did not see those exemptions. **Mr. Ripley** replied that **H 666** differentiated between organizations that provided abortions as their central service and doctors that provided an abortion to save a life. **Senator Ruchti** noted that language was not in **H 666**.

**TESTIMONY:** **Mistie DelliCarpini-Tollman**, State Director, Planned Parenthood Alliance Advocates Idaho, stated that she opposed **H 666**. She remarked that **H 666** limited young people's access to comprehensive sex education. She stated that **H 666** narrowed the pool of sexual health experts and educators in Idaho, making it challenging for youth to access information on sexual health. She stated that only 20 percent of Idaho schools taught the Centers For Disease Control recommended topics in their sex education curriculum. She remarked that Idaho should make it easier to access sexual education, not harder.

**DISCUSSION:** **Senator Wintrow** thanked Ms. Tollman for testifying.

**MOTION:** **Senator Winder** moved to send **H 666** to the floor with a **do pass** recommendation. **Senator Toews** seconded the motion. The motion carried by **voice vote**. **Senators Wintrow and Ruchti** asked to be recorded as voting nay.

**H 668** **NO PUBLIC FUNDS FOR GENDER TRANSITION - Adds to existing law to prohibit the use of public funds for gender transition procedures.** **Representative Skaug** stated **H 668** provided taxpayer protection. He stated that **H 668** backed up the Governor's plan to protect Medicaid funds.

**Representative Young** stated that **H 668** was a taxpayer bill. She remarked that the question was whether taxpayer funds should be used for highly controversial, medically irreversible, life-changing treatments. She remarked that **H 668** ensured that taxpayer dollars were not used to provide medical treatment or surgeries for the purpose of changing the appearance of a person's sex in a way that was not consistent with their biological sex, and such expenditures were not tax deductible. She remarked that **H 668** applied to minors and adults. She remarked that **H 668** contained exemptions for the funding of medically necessary uses of these drugs and procedures.

Attachment 3 and Attachment 4 provide information and research in opposition to gender affirming surgeries.

**DISCUSSION:**

**Senator Wintrow** asked if prison treatments were covered under the Eighth Amendment, and not Medicaid. **Representative Young** replied that she was not sure. **Senator Wintrow** stated that the Affordable Care Act did not allow discrimination of medical treatment based on gender, sexual orientation, and gender identity, and people in Idaho were getting gender affirming care. She asked what the implications were in the court system. **Representative Young** replied that the courts' decisions could not be anticipated. She remarked that if a person's class was defined by the medical treatments that they sought, then it would be unconstitutional to prevent any treatments.

**Senator Wintrow** remarked that medical intervention was defined broadly. She stated that Medicare covered care for erectile dysfunction, and this was gender-affirming care. **Representative Young** stated that **H 668** addressed an individual's perception of their sex in a way that was not consistent with their biological sex.

**Senator Ruchti** stated that if **H 668** was a taxpayer bill, was there an identification of the potential savings of **H 668** offset by the costs of defending **H 668** in litigation. **Representative Young** replied that it was difficult to answer in a conclusive way. She remarked that the State of California had spent millions of dollars providing gender affirming care.

**TESTIMONY:**

The following people testified in opposition to **H 668: Nikson Mathews, Isaac Craghtten, Lily Pannkuk, Crystal Ivie, Howard Belodoff, Saga Christian, Julianne Donnelly Tzul (American Civil Liberties Union of Idaho), Merrick Collins, Nissa Nagel, Mistie Tollman (Planned Parenthood Alliance Advocates), Marvin Alviso, and Talia Stukie.** The general themes were that treatments were medically necessary for mental health, and this was backed by medical organizations and research. There were inconsistencies in the language of **H 668**. Idaho currently provided gender affirming care. Medications used for gender affirming care were used in other treatments, yet **H 668** blocked them for certain classes of people. Sex and gender were not binary. Many people and health systems were negatively impacted by **H 668**. The Legislature should listen to doctors involved in gender affirming care. **H 668** set a precedent to block treatment for other conditions such as obesity and aging. Doctors should have the right to make these decisions with their patients. Gender affirming care was life-saving, and **H 668** was discriminatory.

A letter in opposition to **H 668** from the American Civil Liberties Union of Idaho appears in Attachment 5.

A handout in opposition to **H 668** appears in attachment 6.

**DISCUSSION:**

**Senator Wintrow** asked Nikson Mathews how "medically necessary" was defined. **Nikson Mathews** replied that many organizations defined gender affirming care as medically necessary, and that the treatments saved lives.

**Senator Wintrow** clarified that certain medications were used by people seeking other treatments, but those same medications were denied by **H 668**.

**Senator Wintrow** asked Howard Belodoff about the legal implications of the Supreme Court case addressing gender affirming care. **Howard Belodoff** replied that it would be challenged. **Senator Anthon** asked if the legal argument changed if the treatments were not medically necessary. **Howard Belodoff** replied yes. He remarked that the underlying condition was gender dysphoria.

**Senator Wintrow** asked Julianne Donnelly Tzul and Dr. Alviso how medical providers were impacted by **H 668**. **Julianne Donnelly Tzul and Dr. Alviso** replied that entities that received funding from public sources would not provide care.

**DISCUSSION:** **Representative Young** stated that **H 668** was about the responsibility to oversee taxpayer funds. She remarked that the treatments were not life-saving and not necessary; rather, they were harmful. She referenced Attachments 3 and 4, that detailed the nature of the treatments. She remarked that **H 668** did not carve out a class, and that individuals that struggled with their sexual identity still had access to the same healthcare everyone else received.

**MOTION:** **Senator Toews** moved to send **H 668** to the floor with a **do pass** recommendation. **Senator Anthon** seconded the motion.

**DISCUSSION:** **Senator Wintrow** stated she opposed **H 668**, and that Medicaid was a safety net. She remarked that she did believe that **H 668** discriminated against a group of people. She stated that the medical community supported the treatments, and that the treatments prevented suicide. She remarked that gender affirming care was scientific. She remarked that **H 668** affected a vulnerable group of people.

**Senator Ruchti** stated that **H 668** was not a taxpayer savings bill. He remarked that the cost of litigation outweighed the cost of providing gender affirming care. He stated that in addition, the cost of what happened if someone did not get the gender affirming care was not considered. He stated that health plan carriers based their decisions on data and science, and this was a dangerous thing for a legislative body to do.

**Chairman Guthrie** stated that he was impacted by the testimony. He remarked that he was concerned about the costs of litigation and wanted to ensure State employees received the care that they needed.

**ROLL CALL VOTE:** **Senator Toews** requested a roll call vote on the motion. **Vice Chairman Bernt, and Senators Winder, Anthon, Harris, and Toews** voted aye. **Chairman Guthrie and Senators Wintrow and Ruchti** voted nay. The motion carried.

**ADJOURNED:** There being no further business at this time, Chairman Guthrie adjourned the meeting at 10:24 a.m.

| | |
|---|---|
| Senator Guthrie<br>Chair | Peggy Caraway<br>Secretary |

HB 691
From Gannon

The Treasurer's office reviewed the legislation and does not have any concerns.
Thanks, Tana

---

**From:** Representative John L. Gannon
**Sent:** Friday, February 23, 2024 10:41 AM
**To:** Steven Bailey <Steven.Bailey@adm.idaho.gov>
**Cc:** Ryan Bush <RBush@lso.idaho.gov>
**Subject:** RE: RS31417C1 Feedback

Got it! Will do

---

**From:** Steven Bailey <Steven.Bailey@adm.idaho.gov>
**Sent:** Friday, February 23, 2024 10:20 AM
**To:** Representative John L. Gannon <JGannon@house.idaho.gov>
**Subject:** RS31417C1 Feedback

Representative Gannon – Again, thank you for collaborating with us on the subject RS. We think it looks great and have only one suggestion for change. First, in paragraph (2), it states that "Transactions that go through the request for proposal process...shall be exempt from the provisions of this section." Does that refer to the Division of Purchasing (DOP) RFP process? If so, the DOP has other formal solicitation processes you may want to consider being exempt. To capture these, we recommend changing the paragraph (2) language to:

"Transactions that go through ~~the request for proposal~~ a solicitation process as defined by Idaho code chapter 92 of title 67 ...shall be exempt from the provisions of this section."

If the original sentence isn't meant to refer to the DOP RFP process, then we suggest defining "RFP" because anyone may be able to run a process and call it "RFP".

Please don't hesitate to call me on my mobile number below if you want to discuss any of this.

Respectfully,

*5-Second Customer Satisfaction Survey: Rate Us!*

**Steve Bailey**
Director
Idaho Department of Administration

LEAGUE OF WOMEN VOTERS® OF IDAHO

To: Representative Christopher M. Allgood
Representative John Gannon

From: Jean M. Henscheid, PhD
Co-President
*Jean Henscheid*

Re: LWVID Support for House Bill 691 providing that a notice of intent prior to an agreement taking effect shall be required in certain instances.

Cc: Elizabeth McBride, LWVID Co-President
Kendal Shaber, LWVID, State Board Director
Kathy Dawes, LWVID Legislative Action Committee Co-Chair

Date: March 7, 2024

The League of Women Voters of Idaho is in support of HB 691. This effort to inform stakeholders more fully on issues that may impact their lives and livelihoods is necessary. The League recognizes that, on occasion, contractual negotiations involving state agencies may require confidentiality and speed. These provisions do not outweigh the obligation such agencies have to inform those who may be directly affected. Transparency suggests that this should be the case even when obligation of the state's general fund is not at issue.

Over its 100-plus year history, The League of Women Voters has operated under the belief that inclusion and openness are the hallmarks of a strong democracy. The current legislation is indicative of these hallmarks.

# Senate State Affairs Committee

## Thursday, March 14, 2024 - 8:15 A.M.

## TESTIMONY ON: All Subjects

### Written Testimony

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Julie Reister-Keaton | H 645 | W | self | Sandpoint | For | N | 1 |

Please vote in favor of H645. This bill clarifies procedures following a school board trustee recall and when a recall election is certified. H645 addresses when recalled school board members can no longer make decisions and defines what decisions remaining board members can and cannot make. West Bonner County School District experienced post-recall difficulties that no school district should have to go through. Voting for H645 will solve such problems if they arrive in the future.

Thank you for your time and your service.

Julie Reister-Keaton
Sandpoint/Bonner County

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Nancy Britton | H 645 | W | self | Ponderay | For | N | 1 |

Dear Legislators,

This is a well thought out bill based on our local experience here in North Idaho, when the West Bonner County School District recalled two of its board members resulting in the lack of a state defined "quorum" and were unable to make decisions. This bill with its clear redefinition of how to conduct business, will allow school boards to continue to function.

Thank you for thinking though this process so well,
Nancy Britton

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Clarice McKenney | H 645 | W | Self | Bonners Ferry | For | N | 1 |

As a 27-year resident of Idaho, I watched in horror as our neighboring community of Priest River struggled with lame-duck board members. Although these board members had been voted out, they tried to make major, consequential board decisions that would have been grossly detrimental to the educational work of the district. Please vote for the bill sponsored by my Representative, Mark Sauter, which does the most comprehensive job of preventing future problems for districts like mine that could be similar or worse than those experienced by the West Bonner School District. Thank you for your time and work in this matter. Sincerely, Clarice McKenney, Bonners Ferry/Boundary

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| robin lundgren | H 645 | W | Self | Bonners Ferry | For | N | 1 |

I believe H-645 clarifies procedures following a school board trustees recall.

It defines what kinds of decisions remaining board members can and cannot make. Perhaps even more importantly it addresses when recalled board members can no longer make decisions. This bill targets problems in District 1 had,and people in West Bonner School District support it.

Please vote yes on H-645.

Thank you,
Robin Lundgren
Bonners Ferry

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Pam Duquette | H 645 | W | Self | Sandpoint | For | N | 1 |

Dear Committee Chair: I am in support of this bill as a retired educator, and grandmother of students in the West Bonner School District that was the impetus for this bill to be written because of their experience after their recall election. The bill helps clarify procedures following a school board trustee recall. This bill helps define what decisions remaining board members can and cannot make after a recall election. With this bill, other school districts may have direction if they find themselves in the same position as WBCSD was in when their board could no longer make decisions with the remaining board members after their successful recall. It should help alleviate post-recall issues. Thank you for your consideration in passing this bill 645.

Sincerely, Pam Duquette

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Jean Gerth | H 645 | W | self | Sagle | For | N | 1 |

I am in support of this bill. The events that unfolded around the West Bonner County School Board demand that we do better. This bill clarifies the procedures following trustee recall, and will prevent future problems.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nancy Britton | H 666 | W | self | Ponderay | Against | N | 1 |

Dear Legislators,

According to Idaho Law, curriculum materials decisions are under local control, meaning that the elected board of trustees adopts (or rejects) curriculum and works with their librarians to review materials. Further, local officials evaluate curriculum and oversee library materials based on content. This bill says nothing about content, it's only about who provides the material. Business and/or marketing materials are not included on national and state library associations carefully reviewed lists of appropriate materials for schools, public libraries, or museums. These decisions are best made by local school systems and not mandated by the state.

Thank you for your time,
Nancy Britton

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Katie Knobbs | H 666 | W | Self | Sandpoint | Against | N | 1 |

The decision of the sex curriculum education is at the discretion school board. Restricting where they can obtain their material is taking away their local authority.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Kristi Hardy | H 666 | W | self | Kuna | For | N | 23 |

Please keep Planned Parenthood away from our kids!

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dylan Goldade | H 666 | W | Self | Boise | Against | N | 16 |

Hello again,

Learning about options is not a crime. Knowledge cannot be hidden. Making learning about abortion illegal will not make it go away.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Dylan Goldade | ***cont.*** | | | | | | 16 |

This is a waste of taxpayer time and money to even consider

I urge a strong no vote on this bill that only adds to the crisis of care in this state

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Marilyn Beckett | H 666 | W | Self | Moscow | Against | N | 6 |

I want my grandchildren to receive proper sex education and access to contraception. This information is important for their health and well-being. That is why it is integrated into curriculum. I knew too many girls who, when beginning to menstruate, were very frightened because they did not yet understand "the cycle". It is important for young women to have knowledge of their bodies and control over them. I have been very sad, and angry, that our legislature does not agree with this basic tenet. Civil rights are not unconstitutional because a person has a uterus, unless you live in a state like Idaho, where females are considered merely incubators, librarians dangerous and guns sacred.

This bill is poorly written. It fails miserably to provide the supposed transparency it strives to provide, though I think I read it well between the lines. Vote NAY.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Vickie Fadness | H 666 | W | self | Lewiston | Against | N | 7 |

Please oppose H666

Girls and women should know the dangers self-induced abortions. Information protects people.

Honest and informative discussions about contraception, abortions, and laws prevents pregnancies and save lives.

This bill denies women over the age of 18, the right to learn about or receive emergency contraception from Idaho public institutions of higher education putting them at risk when they need support the most.

Whether we like it or not, people of all ages have sex – it makes sense to help them learn how to protect themselves from pregnancies and disease.

Ignorance doesn't solve the problems, it makes problems.

Thank you for your time.

Vickie Fadness

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Rosann Mathews | H 666 | W | Self | Rockland | Against | N | 28 |

As a lifelong Idahoan, woman, mother, and taxpayer I am vehemently against this bill.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Rosann Mathews | ***cont.*** | | | | | | 28 |

It saddens me that some representatives in Idaho are pushing legislation that limits the rights of Idahoans.

This bill to ban educational materials that would help young people understand and make better choices in their lives is reprehensible.

Not to mention that we are already losing healthcare providers because of the other legislation on abortion and healthcare that has been passed.

Vote No!!

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Joseph Crupper | H 668 | W | self | Pocatello | Against | N | 29 |

Senators,

I am asking you to vote no on this bill.
This is rude to trans people.
It targets them specifically.
It will not stand in court.
I pay taxes. I'd love for my taxes to go towards funding gender transition related costs.
I demand you listen to us.

NO on HB 668.

Joseph Crupper

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Mads Scott | H 668 | W | Self | Caldwell | Against | N | 11 |

I am against this bill. The phrasing is too vague to encompass the intent of the bill and has the potential to effect not only those on public health plans, but also students living on state grounds and government employees should they need to self-administer their medications while on state-owned property. From a purely financial aspect, providing gender affirming care is less expensive to the state than paying for the emotional and physical suffering of those who cannot access it. Limiting access to gender affirming care creates an increased load on mental health professionals and emergency services and decreases population productivity. If this is to truly be an

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Mads Scott | *cont.* | | | | | | 11 |

Idaho by Idahoans for Idahoans then we need to support each other and allow for those that have differing care needs (such as gender transition care) to access that care when and as it is needed. I ask that you please take all of this into consideration and vote against HB668.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Rose Lonardo | H 668 | W | Self | Pocatello | Against | N | 29 |

I want my tax dollars to pay for other Idahoan's gender transition. This bill will cause unnecessary harm towards vulnerable individuals. Removing hormone access to these individuals will cause them to pass away, either through the health complications of stopping hormones or through suicidality. These claims are based off of leading health institutions around the world and empirical evidence. This bill represents a form of government overreach that goes against the people's obligation to provide necessary medical intervention for other Idahoans with their tax dollars. The harm to life will undoubtedly cause a hit to Idaho's economy and create unnecessary lawsuits. Gender affirming care provides these individuals the capability of being contributing members of society. Without it we will lose Idahoans.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Nikson Mathews | H 668 | IP | Self | Boise | Against | Y | 16 |

Chair and Members of the Committee,

My name is Nikson Mathews. I live in Boise Idaho, District 16.

I'm here to express my strong opposition to HB668. To me - this bill comes down to two words - Medical Necessity.

According to the Idaho Medicaid Booklet, services MUST be available when medically necessary to meet an individual's treatment needs. But in lines 29-34, this bill states that Gender-Affirming Care, as it relates to trans and non-binary Idahoans, is 'never necessary.'

So let's talk about medical necessity.

I have extensive documentation, including notarized letters from my Idaho-based therapists and doctors, all affirming the medical necessity of my gender-affirming care. I even have notarized documents from a judge and documents from government entities, accepting the statements of my therapist and doctors. This represents the scrutiny that trans and non-binary individuals endure to prove medical necessity.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Nikson Mathews | ***cont.*** | | | | | | 16 |

Every major medical organization backs gender-affirming care. Moira Szilagyi (Shee-la-gee), past president of the American Academy of Pediatrics, stated, "There is strong consensus among the most prominent medical organizations worldwide that evidence-based, gender-affirming care for transgender children and adolescents is medically necessary and appropriate. It can even be lifesaving."

Research consistently demonstrates that gender-affirming care significantly improves, extends, and saves lives. If saving lives isn't considered medically necessary, what is?

The provision in HB668 stating gender-affirming care is "never necessary" is dangerous. It disregards the wealth of evidence supporting the medical necessity of this care and the expertise of healthcare professionals dedicated to providing care to trans and non-binary individuals.

I urge you to oppose HB668.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Naomi Trueman | H 668 | W | Self | Boise | Against | N | 15 |

I am vehemently against HB 668. This bill is discriminatory towards transgender people and seeks to control what medical access grown adults are able to get. Idaho should be a state that is welcoming to all people, regardless of gender identity. Passing laws like this does not protect anybody. Please vote no on HB 668.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Talia Sturkie | H 668 | V | Self | Meridian | Against | Y | 22 |

I have been a long-time resident of Idaho who recently returned to the State after studying out of State for law school. I only recently became aware of HB 668 and am appalled by the contents. This bill is harmful to the residents of this state, far moreso than any supposed benefit it will provide.

Gender-affirming care is necessary medical treatment for thousands of people, and there is no legitimate reason to specifically exclude it from taxpayer funding. It is almost certainly a minimal portion of the State's medical expenses, and the risks and consequences of such care are thoroughly explained to patients. In my view, the only reasons for such a bill are rooted in bigotry and fear. And this bill demonstrates a fundamental misunderstanding of the people affected and their proper medical treatments. These medical procedures and prescriptions are decisions that should remain fully between the individuals seeking them and their prescribing doctors and should not face the undue inhibition of the State through this sort of, frankly, hateful legislation.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Talia Sturkie | ***cont.*** | | | | | | 22 |

I am strongly opposed to this Bill and urge you all to vote against it and prevent this discriminatory policy from entering State law. A lack of personal understanding of the situation these people are in, or a religious belief that such care is unnecessary or otherwise objectionable is no reason to effectively take this care away from thousands of Idaho residents, as removing the funding would almost certainly do. The lack of empathy this bill embodies has no place in the Idaho I know and love, and I hope the senators can agree with that.

Thank you,
Talia Sturkie

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Makayla Sundquist | H 668 | W | Self | Kootenai | Against | N | 1 |

I am against this bill. This bill is discrimination. This is also such blatant government overreach. Why is the state of Idaho so obsessed with a person's medical care? This bill should not be passed.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nancy Britton | H 668 | W | self | Ponderay | Against | N | 1 |

Dear Legislators,

This is a painfully biased bill against a small minority of Idahoans. Everyone is entitled to standard accepted practices of medical care, including people whose lifestyle or decisions we might personally disagree with. Legislators or the state are not licensed medical practitioners and do not have any right to make medical decisions for other people.

Thank you for your service,
Nancy Britton

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Lily Pannkuk | H 668 | IP | Self | Boise | Against | Y | 17 |

This is an extreme healthcare ban for trans and nonbinary Idahoans. It is targeted to one community and one community only: trans and nonbinary Idahoans. For all the lawyers on this committee, that should itself be setting off some red flags. This kind of bill goes against the US Constitution and the morals and ideals the founding fathers set forth.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Lily Pannkuk | ***cont.*** | | | | | | 17 |

Idahoans support medically necessary, life-saving care for trans and nonbinary people. Gender affirming care is not experimental and should be accessible for those who need it.

There is a lot of misinformation and disinformation today about gender affirming care. A recent document titled "WPATH Files" was debunked (read more here: https://www.erininthemorning.com/p/fact-check-216-instances-of-factual ) as well as a document from last year known as "the Finnish Study" (read more here: https://www.erininthemorning.com/p/fact-checked-new-problematic-finnish ) and again and again over the years. I have no doubt that many of you have been sent both of these documents, but I urge you to read the fact-checkers and their notes about these documents. Many organizations publish studies with the intent of "disproving" either gender affirming care or trans identities. However, I implore you to listen to doctors, psychologists, the families of trans Idahoans, and trans Idahoans themselves.

Gender affirming care is beneficial. It has a regret rate so low, it makes hip surgery look like getting a tattoo.

Please vote against HB 668.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Helen Hawley | H 668 | W | Self | Lewiston | Against | N | 7 |

Please vote NO to H668. This bill imposes state control over what, by all standards should be a private matter between a family and their physican. If a person is eligible for Medicare, they should have the same rights as any other Medicare patient to obtain the necessary medical care that they, their family, and physical have determined is best for their health and well-being.

The repressive bills presented in this years' legislature will continue to drive families, businesses, and medical personnel from our state when we most need them. Therefore, I ask you to reconsider and stop trying to erase the existence of those you may be uncomfortable around from those of us who acknowledge the beautiful minds around us, here, in Idaho. Vote NO on H668. Thank you for your time.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Emilie Jackson-Edney | H 668 | W | Self | Garden City | Against | N | 16 |

My name is Emilie Jackson-Edney. I live and own property in Garden City, Idaho, District 16.

I am providing written testimony to express my deep concern and opposition to H 668 No Public Funds For Gender Transition. H 666 seeks to prohibit the use of Medicaid and public funds for gender transition and gender-affirming healthcare. This legislation, if enacted, would not only undermine the principles of inclusivity and equality but also jeopardize the health and well-being of transgender state employees and other individuals across Idaho.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Emilie Jackson-Edney | ***cont.*** | | | | | | 16 |

Enacting H 668 would violate existing District and Appellate Court Orders in legal actions taken against the State of Idaho, Idaho Department of Corrections and their health care insurer for denying transgender healthcare and surgical procedures. Denying transgender healthcare to IDOC transgender inmates under H 668 will surely be challenged in costly legal proceedings, which the state cannot defend.

Medical consensus unequivocally recognizes gender dysphoria as a legitimate medical condition. The denial of gender-affirming healthcare goes against the recommendations of leading medical organizations, including the American Medical Association and the American Psychiatric Association. By restricting access to these medically necessary treatments, we risk perpetuating health disparities and denying transgender individuals the right to comprehensive healthcare.

Numerous studies have demonstrated the mental health benefits of gender-affirming care, showing a significant reduction in the risk of suicide and improved overall well-being. Denying coverage for these essential treatments not only exacerbates mental health issues but also places an undue economic burden on our healthcare system by necessitating costly emergency interventions and mental health treatments.

Furthermore, the proposed legislation may violate the legal and human rights of transgender individuals, infringing upon their right to gender identity and expression. In the spirit of justice and fairness, we must ensure that all members of our community have equal access to the healthcare they need.

I urge this committee to consider the overwhelming evidence supporting the necessity and cost-effectiveness of gender-affirming care. Let us strive for a healthcare system that embraces inclusivity, respects human rights, and promotes the well-being of every individual. I implore you to reject this regressive legislation and stand on the side of justice, equality, and compassion.

Thank you for your time and consideration.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Erin Burleson | H 668 | W | Self | Boise | Against | N | 18 |

This bill is hateful, predatory, and discriminatory against our LGBTQ community. It speaks volumes that they are not welcome here in a state that boasts itself as "the free-est" state. The LGBTQ community deserve the same rights and access to healthcare as everybody else.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Logan Farley | H 668 | W | Self | Boise | Against | N | 15 |

A blanket ban of public funding for gender transition care in the state would cause unnecesary harm to our fellow affected Idahoans. Public funding to treat gender dysporia has a Return On Investment, allowing affected individuals to get back to day to day life, and continue helping our economy and society at large.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Kathryn Nieri | H 668 | W | Self | Boise | Against | N | 15 |

I am against this bill. As a taxpayer, I find it essential that Idaho support medically necessary, life-saving care for trans and nonbinary people. Gender-affirming care is not experimental and should be accessible to those who need it. We need to protect and take care of fellow Idahoans and that includes trans and nonbinary people.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Karen M. Hansen | H 668 | W | Self | Viola | Against | N | 6 |

Vote against HB~668.

For moderate and low income people denying health insurance coverage for medical care is in effect denying medical care itself. The legislature is not qualified to assess what is and is not necessary treatment nor what is and is not standard, acceptable medical practice. That is for physicians, psychiatrists, patients, and insurance companies to work out.

My main concern is families with pre-teen and teen age children.

Interfering with parents' rights to provide the best care they can for their child using medically accepted treatments is wrong.

This bill lumps all gender dysphoria treatments together and claims they are dangerous and irreversible.

This is also wrong.

Surgery on minors is not accepted medical practice. Puberty suppressing hormone treatments are safe and reversible.

I am tired of seeing gender minorities being singled out due to misunderstandings and culture war dynamics.

I ask the Idaho legislature to please back off.

This broad heavy-handed bill dealing with a delicate complex subject is going to do a lot of harm. This bill is inconsistent with the parents' rights provided for in SB~1329

The only winners here are lawyers working on the lawsuits this bill will generate.

Leave difficult medical care decisions and insurance coverage decisions to the trained professionals and patients who are directly involved.

It bears repeating, denying health insurance coverage for medical care is in effect denying medical care itself.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Dylan Goldade | H 668 | W | Self | Boise | Against | N | 16 |

I am a registered Republican in d16 and this bill is a huge government overstep into healthcare that is inarguably lifesaving. I implore you to vote no on this bill if you have compassion for the future for youth in Idaho.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Kella Brown | H 668 | W | Self | Boise | Against | N | 19 |

I am strongly opposed to this bill, because it is blatantly discriminatory.

The public should not get to decide what kind of medical care anyone receives, even if they are on Medicaid. That should solely be between a person and their doctors.

I am a taxpayer and I want my money to cover gender affirming care.

If we are going to allow taxpayers to cherry pick, then I do not want my tax dollars to pay for anything other than infrastructure and gender affirming care for Medicaid recipients.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Marilyn Beckett | H 668 | W | Self | Moscow | Against | N | 6 |

The physiological need for medical treatment should not only be accessible to the wealthy.
It is not the job of the legislature to diagnose or prescribe, because they do not have the knowledge to do so. Therefore they should note determine what diagnosis is worthy of funding. Vote NAY.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Julianne Donnelly Tzul | H 668 | IP | ACLU of Idaho | Boise | Against | Y | 19 |

Written testimony emailed to SSA Committee Secretary for inclusion in the Legislative Record. Thank you!

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Merrick Collins | H 668 | IP | TransHoming Project | Boise | Against | Y | 16 |

I am Merrick Collins, I'm a voter in district 16, and I am representing the TransHoming Project in opposition to HB 668.
I am here to ask that our legislature listen to doctors - not simply doctors from out of state that don't specialize in trans care, but rather, doctors that do. Doctors and scientists that have studied us and know what sorts of treatments actually help us have a near consensus that allowing transgender people to get hormone replacement therapy and gender-affirming surgeries greatly improves our

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Merrick Collins | ***cont.*** | | | | | | 16 |

quality of life. For many of us, it is necessary for our comfort and, sadly, our safety in many places.

An article published by Healthline states that gender affirming care lowers rates of binge drinking, drug use, suicide, depression, anxiety, self harm, and other mental health concerns. Cornell cites a Dutch study that shows people who underwent sex reassignment surgery between 7 and 20 years before the study found the subjects had, quote, "an overall positive change in their family and social life. None of them showed any regrets about the [surgery]."

Finally, keeping trans healthcare covered under government programs in Idaho won't reduce care for Idahoans that are not trans. According to Idaho Capital Sun, we had a budget surplus of 99.1 million dollars at the end of the 2023 fiscal year, continuing the trend of Idaho having a budget surplus in at least multiple millions. We have enough to afford care for everyone under Medicaid, and Medicare shouldn't even be a concern because it's funded federally.

In my informed opinion, passing HB 668 into law would do more harm than good to Idahoans, specifically those of us that rely on government programs for trans care. Vote no on HB 668. Thank you.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Jennie Myers | H 668 | W | Self | Boise | Against | N | 19 |

To the Members of the Senate State Affairs Committee,

I am writing to you today not only as a concerned business owner in Idaho but as a deeply troubled citizen, regarding the proposed bill (HB668) that seeks to impose unprecedented restrictions on gender-affirming care in our state. This bill as the most restrictive of its kind in the country, a designation that should give us all pause. I urge you to reconsider and hold the bill concerning the restriction of gender-affirming care in committee.

Denying Medicaid coverage for gender-affirming medical care for transgender Idahoans, both adults and minors, directly undermines the fundamental principles of equality, dignity, and the right to healthcare.

The distinction made in the bill's language, targeting care related to 'Gender Transition' exclusively for transgender and non-binary individuals, while allowing similar treatments for cisgender individuals, is overtly discriminatory.

It is important to highlight that every major medical organization supports gender-affirming care. The past president of the American Academy of Pediatrics, in 2022, stated, "There is strong consensus among the most prominent medical organizations worldwide that evidence-based, gender-affirming care for transgender children and adolescents is medically necessary and appropriate. It can even be lifesaving." This bill, therefore, not only challenges the expert consensus but also risks the lives and wellbeing of vulnerable individuals in

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Jennie Myers | ***cont.*** | | | | | | 19 |

our community.

I urge you, as members of the Senate State Affairs Committee, to consider the profound implications of this bill. As taxpayers and constituents, we believe in a state that upholds the rights and dignity of all its citizens. Gender-affirming care, which is neither experimental nor optional but medically necessary and potentially lifesaving, should be accessible to those in need. I strongly advocate for the committee to 'Hold the Bill in Committee' during the final public hearing tomorrow morning at 8 a.m. This action would not only represent a commitment to healthcare equity and human rights but also demonstrate a compassionate understanding of the needs of all Idahoans.

Thank you for your time and consideration. I hope you will stand on the right side of history and human dignity by opposing this harmful and discriminatory bill.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sylvia Swassing | H 668 | W | Self | Pocatello | Against | N | 29 |

Taxpayer money should be utilized in public healthcare, including gender-affirming care, because healthcare is a fundamental human right. Providing access to gender-affirming care, such as hormone therapies and gender confirmation surgeries, not only improves the well-being and quality of life for transgender individuals but also reduces the burden of mental health issues and other health complications associated with untreated gender dysphoria. Additionally, investing in gender-affirming care fosters a more inclusive and equitable society, where everyone can access the healthcare they need to live authentically and thrive. Ultimately, it's about ensuring equal treatment and dignity for all members of society, regardless of gender identity.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Kendra Scheid | H 668 | W | Self | Pocatello | Against | N | 29 |

Supporting the use of public funds for gender-affirming care is not just a matter of providing healthcare; it's about upholding basic human rights and promoting societal well-being. The distress that comes from a conflict between one's gender identity and assigned sex at birth, can lead to significant mental health issues if left untreated. Gender-affirming care, such as hormone therapy and surgeries, has been shown to alleviate gender dysphoria and improve mental well-being. By providing gender-affirming care, we can mitigate the long-term healthcare costs associated with untreated gender dysphoria, such as mental health treatment and medical complications.

Supporting the use of public funds for gender-affirming care is not only a matter of compassion and justice but also makes practical and ethical sense for the well-being of individuals and society as a whole.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Kendra Scheid | ***cont.*** | | | | | | 29 |
| Jennifer Attebery | H 668 | W | Self | Pocatello | Against | N | 29 |

Dear senators,

The bill before your committee would deny life sustaining health care to some of Idaho's most economically marginalized people. It attempts to do so by singling out these individuals on the basis of sex/gender. In a recent federal court in Florida a nearly identical bill was found unconstitutional. Please, Idahoans, do not continue down this path of senseless discrimination.

Sincerely,
Jennifer Attebery

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Rosann and Mike Mathews | H 668 | W | Self | Rockland | Against | N | 28 |

As lifelong Idahoans, parents of a transgender son, and taxpayers, we are writing to voice our opposition to HB668.

We support all Idahoans including trans and queer Idahoans in accessing life-saving medical care, including the right to care that improves their mental health and affirms their gender.

Start focusing on legislation that helps all Idahoans not legislation that excludes and minimizes certain groups of Idahoans.

Vote no on this bill.

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Nissa Nagel | H 668 | IP | Self | Boise | Against | Y | 19 |

I am against this bill. I have had the opportunity to take advantage of Medicaid in my lifetime. I was self-employed at the time when my husband became unemployed and we lost our insurance. As a taxpayer I have paid into the system and I was grateful it was there for my family when we needed it. As a parent it would be devastating to not be able to provide my child with recommended medical care when needed. As a parent you don't know ahead of time your child's journey or future self. I hear people saying they don't want their tax dollars going to GAC. What they don't seem to realize is that this is a slippery slope and someday they may be trying to access care

| Name (First & Last) | Subject | Manner Testifying | Representing Company/Organization | City | For / Against | Wish to Testify | District # |
|---|---|---|---|---|---|---|---|
| Nissa Nagel | ***cont.*** | | | | | | 19 |

that other tax payers don't believe is necessary. Then it will be there life and wellbeing on the line.

This worst part of this bill is that people who are employed by the state with state-provided private insurance will loose access for self, spouse and child. Imagine you are a parent with a stable state job to provide a good life for your family and your child grows up to need access to care that the state disallows. Wouldn't that feel like a betrayal?

Please hold this bill in committee.

- Nearly all respondents (98%) who were currently receiving hormone treatment reported that receiving hormones for their gender identity/transition made them either "a lot more satisfied" (84%) or "a little more satisfied" (14%) with their life. One percent (1%) reported that hormones made them "neither more nor less satisfied" with their life, and less than 1% said that they were "a little less satisfied" or "a lot less satisfied" with their lives after receiving hormones.




- Nearly all respondents (97%) who had at least one form of surgery for their gender identity/ transition reported that they were either "a lot more satisfied" (88%) or "a little more satisfied" (9%) with their life. One percent (1%) reported that surgery made them "neither more nor less satisfied" with their life, less than 1% were "a little less satisfied," and 1% were "a lot less satisfied" with their life.



## Health Insurance

- Eighty-seven (87%) percent of respondents had health insurance coverage.
- Approximately 1 in 4 respondents (26%) had at least one issue with their insurance company in the last 12 months, such as being denied coverage for hormone therapy, surgery, or another type of health care related to their gender identity/transition; gender-specific health care because they were transgender; or routine health care because they were transgender.

## Gender Identity and Transition

- Nearly all respondents (94%) who lived at least some of the time in a different gender than the one they were assigned at birth ("gender transition") reported that they were either "a lot more satisfied" (79%) or "a little more satisfied" (15%) with their life. Three percent (3%) reported that transitioning gender made them "neither more nor less satisfied" with their life, 1% were "a little less satisfied," and 2% were "a lot less satisfied" with their life.



Young-30
Skang-10

Attachment 4 - Handout for H 668, March 14, 2024

Governor Brad Little
State Capitol :: Boise, Idaho 83720
(208) 334-2100 :: gov.idaho.gov

May 1, 2023

Director Dave Jeppesen
Department of Health and Welfare
P.O. Box 83720
Boise, Idaho 83720

Dear Director Jeppesen,

On April 4, 2023, I signed into law House Bill 71, The Vulnerable Child Protective Act, prohibiting children from being provided irreversible sex reassignment surgeries, puberty blockers, or hormones for the purpose of changing the appearance of a child's sex. Additionally, I have previously stated publicly my position that hardworking taxpayers should not be forced to pay for an adult's sex reassignment surgery, especially when evidence exists that such procedures are neither medically necessary nor in the best interest of the patient's mental health.

It has come to my attention that you and the Department of Health and Welfare are currently being sued for having not pre-authorized Medicaid coverage for the sex reassignment surgeries of two young adults. I further understand it has been alleged that it is unclear whether Idaho Medicaid provides coverage for such procedures.

To be clear, I oppose Idaho Medicaid using public funds to pay for irreversible sex reassignment surgeries, puberty blockers, or hormones for the purpose of changing the appearance of any child's or adult's sex. Consistent with House Bill 71, and my stated policy preference as to adults, I hereby direct you and the Department of Health and Welfare to take all appropriate steps to implement a policy consistent with state and federal law excluding the same from Medicaid coverage.

Sincerely,

Brad Little
Governor of Idaho

EXHIBIT
A

Young-30
Skaug-10

THE INSTITUTE FOR RESEARCH & EVALUATION

6068 S Jordan Canal Rd
Salt Lake City, UT 84129
801-414-3443

evidence-based

# Transgender Research: Five Things Every Parent and Policy-Maker Should Know©

*published September 2022, updated November 2022*

READING ONLY THE BLUE TEXT PROVIDES AN EXECUTIVE SUMMARY OF THIS DOCUMENT

The past 10 years have seen an exponential rise in the occurrence of gender confusion or gender dysphoria (also called transgender or gender non-conforming)* among young people worldwide, especially among teenage girls. The distress of these young people is real, and the causes of this unprecedented trend are unclear, raising difficult questions about compassionate, ethical, and effective ways to respond. Experts disagree, with some recommending watchful waiting plus counseling and some asserting that cross-sex medical procedures are necessary in order to prevent suicide. The U.S. federal policy of the current administration, which endorses "early gender affirming care" for "children and adolescents" (HHS, 2022), is considered controversial by many. And the dramatic rise in use of cross-sex hormones and surgery for young people has been the focus of heated debate, causing uncertainty in patients, parents, physicians, and policy-makers as to what is best. Below is a compilation of research evidence on five key questions about these issues, shared in the hope of helping gender-confused young people receive the best care.

## 1. What does research show about the benefits and harms of cross-sex medical treatment for minors?

**Scientific evidence has not shown that cross-sex medical treatments are beneficial to children or adolescents. The research making these claims is not scientifically reliable. In fact, there is evidence of harmful impact. Consequently, a growing number of scientific agencies do not recommend such treatments. Instead, they recommend counseling and watchful waiting for gender-confused youth.**

### Summary of Evidence

Many scientific agencies—both U.S. and international—do not recommend medical "transition" for youth because the research claiming to show positive effects from cross-sex hormones or surgery is methodologically flawed and not scientifically reliable. The limitations of these studies include lack of control groups, small sample sizes, recruitment bias, nongeneralizable study populations, short follow-up times, and high numbers lost to follow-up. However, studies finding negative outcomes from medical transition tend to be of adequate scientific quality. In other words, reliable studies have shown harmful effects. "Watchful waiting," is the option recommended by many scientific agencies. It means deferring transgender interventions for gender-confused children or youth for an extended time during which counseling can occur and a natural desistance or persistence process can play out.

**Highlights from Published Research** (studies are listed by first author and year):

**Sweden National Board of Health & Welfare (NBHW), 2022**

- "For adolescents…the NBHW deems that the risks of puberty suppressing treatment…and gender-affirming hormonal treatment currently outweigh the possible benefits…based on…continued lack of reliable scientific evidence concerning the efficacy and the safety of both treatments."

**England, National Health Service (NHS)/The Cass Evidence Review, 2022**

- After an evidence review, NHS determined that "gender incongruence [usually] does not persist into adolescence," that "psychological support" and "a watchful approach" are generally recommended instead of "social transition" due to its "risks," and that puberty blockers/cross-sex hormones will only be given to minors in a research study.
- The Cass Review found that "due to gaps in the evidence base [about hormone treatments] …Evidence on the appropriate management of children and young people with gender incongruence and dysphoria is inconclusive."

**England, National Institute for Health and Care Excellence (NICE) Evidence review, 2020a**

- The studies on puberty blockers "are of very low certainty [i.e., quality] using the G.R.A.D.E. rating system… As the studies all lack appropriate control [groups], any positive changes could be a regression to [the] mean."
- The G.R.A.D.E. rating system is the most widely adopted tool for grading the quality of [research] evidence.

**The British Medical Journal (BMJ) Evidence Review, 2019 (Henagan, C. & Jefferson, T.)**

The prestigious scientific publication concluded:

- "Puberty blockers are being used in the context of profound scientific ignorance…treatments for under 18 gender dysphoric children and adolescents remain largely experimental. There are a large number of unanswered questions that include the age at start, reversibility; adverse events, long term effects on mental health, quality of life, bone mineral density, osteoporosis in later life and cognition…The current evidence base does not support informed decision making and safe practice in children."

**Finland Board for Selection of Choices for Health Care (PALKO / COHERE Finland), 2020**
*"Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors:"*

- "The first-line treatment for gender dysphoria is psychosocial support and, as necessary, psychotherapy and treatment of possible comorbid psychiatric disorders."
- "The reliability of the existing studies with no control groups is highly uncertain, and because of this uncertainty, no decisions should be made that can permanently alter a still-maturing minor's mental and physical development …In light of available evidence, gender reassignment of minors is an experimental practice…no irreversible treatment should be initiated."
- "Surgical treatments are not part of the treatment methods for dysphoria caused by gender-related conflicts in minors." Hormonal interventions may be considered on a case-by-case basis after extensive evaluation.

**U.S. Food & Drug Administration (FDA), 2022**

- The FDA added a warning to the labeling for puberty blocking hormones (GnRH agonists): "to monitor patients taking GnRH agonists for signs and symptoms of pseudotumor cerebri, including headache, papilledema, blurred or loss of vision, diplopia, pain behind the eye or pain with eye movement, tinnitus, dizziness and nausea."
- "These hormones [puberty blockers] have FDA approval only for the treatment of precocious puberty [not gender dysphoria] in pediatric patients." They are not approved for…halting normally timed puberty. (AbbVie, 2018).

**U.S. Medicare National Coverage Analysis (NCA) – Decision Memo, 2016**

- "Based on an extensive assessment of the clinical evidence…there is not enough high-quality evidence to determine whether gender reassignment surgery improves health outcomes…"

**Hruz, 2020**
"Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria."

- "It is important to recognize the low quality of scientific evidence used in generating treatment recommendations … [For example], nearly all of the recommendations made by the Endocrine Society were based upon "low" or "very low" quality evidence [according to the G.R.A.D.E. rating system]… The limitations of the published studies in…transgender medicine are many. They include a general lack of randomized controlled trial design, small sample sizes, high potential for recruitment bias, …nongeneralizable population groups, relatively short follow-up, [and] high numbers of patients lost to follow-up… The only data that reached the level of "moderate" quality were related to adverse [i.e., harmful] medical outcomes…risks include low bone density, altered adult height, and impaired spatial memory (de Vries et al. 2011; Hough et al. 2017)."

**de Vries, 2014**
For example, this flawed study is widely cited as evidence that cross-sex hormones are beneficial to youth, yet:

- It had no control group, used a non-representative sample, and had an inadequate sample size—only 32 people for mental health outcomes, with key results based on subgroups as small as 12.
- Thus, the flawed results for 12 patients have been widely used to justify giving cross-sex hormones to children.

**Levine, 2022**

- "When evidence is assessed to be "very low certainty" [by G.R.A.D.E.], there is a high likelihood that the patients will not experience the [claimed] effects of the proposed interventions (Balshem et al., 2011)."
- "In the context of providing puberty blockers and cross-sex hormones, the [G.R.A.D.E.] designation of 'very low certainty' signals that the body of evidence asserting the benefits of these interventions is highly unreliable."
- "In contrast, several negative effects are quite certain. For example, puberty blockade followed by cross-sex hormones leads to infertility and sterility (Laidlaw, Van Meter, Hruz, Van Mol, & Malone, 2019). Surgeries to remove breasts or sex organs are irreversible. Other health risks includ[e] risks to bone and cardiovascular health."

**Alzahrani, 2019; Nota, 2019; Getahun, 2018**

- At least three studies have found significantly elevated rates of acute cardiovascular events (such as heart attacks and strokes) in transgender adults who have received cross-sex hormone treatment.

**Turner, 2022**
An investigation of England's Gender Identity Development Service (GIDS) for *The Times Magazine* found:

- "A barely pubescent child prescribed [puberty] blockers who goes on to take cross-sex hormones—as almost every patient does—will be infertile and unable to orgasm."
- Transgender lobby groups influenced GIDS in favor of medical transition of children, despite scientific evidence.
- Britain's National Health Service is closing the GIDS clinic due to concerns about patient safety (Glebova, 2022).

**Cantor, 2019**

- "Although almost all clinics and professional associations in the world use what's called the watchful waiting approach to helping transgender and gender diverse (GD) children, the AAP [American Academy of Pediatrics] statement rejected that consensus, endorsing only gender affirmation. That is, where the consensus is to delay any transitions [until] after the onset of puberty, AAP instead rejected waiting before transition... As I read the works on which they based their policy, I was...alarmed: These documents simply did not say what AAP claimed they did. In fact, the references that AAP cited as the basis of their policy instead outright contradicted that policy, repeatedly endorsing watchful waiting."

**The Society for Evidence-Based Gender Medicine, 2022**

- A review of the cited scientific support for the U.S. Department of Health & Human Services recent policy statement that "For transgender and nonbinary children and adolescents, early gender affirming care is crucial to overall health and well-being" (HHS Office of Population Affairs, 2022) found misstatements of study findings, use of one flawed study as evidence for major claims, misrepresentation of treatment "reversibility," lack of evidence for the claims made, a failure to discuss the well-documented risks, and no presentation of alternatives.

## 2. What does research on medical gender transition tell us about preventing suicide in trans youth?

**Research does not show that medical gender transition is necessary to prevent suicide. In fact, there is evidence that medical transition procedures may increase suicide risk in gender-confused teens.**

**Summary of Evidence**

The "transition or suicide" claim—that parents must choose between a "live trans son or a dead daughter" (or vice-versa)—is not supported by scientific evidence. Widely cited studies claiming that suicidality in gender-confused youth is reduced by cross-sex hormonal and surgical interventions have been found to have significant methodological flaws and therefore should not be relied on. Scientifically sound studies have found either no reduction or an increase in transgender suicidality after youth have received cross-sex medical procedures.

**Highlights from Published Research:**

**Dhejne, 2011**

A Swedish study recognized as a landmark 30-year longitudinal study of life after transgender surgery found that...

- Ten years after sex reassignment surgery, the transgender patients were 19 times more likely to die from suicide than the typical Swedish population, after accounting for differences in individual mental illness before surgery.
- Those transitioning "male-to-female are at higher risk for suicide attempts after sex reassignment."
- The study authors concluded: "...surgery and hormonal therapy...is apparently not sufficient to remedy the high rates of [mental illness] and mortality found among transsexual persons... Our findings suggest that sex reassignment, although alleviating gender dysphoria, may not suffice as treatment for transsexualism..."
- A U.S. Medicare National Coverage Analysis (NCA) Decision Memo (2016), which reviewed this Dhejne study, stated: "we cannot exclude therapeutic interventions [i.e., transgender surgery] *as a cause* of the observed excess [mental illness] and mortality" (p. 62, emphasis added).

**Heylens, 2014**

- Although the study reported a reduction in patients' psychological distress, there was no reduction in suicide attempts at any step in the process of cross-sex medical intervention.

**Bauer, 2015**

- Although there was a decrease in "suicidal thoughts" after cross-sex hormonal intervention, among those who did have suicidal thoughts, being in the process of cross-sex medical treatment was associated with a three-fold increase in actual suicide attempts.

**Adams, 2017**

A meta-analysis of 42 studies of suicidality in transgender adults reported...

- Suicidal thoughts appeared to increase after medical transition and suicide attempts did not appear to decrease.

**Branstrom, 2020b**

A 10-year study on the impact of cross-sex hormones and/or surgery on patients' mental health, found...

- "...the results demonstrated no [positive effects] of surgery in relation to subsequent mood or anxiety disorder-related health care visits or prescriptions or hospitalizations following suicide attempts."

**Wiepjes, 2020**

- "An important finding was that the incidence for observed suicide deaths was almost equally distributed over the different stages of treatment" (i.e., the suicide rate was roughly the same before and after cross-sex surgery).

**Turban, 2020**

A weak study widely cited as showing that puberty blockers reduce suicidality, actually obscured contradictory findings:

- The study employed the inferior correlational research design which is not able to test causality.
- The study Abstract (or summary) reported that puberty blockers had reduced Suicidal Thoughts in adolescents, but the author failed to include in the Abstract that there was no reduction in the more serious measures of suicidality: Suicide Attempts, Lifetime Suicide Attempts, and Suicide Attempts Resulting in Hospitalization—all key findings.
- The study results suggest that recent suicide attempts may have increased after puberty blockers, although not significant due to small numbers. And 75% of those who received puberty blockers still had suicidal thoughts.

**Carmichael, 2021**

- A recent study, patterned after an early study in the Netherlands that said puberty blockers improved mental health in transgender youth (deVries, 2011), found puberty blockers had no positive effect on mental health or suicidality.

**Turban, 2022**

A recent study, often named as evidence that cross-sex hormones during adolescence reduce suicidality in adults, obscures contradictory findings and seems to downplay evidence suggesting increased suicidality for 16-17-year-old patients:

- The study had only a correlational research design, used a non-representative sample, lacked adequate controls for pre-existing mental health, and combined the effects of two very different hormones (testosterone and estrogen).
- The study Abstract reported a reduction in Suicidal Thoughts for those starting cross-sex hormones by age 17 as evidence of "favorable outcomes" from this treatment. But there was no reduction in the more serious measures of suicidality—Suicidal Thoughts with Plan, Suicide Attempt, or Suicide Attempt requiring Hospitalization—related to the use of cross-sex hormones at any age. As in his previous study (Turban, 2020), the author failed to include these contradictory and more important findings in the Abstract, where key results/non-results should be reported.
- 16- and 17-year-olds who received hormones were more than twice as likely to report a "past-year suicide attempt requiring inpatient hospitalization" (aOR=2.2, $p<.01$). But by setting the cut-off for statistical significance much higher than is standard in empirical research (i.e., at $p<.001$ instead of $p<.05$—a debatable Bonferroni correction) the study avoided reporting this as an increase in suicidality related to hormone therapy in adolescence.

**Biggs, 2022a**

A second analysis of the same data used in Turban, 2022 (above entry), found…

- Use of cross-sex hormones significantly <u>increased</u> suicidality (nearly two-fold) for biological males receiving estrogen—increases in Suicidal Thoughts with Plan, Suicide Attempt, and Suicide Attempt Requiring Hospitalization—when the effects were analyzed separately for biological males compared to females.
- Receiving puberty blockers in adolescence did not reduce any measure of suicidality.

**Tordoff, 2022; Reddit 2022**

This flawed study is purported to show that cross-sex hormones reduced depression and suicidality rates in 57 adolescents:

- However, the study reported no significant declines in these rates from baseline to the 12-month follow-up; they remained high, at 56% depressed and 37% with suicidal thoughts, 12 months after the start of hormonal treatment.
- The hormonal "reductions" were claimed because the rates did not *increase* as they did for the group <u>not</u> receiving hormones, whose rates increased greatly by the 12-month follow-up. But unlike the hormone group, this group had 82% drop out of the study, reducing it to only 7 youth and invalidating its use as a legitimate comparison group.
- These data, in the study Supplement, do not show that cross-sex hormones improved mental health in trans youth.

**Biggs, 2022b**

Longitudinal analysis of patient records from the world's largest clinic for transgender youth:

- There was no difference in the suicide rate for those who had not yet received treatment and those who had received treatment (puberty blockers and/or cross-sex hormones).
- "It is irresponsible to exaggerate the prevalence of suicide… Data from the world's largest clinic for transgender youth, accumulated over an 11-year period, [found that] … The proportion of individual patients who died by suicide was 0.03% [or 3 out of 10,000], which is orders of magnitude smaller than the proportion of transgender adolescents who report attempting suicide when surveyed."
- The finding that [actual] deaths were so rare is helpful information for transgender youth and their families.

**Levine, 2022**

- "The "transition or suicide" narrative falsely implies that transition will prevent suicides… [Yet,] neither hormones nor surgeries have been shown to reduce suicidality in the long-term… [Thus,] the "transition or die" narrative, whereby parents are told that their only choice is between a "live trans daughter or a dead son" (or vice-versa), is both factually inaccurate and ethically wrong."

## 3. Is gender dysphoria in children a permanent condition, and one that requires medical treatment?

**Research shows gender dysphoria in children usually goes away on its own by young adulthood, if "transition" is not encouraged. This avoids the harmful effects of cross-sex medical interventions.**

**Summary of Evidence**

There is strong evidence showing that the vast majority of children (averaging about 85%) who experience gender dysphoria will resolve their gender identity confusion and accept their biological sex by the time they reach young adulthood, that is, if they are not subjected to "social transition" or cross-sex medical intervention. But for those who are the subject of early transition efforts, the large majority will most likely persist in a "trans" identity. ("Social transition" refers to cross-sex dressing and social reinforcement of a transgender identity for children by adults.)

**Highlights from Published Research:**

**Steensma, 2015**

- "In long-term follow-up [into young adulthood], the childhood sample showed 66.7% desistence." That is, by young adulthood, two-thirds of those with childhood gender dysphoria did not identify as transgender. (As quoted in Cantor, 2020.)

**Ristori & Steensma, 2016**

- A review of 10 studies measuring the persistence of childhood gender dysphoria found that, by the follow-up time in adolescence or young adulthood, 2% to 39% of cases had persisted in gender dysphoria or transgender identity, resulting in an average of 85% who identified with their biological sex at that point.

**Zucker, 2018**

- Results of four studies: "Among children meeting the diagnostic criteria for "Gender Dysphoria" ...67% were no longer gender-dysphoric as adults; the rate of natural resolution for gender dysphoria was 93% for children whose gender dysphoria was significant but [did not reach a medical] diagnosis" (as quoted by Levine, 2022).

**Singh, 2021**

- 88% of boys with childhood gender dysphoria did not identify as transgender by young adulthood.

**Steensma, 2013**

- Young children who experience early social "transitioning" (i.e., cross-sex dressing and identification and "affirmation" of a transgender role by adults) are more likely to persist in a transgender identity.

**de Vries, 2011; van der Loos, 2022**

- Study results support the view that puberty blockers disrupt the natural desistence process, funneling kids into an irreversible path of cross-sex hormones (whose negative side-effects include infertility, see Cheng, et al., 2019).

## 4. Can young people be influenced to identify as transgender, or is it all biologically determined?

**Scientific evidence indicates that the causes of gender dysphoria are complex. Social and cultural factors can have a significant influence on whether a young person will identify as transgender.**

**Summary of Evidence**

Recent unprecedented increases in transgender identity worldwide suggest that non-biological influences are a major factor. Genetic studies show gender identity development is a complex process with bio-psycho-social components. This means children and young people are susceptible to social, educational, and cultural influences.

**Highlights from Published Research:**

**Heylans, 2012**

A systematic review of research on identical twins and gender dysphoria...

- Concluded that the 39% concordance rate for transgender identity in identical twins (i.e., where both were transgender) was "consistent with a genetic influence...although shared and nonshared environmental factors cannot be ruled out... [Gender identity development] is a complex process of biopsychosocial components."
- While this suggests "a role for genetic factors in the development of [gender dysphoria]," it also indicates a significant role played by social and environmental factors for many individuals.
- The study found the influence of social factors was higher for biological females than males.

**Jones, 2021**

- A recent U.S. Gallup Poll found that the percent of Generation Z (born 1997 – 2002) who identify as transgender has increased by 900% over the percent of Generation X (born 1965 – 1980), who say they are transgender.

**The Economist, 2020; Turner, 2022**

- In Great Britain, between 2010 and 2020, the number of teenage girls referred for gender dysphoria (GD) to the largest pediatric gender clinic in the world, increased by about 5000%, while the rates for girls under age 12 saw only small increases. Rates for teenage boys also increased dramatically, although much less than for girls, with similarly small increases for boys under 12. In Sweden, GD in teen girls has risen 1500% in a similar time span.
- This pattern suggests that the exponential increase in GD for teen girls (which did not occur for preteens) may be due to social influence, i.e., transgender identity promotion, rather than merely an increase in public acceptance.

**Zucker, 2019; Littman, 2018 & 2019**

- There has been a recent dramatic reversal in the male-to-female sex ratio of transgender youth, with biological females now far out-numbering males (the previous consistent ratio of about 2:1 has now changed to a ratio ranging from 1:2 to 1:7), coupled with a corresponding recent dramatic "increase in the number of adolescents referred to specialized gender identity clinics/programs [which] has become an international phenomenon, observed all across North America, Europe, Scandinavia, and elsewhere" (Zucker, 2019).
- These changes are considered by some experts to be an important new clinical phenomenon that needs to be studied and better understood, especially the role of social influences (Zucker 2019, Littman, 2018/9).

**Downey, 2022; Mason, 2022**

- A popular researcher advocating for the use of puberty blockers in children—who has been funded by an agency that receives financial support from the makers of puberty blockers—claims to have shown that social influence is not a cause of the recent worldwide explosion in rates of gender dysphoria. However, his research has been criticized for its use of an invalid survey measure and for using only U.S. data, as well as for a conflict of interest.

## 5. <u>What does research tell us about teaching sex education and gender ideology to young children</u>?

**There is no scientific evidence showing that young children benefit from being taught in school about sexuality, transgender identity, or homosexuality, or showing that such teaching does <u>not</u> do harm.**

### Summary of Evidence

Studies to date have not produced sound scientific evidence to back up the claim that teaching sex education to young children in early elementary school, including content about transgender ideology and homosexuality, is beneficial to them or reduces rates of child sex abuse. There is also no evidence that it is <u>not</u> harmful. And research has not shown reliable evidence that sex education classes which teach these topics to older youth produce any psychosocial benefit.

### Highlights from Published Research

**Goldfarb & Lieberman, 2021; critique of Goldfarb & Lieberman by Ericksen & Weed, 2022**

Contrary to its claims, a wide-ranging review of research on school-based sex education in the U.S. and internationally…

- Showed no credible scientific evidence that sexuality education is beneficial to children in early elementary school or that it reduces child sex abuse. Child sex abuse programs have shown some benefits, but not actual reductions.
- Found no scientifically credible research demonstrating that teaching young children about transgender ideology or homosexuality in school is beneficial to them or has any other positive impact. No scientifically sound studies were found on this, <u>or</u> that tested possible negative impacts. Thus, it is unknown whether these programs do harm.
- Studies cited as showing benefits from teaching transgenderism and homosexuality in sex education classes for older grades were not scientifically capable of measuring this impact and also showed conflicting results.

## SUMMARY of FINDINGS

***1) Research evidence does not support medical intervention for gender-confused minors. 2) Medical transition procedures have not been shown to reduce youth suicides. 3) Childhood gender dysphoria usually dissipates on its own by adulthood. 4) The dramatic increase in gender dysphoria in the past decade is likely being driven by social influence. 5) Sex education for early elementary school children, including content about transgender ideology, has not been shown by scientific research to be beneficial.***

## *GLOSSARY of TERMS

**For the purposes of this paper, we use the following definitions:**

**Gender Dysphoria:** A diagnostic term for a person experiencing profound discomfort with their biological/natal sex.
**Gender Confusion:** A nonclinical term that refers to a person's feeling of not identifying with his or her biological sex.
**Transgender:** This refers to a person whose declared gender identity does not match that person's biological sex at birth.
**Gender Non-Conforming:** This term refers to a person whose behavior or appearance does not conform to prevailing cultural and social expectations about what is appropriate for their biological sex at birth.

## REFERENCES

AbbVie. 2018. Lupron Depot (Leuprolide acetate) Product Monograph. Chicago: AbbVie Corporation.

Adams, N., M. Hitomi, and C. Moody. 2017. "Varied Reports of Adult Transgender Suicidality: Synthesizing and Describing the Peer-Reviewed and Gray Literature." Transgender Health 2:60–75.

Alzahrani, T., Nguyen, T., Ryan, A., Dwairy, A., McCaffrey, J., Yunus, R., Forgione, J., Krepp, J., Nagy, C., Mazhari,R., & Reiner, J. (2019). Cardiovascular disease risk factors and myocardial infarction in the transgender population. *Circulation: Cardiovascular Quality and Outcomes, 12*(4). doi:10.1161/CIRCOUTCOMES.119.005597

Balshem, H., Helfand, M., Schunemann, H. J., Oxman, A. D., Kunz, R., Brozek, J., Vist, G. E., Falck-Ytter, Y., Meerpohl, J., & Norris, S. (2011). GRADE guidelines: 3. Rating the quality of evidence. *Journal of Clinical Epidemiology, 64*(4), 401–406. doi:10.1016/j.jclinepi.2010.07.015

Bauer GR, Scheim AI, Pyne J, Travers R, Hammond R. (2015). Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada. *BMC Public Health*, 15:525.

Biggs M. (2022a). "Comment on Turban et al. 2022: Estrogen Is Associated with Greater Suicidality Among Transgender [Fe]Males, and Puberty Suppression Is Not Associated with Better Mental Health Outcomes for Either Sex." figshare. journal contribution, 2022. https://doi.org/10.6084/m9.figshare .19018868.v1

Biggs M. (2022b). Suicide by clinic-referred transgender adolescents in the United Kingdom. *Archives of Sexual Behavior*. https://doi.org/10.1007/s10508-022-02287-7

Branstrom, R., & Pachankis, J. E. (2020b). Correction to Branstrom and Pachankis. (2020). *American Journal of Psychiatry, 177*(8), 734–734. doi:10.1176/appi.ajp.2020.1778correction

Burke, S. M., P. T. Cohen-Kettenis, D. J. Veltman, D. T. Klink, and J. Bakker. 2014. Hypothalamic Response to the Chemo-Signal Androstadienone in Gender Dysphoric Children and Adolescents. *Front Endocrinol (Lausanne)* 5:60. doi: 10.3389/fendo.2014.00060.

Cantor, J. M. (2019). Transgender and gender diverse children and adolescents: Fact-checking of AAP Policy. *Journal of Sex & Marital Therapy*, 46(4), 307–313. doi:10.1080/0092623X.2019.1698481

Carmichael P, Butler G, Masic U, Cole TJ, De Stavola BL, Davidson S, et al. (2021) Short term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. PLoS ONE 16(2): e0243894

Cheng PJ, Pastuszak AW, Myers JB, Goodwin IA, Hotaling JM. (2019). Fertility concerns of the transgender patient. *Transl Androl* Urol;8(3):209-218.

Delemarre-van de Waal, H.A. and Cohen-Kettenis, P.T. (2006) Clinical management of gender identity disorder in adolescents: a protocol on psychological and paediatric endocrinology aspects, *European Journal of Endocrinology*,155:S131–S137

de Vries, A. L., T. D. Steensma, T. A. Doreleijers, and P. T. Cohen-Kettenis. 2011. "Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study." Journal of Sexual Medicine 8:2276–83. doi: 10.1111/j.1743-6109.2010.01943.x; de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, CohenKettenis PT. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. Pediatrics;134(4):696–704.

Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Langstrom N, et al. (2011) Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden. *PLoS ONE* 6(2): e16885.

Downey C. (2022). 'Advocate Rather Than a Scientist': The Compromised Research of Child Gender-Transition Doctor Jack Turban. *National Review Online*, August 16, 2022. Available at: https://www.nationalreview.com/news/advocate-rather-than-a-scientist-the-compromised-research-of-child-gender-transition-doctor-jack-turban/?utm_source=onesignal&utm_medium=push&utm_campaign=article

Drummond, K. D., S. J. Bradley, M. Peterson-Badali, and K. J. Zucker. 2008. "A Follow-Up Study of Girls with Gender Identity Disorder." *Developmental Psychology* 44:34–45. doi: 10.1037/0012-1649.44.1.34.

England, National Health Service (2022). Interim service specification: Specialist service for children and young people with gender dysphoria (phase 1 providers) 20 October 2022. Available at: https://www.engage.england.nhs.uk/specialised-commissioning/gender-dysphoria-services/user_uploads/b1937-ii-specialist-service-for-children-and-young-people-with-gender-dysphoria-1.pdf; The Cass Review. (2022). Independent review of gender identity services for children and young people: Interim report. February 2022. Available at: https://cass.independent-review.uk/publications/interim-report/

England, National Institute for Health and Care Excellence (NICE). (2022a). Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria. Available at: https://arms.nice.org.uk/resources/hub/1070905/attachment

Ericksen IH and Weed SE. (2022). "Three Decades of Research:" A New Sex Ed Agenda Wrapped in the Veneer of Science. Salt Lake City: *The Institute for Research & Evaluation.* Available at: https://institute-research.com/pdf/Rebuttal_to_Goldfarb_and_Lieberman_2021_%28IRE%209-26-22%29.pdf

Finland Board for Selection of Choices for Health Care (PALKO / COHERE Finland). (2020). Medical Treatment Methods for Dysphoria Related to Gender Variance In Minors. Official English Translation, May 18, 2022.

Getahun, D., Nash, R., Flanders, W. D., Baird, T. C., Becerra-Culqui, T. A., Cromwell, L., Hunkeler, E., Lash, T. L., Millman, A., Quinn, V. P., Robinson, B., Roblin, D., Silverberg, M. J., Safer, J., Slovis, J., Tangpricha, V., & Goodman, M. (2018). Cross-sex Hormones and Acute Cardiovascular Events in Transgender Persons. *Annals of Internal Medicine, 169*(4), 205–213.

Glebova, D. (2022). English Gender-Identity Center to Close after Report Finds It Not 'Safe.' *National Review Online*. Available at: https://www.nationalreview.com/news/english-gender-identity-center-to-close-after-report-finds-it-not-safe/

Goldfarb E, Lieberman L. (2021). Three Decades of Research: The Case for Comprehensive Sex Education. *J Adolesc Health*, 68(1):13-27. doi: 10.1016/j.jadohealth.2020.07.036

GRADE (Grading of Recommendations, Assessment, Development and Evaluations). See: https://bestpractice.bmj.com/info/toolkit/learn-ebm/what-is-grade/

Henagan, C. & Jefferson, T. (2019). Gender-affirming hormone in children and adolescents. *British Medical Journal (BMJ) Evidence Review*. Available at: https://blogs.bmj.com/bmjebmspotlight/2019/02/25/gender-affirming-hormone-in-children-and-adolescents-evidence-review/

Heylens, G., G. De Cuypere, K. J. Zucker, C. Schelfaut, E. Elaut, H. Vanden Bossche, E. De Baere, et al. (2012). Gender Identity Disorder in Twins: A Review of the Case Report Literature. *Journal of Sexual Medicine* 9:751–57.

Heylens G, Verroken C, De Cock S, T'Sjoen G, De Cuypere G. (2014). Effects of different steps in gender reassignment therapy on psychopathology: A prospective study of persons with a gender identity disorder. *J Sex Med*; 11: 119-26.

HHS Office of Population Affairs. (2022). Gender-Affirming Care and Young People. https://opa.hhs.gov/sites/default/files/2022-03/gender-affirming-care-young-people-march-2022.pdf

Hough, D., M. Bellingham, I. R. H. Haraldsen, M. McLaughlin, M. Rennie, J. E. Robinson, A. K. Solbakk, and N. P. Evans. 2017. "Spatial Memory Is Impaired by Peripubertal GnRH Agonist Treatment and Testosterone Replacement in Sheep." Psychoneuroendocrinology 75:173–82. doi: 10.1016/j.psyneuen.2016.10.016.

Hruz, P.W. (2020). Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria. *The Linacre Quarterly*, 87(1) 34-42. DOI: 10.1177/0024363919873762

Ismail, Fatima Yousif, Ali Fatemi, and Michael V. Johnston. (2017). "Cerebral Plasticity: Windows of Opportunity in the Developing Brain." *European Journal of Paediatric Neurology* 21:23–48. doi: 10.1016/j.ejpn.2016.07.007.

Jones, JM. (2021). LGBT Identification Rises to 5.6% in Latest U.S. Estimate. *Gallup Poll Social Series*. February 24, 2021. Available at: https://news.gallup.com/poll/329708/lgbt-identification-rises-latest-estimate.aspx

Laidlaw, M. K., Van Meter, Q. L., Hruz, P. W., Van Mol, A., & Malone, W. J. (2019). Letter to the Editor: "Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society Clinical Practice Guideline". *The Journal of Clinical Endocrinology & Metabolism, 104*(3), 686–687. doi:10.1210/jc.2018-01925

Levine SB, Abbruzzese E, Mason JW. (2022): Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults, *Journal of Sex & Marital Therapy*, DOI: 10.1080/0092623X.2022.204622

Littman L. (2018). Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS ONE. 13(8): e0202330. https://doi.org/10.1371/journal.pone.0202330 PMID: 30114286

Littman L (2019) Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. PLoS ONE 14(3): e0214157. https://doi.org/10.1371/journal.pone.0214157

Luders, E., F. J. Sanchez, C. Gaser, A. W. Toga, K. L. Narr, L. S. Hamilton, and E. Vilain. (2009). "Regional Gray Matter Variation in Male-to-Female Transsexualism." *Neuroimage* 46:904–7. doi: 10.1016/j.neuroimage.2009.03.048.

Mason J. and Sapir L. (2022). The American Academy of Pediatrics' Dubious Transgender Science. *The Wall Street Journal*, August 17, 2022. Available at: https://www.wsj.com/articles/the-american-academy-of-pediatrics-dubious-transgender-science-jack-turban-research-social-contagion-gender-dysphoria-puberty-blockers-uk-11660732791

Nota, N. M., Wiepjes, C. M., de Blok, C. J. M., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2019). Occurrence of Acute Cardiovascular Events in Transgender Individuals Receiving Hormone Therapy: Results From a Large Cohort Study. *Circulation, 139*(11), 1461–1462. https://doi.org/10.1161/CIRCULATIONAHA.118.038584

Reddit. (2022). "Transgender and nonbinary youth who received gender affirming medical care experienced greatly reduced rates of suicidality and depression over the course of 12 months." This archived post, deleted in March, 2022, shows the claims initially being made about the Tordoff, et al., 2022, study. Available at: https://www.reddit.com/r/science/comments/t5kaiy/transgender_and_nonbinary_youth_who_received/

Ristori J and Steensma TD. (2016). Gender dysphoria in childhood. *International Review of Psychiatry* 28:13-20. DOI: https://doi.org/10.3109/09540261.2015.1115754

Schagen SEE, Wouters FM, Cohen-Kettenis PT, Gooren LJ, Hannema SE. (2020). Bone Development in Transgender Adolescents Treated With GnRH Analogues and Subsequent Gender-Affirming Hormones. *The Journal of Clinical Endocrinology & Metabolism*, Volume 105: e4252–e4263

Singh, D., Bradley, S. J., & Zucker, K. J. (2021). A follow-up study of boys with gender identity disorder. *Frontiers in Psychiatry*, 12. doi:10.3389/fpsyt.2021.632784

Society for Evidence-Based Gender Medicine. (2021). *New Systematic Reviews of Puberty Blockers and Cross-Sex Hormones Published by NICE: Weighing potential benefits against profound long-term uncertainties.* Available at: https://segm.org/NICE_gender_medicine_systematic_review_finds_poor_quality_evidence

Society for Evidence-Based Gender Medicine. (2022). Early Social Gender Transition in Children is Associated with High Rates of Transgender Identity in Early Adolescence. May 6, 2022. Available at: https://segm.org/early-social-gender-transition-persistence

Society for Evidence-Based Gender Medicine. (2022). Fact-checking the HHS. See: https://segm.org/fact-checking-gender-affirming-care-and-young-people-HHS

Steensma, T. D., & Cohen-Kettenis, P. T. (2015). More than two developmental pathways in children with gender dysphoria? *Journal of the American Academy of Child and Adolescent Psychiatry*, 52, 147–148. doi:10.1016/j.jaac. 2014.10.016

Steensma, T.D., McGuire, J.K., Kreukels, B.P., Beekman, A.J., & Cohen-Kettenis, P.T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: a quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry*, 52, 582–590.

Swedish National Board of Health & Welfare. (2022). *Care of Children and Adolescents with Gender Dysphoria: Summary.*

The Economist Group Limited. (2020). An English ruling on transgender teens could have global repercussions. *The Economist*, International, December 12, 2020. Available at: https://www.economist.com/international/2020/12/12/an-english-ruling-on-transgender-teens-could-have-global-repercussions

Tordoff, D.M., Wanta, J.W., Collin, A., Stepney, C., Inwards-Breland, D.J., and Ahrens, K. (2022). Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care. *Pediatrics. JAMA Network Open*. 2022;5(2):e220978. doi:10.1001/jamanetworkopen.2022.0978

Turban JL, King D, Carswell JM, Keuroghlian AS. (2020). "Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation," *Pediatrics*, Vol. 145, No. 2, p. e20191725,

Turban JL, King D, Kobe J, Reisner SL, Keuroghlian, (2022) "Access to Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults," *PLOS ONE*, Vol. 17, No. 1 (January 12, 2022), p. e0261039, https://doi.org/10.1371/journal.pone.0261039

Turner, J. (2022). Special Report: What went wrong at the Tavistock clinic for transgender teens? *The Times Magazine*. June 17, 2022. Available at: https://segm.org/GIDS-puberty-blockers-minors-the-times-special-report

U.S. Food & Drug Administration. (2022). *Risk of pseudotumor cerebri added to labeling for gonadotropin-releasing hormone agonists.* Available at: https://aap2.silverchair-cdn.com/aap2/content_public/autogen-pdf/cms/20636/20636.pdf?Expires=2147483647&Signature=bhuLtZ12pTNS27GJq54IBzMVmynjPxTw6iMXeF9P4qUBbCfFnXEUEmNpIl2rHmXvh7VbZiTdsBduxGL5q4ZvLPm-Fr7VOVtxM-n9hKHXTurpexaHK5dcE2YWyfo4-ALsTD3GMP7d2oLgMr0vFgjPhXId6DPFJLVwncClprhKlv8zWjTZLcQYtbOEy4kTOOkRsvM-S-~Sn1yd7X~nT295Lnr4yO~txrKkSLY2uZIhitrc3jnLv0ruS1gMZ0XIFYKRsBDflvNn3mL68psGgN9LLN2SP9p31agUAz4Zcj00FPTmbnCxm2nxpbsffXypvUGinj7qkWuHQA7ajVmu5redYA__&Key-Pair-Id=APKAIE5G5CRDK6RD3PGA

U.S. Medicare National Coverage Analysis (NCA) Decision Memo (2016). *Gender dysphoria and gender reassignment surgery* (CAG-00446N). Centers for Medicare & Medicaid Services, Available at: https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?proposed=N&NCAId=282&bc=ACAAAAAAQAAA&

van der Loos M, Hannema S, Klink D, Heijer M, Wiepjes C. (2022). Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. *The Lancet Child & Adolescent Health*. October 20, 2022. DOI:10.1016/S2352-4642(22)00254-1

Wiepjes, C. M., den Heijer, M., Bremmer, M. A., Nota, N. M., Blok, C. J. M., Coumou, B. J. G., & Steensma, T. D. (2020). Trends in suicide death risk in transgender people: Results from the Amsterdam Cohort of Gender Dysphoria Study (1972–2017)). Acta Psychiatrica Scandinavica, 141(6), 486–491. doi:10.1111/acps.13164

Zucker, K. J. (2018). The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al. (2018). *International Journal of Transgenderism*, 19(2), 231–245. oi:10.1080/15532739.2018.1468293

Zucker KJ. (2019). Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues. *Archives of Sexual Behavior* 48:1983–1992. Available at: www.segm.org or https://link.springer.com/epdf/10.1007/s10508-019-01518-8?sharing_token=IbyqVzajww_5oCp2gORwKfe4RwlQNchNByi7wbcMAY6LN5LnWIfAZ0Tvz7RsVNs8G4Hfdu_I29pZ5Oyo0lZT_TGhTswOdNyZebFztiQIyv4jzVsT_HYaBCYqpf-0VT5V5URUjxJEMdZPUO18mhGz9WBttEmM9gwKQxxcO4E_xI%3D

---

***© 2022 The Institute for Research and Evaluation (IRE)***

IRE is a nonprofit research agency that has been evaluating prevention programs for more than 30 years, specializing in sex education in schools—involving more than 100 evaluation studies and 900,000 teens, including studies in 30 U.S. states (many federally-funded) and three international countries. IRE has been an invited consultant on sex education effectiveness at the U.S. House of Representatives and Senate, The White House, and state legislatures. IRE research has been presented at the National Academies of Sciences (2019), the United Nations Civil Societies Conference (2019), and the U.S. Department of Health and Human Services (2020), and published in peer-reviewed journals, including *The American Journal of Preventive Medicine*, *The American Journal of Health Behavior*, and *Issues in Law and Medicine*.

**Contact:** Dr. Stan Weed at *weedstan@aol.com*
**This document is available at:** *https://institute-research.com/pdf/Transgender_Research--5_Questions_for_Parents_%26_Policymakers_%28IRE%209-26-22%29.pdf*

# PROTECTING MINORS FROM THE HARMS OF PUBERTY BLOCKERS, CROSS-SEX HORMONES, AND IRREVERSIBLE SURGERIES

State lawmakers have a duty to protect citizens' health and safety. This responsibility is even more significant when protecting vulnerable children.

Children who experience discomfort with their biological sex deserve to be treated with dignity and respect and need compassionate, effective mental health care. But radical activists and profit-driven gender clinics have deceived children and parents alike into believing that unnatural, life-altering and even permanently sterilizing puberty blockers, hormones, and surgeries are the solution to their struggle.

State lawmakers can protect children and parents from being pressured into agreeing to these harmful, experimental "gender transition" procedures by enacting laws that prohibit the administration of puberty blockers, cross-sex hormones, and surgeries on minors who experience discomfort with their biological sex.

We must be clear: the experimental gender-transition procedures—including puberty blocker and hormones—pushed on our children are often irreversible. They prevent healthy puberty, radically alter the child's hormonal balance, and may even remove healthy external or internal organs and body parts.

Such drugs and procedures are not only dangerous, but they are also experimental and unproven. In fact, multiple long-term studies show that when young children who experience gender dysphoria are allowed to mature naturally, most of them—over 90 percent according to some sources—grow out of their dysphoria.

And there is a growing movement of "detransitioners" who have come to realize—after undergoing puberty blockers, hormone treatments, and more—that they were lied to and that their medical gender transition was a devastating mistake. Many are now bravely speaking out about the damage caused by being rushed into these drugs and procedures without understanding the consequences.

But to fully protect vulnerable children from these harms, lawmakers cannot ignore that puberty blockers and cross-sex hormones—regularly pushed by gender clinics as part of the "gender affirmation" protocols—are just as damaging to children as the surgical procedures.

## I. Puberty Blockers Have Not Been Shown to Be Safe or Reversible

No study has ever demonstrated that the use of puberty blockers on children with gender dysphoria is safe. As a recent paper from Professor Michael Biggs of Oxford University explained, the claims that puberty blockers and other hormonal interventions are safe and reversible is "increasingly implausible."

Rather, growing evidence shows that puberty blockers hurt a child's physical, emotional, and psychological development in ways that we still don't understand:

- FDA Warnings: In July 2022, the FDA issued a warning that puberty blockers carry a risk of pseudotumor cerebri, a disease with symptoms that include swelling of the optic nerve, headaches, vomiting, elevated blood pressure, and eye muscle paralysis.

- Fertility Issues: Puberty blockers prevent the natural development of a child's reproductive organs (i.e., ovaries and testes). Yet there has not been a single study on whether children will develop full reproductive capacity after the prolonged use of puberty blockers. As a result, the Endocrine Society has cautioned about this troubling lack of data on the long-term effects that blockers may have on child's fertility.

- Impaired Brain Development: Children experience vital neurological growth and development during puberty. But as the Endocrine Society warns, the use of puberty blockers on children "may include … unknown effects on brain development." Researchers in the U.K. have expressed that:

  > A closely linked concern [arising from use of puberty blockers] is the unknown impacts on development, maturation and cognition if a child or young person is not exposed to the physical, psychological, physiological, neurochemical and sexual changes that accompany adolescent hormone surges.

- Lower Bone Strength: Numerous studies prove that puberty blockers diminish bone density. After just two years on puberty blockers, children's bone density levels were at dangerously low levels, with some children having spinal densities at the bottom 0.13% of the population.

## II. Cross-Sex Hormones Have Not Been Shown to be Medically Safe for Minors

Just like with puberty blockers, there are no reliable studies about the safety of the long-term use of cross-sex hormones on minors. But there are some things we do know:

- Extended use of cross-sex hormones will sterilize a child. As the Endocrine Society has explained, the high doses of estrogen given to adolescent males causes severe "testicular damage," while large doses of testosterone on young females impacts ovarian function. That led one research to warn that "cross-sex hormones … may have irreversible effects."

- Cross-sex hormones cause cardiovascular harm. Three different studies have found that cross-sex hormones increase the occurrence of several cardiovascular diseases, strokes, blood clots, and other severe cardiovascular issues.

## III. Puberty Blockers and Hormones Lead to Sterilizing and Irreversible Surgeries

Putting a child experiencing gender dysphoria on puberty blockers is not a "pause button" as some gender activists claim. Instead, giving children puberty blockers and

hormones places them on a one-way street that virtually always leads them to sterilizing, irreversible surgeries.

For example, a recent study from the world's largest gender clinic in the United Kingdom found that 98% of children who were administered puberty blockers went on to eventually receive cross-sex hormones. This aligned with a similar study from the Netherlands that found that nearly 97% of children given puberty blockers proceeded to cross-sex hormones.

And when children received cross-sex hormones alone (or with puberty blockers), 100% of those children went on to receive damaging, irreversible surgeries according to three Dutch clinical studies. As explained by Dr. Stephen Levine:

> These studies demonstrate that going on puberty blockers virtually eliminates the possibility of desistance in juveniles. Rather than a 'pause,' puberty blockers appear to act as a psychosocial 'switch,' decisively shifting many children to a persistent transgender identity. Therefore, as a practical and ethical matter the decision to put a child on puberty blockers must be considered as the equivalent of a decision to put that child on cross-sex hormones . . .

This one-way street toward "transition" surgeries mutilates healthy bodies, turns children into lifelong customers of gender clinics, and irreparably deprives them of the fulfillment and basic human right of potentially becoming natural parents later in their lives, all with no proven long-term benefits. Worst of all, the surgeries lead to tragically higher rates of suicide. One study from Sweden showed that individuals who were subject to gender transition surgery had suicide rates almost 20 times higher than their peers.

## IV. Several Nations Are Restricting or Backing Away from Puberty Blockers and Cross-Sex Hormones for Minors

A growing number of nations, including some that pioneered these medical transitions, are reversing course. Health authorities and medical associations in England, Sweden, Finland, France, Australia, and New Zealand are warning against, and even curtailing the use of puberty blockers, hormones, and surgeries on children with gender dysphoria:

- Sweden: The country's main gender clinic will no longer authorize puberty blockers and hormones to be given to minors under the age of 16 because "the risks of puberty suppressing treatment . . . and gender-affirming hormonal treatment currently outweigh the possible benefits . . . based on ... continued lack of reliable scientific evidence concerning the efficacy and the safety of both treatments."
- Finland: The country severely restricts the use of puberty blockers and hormones except for exceptional case after extensive psychiatric assessment of the child,

warning that "no decisions should be made that can permanently alter a still-maturing minor's mental and physical development."

- United Kingdom: Recently, the National Health Service eliminated their "gender clinic" model of care, suspended the use of puberty blockers and hormones except for purely research purposes, and instead announced that "psychological support" and "a watchful approach" are the recommend treatment for gender dysphoria.

- France: The National Academy of Medicine issued a statement urging "great medical caution" when working with children experiencing gender dysphoria "given the vulnerability, particularly psychological, of this population and the many undesirable effects, and even serious complications, that some of the available therapies can cause."

- Australia & New Zealand: The Royal Australian and New Zealand College of Psychiatrists recently emphasized that treatments for gender dysphoria should focus on psychotherapy and address "co-existing issues which may need addressing and treating."

In other words, these countries are putting psychological treatment and counseling at the forefront of caring for these children, who often suffer from other psychiatric conditions, not puberty blockers, hormones, or surgeries.

## CONCLUSION

Denying the truth that each and every person is either male or female hurts real people, especially vulnerable children. Science and common sense tell us that children are not mature enough to properly evaluate the serious, lifelong ramifications when making important medical decisions. And the decision to undergo dangerous, experimental, and likely sterilizing gender transition procedures is no exception.

States must enact laws that protect minors from adults who would push them toward life-altering, sterilizing treatments that cause permanent harm. Lawmakers must stand for the children they have a responsibility to protect.

ACLU
Idaho

Written Testimony Against House Bill 668
Submitted To The Idaho Senate Judiciary, Rules & Administration Committee
March 14, 2024
American Civil Liberties Union Of Idaho

Chairman and Committee Members:

I am submitting this testimony on behalf of the ACLU of Idaho in strong **opposition to HB 668,** one of the most extensive bills targeting transgender people of all ages that we have seen introduced anywhere in the country. We urge you to oppose this bill not only because it violates the constitutional rights of Idahoan of all ages but also because of the unprecedented threat it poses to transgender adults and adolescents and the families and communities who love and care for them.

HB 668 is a sweeping assault on access to medical treatment for transgender people. It bans government funding for necessary healthcare for transgender adults and adolescents. The bill's broad funding restrictions could prohibit access to evidence-based medical treatment at a majority of hospitals and health centers across the state. The bill also categorically bans Medicaid coverage for gender-affirming medical treatment, singling out low-income Idahoans for significant harm. The impact of these restrictions will be far-reaching and devastating.

**GENDER AFFIRMING CARE IS WIDELY ACCEPTED IN THE PRACTICE OF MEDICINE**

American Medical Association (2021)

*"The AMA opposes the dangerous intrusion of government into the practice of medicine and the criminalization of health care decision-making," said AMA Board Member Michael Suk, MD, JD, MPH, MBA. "Gender-affirming care is medically-necessary, evidence-based care that improves the physical and mental health of transgender and gender-diverse people."*

American Academy of Child & Adolescent Psychiatry (Nov. 2019)

The American Academy of Child and Adolescent Psychiatry (AACAP) supports the use of current evidence-based clinical care with minors. AACAP strongly opposes any efforts – legal, legislative, and otherwise – to block access to these recognized interventions. Blocking access to timely care has been shown to increase youths' risk for suicidal ideation and other negative mental health outcomes. Consistent with AACAP's policy against conversion therapy, AACAP recommends that youth and their families formulate an individualized treatment plan with their clinician that addresses the youth's unique mental health needs under the premise that all gender identities and expressions are not inherently pathological.

American Academy of Pediatrics (Aug. 2023)

Policy Statement on standards of care for transgender and gender diverse youth, and reiterating that AAP supported standards of care including puberty blockers and hormone therapy. Also see article, Taking a toll: Pediatricians highlight how bans on gender-affirming care harm patients, families.

WPATH Standards of Care 8

World Professional Association for Transgender Health (Statement in Opposition to UK Tavistock Decision, 2020)

*"Responding to decision from UK high court limiting care for transgender minors – WPATH and all national PATHs oppose decision and explain the importance of care for transgender youth. "WPATH, EPATH, USPATH, AsiaPATH, CPATH, AusPATH, and PATHA recommend that capacity to consent is evaluated on a case-by-case basis by the treating clinician and not by a court of law. We do not agree that transgender healthcare is so different in kind to that provided to cisgender people as to warrant separate legal provision. We consider puberty blocking treatment and treatment with gender affirming hormones as two separate treatment steps each requiring informed consent at the time such treatment is to be started.*

*We support the provision of healthcare to gender diverse people in a timely manner such that they can live their best lives. We are gravely concerned that the ruling will have a significantly adverse impact upon gender diverse youth and their families by imposing barriers to care that are costly, needlessly intimidating, and inherently discriminatory."*

Endocrine Society (Clinical Practice Guidelines, 2017)

Recognizes that puberty blockers and gender-affirming hormone treatment are appropriate treatment for some transgender adolescents.

Endocrine Society (Transgender Health Position Statement 2020)

There is a durable biological underpinning to gender identity that should be considered in policy determinations.
Medical intervention for transgender youth and adults (including puberty suppression, hormone therapy and medically indicated surgery) is effective, relatively safe (when appropriately monitored), and has been established as the standard of care. Federal and private insurers should cover such interventions as prescribed by a physician as well as the appropriate medical screenings that are recommended for all body tissues that a person may have.
Increased funding for national pediatric and adult transgender health research programs is needed to close the gaps in knowledge regarding transgender medical care and should be made a priority.
Endocrine Society (Transgender Health: Supporting Gender Diverse Youth to Improve Their Health, Well-Being, and Safety, 2020)

Re-affirms importance of gender-affirming care including puberty blockers and hormone therapy.

**TRANSGENDER INDIVIDUALS RECEIVING GENDER AFFIRMING CARE REPORT VERY HIGH RATES OF SATISFACTION WITH TREATMENT**

The 2022 U.S. Transgender Survey submitted with this testimony gathered inputs from 92,329 transgender individuals. **94% of respondents** who lived at least some of the time in a different gender than the one they were assigned at birth ("gender transition") reported that they were either **"a lot more satisfied" (79%)** or **"a little more satisfied" (15%) with their life.** Life satisfaction

with hormone treatment was reported by **98%** of recipients to improve life satisfaction, with ***less than 2%*** reporting neutral and negative satisfaction post treatment. Life satisfaction with surgical treatment was reported by **97%** of recipients to be improved, with less than 2% reporting a little or a lot less satisfied.

**TO ENFORCE HB 668 AND AVOID PERSONAL CRIMINAL LIABILITY, STATE EMPLOYEES WOULD HAVE TO VIOLATE FERPA AND HIPAA**

The Family Educational Rights and Privacy Act (FERPA) is a federal law that affords parents the right to have access to their children's education records, the right to seek to have the records amended, and the right to have some control over the disclosure of personally identifiable information from the education records. When a student turns 18 years old, or enters a postsecondary institution at any age, the rights under FERPA transfer from the parents to the student ("eligible student"). The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge. The US Department of Health and Human Services (HHS) issued the HIPAA Privacy Rule to implement the requirements of HIPAA. The HIPAA Security Rule protects a subset of information covered by the Privacy Rule. To investigate whether gender affirming care medications were being consumed in State properties, any State employee would have to violate the privacy of an individual, which would violate both HIPAA and, if that person was a student, FERPA as well.

**U.S. CONSTITUTIONAL VIOLATIONS**

In addition to the severe material harm that would flow from HB 668, the bill also violates the equal protection rights of transgender Idahoans.

Because HB 668 singles out treatment if and only if it "alter[s] the appearance of an individual in order to affirm the individual's perception of the individual's sex in a way that is inconsistent with the individual's biological sex," it facially classifies based on a person's sex and transgender status. It also has the intent and impact of enforcing sex stereotypes because whether or not treatment is permitted depends on whether it is deemed "consistent" with a person's "biological sex".

Laws that classify based on transgender status and sex trigger heightened scrutiny under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. *See United States v.*

*Virginia*, 518 U.S. 515, 555, (1996) ("all gender-based classifications today warrant heightened scrutiny"); *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019) (holding that transgender status qualifies as a quasi-suspect classification). Under heightened scrutiny it is the government's burden to show that the disparate treatment substantially advances an important government interest. Most recently, when this state acted to categorically prohibit the same treatment for minors, a federal court held that the law likely could not survive constitutional scrutiny and enjoined it in its entirety. *Poe ex rel. Poe v. Labrador,* No. 1:23-CV-00269-BLW, 2023 WL 8935065, at *12, *13-19 (D. Idaho Dec. 26, 2023). The Ninth Circuit denied Idaho's motion for a stay pending appeal, *see Poe v. Labrador,* No. 24-142, ECF 24 (9th Cir. Jan. 30, 2024), and also denied the State's request for en banc review of that denial, ECF 31.1 (9th Cir. Feb. 9, 2024).

Under heightened scrutiny, it is not enough to come forward with *post hoc* justifications for a law or a bare desire to harm a politically unpopular group. Instead, Idaho needs an exceedingly persuasive justification why this treatment alone will be subject to a de facto ban across Idaho. No such justification exists.

**FEDERAL LAW VIOLATIONS**

In addition to violating the constitutional rights of transgender Idahoans, the law likely violates multiple federal laws including the Affordable Care Act and the Medicaid Act. *See, e.g., Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018); *Tovar v. Essentia Health*, 42 F. Supp. 3d 947 (D. Minn. 2018); *Flack v. Wis. Dep't of Health Servs*., 328 F. Supp. 3d 931 (W.D. Wis. 2018). Advancing such a patently illegal measure could cost Idaho greatly in both litigation costs and threats to federal funding.

**SOCIAL IMPACT**

And beyond the many legal problems with HB 668, the human cost is devastating. Transgender people live in and call Idaho home. By cutting off their health care – care that people may have been relying on for years, if not decades – the state is subjecting them to predictable and dire harm. As the American Medical Association has explained, "Gender-affirming care is medically necessary, evidence-based care that improves the physical and mental health of transgender and gender-diverse people." Taking away this care increases anxiety, depression, and suicidality, needlessly harming a stigmatized minority and taking away their ability to live full lives.

We urge you to oppose this measure and give the transgender community an opportunity to continue to live in Idaho and contribute to our beautiful state.

Respectfully,

Julianne Donnelly Tzul

Advocacy Director

ACLU of Idaho