Howard A. Belodoff, ISB # 2290
Law Office of Howard Belodoff, PLLC
1004 W. Fort St.
Boise, ID 83702
Tel: (208) 331-3378 Fax: (208) 947-0014
hbelodoff@hotmail.com

Jane Gordon, ISB # 9243
Jane Gordon Law
1004 West Fort Street
Boise ID 83702
Tel: (208) 371-4747; Fax: (208) 807-2290
Jane@JaneGordonLaw.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF IDAHO**

| | |
|---|---|
| MH, TB, KB, SG, AC, BM, individually, and G Doe, by and through her parents and next friends, JANE Doe and JOHN Doe<br><br>Plaintiffs,<br><br>vs.<br><br>JULIET CHARRON, et. al.,<br><br>Defendants. | CASE NO. 1:22-CV-409-REP<br><br>PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF MICHAEL K. LAIDLAW, M.D.<br>[Dkt. 214-9] |

A party may use a motion in limine to exclude inadmissible or prejudicial evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984).

## I. THE STANDARD FOR THE ADMISSION OF EXPERT OPINIONS

The United States Supreme Court established the requirements for expert testimony. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-93 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1993). In *Daubert*, the Court required the trial court to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be

applied to the facts at issue." *Daubert,* 509 U.S. at 592-593. Fed. R. Evid. 702 places "a special gatekeeping obligation" on a trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Id.* at 597. Fed. R. Evid. 702 adopted the Daubert requirements and identified additional requirements for expert testimony. The admission of expert testimony is based on a preponderance of the evidence. *See* 2023 Advisory Committee Notes. Defendants must meet the burden of showing reliability with some evidence more than the word of the testifying expert that the expert's methodology meets the admissibility requirements of Fed. R. of Evid. 702.

The admission or exclusion of the expert testimony rests on whether the opinions have "'a reliable basis in the knowledge and experience of the relevant discipline.'" *Estate of Barabin v. Asten Johnson. Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (*En Banc*) (quoting *Kumho Tire*, 526 U.S. at 149). "This means that the expert's bald assurance of validity is not enough. Rather. the party presenting the expert must show that the expert's findings are based on sound science. and this will require some objective independent validation of the expert's methodology." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir.1995) ("*Daubert II*"). Fed. R. of Evid. 702(d) was specially "amended to emphasis that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *See* 2023 Advisory Committee Notes.

Fed. R. Evid. 702 "establishes several requirements for admissibility: (1) the evidence has to 'assist the trier of fact' either 'to understand the evidence' or 'to determine a fact in issue'; (2) the witness has to be sufficiently qualified to render the opinion." *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010) (citing *Daubert*). If an opinion requires "scientific, technical, or other specialized knowledge," then the expert must be qualified "as an expert by knowledge, skill,

experience, training, or education." *Id*. The court's duty is to act as a gatekeeper to exclude "junk science" that does not meet Fed. R. Evid. 702's reliability standards. *Estate of Barabin*, 740 F.3d at 463 (citation modified). The expert's methods must be adequately explained; vague and generalized explanations are insufficient. *United States v. Vera*, 770 F.3d 1232, 1241 (9th Cir. 2014). "Under Daubert's testability factor, the primary requirement is that '[s]omeone else using the same data and methods...be able to replicate the result[s].'" "The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, 2000 Advisory Committee Note. Dr. Laidlaw does not meet these basic admissibility requirements for offering expert testimony.

The Ninth Circuit has approved four non-exclusive factors to test the reliability of expert testimony, including: "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant the relevant scientific community." *Estate of Barabin*, 740 F.3d at 463. (citation modified). The question is whether the expert's methodology is "simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." *See* Fed. R. of Evid. 702, 2000 Advisory Committee's Notes.[1] The Ninth Circuit has observed that "independent research, rather than research conducted for the purposes of litigation, carries with it the indicia of reliability." *Daubert II*, 43 F.3d at 1317. If independent research is not available then the party must establish

---

[1] Fed. R. of Evid. 702 Advisory Committee's Notes to 2000 Amendments stated the Supreme Court in *Kumho* held these non-exclusive factors might also be used by trial courts in assessing reliability of non-scientific expert testimony: "(1) whether the expert's technique or theory can be or has been tested---that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subjected to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique and theory has generally been accepted in the scientific community."

the methodology is based upon "other objective verifiable evidence that the testimony is based on scientifically valid principles" and "by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Id.* at 1317-18. Dr. Laidlaw's opinions are unreliable because they are not based upon independent research, are simply subjective, cannot be tested, were conducted for purposes of litigation, and have not been subjected to normal scientific scrutiny through peer review and publication, and are not acceptable by the relevant scientific community.

Expert testimony is reliable if the knowledge underlying it "has a reliable basis in the knowledge and experience of [the relevant] discipline." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (quoting *Kumho Tire*, 526 U.S. at 149) (cleaned up). In *Daubert* and *Kumho Tire*, the Supreme Court set forth a non-exclusive list of factors that can be used to evaluate whether an expert's reasoning or methodology meets the criteria of reliability. *Estate of Barabin*, 740 F.3d at 463. The Advisory Committee Note to the 2000 amendment of Fed. R. Evid. 702 identified the Court's *Daubert* checklist of objective factors.[2]

The Supreme Court requires experts to justify the foundational assumption for their opinions. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A

[2] "The specific factors explicated by the *Daubert* Court are (1) whether the expert's technique or theory can be or has been tested---that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subjected to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique and theory has generally been accepted in the scientific community." Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment.

The advisory committee note further states "*Daubert* set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony" and that "[t]he Court in Kumho held that these factors might also be applicable in assessing the reliability of non-scientific expert testimony, depending upon 'the particular circumstances of the particular case at issue.'" *Id.* (quoting *Kumho*, 526 U.S. at 150).

court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).[3] The expert's methods must be reliable and adequately explained: vague and generalized explanations are insufficient. *Vera*, 770 F.3d at 1241. "Opinions based upon 'unsubstantiated and undocumented information is the antithesis of . . . scientifically reliable expert opinion.'" *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998)). "It is well settled that bare qualifications alone cannot establish the admissibility of expert testimony." *Oilier v. Sweetwater Union High School Dist*., 768 F.3d 843, 860 (citation modified). The expert's opinions must be based on a systematic assessment, not personal opinion or speculation. *Id.*, 768 F.3d at 861. *See also Bragdon v. Abbott*, 524 U.S. 624, 653 (1998) ("expert testimony must have a traceable, analytical basis in objective fact before it may be considered on summary judgment."). "[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.,* 523 F.3d 1051, 1058 (9th Cir. 2008) (citation omitted).

The Court should not accept personal and subjective expert opinions just because of the expert's qualifications or vitae. An expert's self-professed experience or qualifications or assurances of validity do not make the opinions admissible. "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Daubert II*, 43 F.3d at 1316. "This means that the expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Id.*

An expert cannot rely upon the expert opinions of non-testifying experts. *In re Imperial*

---

[3] *Ipse dixit*: Latin "An unsupported statement that rest solely on the authority of the individual who makes it." *West's Encyclopedia of American Law*, 2nd Ed.

*Credit Industries, Inc. Securities Litigation*, 252 F.Supp.2d 1005, 1012-13 (C.D. Cal. 2003). Fed. R. of Evid. 702 and 703 "do not permit an expert to rely upon excerpts from opinions developed by another expert for the purposes of litigation." *Id.*[4] Rule 703 is not a license for the testifying expert to simply repeat the undisclosed, inadmissible, and unsubstantiated opinions of a non-testifying expert witness. As Judge Poser most succinctly stated: "The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed [s]he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science." *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). With these basic principles in mind the Court should find that Dr. Laidlaw expert opinion is not admissible.

## II. DR. LAIDLAW IS NOT QUALIFIED TO OFFER OPINIONS FOR PURPOSES OF SUMMARY JUDGMENT

Plaintiffs respectfully move to exclude the opinions of Defendants' expert, Dr. Michael Laidlaw, because he is not an expert and he is not qualified to offer his expressed opinions and his opinions are neither reliable nor helpful to the trier of fact pursuant to the standards set forth in *Daubert*, and its progeny. Dr. Laidlaw has a "clinical practice as an endocrinologist in dealing with hormonal excess, hormonal deficiency, and hormonal balance." Dkt. 103-10 at ¶ 8(1). Dr. Laidlaw lacks the knowledge, skill, experience, training, or education on the issues for which his opinions are proffered so the Court must exclude his opinion. *See, e.g.*, *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989). Dr. Laidlaw's Declaration states he was

---

[4] *See, e.g., Tokio Marine & Fire Ins. Co. v. Norfolk & Western Ry. Co.*, 1999 U.S. App. LEXIS 476 at *4 (4th Cir.1999) ("one expert may not give the opinion of another expert who does not testify"); *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1580 (11th Cir.1985) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not"); *6816.5 Acres of Land etc. v. United States*, 411 F.2d 834, 839–40 (10th Cir.1969) ("the trial court must take steps to exclude any expert opinion that is predicated upon another opinion"); *Taylor v. B. Heller and Co.*, 364 F.2d 608, 613 (6th Cir.1966) ("expert opinion may not be based upon the opinion of others, either in evidence or not in evidence").

retained "to provide an expert opinion on the efficacy and safety of sex reassignment treatment, including the trustworthiness of proposed standards of care or treatment guidelines promulgated by medical organizations." Dkt. 217-9 at ¶ 5. Dr. Laidlaw claims his opinions are based upon his "knowledge of research and studies regarding the treatment of gender dysphoria, including minors and adults" and his "personal experience in human research as a practicing physician, having been involved in two studies, one involving magnesium and bone density and the other involving ultrasound use for detecting recurrent thyroid cancer." Dkt. 103-10 at ¶ 8(3) - (4).

Dr. Laidlaw asserts his qualifications are based upon his "frequent[ ] review medical studies conducted by others and [his] experience assessing the strengths and weaknesses of such studies." *Id.* at ¶ 8. Dr. Laidlaw's qualifications as an endocrinologist do not qualify him to offer opinions in areas outside of his knowledge, skill, experience, training, or education. A medical doctor is not automatically an expert on every medical issue because he or she graduated from medical school and has a medical specialty. "Expertise in one field does not qualify a witness to testify about others." *Lebron v. Secretary of Florida Dept. of Children and Families*, 772 F.3d 1352, 1368 (11th Cir. 2014). Dr. Laidlaw's expertise was not acquired from research independent of litigation but from his involvement as a retained expert in 21 cases involving transgender individuals, including this case and another Idaho case. Dkt. 217-9 at 6-7 ¶ 10.

Dr. Laidlaw's unscientific opinion methodology was not the product of his own research but was based upon his "knowledge of research and studies regarding the treatment of gender dysphoria, including for minors and adults." Dkt. 103-10 at 3 ¶ 8(3). Dr. Laidlaw's self-professed knowledge of medical studies conducted by others, including coauthors of non-peered letters to journals, and his self-published website articles criticizing actual peer-reviewed studies and publications do not qualify Dr. Laidlaw to offer his personal opinions on the wide-ranging topics

expressed in his Report. Letters to the editor of medical journals are not the type of studies an expert in the relevant field would rely on. See *Declaration of Meredithe Mcnamara in Support of Plaintiffs' Motions in Limine* ("*McNamara MIL Dec*."), ¶ 27.

Dr. Laidlaw has never conducted any independent research on the safety, efficacy, and reversibility of transitioning medications or the surgeries used to treat transgender individuals diagnosed with gender dysphoria. His research experience had nothing to do with the treatment of gender dysphoria in adults. His opinions of the actual research undertaken to develop the WPATH Standards of Care, Endocrine Practice Guidelines, the American Psychiatric Association's DSM-5-TR, and the American Medical Association do not represent the kind other experts would rely upon. He is not a member of any of these professional associations. Dr. Laidlaw's bias and motives drive his unreliable personal opinions. *See* Dkt. 217-9 at 14 ¶ 50:

> I am concerned that the medical society that claims to speak for me and other endocrinologists has abandoned scientific principles in endorsing treatments for GD that have questionable scientific support. The opinions expressed in this report are the result of my own experience, studies, education, and review of the scientific literature related to GD.

Dr. Laidlaw's personal opinions about the Endocrine Guidelines' "low quality of evidence for the treatment of adolescents" is not based upon his own research but his and co-authors letters to the publisher. Dkt. 217-9 at ¶ 193 (citing Lawlaw et. al., 2019). Dr. Laidlaw's criticisms of WPATH are copied from a "Confidential – Attorney Eyes Only" Supplemental Report submitted in Alabama's *Boe v. Marshall*, (Middle District of Alabama, Case No. 2:22-cv-00184, Dkt. 700-2 filed on 10/09/24). Dkt. 217-89.

Dr. Laidlaw states his opinions are based on in his clinical experience as an endocrinologist in, "dealing with hormone excess, hormone deficiency, and hormone balance." Dkt. 103-10 at 3 ¶ 8(1). *See also* Dkt. 217-9 ¶ 41. He states in his "clinical practice as an

endocrinologist he evaluate[s] and treat[s] patients with hormonal and/or glad disorders." Dkt. 103 at 2 ¶ (4). Dr. Laidlaw has never conducted any original primary research on gender dysphoria, transgender individuals, or gender identity. *Declaration of Jane Gordon* (*"Dec. JG*"), Exhibit 1, Deposition of Dr. Laidlaw ("*Laidlaw Dep*.") in *C.P. v. Blue Cross Blue Shield of Illinois*, No. 4:22-cv-06145 (W.D. Wash.), at 29:5-30:6. Dr. Laidlaw has never diagnosed a patient with gender dysphoria or gender identity disorder because it is a "psychological diagnoses." *Id.* at 45:21-46:3 Dr. Laidlaw has treated one patient with gender dysphoria to refill a prescription for estrogen. *Id.* at 43:8-17. Dr. Laidlaw does not provide mental health care of any kind. *Id.* at 184:8-11. He is not a surgeon and has never provided gender-affirming surgery. *Id.* at 184:12-13. Dr. Laidlaw's publications in a peer-reviewed journal are letters to the editor relating to gender dysphoria or self-published websites which are not based on any his own research or scientific study or subjected to peer-review. *Id.* at 31:7-39:25 & 42:10-42:22. He has never published any scientific, peer-reviewed literature on gender dysphoria or transgender people based upon primary research. *Id.* He states his opinions are limited to reviews of studies conducted by others. His reviews of selected literature that agrees with his personal opinions and biases do not qualify him to opine about the treatment of gender-dysphoria in transgender individuals. Dr. Laidlaw admits "Gender dysphoria, on the other hand, is not an endocrine diagnosis. It is a psychological diagnosis...It is diagnosed purely by psychological methods of behavioral observation and questioning. The criteria for diagnosis is found in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5 TR)." Dkt. 217-9 at 13-14 ¶ 49.

In *Kadel v. Folwell*, an endocrinologist, like Dr. Laidlaw, "offer[ed] a wide range of conclusions that fall into five main categories: mental healthcare, medical and surgical care, informed consent, criticism of medical associations, and political criticisms." *Kadel*, 2022 WL

3226731, at *8. The district court found that, given the endocrinologist's lack of experience in those areas, he was not qualified to offer expert opinions on the diagnosis of gender dysphoria, the DSM-V, gender dysphoria's potential causes, the likelihood that a patient will 'desist,' or the efficacy of mental health treatments. *Id.*, at *9. The court excluded the opinions of defendants' endocrinologist, similar to Dr. Laidlaw, because he was "not a psychiatrist, psychologist, or mental healthcare professional," and he "never diagnosed a patient with gender dysphoria, treated gender dysphoria, treated a transgender patient, conducted any original research about gender dysphoria diagnosis or its causes, or published any scientific, peer-reviewed literature on gender dysphoria." *Id*.

This Court, like in *Kadel*, should exclude Dr. Laidlaw's opinions because he is "not a surgeon and has no experience with surgery for gender dysphoria and, therefore, is not qualified to testify to the risks associated with surgery or the standard of care used by surgeons for obtaining informed consent for surgery." *Kadel*, at *9. *See also Laidlaw Dep*. at 47:16- 47:17. Since Dr. Laidlaw has no clinical or research experience with gender-affirming therapy or surgeries used to treat gender dysphoria, he is not only unqualified but his opinions are wholly unreliable given his lack of expertise, skill, and experience with gender affirming care.

## III. DR. LAIDLAW'S METHODOLOGY AND OPINIONS ARE UNRELIABLE AND IRRELEVANT

Rule 702's reliability requirement requires an expert to base an opinion on scientifically valid principles, reasoning, and methodology that are properly applied to the relevant facts. *See Daubert*, 509 U.S. at 593-94. "In evaluating the reliability of an expert's method...a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005). Opinions should be excluded if they are not consistent with a generally accepted scientific consensus rather than

speculation, bias. or if the opinions “are connected to existing data only by the *ipse dixit* of the expert.” *General Electric Co.*, 524 U.S. at 146.

Dr. Laidlaw’s opinions lack any indicia of admissibility required under the standards established in *Daubert* or the Federal Rules of Evidence. Defendants have not met their burden of establishing that Dr. Laidlaw is qualified to proffer reliable and relevant opinions on the assessment of gender dysphoria generally or the assessment of the propriety of Plaintiffs’ physician-recommended treatments. Dr. Laidlaw has never conducted any original research nor published any peer-reviewed literature on gender-affirming care. Dr. Laidlaw is not a mental health professional or a surgeon. Defendants have not established that Dr. Laidlaw is qualified to testify about the appropriateness of the treatment of Plaintiffs’ gender dysphoria in the future. His *ipse dixit* opinions on the effectiveness of gender-affirming care, the harms it may pose, “desistence,” informed consent, and the WPATH Standard of Care exceed his qualifications, lack any reliable scientific methodology, and are merely based on speculation and his personal animus against transgender individuals. His personal opinions were not developed independently or based upon a methodology that can be assessed for reliability under Fed. R. Civ. Proc 702.

Dr. Laidlaw’s opinions concerning minors, the number of people diagnosed with gender dysphoria, human sexual development, the difference between gender identity and biological sex, whether biological sex can be changed, social transition, and the polices of other countries are not relevant. Under Fed. R. Civ. Proc. 403 the probative value of his opinions is substantially outweighed by the danger of unfair prejudice, confusion, and a waste of time.

**1. Consensus On the Effectiveness of Gender Affirming Treatments**

In assessing reliability, the fact that an opinion “has been able to attract only minimal support within the community may properly be viewed with skepticism.” *Daubert*, 509 U.S. at

594. Dr. Laidlaw's opinions about the effectiveness and propriety of gender-affirming care are far outside the mainstream and have been explicitly rejected by every relevant scientific and professional medical association and have been contradicted by existing peer reviewed studies. *McNamara MIL Dec*. Dr. Laidlaw offers no evidence for his personal opinions except undisclosed letters to the editor and the self-published online articles on "Public Discourse" he and his co-authors have manufactured to critique the "low quality of evidence" and the "absence of proper studies" in gender affirming care. Dkt. 217-9 at 44 ¶ 193; *Laidlaw Dep*. at 30:14-39:19.[5] Dr. Laidlaw relies upon the non-peer reviewed opinions of William Malone and Paul Hruz to criticize the recognized effectiveness and safety of gender-affirming care they co-authored in a letter. *Id.* at ¶ 195. All three are members of the anti-trans advocacy group Society for Evidence Based Gender Medicine (SEGM) that promotes misinformation that lacks evidentiary support.[6] Dr. Laidlaw and his SEGM cohorts' biased and unsupported opinions should be excluded because they fail to meet any indicia of reliability and are not consistent with the generally accepted scientific consensus.

The Endocrine Society, a leading international professional organization of endocrinologists devoted to research on hormones and the clinical practice of endocrinology, has issued clinical guidelines for the treatment of transgender individuals. McNamara MIL Dec., ¶ 4. The WPATH version 8 and the Endocrine Guidelines are based upon systematic peer reviewed literature by over one hundred experts and are based on the best available science and expert

---

[5] *See* Dkt. 217-9 at 81 (citing Laidlaw MK, Van Meter Q, Hruz P, Van Mol W, & Malone W, "Letter to the Editor: and *Id.* at 85 (citing Endocrine Treatment of Gender-Dysphoria/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," J Clin Endocrinol Metab, 104(3) (March 2019)) and Van Mol, A., Laidlaw, M. K., Grossman, M., McHugh, P. "Gender-Affirmation Surgery Conclusion Lacks Evidence".)

[6] *See:* https://transdatalibrary.org/organization/society-for-evidence-based-gender-medicine/ ("SEGM's materials present a plausible veneer of professionalism that can be confusing for the average person who encounters them. A report from Yale School of Medicine found "the group appears to be nothing more than a website; it does not appear to hold meetings, screen its members, or publish a journal. The original content on the website includes statements unsupported by any citations. When the content does provide citations, they are often unreliable or misleading.").

opinions. *Id.* at ¶ 4. Dr. Laidlaw does not provide gender-affirming care and does not treat transgender patients. His opinion that the Endocrine Society is "a vassal organization of WPATH's social-political advocacy group rather than an independent medical society generating its own scientific opinions" reflects his bias rather than expert opinion and is contrary to the opinions of the Endocrine Society's members. *Id.* at ¶¶ 3 & 4. The scientific and medical consensus of professional medical associations support treatment of transgender individuals under the WPATH standards of care and the Endocrine Practice Guidelines. *Id.* at ¶¶ 4-8. Gender affirming treatments are available to adults in all the countries relied upon by the Dr. Cantor, including Finland, Sweden, Norway, Great Britain, and France.[7] *Id.* at ¶ 40.

Dr. Laidlaw mischaracterizes selected studies that are part of the consensus on the effectiveness of the treatment of gender dysphoria. Dr. Laidlaw cites another author's criticism of the sampling methodology in the 2015 US Transgender Survey but does not cite to any studies that contradicts the findings. Dkt. 217-9 at 45-46 ¶ 201.[8] Dr. Laidlaw falsely claims that after he and another eleven authors submitted a letter to the editors of a journal which published the Bränström study issued a retraction. *Id.* at ¶¶ 202-03. However, the published corrected version confirmed that "the longitudinal association between gender-affirming surgery and reduced likelihood of mental health treatment lends support to the decision to provide gender affirming surgeries to transgender individuals who seek them." *McNamara MIL Dec*. ¶ 18. Because Dr. Laidlaw lacks any qualifications supporting his opinions on gender-affirming care, he is forced

[7] New medical guidelines released in German, span more than 400 pages and represent the collective expertise of 26 medical and psychotherapeutic professional organizations, along with two self-representation organizations from Germany, Austria, and Switzerland. These countries have reaffirmed the importance of gender-affirming care for transgender youth and issued sharp critiques of the Cass Review, calling out its severe methodological flaws and misrepresentations. Their stated goal was "to provide guidance to all professionals in the healthcare system who deal with young transgender people for the best possible professionally informed care based on the current state of medical knowledge." https://www.erininthemorning.com/p/new-german-swiss-and-austria-guidelines.

[8] Many of the findings were confirmed by a March 2023 Kaiser Family Foundation/ Washington Post survey that used a random sampling methodology. https://www.kff.org/lgbtq/kff-the-washington-post-trans-survey/

to rely upon personal opinion letters rather than peer reviewed research and the consensus of scientific research. Dkt. 217-9 at 42-43 ¶¶ 204-208. His letters complaining about the methodology and his unsupported conclusions does not make a study unscientific or unreliable.

**2. Gender Affirming Treatments Reduce Suicidal Ideation and Completed Suicide Rates**

Dr. Laidlaw personally agrees that transgender persons have higher rates of suicidal ideation and completed suicides than the general population but he asserts that providing hormones does not reduce rates of suicide and in fact may increase rates. Dkt. 217-9 at 49 ¶ 216. He cites a 2011 Swedish study conducted by Dhejne to assert that transgender persons were more likely to attempt and complete suicide compared to the general population. *Id.* at 47 ¶ 210.[9] Studies that do control for mental health support demonstrate an independent effect of gender-affirming care.[10] Dr. Laidlaw does not report that Dhejne also stated "it is impossible to conclude from this data that gender-affirming procedures were a causative factor in suicidality among transgender individuals."[11] The continued existence of elevated morbidity and mortality rates, compared to the population at large, is unsurprising and says nothing about whether a treatment is a safe and effective. Surgery alone cannot fully eliminate the stigma and discrimination, as evidenced by Idaho's animus towards transgender Idahoans. Dr. Laidlaw's unsupported speculation and conjecture are not substitutes for research and actual evidence.[12]

---

[9] In a prospective, longitudinal investigation, de Vries et al. (2011) reported improvements in general functioning as well as decreases in depressive symptoms and emotional and behavioral problems. A more recent longitudinal investigation that found youth aged 9–25 years who engaged in gender-affirming endocrine treatment (i.e., puberty suppression or cross-sex hormones) demonstrated **improved mental health over time (**Achille et al., 2020)." McNamara MIL Dec. ¶ 18.

[10] Studies with control groups include Costa 2015, Turban 2020, van der Misen 2020 and studies that gathered data on mental health and controlled for it in the analysis include Kuper 2020 and Tordoff 2022. McNamara MIL Dec. ¶ 19.

[11] *See* McNamara MIL Dec. ¶ 10 & FN 7, quoting Dhejne (2011) ("the results should not be interpreted such as sex reassignment per se increases morbidity and mortality. Things might have been even worse without sex reassignment."

[12] *See also* Lynn Rew et al., *Review: Puberty Blockers for Transgender and Gender Diverse Youth-A Critical Review of the Literature*, 26 Child. Adolesc. Ment. Health 3, 3 (2021), which critically reviews the literature as of 2021 and finds benefits.

Dr. Laidlaw misrepresents the opinions of Dr. Johnna Olsen-Kennedy. Dkt. 217-9 at 48 ¶¶ 212-215. Dr. Olsen-Kennedy submitted an expert declaration in *Dekker, et al., v. Weida, et al.*, (N.D. Fla., 4:22-cv-00325, Dkt. 11-2). *Dec. JG*, Ex. 2, "*Olsen-Kennedy Dec.*" She opined that peer-reviewed research studies found statistically significant improvements including anxiety, depression and suicidality with gender-affirming hormone treatment. *Id.* at 44-45 ¶104 (citing Achille, et al., 2020; de Lara, et al., 2020; Grannis, et al., 2021; de Lara, et al., 2020; Allen, et al., 2019). The existence of elevated morbidity and mortality rates, compared to the general population does not mean a treatment is not safe and effective. *Id.* at 37 ¶ 68.

### 3. Dr. Laidlaw's Opinions on Minors Are Irrelevant and Unreliable

Dr. Laidlaw's numerous opinions relating to minors are irrelevant. His opinions on "Mastectomy Surgery for Minors" are irrelevant since no minor is seeking surgery in this case and he is not qualified to render opinions on surgeries since he does not perform surgeries. Dkt. 217-9 at 53-54 ¶¶ 234-241. Dr. Laidlaw's opinions on tapering and cessation of puberty blocking medications for minors and hormonal treatments for various medical conditions are not relevant to the issues here. *Id.* at ¶¶ 259-272.

His subjective and conclusory opinions regarding Dr. Ragan and Dr. Alviso, who, unlike Dr. Laidlaw, treat and monitor transgender patients with hormones lacks any reliability. *Id.*[13] He is not qualified to offer expert legal opinions interpreting HB 668. *Id.* at 60 ¶¶ 264-265. Dr. Laidlaw's asserts that Dr. McNamara "does not fully grasp the endocrine issues" because she is not an endocrinologist. *Id.* at 61 ¶ 269. Dr. Laidlaw does not treat transgender patients, does not treat children, is not a pediatrician, does not perform gender reassignment surgeries, has not

[13] Dr. Laidlaw's references to tapering by "prison physicians" and puberty blocking medication exemplifies that his cookie cutter personal and unreliable opinions which are irrelevant. Dkt. 217-9 at ¶¶ 267-268.

conducted primary research or published peer-reviewed articles, and only self publishes letters on the Public Discourse web site. He offers unqualified opinions on a multitude of subjects beyond his grasp as an endocrinologist, primarily based on his review of medical studies conducted by others and not his actual clinical experience or research with transgender patients. *Id.* His opinions on these subjects lack any reliability.

**4. "Social Contagion" Is a Myth**

Dr. Laidlaw contends an increase in referrals of children and adolescents for gender dysphoria is evidence of a "social contagion," meaning gender dysphoria spreads among peers. Dkt. 217-9 at 49 ¶¶ 217-220. Dr. Laidlaw's opinions are unreliable because no clinical studies have found that rapid-onset gender dysphoria exists..[14] Dkt. 217-13 at 10, Dr. McNamara Rebuttal Report. See also *Laidlaw Dep.* at 119:18-121:18 and *McNamara MIL Dec*. ¶¶ 27 - 29. Neither the American Psychiatric Association nor any other reputable professional organization has recognized rapid-onset gender dysphoria as a clinical condition. *McNamara MIL Dec*. ¶¶ 27 - 29. Experts and researchers have noted that Lisa Littman's "hypothesis" of rapid-onset gender dysphoria, which Dr. Laidlaw relies upon, suffers from serious methodological errors, including the use of parent reports instead of clinical data from youth with gender dysphoria and the recruitment of parents with negative views of gender-affirming treatment from anti-transgender websites. *Id.* at n. 25 & *Laidlaw Dep*. at 19:17-121:18. The journal subsequently required Littman to submit an apology and extensive corrections because of the article's misstatements. *Id.* at n. 25. The reality is that studies disprove the "social contagion" theory. *Id.* at 15 n. 28 (citing Bauer, et al, 2022).

[14] For example, an April 2022 study of 173 youth presenting at Canadian gender clinics found no evidence of rapid-onset dysphoria or social contagion. Restar AJ. Methodological Critique of Littman's (2018) Parental-Respondents Accounts of "Rapid-Onset Gender Dysphoria". Arch Sex Behav. 2020 Jan;49(1):61-66. doi: 10.1007/s10508-019-1453-2.

**5. Dr. Laidlaw's Opinions on Natural Desistence Are Unreliable**

Dr. Laidlaw's opinions on natural desistance by minors have been rendered moot and largely irrelevant by *United States v. Skrmetti*, 605 U. S. 495, 145 S. Ct. 1816 (2025). Dr. Laidlaw offers no evidence, except his own non-peer reviewed commentary to support his self-proclaimed contention that the majority of youth diagnosed with gender dysphoria will "naturally desist" by adulthood and that gender-affirming medications cause a minor's gender identity to persist. Dkt. 217-9 at 50 ¶¶ 223, 224, & 226.[15] He relies on three studies involving minors who are 3 to 12 years old which are irrelevant here. *Id.* at ¶ 226.[16] He opines extensively on desistence by extrapolating data from 1968 to 2012 in the Ristoria & Steensma review to conclude that a majority of preadolescent children aged 3 to 12 diagnosed with gender identity disorder, a distinct diagnostic criterion from gender dysphoria, naturally desist by adulthood. *Id*. at 50 ¶ 224.[17] Dr. Laidlaw previously testified he was not aware of any study of desistance in youth age 13 to 18 or in adults. *Laidlaw Dep*. at 109:2-14.[18] Dr. Laidlaw has admitted being unaware of any studies documenting "desistance" among adolescents (people over the age of 12) or adults. *Id.* at 109:2-109:14. Dr. Laidlaw has also admitted that the "desistance" studies he relied upon only included preadolescent youth who were diagnosed with gender identity disorder under the DSM-III or the DSM-IV, and youth diagnosed with gender dysphoria under the DSM-5. *Id.* at 103:4-104:4. Not only is this completely irrelevant to this case, Dr. Laidlaw overlooks an

---

[15] Dr. Laidlaw's opinions on minors have been rendered moot and largely irrelevant by *United States v. Skrmetti*, 605 U. S. 495, 145 S. Ct. 1816 (2025).

[16] Dr. Laidlaw's unsupported *ipse dixit* opinion that "gender-affirming therapy will necessarily cause serious and reversable harm" is the "antithesis of...scientifically reliable expert opinion." *City of Pomona*, 750 F.3d at 1044.

[17] The co-authors in his commentary include Michelle Cretella who has been criticized for "pushing political and ideological agendas not based on science and facts" (Dec. JG, Ex. 3, Sct'y Adol. Health & Med. (2017)).

[18] *McNamara MIL Dec.* ¶ 25, n. 25 (citing Maria A.T.C. van der Loos, et al., Continuation of Gender-Affirming Hormones in Transgender People Starting Puberty Suppression in Adolescence: A Cohort Study in the Netherlands, The Lancet Child and Adolescent Health, Oct. 21, 2022, at https://www.sciencedirect.com/science/article/abs/pii/S2352464222002541.

obvious explanation that very young children are different than youth who continue to need medications as they age because of their persistent transgender identity. *McNamara MIL Dec.* ¶ 25. Dr. Laidlaw's opinions on "natural desistence" should be excluded as not based on a "reliable methodology" because he admits it is not possible to predict which child will desist and the one study he relies on contradicts his opinions.[19] Dkt. 217-9 at ¶ 227.

**6. CMS's Department Appeals Board**

Dr. Laidlaw admits that the CMS's Department Appeals Board ("DAB") recommended the removal of a categorical exclusion of Medicare's gender-affirming surgery. Dkt. 217-9 at 50 ¶ 242. CMS determined there was "a consensus among researchers and mainstream medical organizations that [gender-affirming] surgery is an effective, safe and medically necessary treatment for" gender dysphoria. Dr. Laidlaw, despite not treating transgender patients and not having any surgical training or experience, contends "[t]here were numerous deficiencies in DAB's decision-making process." *Id.* at 51 ¶ 242. In his unscientific personal opinion, the DAB "relied on six pro-gender affirmation surgery advocacy organizations to help make their decisions" including WPATH, physicians associated with WPATH and transgender organizations and failed to consider Dhejne's findings on the rate of suicidality. *Id.* at 51-52 ¶¶ 243-46. Dr. Laidlaw criticizes Dr. Schechter and Dr. McNamara's failure to address the findings of the subsequent 2016 CMS Decision Memo. *Id.* at 53 ¶ 250. CMS determined, because the Medicare population consists of individuals over the age of 65, the evidence is not applicable to most other population groups. "These differences can be due to, for example, multiple health conditions or co-morbidities, longer duration needed for healing, metabolic variances, and impact of reduced

[19] Dr. Laidlaw attacks Dr. McNamara's use of peer reviewed studies that contradict his hypothesis of "natural" as "meaningless" because of their findings that very few patients desisted and an overwhelmingly continue to identify as transgender actually confirmed "natural desistance" is a non-sequitur. Dkt. 217-9 ¶¶ 228-23.

mobility."[20]

In August 2016, CMS decided not to issue a National Coverage Determination or "NCD" for determining under what circumstances Medicare will cover gender confirming surgical care.[21] CMS decided the local Medicare Administrative Contractors (MACs) "will make the determination on whether or not to cover gender reassignment surgery based on whether gender reassignment surgery is reasonable and necessary for the individual beneficiary after considering the individual's specific circumstances." *Id.* at IX. CMS "did not analyze the clinical evidence for counseling or hormone therapy treatments for gender dysphoria." *Id.* Dr. Laidlaw's opinions are not reliable and misrepresents the basis of CMS's decisions.

**7. Dr. Laidlaw's Opinions on Plaintiffs' Treatments Is Pure Speculation and Animus**

Dr. Laidlaw's medical opinions reflect his animosity for transgender patients based upon conjecture permeated by his ideological bias against access to gender-affirming care as recognized in the DSM-V-TR.[22] Dr. Laidlaw lacks even a rudimentary understanding of the DSM-5 TR's F64.0 diagnostic criteria for gender dysphoria, including the presence of clinically significate distress or impairments associated with the condition. DSM-5 TR at 512. His opinions on informed consent are based upon the same unreliable opinions regarding the risks of hormone therapy that equally apply to cisgender patients.[23] All medical treatment can cause potential side

[20] Dep't of Health & Human Servs., Departmental Appeals Bd., Appellate Div., Decision No. 2676 (May 30, 2014), https://www.hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2014/dab2576.pdf.
[21] *See* https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?proposed=N&NCAId=282.
[22] Dr. Laidlaw ignores peer-reviewed research studies finding improved mental health following hormone treatment. (see, e.g., Achille, C., Taggart, T., Eaton, N.R., et al. (2020). Longitudinal Impact of Gender-Affirming Endocrine Intervention on the Mental Health and Well-Being of Transgender Youths: Preliminary Results. International Journal of Pediatric Endocrinology, 2020(8), 1-5; de Lara, D.L., Rodríguez, O.P., Flores, I.C., et al. (2020), Psychosocial Assessment in Transgender Adolescents. Anales de Pediatría (English Edition), 93(1), 41-48; Allen, L.R., Watson, L.B., Egan, A.M., & Moser, C.N. (2019), Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones. Clinical Practice in Pediatric Psychology, 7(3), 302-311. *McNamara MIL Dec*. ¶¶ 18.
[23] The informed consent MH signed on 8-21-19 referred to the use of hormone therapy to "alleviate gender dysphoria" to ensure she fully understood "the risks, benefits, and alternatives of taking feminizing hormones" and included what

effects. He mispresents the purposes of informed consent. Patients should be informed about the risks and benefits, including forgoing the treatment. It is ethically necessary so they can make an independent and voluntary decision about treatment.[24] MH's treatment was safe because it was properly supervised by numerous medical providers with experience in treating gender dysphoria.[25] The potential risks identified by Dr. Laidlaw have not been experienced by Plaintiffs. Dr. Laidlaw prefers to have transgender persons suffer distress from gender dysphoria, including the risks of depression, anxiety, isolation, self-harm and suicidality rather than receiving medically necessary treatments.

**8. The WPATH Standards Are Based on Scientific Evidence and Expert Consensus**

Dr. Laidlaw's opinion on the WPATH Standards of Care is unreliable and unscientific. Dkt. 217-9 at 73 ¶¶ 327-328. Dr. Laidlaw is not a member and has not participated in WPATH's internal discussions or conferences. *Laidlaw Dep*. at 90:1-12. His opinion of WPATH is because it doesn't offer his "alternative" views and a conversation with one psychologist. *Id.* at 90:13-16 & 92:2-12. WPATH was developed by medical professionals using the best available scientific evidence and the professional consensus of experts. *Dec. LS* ¶¶ 24 - 27. Dr. Laidlaw's non-scientific opposition to treating transgender persons because "one cannot in fact change sex" or "acquire the deep characteristics of biological sex in order to gain the complete sexual and reproductive functions of the opposite sex." Dkt. 217-9 at 72 ¶¶ 324.

---

to expect and warning signs for adverse reactions. *Declaration of MH in Support of Plaintiffs' Motion for Summary Judgment*. An informed consent of potential risks does not determine whether a treatment is safe or effective.

[24] *See* AMA Code of Medical Ethics, at § 2.1.1, *Informed Consent*. https://code-medical-ethics.ama-assn.org/sites/default/files/2022-08/2.1.1%20Informed%20consent%20--%20background%20reports.pdf

[25] MH was treated by Dr. Whitaker who is trained and experienced with providing gender-affirming care for St. Lukes Regional Medical Center. Dec JG., Ex. 4 (DHW 00081067-71). Dr. Laidlaw is not a pediatric endocrinologist and does not treat transgender patients. Laidlaw Dec. at 43:11-43:17. Many common medications, including hormones, are used off-label in adults and minors with the knowledge of the FDA. FDA approval signifies the medication is safe and off-label use is not considered experimental. The American Academy of Pediatrics specifically approves the off-label use of drugs. McNamara MIL Dec. ¶¶ 35-37.

## CONCLUSION

Dr. Laidlaw's subjective *ipse dixit* opinions are not reliable and consistent with accepted scientific consensus on gender-affirming care. His opinions are based upon speculation, unsupported assumptions, bias, and non-peer reviewed letters and self-published commentaries.[26] Dr. Laidlaw's unqualified, irrelevant, and unreliable opinions should be excluded by the Court.

DATED: August 30, 2026.

JANE GORDON LAW

*/s/ Jane Gordon*
Jane Gordon

LAW OFFICE OF HOWARD BELODOFF

*/s/ Howard A. Belodoff*
Howard A. Belodoff

*Attorneys for Plaintiffs*

[26] Dr. Laidlaw's Report cites his own letters or self-published articles 8 times. *See* Dkt. 214-9, ¶¶ 19, 102, 149 n. 13, 151, 193, 205, 220, & 224. Additionally, he relies on his collaborators. *See*: Cretella Dkt. 214-9 at ¶ 102, Hurz at Dkt. 214-9 ¶ 195; Malone at Dkt. 214-9 ¶¶ 135, & 195 Van Mol at Dkt. 214-9 ¶¶ 202 & 205.